**McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
Ronald J. Riccio
Louis A. Modugno
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
Tel: 973-993-8100
Fax: 973-425-0161
E-Mail: rriccio@mdmc-law.com
          lmodugno@mdmc-law.com

**GIBBONS P.C.**
Michael R. Griffinger
One Gateway Center
Newark, New Jersey 07102
Tel: 973-596-4500
Fax: 973-596-0545
E-Mail: griffinger@gibbonslaw.com

Counsel to Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE LAUTENBERG FOUNDATION, JOSHUA S. LAUTENBERG and ELLEN LAUTENBERG, <br><br> Plaintiffs, <br><br> -against- <br><br> PETER MADOFF, <br><br> Defendant. | Civil Action No. <br><br><br><br> **COMPLAINT** |

Plaintiffs, The Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg, by

and through their attorneys, McElroy, Deutsch, Mulvaney & Carpenter, LLP and Gibbons P.C.,

as and for their complaint against Peter Madoff, state as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332 in that this

is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction in this Court is also conferred pursuant to 28 U.S.C. §§ 1331 (Federal question), and 1367 (supplemental). Jurisdiction is further conferred pursuant to 15 U.S.C. § 78aa of the Securities Exchange Act of 1934 (the "Exchange Act"), as this action arises under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5, promulgated thereunder by the Securities Exchange Commission ("SEC").

2. Venue is proper in this District pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1391, in that relevant events and violations alleged in this Complaint have occurred within this District, the Defendant transacts business in this District, and the Defendant is found in this District.

**PARTIES**

3. The Lautenberg Foundation (the "Foundation") is a charitable foundation having its principal place of business in Cliffside Park, New Jersey. The Foundation is a private foundation, and is a citizen of the State of New Jersey. The Foundation contributes regularly to such charitable and non-profit institutions as museums, performing art centers, universities, Jewish organizations, Catholic Relief Services, medical research, hospitals, libraries, environmental organizations, public radio, NAACP, United Negro College Fund, Salvation Army and United Way.

4. Joshua Lautenberg ("Joshua") is an individual domiciled in Edwards, Colorado. Joshua Lautenberg is a citizen of the State of Colorado.

5. Ellen Lautenberg ("Ellen") is an individual domiciled in Westport, Connecticut. Ellen is a citizen of the State of Connecticut.

6. Peter Madoff ("Peter Madoff" or "Defendant") is an individual domiciled in New

York, New York. Peter Madoff is a citizen of the State of New York.

**GENERAL ALLEGATIONS**

**A.     Bernard L. Madoff Investment Securities, LLC**

7.     Bernard L. Madoff Investment Securities, LLC ("BMIS") is a New York limited liability company organized in 1960. BMIS, at all times herein relevant, functioned as a SEC registered investment adviser, SEC registered broker-dealer, and as a proprietary trader. It was located on floors 17, 18 and 19 of the Lipstick Building in New York City.

8.     BMIS, at all times herein relevant, provided investment advisory services by taking custody of client funds or securities and managing those client funds on a fully discretionary basis. BMIS provided investment advisory and brokerage services to commercial banks, hedge funds, institutional investors, investment bankers, individual investors and other financial institutions.

9.     In BMIS sales literature, an example of which is attached as Exhibit A hereto, it is represented to its investors and others that "the firm's hallmark" has always been its "unblemished record of value, fair-dealing, and high ethical standards." Contrary to this representation, on or about December 9, 10 and 11, 2008, Bernard L. Madoff confessed, *inter alia*, that BMIS's investment advisory business was a "giant Ponzi scheme," and a fraud. Bernard L. Madoff further admitted that BMIS had been "insolvent for years" and that losses from the "giant Ponzi scheme" were at least approximately $50 billion. (Annexed hereto as Exhibit B is an Affidavit of agent Theodore Cacioppi of the Federal Bureau of Investigation).

10.     On or about January 7, 2008, BMIS filed with the SEC a Uniform Application for Investment Adviser Registration, a copy of which is attached as Exhibit C. The Application, *inter alia*, represented that BMIS had assets under management of approximately $17.1 billion,

that of its 51-250 employees only 1-5 performed investment advisory functions, that no one solicited advisory clients on behalf of BMIS, that investment advisory services were compensated solely on a commission basis, that BMIS had discretionary authority to determine the securities to be bought or sold for a client's account as well as the amount of such securities, that BMIS had custody of clients cash accounts, bank accounts, and securities, and that the control persons of BMIS are Bernard L. Madoff and Peter B. Madoff.

**B.     Peter Madoff's Control Status at BMIS**

11.     Peter Madoff is an attorney.  He began his employment with BMIS in or about June, 1969. He is 63 years old and is the younger brother of Bernard L. Madoff.  The two have worked side by side at BMIS for nearly 40 years, and their offices, reportedly, were only a few feet from each other.  BMIS sales literature (Exhibit A hereto) credits both Bernard and Peter Madoff with building BMIS "into a significant force in the securities industry."  The Uniform Application For Investment Adviser Registration (Exhibit C) at page 20 lists Peter Madoff as a "control" person.  As a control person Peter Madoff had the power, directly or indirectly, to direct or cause the direction of the management and policies of BMIS and its employees.

12.     In late 1970 and early 1980, Peter Madoff created the technology that permitted customers of BMIS to perform trade transactions via computer.  Peter Madoff was highly skilled in the use of technology in connection with the business operations of BMIS.

13.     In late 1980, Peter Madoff became responsible for the day-to-day management of the trading desk at BMIS.

14.     Peter Madoff, at all times herein relevant, was the senior managing director, director of trading, chief compliance officer and general counsel of BMIS.  His daughter also worked at BMIS as a compliance lawyer.

15. At all times herein relevant, Peter Madoff's duties and responsibilities at BMIS as a control person and the senior managing director, director of trading, chief compliance officer and general counsel of BMIS included, among other things, (i) directing the management and policies of BMIS; (ii) regularly verifying and accurately reporting the financial condition of BMIS; (iii)establishing, implementing, controlling, monitoring and enforcing a compliance program of internal controls (the "Compliance Program") designed to ensure BMIS' compliance with all laws; and (iv) the detection, prevention, and reporting of all violations of any laws or regulations by BMIS or its employees. Peter Madoff was well qualified and experienced to honestly perform his duties and responsibilities. Not only was he an attorney, but he also served as vice chairman of the NASD, a member of its board of governors, and chairman of its New York region. He was also a member of the NASDAQ stock market board of governors, its executive committee, and chairman of its trading committee. He is past president of the Securities Traders Associations of New York, a member of the board of directors of the Depository Trust and Clearing Corp., and a member of the board of the Securities Industry Association.

## C. Plaintiffs' Entrust the Custody and Control of Their Investments to BMIS on a Fully Discretionary Basis

16. In 2001, the Foundation, in reliance on the purported superior knowledge, training, skill, honesty, ethics, and intergrity of BMIS, its members, officers, directors and employees, gave custody to and entrusted BMIS on a fully discretionary basis with $5,822,000 for the purpose of providing the Foundation with investment advisory services that would facilitate the carrying out of the Foundation's various charitable activities.

17. In 2002, the Foundation, in reliance on the purported superior knowledge, training, skill, honesty, ethics, and intergrity of BMIS, its members, officers, directors and

employees, gave custody to and entrusted BMIS on a fully discretionary basis with an additional $1,500,000 for the further purpose of facilitating the Foundation's various charitable activities.

18.     As of November 30, 2008, the value of the Foundation's investment account, according to statements provided by BMIS, was purportedly $15,424,682, when, in fact, the true value was substantially less than that sum.

19.     In 2003, Joshua, in reliance on the purported superior knowledge, training, skill, honesty, ethics, and intergrity of BMIS, its members, officers, directors and employees, gave custody to and entrusted BMIS on a fully discretionary basis with $1,000,000 for investment.

20.     As of November 30, 2008, the value of Joshua's investment account with BMIS, according to statements provided by BMIS, was purportedly $1,779,074, when, in fact, the true value was substantially less than that sum.

21.     In 2003, Ellen, in reliance on the purported superior knowledge, training, skill, honesty, ethics, and intergrity of BMIS, its members, officers, directors and employees, gave custody to and entrusted BMIS on a fully discretionary basis with $600,000 for investment.

22.     As of November 30, 2008, the value of Ellen's investment account with BMIS, according to statements provided by BMIS, was purportedly $1,064,059, when, in fact, the true value was substantially less than that sum.

23.     Plaintiffs' combined investment with BMIS was $8,922,000. The current value of Plaintiffs' combined investment is substantially less than that sum.

**D.     BMIS and Bernard Madoff Confess to a Giant Ponzi Scheme**

24.     Bernard Madoff has confessed that all of the investment advisory services purportedly provided by BMIS to Plaintiffs on a fully discretionary basis were, at all times herein relevant, a giant Ponzi scheme in violation of the 1934 Securities Exchange Act, rules

promulgated thereunder, and other laws.

25. As part of the admitted BMIS giant Ponzi scheme, BMIS paid monies to some investors with the principal from funds received from other investors in connection with the purchase and sale of securities.

26. On or about December 9, 2008, Bernard L. Madoff told Peter Madoff that there had been requests from clients for approximately $7 billion in redemptions, and that BMIS was unable to obtain the liquidity necessary to meet those obligations. Peter Madoff, despite being a control person, upon receiving this information from his brother, failed to notify the SEC or any other industry regulators.

27. On December 11, 2008, Bernard L. Madoff confessed to agent Theodore Cacioppi of the Federal Bureau of Investigation that the investment advisory services provided by BMIS were fraudulent. Bernard Madoff said that there was "no innocent explanation." Bernard Madoff further admitted that he had "paid investors with money that wasn't there." He further said he was "broke" and expected to go to jail.

28. The day before confessing to the Federal Bureau of Investigation, Bernard L. Madoff told Peter Madoff and other BMIS employees that the investment advisory arm of BMIS was a fraud, that it was "all just one big lie," and that it was a "giant Ponzi scheme" that had lost approximately $50 billion. Bernard L. Madoff further admitted that BMIS had been insolvent for years.

29. On December 11, 2008, the SEC charged BMIS and Bernard L. Madoff with securities fraud. On February 9, 2009, Bernard L. Madoff entered into a Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief. Pursuant thereto, Bernard L. Madoff, among other things, is precluded from arguing that he did not violate the Federal

securities law as alleged in the SEC Complaint in connection with any motion by the SEC for disgorgement and/or civil penalties.

30. On December 11, 2008, Bernard L. Madoff was also criminally charged by the United States Attorney's Office for the Southern District of New York with securities fraud.

**E. The Obvious Material Red Flags Evidencing the BMIS Giant Ponzi Scheme And Repeated Alerts of Fraudulent Activity That Were Recklessly Ignored and/or Concealed and/or Not Disclosed and/or Consciously Disregarded by Peter Madoff**

31. Despite being a control person of BMIS and the highly experienced senior managing director, director of trading, chief compliance officer and general counsel of BMIS, there were many obvious material red flags evidencing the giant Ponzi scheme at BMIS and other alerts of fraudulent activity at BMIS that were recklessly ignored and/or concealed and/or not disclosed and/or consciously disregarded by Peter Madoff.

32. The obviously material red flags and alerts of fraudulent activity include, without limitation, the following:

a. The lack of any transparency concerning BMIS' investment advisory services including, for example, that BMIS employees were not allowed to enter the 17th floor of BMIS offices, referred to as the "cage", wherein the fraudulent BMIS investment advisory services were conducted;

b. The purported returns from the BMIS investment advisory services were abnormally profitable in terms of consistency and amounts, as there were only about five months of any negative returns during one hundred and forty-four months of reported operations;

c. Other entities funds using the same "split-strike conversion" strategy purportedly employed by BMIS failed to produce returns even remotely as consistent or as profitable as the returns reported by BMIS;

8

d.     BMIS did not use either itself or outside brokers when buying or selling the securities it purported to manage and trade on a monthly basis on behalf of its investors;

e.     BMIS charged transaction-based commission fees rather than performance based management fees;

f.     The monthly account statements sent by BMIS to investors, upon analysis, could not substantiate the returns purportedly produced;

g.     Despite having a purported total of $17.1 billion in assets under management, BMIS used Freihling & Horowitz as its auditing firm, a firm that consisted of one office in Rockland County, New York, with three employees, one of whom was a 78 year old accountant living in Florida, and one of whom was a secretary;

h.     The comptroller for BMIS was based in Bermuda and was not an in-house comptroller;

i.     BMIS kept its records of investment advisory services secret and segregated from other BMIS records;

j.     The account statements of BMIS revealed a pattern of purchases that were regularly at or close to daily lows and sales that were regularly at or close to daily highs, a timing of the market that is virtually impossible to achieve in the absence of deceit and manipulation;

k.     The earnings reflected in documents produced by BMIS, upon analysis, showed a 6% correlation to the S&P 500 Stock Index, a percentage that was statistically irrational;

l.     BMIS did not provide its customers, including feeder fund managers and other investors, with electronic real-time online access to their accounts, despite Peter Madoff having purportedly pioneered technological advancements in computerizing the securities

trading industry;

   m. In May 1999, Harry Markopolos, a person with experience managing the "split-strike conversion" strategy purportedly employed by BMIS, transmitted a correspondence to the SEC explaining that BMIS could not have generated the returns reported using the "split-strike conversion" method;

   n. In May 2001, an article entitled "Madoff Tops Charts: Skeptics Ask How" was published in MAR/Hedge, a semi-monthly newsletter. In the article, author Michael Ocrant wrote:

   i. "[Bernard L.] Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry."

   ii. "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

   iii. These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

   iv. "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

   v. "The strategy and trading, [Bernard L. Madoff] says, are done mostly by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

   vi. "As for the specifics of how the firm manages risk and limits the

market impact of moving so much capital in and out of positions, [Bernard L.] Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

vii.    "[Bernard L. Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

viii.    "[Bernard L.] Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'the strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

o.    On May 27, 2001, Barron's published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote:

i.    The private accounts managed by [Bernard L.] Madoff "have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When Barron's asked [Bernard L.] Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's funds forthcoming."

ii.    "Still, some on Wall Street remain skeptical about how [Bernard L.] Madoff achieves such stunning double-digit returns using options alone. Three options strategists for major investment banks told Barron's they couldn't understand how [Bernard L.] Madoff churns out such numbers using this strategy."

iii.    "Adding further mystery to [Bernard L.] Madoff's motives is the

fact that he charges no fees for his money management services."

          iv.    "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But [Bernard L.] Madoff's investors rave about his performance - even though they don't understand how he does it. 'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's. 'People who have all the trade confirms and statements still can't define it very well.' . . . This investor declined to be quoted by name. Why? Because [Bernard L.] Madoff politely requests that his investors not reveal that he runs their money."

          v.    "'What [Bernard L.] Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

          p.    On November 7, 2005, Harry Markopolos transmitted a correspondence to the SEC entitled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how BMIS's returns could not be accurate. Mr. Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS. A copy of the Markopolos letter is attached hereto as Exhibit D and incorporated herein by reference. On February 4, 2009 Markopolos testified before a congressional committee about the red flags and, among other things, obvious alerts evidencing the BMIS Ponzi scheme. Markopolos testified, among other things, that BMIS' "performance charts were clearly deceiving" and that the firm's "financial statements" were the work of a "fraudster" because the year-end statements contained "no investment positions to mark to market."

33.	Notwithstanding Peter Madoff's duties and responsibilities as a control person and an experienced senior managing director, director of trading, chief compliance officer and general counsel of BMIS, he recklessly ignored in complete abdication of his duties and/or concealed and/or failed to disclose and/or consciously disregarded for years the many obvious aforementioned material red flags and alerts of fraudulent activity to the great detriment and financial loss of Plaintiffs.

34.	In addition to recklessly ignoring and or concealing and/or failing to disclose and/or consciously disregarding red flags and alerts, Peter Madoff, as a control person and as the experienced senior managing director, director of trading, chief compliance officer and general counsel of BMIS, is responsible for making and/or acquiescing in the making of affirmative misrepresentations contained in Exhibit A hereto that, for example, falsely stated that BMIS' "hallmark" was an "unblemished record of value, fair-dealing, and high ethical standards" when, in fact, BMIS' "hallmark" was and is as the largest financial fraud in history.  Further, Peter Madoff is responsible for making and/or acquiescing in the making of affirmative misrepresentations contained in financial reports of BMIS filed with the SEC.  For example, since at least 2002, BMIS has filed with the SEC Annual Audit Reports on Form X-17A-5.  At a time when BMIS was, according to Bernard Madoff, insolvent these Reports (i) falsely listed BMIS' total assets as being between $845 million and $1.93 billion; (ii) misrepresented BMIS' Statement of Income; (iii) misrepresented BMIS' Statement of Cash Flows; (iv) misrepresented BMIS' Computation of Net Capital; and (v) misrepresented BMIS' Computation for Determination of Reserve Requirements.  Furthermore, Peter Madoff is responsible for making and/or acquiescing in the making of affirmative misrepresentations contained in account statements provided by BMIS to investors.  For example, the account statement for the period

ending 11/30/08 for the Foundation lists purchases and sales in the Fidelity Spartan U.S. Treasury Money Market Fund. Upon information and belief no such Fund existed during that time period. Upon information and belief, most if not all of the transactions listed on Plaintiffs account statements were materially false and misleading. Accordingly, Peter Madoff made, directly or indirectly, false representations that BMIS was an ethical and honest entity when, in fact, BMIS was a giant Ponzi scheme, that BMIS engaged in lawful investment advisory services when, in fact, BMIS was engaged in a giant Ponzi scheme and artifice to defraud Plaintiffs and other investors, that BMIS was solvent and profitable when it was, in fact, insolvent, and that BMIS customer investment accounts were profitable when, in fact, the investment accounts were not profitable but were artifices to defraud BMIS investors.

## COUNT ONE

### (Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

35.     Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

36.     Peter Madoff, as a control person and the experienced senior managing director, director of trading, chief compliance officer and general counsel of BMIS, recklessly ignored and/or concealed and/or failed to disclose and/or consciously disregarded the obviously material aforementioned red flags and repeated alerts of fraudulent activity. He was also responsible for making, directly or indirectly, affirmative misrepresentations concerning the honesty of BMIS' business, the ethics of BMIS, the profitability of BMIS' business, the financial condition of BMIS, and the accuracy of account statements provided to Plaintiffs and other investors. Peter Madoff's acts and conduct, as set forth herein, was such an extreme departure from the standards

of ordinary care that Peter Madoff was either knowingly indifferent or actually aware that BMIS was engaged in the largest financial fraud in history by means of a Ponzi scheme perpetrated in connection with the purchase and sale of securities.

37.     Peter Madoff, as a control person and as the experienced senior managing director, director of trading, chief compliance officer and general counsel of BMIS, owed Plaintiffs the affirmative duty (i) not to recklessly ignore and/or conceal and/or fail to disclose and/or consciously disregard the obviously material red flags and alerts of fraudulent activity; (ii) not to make and/or acquiesce in the making of affirmative misrepresentations; and (iii) to promptly take all necessary steps to disclose to Plaintiffs, government regulators and others that BMIS was engaged in a scheme and artifice to defraud Plaintiffs in connection with the purchase and sale of securities as well as to take all reasonable steps to protect Plaintiffs from being defrauded.

38.     Notwithstanding his duties as a control person and the senior managing director, director of trading, chief compliance officer and general counsel, Peter Madoff recklessly ignored and/or concealed and/or failed to disclose and/or consciously disregarded many obvious indicia of fraud at BMIS, recklessly failed to investigate the indicia of fraud, recklessly failed to disclose the indicia of fraud to Plaintiffs, government regulators and others, and recklessly made and/or acquiesced in the making of materially false and misleading representations that he directly or indirectly caused to be transmitted to Plaintiffs and government regulators concerning the honesty of BMIS, the ethics of BMIS, the profitability of BMIS, the financial condition of BMIS, and the accuracy of securities transactions purportedly conducted on behalf of investors. By making and/or acquiescing in the making of material misrepresentations and by recklessly ignoring and/or concealing and/or failing to disclose and/or consciously disregarding the obvious

indicia of fraud, Peter Madoff effectively covered up for years what his brother confessed was the largest financial fraud in history.

39. By reason of the foregoing, Peter Madoff is a primary violator of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that he used the mails and instrumentalities of interstate commerce to affirmatively misrepresent material facts. Further, he recklessly omitted to disclose material facts that he had a duty to Plaintiffs to discover, investigate and disclose to Plaintiffs and others in connection with the purchase and sale of securities. As a proximate result of Peter Madoff's acts and conduct, Plaintiffs relied to their detriment and suffered damages.

## COUNT TWO

### (Breach of Fiduciary Duty)

40. Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

41. Peter Madoff, as a control person and the senior managing director, director of trading, chief compliance officer and general counsel of BMIS, owed Plaintiffs fiduciary duties of care, loyalty and good faith in connection with their fully discretionary accounts at BMIS including, without limitation, the following:

a. The duty to act with reasonable care to guarantee that the information set forth in all BMIS communications, such as SEC filings, sales literature, and monthly statements to Plaintiffs, were lawful, honest, complete, and not misleading;

b. The duty to take all necessary steps and perform all due diligence to supervise and monitor the discretionary accounts of Plaintiffs and ensure that they were

maintained in a lawful, honest, prudent and professional manner;

c. The duty to establish and implement a Compliance Program, exercising careful oversight and due diligence over the Compliance Program, monitoring the Compliance Program and monitoring employees of BMIS to ensure compliance with all laws, including the obtaining of relevant information and the reporting of any potentially illegal and improper activities to BMIS investors and the appropriate governmental agencies for the protection of BMIS investors;

d. The duty to report to the appropriate governmental agencies and investors that BMIS may be engaged in a common plan, scheme, artifice to defraud and unlawful course of conduct;

e. The duty to act in the face of a known duty to act with undivided loyalty to Plaintiffs and in the best interest of Plaintiffs, including Peter Madoff's duty not to abdicate his responsibilities and not to subordinate Plaintiffs best interest to the interests of himself or his brother; and

f. The duty not to abdicate the fiduciary duties of care, loyalty and good faith owed to Plaintffs.

42. Peter Madoff breached his fiduciary duties that he owed to Plaintiffs.

43. The acts of Peter Madoff in breaching his fiduciary duties owed to Plaintiffs show a reckless disregard for the obligations he owed Plaintiffs.

44. As a direct and proximate result of Peter Madoff's breach of fiduciary duties, Plaintiffs suffered damages.

## COUNT THREE

### (Liability Under Section 20(a) of the Exchange Act)

45.     Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

46.     Bernard L. Madoff confessed that he and BMIS violated the Securities Exchange Act of 1934 and regulations promulgated thereunder by intentionally engaging in a common plan, scheme, artifice to defraud and unlawful course of conduct, which he described as a "giant Ponzi scheme," that operated as a fraud and deceit upon the Plaintiffs in connection with the purchase and sale of securities (Exhibit B hereto).

47.     Peter Madoff is identified as a control person on page 20 in an SEC filing (Exhibit C hereto) entitled Uniform Application For Investment Adviser Registration and he acted as a control person of BMIS within the meaning of Section 20(a) of the Exchange Act.  He and his brother, according to their own sales literature, were jointly responsible for building BMIS into a "significant force in the securities industry" (Exhibit A).  By virtue of his status as a control person under the law as well as his duties and responsibilities at BMIS, as more particularly described herein, Peter Madoff had the power to directly or indirectly control the management and policies of BMIS and the ability, obligation, power, duty and control to directly or indirectly detect, prevent and/or report the fraudulent conduct confessed to by his brother, and by recklessly failing to do so, Peter Madoff facilitated, endorsed, acquiesced in, and covered up the fraudulent conduct of BMIS.  The fraudulent conduct of BMIS was not disclosed to regulators until the date Peter Madoff's brother finally admitted same to the Federal Bureau of Investigation on or about December 11, 2008 (Exhibit B hereto).

48.     Peter Madoff had direct and supervisory involvement in the day-to-day operations of BMIS. He had the obligation to maintain a system of internal controls and the power to control the system in a diligent manner by developing and implementing precautionary measures or otherwise, but he recklessly failed to do so.

49.     By reason of the foregoing, Peter Madoff is jointly and severally liable under Section 20(a) of the Exchange Act with and to the same extent as BMIS and Bernard Madoff in that (a) Peter Madoff is a control person of BMIS within the meaning of Section 20(a) of the Exchange Act, (b) BMIS and Bernard L. Madoff confessed to a "giant Ponzi scheme" and, thereby, to having violated the 1934 Securities Exchange Act and regulations promulgated thereunder as more particularly set forth herein, (c) Peter Madoff was a culpable participant in the admitted giant Ponzi scheme in that he directly or indirectly recklessly endorsed, furthered, induced, prevented the discovery of, permitted and/or concealed the underlying securities violations despite having crucial decision-making authority to control BMIS to operate in accordance with the law, and (d) Peter  Madoff failed to act in good faith.

## COUNT FOUR

### (Liability For Aiding and Abetting)

50.     The Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

51.     Bernard L. Madoff confessed that he and BMIS breached their fiduciary duties to Plaintiffs.

52.     The acts and conduct of Peter Madoff, as alleged herein, substantially assisted, encouraged, induced, recklessly participated in, endorsed, and/or concealed the breach by BMIS

19

and Bernard L. Madoff of their fiduciary duties owed to Plaintiffs.

53.     As a direct and proximate result of the acts and conduct of Peter Madoff, as alleged herein, Plaintiffs suffered damages.

54.     By reason of the foregoing, Peter Madoff is liable to Plaintiffs for aiding and abetting the breach of fiduciary duties owed to Plaintiffs by BMIS and Bernard L. Madoff.

## COUNT FIVE

### (Negligent Misrepresentation)

55.     The Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

56.     Peter Madoff, as a control person and the senior managing director, director of trading, chief compliance officer and general counsel of BMIS, negligently misrepresented and/or acquiesced in the making of materially false and misleading representations that he directly or indirectly caused to be transmitted to Plaintiffs and government regulators concerning the honesty of BMIS, the ethics of BMIS, the profitability of BMIS, the financial condition of BMIS, and the accuracy of securities transactions purportedly conducted on behalf of investors.

57.     By making and/or acquiescing in the making of material misrepresentations of fact to Plaintiffs, upon which Plaintiffs reasonably relied to their detriment, Peter Madoff negligently breached his duties to Plaintiffs and effectively covered up for years what his brother confessed was the largest financial fraud in history.

58.     As a direct and proximate result of Peter Madoff's negligent misrepresentations, Plaintiffs suffered damages.

## COUNT SIX

### (Negligence)

59.     The Plaintiffs repeat each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

60.     Peter Madoff, as a control person and the senior managing director, director of trading, chief compliance officer and general counsel of BMIS, owed Plaintiffs certain duties including, without limitation, the following:

a.     The duty to act with reasonable care to guarantee that the information set forth in all BMIS communications, such as SEC filings, sales literature, and monthly statements to Plaintiffs, were lawful, honest, complete, and not misleading;

b.     The duty to take all necessary steps and perform all due diligence to supervise and monitor the discretionary accounts of Plaintiffs and ensure that they were maintained in a lawful, honest, prudent and professional manner;

c.     The duty to establish and implement a Compliance Program, exercising careful oversight and due diligence over the Compliance Program, monitoring the Compliance Program and monitoring employees of BMIS to ensure compliance with all laws, including the obtaining of relevant information and the reporting of any potentially illegal and improper activities to BMIS investors and the appropriate governmental agencies for the protection of BMIS investors;

d.     The duty to report to the appropriate governmental agencies and investors that BMIS may be engaged in a common plan, scheme, artifice to defraud and unlawful course of conduct; and

21

e.     The duty not to abdicate the duties owed to Plaintffs.

61.     Peter Madoff negligently breached his duties that he owed to Plaintiffs.

62.     As a direct and proximate result of Peter Madoff's breach of duties, Plaintiffs suffered damages.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiffs demand that judgment be entered against the Defendant, Peter Madoff, as follows:

(a)     On the First Count, for the full amount of their damages, which include, without limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper;

(b)     On the Second Count, for the full amount of their damages, which include, without limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper;

(c)     On the Third Count, for the full amount of their damages, which include, without limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper;

(d)     On the Fourth Count, for the full amount of their damages, which include, without

limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper.

(e) On the Fifth Count, for the full amount of their damages, which include, without limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper.

(f) On the Sixth Count, for the full amount of their damages, which include, without limitation, compensatory, consequential and incidental damages, attorneys' fees, expert fees, litigation expenses, pre-judgment and post-judgment interest, punitive damages and for such other and further relief in favor of the Plaintiffs and against the Defendant as the Court may deem just and proper.

Dated: February 24, 2009

**McElroy, Deutsch, Mulvaney & Carpenter, LLP**

By: _____

Ronald J. Riccio
Louis A. Modugno
1300 Mount Kemble Avenue
Morristown, New Jersey 07960
Tel: (973) 993-810
Fax: (973) 425-0161

**Gibbons P.C.**

By: _____

Michael R. Griffinger
One Gateway Center
Newark, New Jersey 07102
Tel: 973-596-4500
Fax: 973-596-0545

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding. No other action or arbitration proceeding is contemplated and, at the present time, Plaintiffs' counsel is not aware of any other parties who need to be joined in the above action.

Dated: February 24, 2009

**McElroy, Deutsch, Mulvaney & Carpenter, LLP**

By: _____
Ronald J. Riccio
Louis A. Modugno
1300 Mount Kemble Avenue
Morristown, New Jersey 07960
Tel: (973) 993-810
Fax: (973) 425-0161

**Gibbons P.C.**

By:_____
Michael R. Griffinger
One Gateway Center
Newark, New Jersey 07102
Tel: 973-596-4500
Fax: 973-596-0545