```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
 2                     CIVIL NO. 09-816-SRC-MAS

 3

     LAUTENBERG FOUNDATION, THE              MOTIONS
 4
             Plaintiff,
 5
             VS.
 6
     PETER MADOFF,
 7
             Defendant.
 8   _____

 9                          August 11, 2009
                            Newark, New Jersey
10

11
     B E F O R E:   HONORABLE STANLEY R. CHESLER, USDJ
12

13

14   Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record
15   as taken stenographically in the above-entitled
     proceedings.
16

17   S/Jacqueline Kashmer
     _____
     JACQUELINE KASHMER
18   Official Court Reporter

19

20

21
                        JACQUELINE KASHMER, C.S.R.
22                        OFFICIAL COURT REPORTER
                              P. O. Box 12
23                        Pittstown, NJ 08867
                            (908) 229-6496
24

25
```

```
 1            McELROY DEUTSCH MULVANEY & CARPENTER, LLP
 2            1300 Mount Kemble Avenue
              P.O. Box 2075
 3            Morristown, NJ 07962-2075
              BY:  RONALD J. RICCIO, ESQ.
 4                 STEPHEN GREENBERG, ESQ.

 5                      and

 6            GIBBONS, PC
              Gateway I
 7            Newark, NJ 07102
              BY: MICHAEL GRIFFINGER, ESQ.
 8            For the Plaintiff

 9

10

11            SAIBER, LLC
              One Gateway Center
12            13th Floor
              Newark, NJ 07102-5311
13            BY:  WILLIAM F. MADERER, ESQ.

14                      and

15            LANKLER SIFFERT & WOHL, LLP
              500 Fifth Avenue
16            New York, NY 10110-3398
              BY:  CHARLES T. SPADA, ESQ.
17                 JEANNIE RUBIN, ESQ.
                   JOANNE HARVEY, ESQ.
18            For the Defendant

19

20

21

22

23

24

25
```

1     THE COURT:  Be seated.  Good afternoon.  Lautenberg

2  Foundation vs. Madoff, 09-816.  Please note your

3  appearances for the record.

4     MR. RICCIO:  Good morning -- good afternoon, your

5  Honor.  Ronald J. Riccio for the plaintiffs.

6     MR. GREENBERG:  I'm Stephen Greenberg.  I'm with

7  Ronald Riccio.

8     MR. GRIFFINGER:  Michael Griffinger, also with

9  Riccio.

10     MR. MADERER:  Good afternoon, your Honor.  William

11  Maderer of the Saiber firm on behalf of the defendant.

12     MR. SPADA:  Your Honor, Charles Spada from Lankler,

13  Siffert & Wohl.  With me are my colleagues Joanne Harvey

14  and Jeannie Rubin on behalf of defendant, Peter Madoff,

15  also.

16     THE COURT:  Good afternoon to you.  All right.  Mr.

17  Spada, you're going to be arguing this for the defendants?

18     MR. SPADA:  Yes, your Honor.

19     THE COURT:  And Mr. Riccio, you're going to be

20  arguing it for plaintiffs?

21     MR. RICCIO:  Yes, your Honor.

22     THE COURT:  All right.  Mr. Spada, it's your motion.

23  Why don't you start.

24     MR. SPADA:  Thank you, your Honor.  May it please

25  the Court, my name is Charles Spada on behalf of the

1    defendant, Peter B. Madoff.

2         As your Honor is aware, we brought a motion to

3    dismiss the complaint brought by the plaintiffs, which

4    there are three plaintiffs here, The Lautenberg Foundation

5    and two individual plaintiffs.

6         The complaint here alleges violations of the federal

7    securities laws Section 10(b) and also 20(a), controlling

8    personal liability, as well as various state law claims for

9    breach of fiduciary duty, aiding and abetting a breach of

10   fiduciary duty, negligent misrepresentation and negligence.

11        If it would please the Court, I will address first

12   the federal securities law.

13        THE COURT:  Fine.  Why don't we focus on that to

14   start off with.

15        MR. SPADA:  Yes, your Honor.  As your Honor is aware

16   I'm sure from looking at the complaint, this case arises

17   out of the Ponzi scheme committed by Bernard Madoff.

18   There's no dispute as to that Mr. Madoff committed the

19   scheme, that he's pled guilty, that he's in jail.

20   Everybody's read all about that.

21        The scheme occurred at Madoff Securities, and I'll

22   refer to the company as The Company or Madoff Securities.

23   It's alleged that my client, Peter Madoff, who is Bernard

24   Madoff's brother, worked at The Company and plaintiffs do

25   not describe much of anything but allege that he was the

1  compliance officer, senior managing director, general

2  counsel of Madoff Securities and that he worked with his

3  brother there.

4       The plaintiffs do not allege many facts in their

5  complaint with respect to the conduct of Peter Madoff.

6  Plaintiffs allege his position, that he worked side-by-side

7  with his brother, that he was highly skilled in the use of

8  technology and the business operations of the company, and

9  that he ignored various alleged red flags.

10      As the complaint is pled, it is pled as a

11  misstatement or omissions case with respect to the 10(b)(5)

12  claim, although plaintiffs in their brief claim that

13  they're alleging scheme liability.  It's clear if you look

14  at the complaint, it doesn't allege that at all.  It

15  doesn't mention scheme liability with respect to the

16  defendant at all.

17      It's clear what they're saying is that this is a

18  misstatements and omissions case and that they allege that

19  the defendant was responsible as a compliance officer,

20  senior director, to ensure the accuracy of, and they point

21  to essentially three statements; marketing materials, SEC

22  filings of the financial condition of the firm, and monthly

23  account statements that go to the investors.

24      Now, beyond that, they allege nothing as to the

25  defendant's activity in connection with making any of these

1    statements and, as we point out in our brief, you know, the

2    law is clear that you have to -- one of the first elements

3    if you're making a misstatements or omissions claim, you

4    have to allege and show that there's some misstatement that

5    the defendant participated in making.  It's not enough just

6    to allege he's the compliance officer.  There are false

7    filings, false account statements, therefore, he is

8    responsible for them.

9          The federal securities laws require more under

10   10(b)(5) and, as your Honor is aware, the heightened

11   pleading standards of 9(b) apply to the federal securities

12   laws claims and you have to have some concrete allegations

13   of what participation the defendant is alleged to have had

14   with each of the particular statements that are claimed to

15   be false.  And here the complaint alleges nothing about was

16   the defendant involved with the preparation of the

17   financial statements.  Although some marketing materials

18   are referenced, it's not even alleged whether -- when those

19   misstatements were made, whether the defendant had any

20   participation with the creation or publication of those

21   misstatements.

22         THE COURT:  Let me stop you for just one second.

23         MR. SPADA:   Yes, your Honor.

24         THE COURT:  All right.  In your brief, one of the

25   first arguments you make is that they haven't even pled

1   that was in connection with the sale or offering or

2   purchase or sale of a security, which of course is a basic

3   requirement for any 10(b)(5) claim.

4        MR. SPADA:   Correct, your Honor.

5        THE COURT:  Now, the Supreme Court has given us sort

6   of an expansive interpretation of what constitutes in

7   connection with the sale of a security.  Correct?

8        MR. SPADA:   Yes, your Honor, that's correct.

9        THE COURT:  If I recall correctly, SEC vs. Zanford,

10  reported at 122 Supreme Court 1899 does, in fact, give an

11  expansive view of what constitutes in connection with the

12  sale or offer of a security.

13       MR. SPADA:   That's correct, your Honor.

14       THE COURT:  Are you seriously arguing that the

15  complaint does not meet that, the requirement of the SEC

16  standard at this point?

17       MR. SPADA:   I'm saying that the complaint doesn't

18  particularize what purchase or sale they're referring to

19  and what the misstatement goes to, whether it was at the

20  opening of the account, was it subsequent purchases or

21  sales.  It's not clear to me from the complaint how they're

22  saying there's a nexus there.  What is the purchase or

23  sale?

24       I'm not saying that they couldn't allege it.  I'm

25  just saying that as drafted, you can't tell.  But I agree

1    with your Honor that the Supreme Court precedent in other

2    cases, that does take a very expansive definition of what

3    is a security.  I'm saying here there is no

4    particularization of what they're saying as to what that

5    security is.

6          THE COURT:  As to what the nexus is.

7          MR. SPADA:   That's correct, that's correct, your

8    Honor.  So, where here they're not alleging that the

9    defendant signed, created any of the misrepresentations,

10   he's not alleged to have prepared them, there's no

11   allegation at all except for this general allegation that

12   he is responsible for ensuring the accuracy.

13         We submit under the federal securities laws that is

14   not enough for a misstatement or omissions case.  All the

15   cases in this area involve where somebody had some

16   involvement with a misstatement or omission that can be

17   pled.  And there is a lack of facts in the complaint here

18   alleging anything other than the defendant's position.

19         THE COURT:  All right.  Let me hear from them on that

20   issue.

21         MR. SPADA:   Sure.

22         THE COURT:  All right.  Mr. Riccio.

23         MR. RICCIO:  Yes, your Honor.

24         THE COURT:  First of all, is scheme liability pled in

25   the complaint?

1          MR. RICCIO:  Yes, it is, Judge.

2          THE COURT:  Show me where.

3          MR. RICCIO:  If you look at paragraph 39, we allege

4     that Peter Madoff is a primary violator of Section 10(b) of

5     the Exchange Act.  We do not limit ourselves to A, B or C.

6     Scheme liability is A and C.

7          THE COURT:  Yeah.

8          MR. RICCIO:  Misleading misrepresentations is B.  We

9     are alleging two things.  We're alleging that the conduct

10    of the defendant was manipulative and deceptive, and I can

11    explain the details for that in a moment, and we're also

12    alleging they're misleading misrepresentations.

13          Let me address, if I can, what I consider to be a

14    fairly cramped reading of the complaint by the defendant.

15    The suggestion is that we don't allege many facts and the

16    suggestion is that perhaps the reasonable inferences that

17    should be drawn from these facts should not be viewed in a

18    light most favorable to the plaintiff, which is what the

19    standard is even under Iqbal and the new approach to

20    12(b)(6) motions.

21          But if I could, Judge, let me get into what the

22    complaint does allege.  First of all, I think you need to

23    begin with the underlying fraud, which Mr. Spada correctly

24    identifies as a Ponzi scheme.  Everybody knows something

25    about the Bernard Madoff scandal, but there's more to it

1    than just that.  This Ponzi scheme lasted for 20 years.

2    During that 20-year time period, the defendant was the

3    chief compliance officer, senior managing director, general

4    counsel, head of trading, and in a document filed with the

5    SEC by BMIS, which Bernard Madoff testified in his plea

6    allocution was prepared by him, identified Peter Madoff as

7    a co-control person of BMIS.

8         THE COURT:  Where is that pled?

9         MR. RICCIO:  That's in Exhibit C to our complaint,

10   page 20.  If your Honor turns, your Honor, to page 20 of

11   31, Exhibit C to our complaint, you'll see that there are

12   some boxes, and beneath the name Bernard Madoff is the name

13   Peter Madoff.  Then it has title or status, director of

14   trading, chief compliance officer.  Date or title of status

15   acquired, 1969.  So, he held this position for 40 years.

16        And then under the label control person, the letter

17   "Y" appears, indicating yes.

18        Then your Honor, if you look at paragraph 15 of our

19   complaint, the allegations -- actually that would be

20   paragraph 17 of our complaint -- the allegations very

21   clearly spell out Peter Madoff's duties and

22   responsibilities at BMIS as a control person and the senior

23   managing director, director of trading, chief compliance

24   officer, and general counsel of BMIS.

25        So, when Mr. Spada says that Peter Madoff worked at

1    BMIS, that might be the understatement of the century.  He

2    controlled BMIS with Bernard Madoff.  He was the person who

3    was responsible for ensuring, as we allege in our

4    complaint, that BMIS adhered to the law.

5            For 20 years, while Peter Madoff worked side-by-side

6    with his brother, there was a Ponzi scheme afoot which he

7    did nothing about.  The Ponzi scheme resulted in Bernard

8    Madoff taking money from some investors, paying it out to

9    other investors, filtering some of the money into the

10   so-called legitimate arm of his enterprises, and keeping

11   the rest of it for himself and his family and his friends.

12           In his plea allocution Bernard Madoff tells the Court

13   how he perpetrated the fraud.  He says I lied to the SEC, I

14   lied to my clients, but then he also says things that are

15   directly attributable to Peter Madoff.

16           THE COURT:  Let me stop you again.

17           MR. RICCIO:  Yes.

18           THE COURT:  Where is this in the complaint?

19           MR. RICCIO:  The plea allocution is attached as an

20   exhibit to Mr. Spada's motion papers and it's appropriate

21   to consider it, your Honor, as a public record.  This came

22   up in the In Re Able Labs case where matters outside the

23   complaint can be considered if they're integral to an

24   understanding of the complaint and if they're matters of

25   public record, you can take judicial notice of the plea

1    allocution.

2          They submitted it to your Honor, so it's not --

3          THE COURT:  I understand -- look, I know I can take

4    and consider some things on a 12(b)(6) but, by and large,

5    the factual allegations of a complaint are taken from the

6    complaint.  Correct?

7          MR. RICCIO:  That is correct, your Honor.  But they

8    can be augmented when the complaint -- and this was an

9    after-occurrence event from the filing of the complaint.

10   But if your Honor doesn't want to take into account the

11   plea allocution, that's fine.

12         THE COURT:  It may be very well material which, in

13   fact, could appropriately be submitted in connection with a

14   repleading if that's appropriate but, in short, you know,

15   and I've had some experience with taking into consideration

16   matters outside of the complaint, but generally the Third

17   Circuit law has been you look at matters outside the

18   complaint which are essentially referred to or incorporated

19   or relied upon by the complaint.  You know, that's the

20   basic rule in the Third Circuit, at least.

21         MR. RICCIO:  Well, I'm referring to it, your Honor,

22   because they presented it to your Honor in their papers.

23         THE COURT:  And I thank you for doing that and I

24   thank them for doing it, but I will tell you, all right, I

25   mean, I've used material outside the complaint, as I've

```
 1    said, where the complaint in fact relies upon that
 2    material.  There have been situations and the Third Circuit
 3    has upheld looking at material outside the complaint for
 4    purposes of dealing with statute of limitations issues
 5    because the Court can take judicial notice of the fact
 6    that, for example, newspaper articles put people on notice
 7    of various things.  But quite frankly, the mere fact that
 8    they have submitted or you submit a certification is not
 9    something which I am at least at this point inclined to be
10    using in determining the sufficiency of the complaint --
11    all right -- because, quite frankly, then I've got people
12    changing the complaint in front of my eyes.
13         MR. RICCIO:  We don't need to consider the plea
14    allocution.
15         THE COURT:  And then I get confused and, you know,
16    Mr. Riccio, I'm very easily confused.
17         MR. RICCIO:  Your Honor, you're not easily confused
18    and if you are confused by the plea allocution, we don't
19    need this --
20         THE COURT:  Okay.
21         MR. RICCIO:  -- to sustain this complaint.
22         THE COURT:  Let's go back for a second.  All right.
23    I was asking you whether the complaint pleads scheme
24    liability.
25         MR. RICCIO:  Yes.
```

```
1          THE COURT:  All right.  And as I am reading the
2     complaint, I've got his responsibilities laid out here,
3     yes, and certainly the complaint alleges that Bernard
4     Madoff admitted to a Ponzi scheme and, indeed, paragraph 28
5     says the day before he confessed to the FBI, he told Peter
6     Madoff and other BMIS employees that the investment
7     advisory arm of BMIS was a fraud, that it was all just one
8     big lie, and that they lost $50 billion.
9          What I'm not seeing is how that pleads essentially
10    his integral involvement in a scheme to defraud.  As I
11    recall the scheme liability theory, it is that the Supreme
12    Court has asserted, number one, there need not be a
13    misrepresentation or an omission where there's a duty to --
14    an omission to disclose when there's a duty to disclose,
15    conduct can be deceptive and that that is one of the
16    hallmarks of scheme liability.  And then we have all the
17    case law which goes into great detail distinguishing
18    between scheme liability and aider and abettor liability,
19    and how one should not confuse one with the other, and then
20    we really have the problem of figuring out where that line
21    is supposed to be drawn.
22         But in the first instance I'm trying to see where
23    this is really essentially asserting that Peter Madoff is
24    part of this Ponzi scheme.
25         MR. RICCIO:  Yes.  Well, your Honor, what we need to
```

1    show is that he engaged in a deceptive act or a

2    manipulative act.

3         THE COURT:  Okay.

4         MR. RICCIO:  In order to establish, from my pleading

5    perspective, liability under 10(b)(5)(A) or (C) --

6         THE COURT:  Right.

7         MR. RICCIO:  -- we need only show that he, Peter

8    Madoff, engaged in a deceptive act or a manipulative act.

9    In paragraph 46 of our complaint we allege that he

10   effectively covered up for years what his brother confessed

11   was the largest financial fraud in history.

12        So, what did he do in covering up the largest

13   financial fraud in history, and that takes you to what his

14   function was at BMIS.

15        THE COURT:  Paragraph 46 does that?

16        MR. RICCIO:  Well, you know, your Honor, it's

17   either -- we have two copies of the complaint.  It's either

18   46, right at the end of 46, the last sentence --

19        THE COURT:  It says Peter Madoff confessed that he --

20   confessed that he and BMIS violated the Securities Act of

21   1934 and the regulations promulgated thereunder by

22   intentionally engaging in a common plan, scheme, artifice

23   to defraud and unlawful course of conduct, which he

24   described as a giant Ponzi scheme that operated as a fraud

25   and deceit upon plaintiffs in connection with the purchase

1    and sale of securities.

2         MR. RICCIO:  Your Honor, then take a look at 38.

3         THE COURT:  Maybe I am.

4         MR. RICCIO:  38 is what was attached to Mr. Spada's

5    submission, paragraph 38.  It's on page 16.

6         THE COURT:  Okay.  I've got it on page 15 of mine.

7    All right.

8         MR. RICCIO:  But the cover-up allegation is on page

9    16.

10        THE COURT:  Okay.

11        MR. RICCIO:  We have the same complaint.

12        THE COURT:  All right.  Now, I think we've got it.

13   Okay.

14        MR. RICCIO:  Very good.  Then you're working off of

15   the exhibit to Mr. Spada's motion.  I'm working off the

16   same copy of the complaint.  In any event, we've alleged

17   the cover-up.  Now, we don't just say in a conclusory

18   manner that he engaged in a cover-up.  We explain why this

19   is our theory.  Bearing in mind this is a motion to

20   dismiss, we're not determining whether or not we're

21   ultimately going to win this allegation but whether or not

22   there's enough pled here.

23        What we have alleged is the following:  There was a

24   Ponzi scheme, which is admitted.  It lasted for 20 years.

25   It involved billions of dollars.  Peter Madoff's function

1    was to work side-by-side with his brother for 20 years.

2    His brother in an SEC filing identified Peter Madoff as a

3    control person.

4         When you are a control person, you take

5    responsibility for what's happening at the entity that

6    you're controlling.

7         What was happening at the entity that Peter Madoff,

8    along with Bernard Madoff, were controlling for 20 years

9    was a vibrant, vicious, merciless Ponzi scheme.  Who was

10    in charged of complying with the law during that time

11    period?  Peter Madoff.  Who was the general counsel?  Peter

12    Madoff.  Who was the senior managing director?  Peter

13    Madoff.  Who was in control of the management and policies

14    of the business at the time the Ponzi scheme was being

15    perpetrated according to Bernard Madoff?  Peter Madoff.

16         Did he just say that arbitrarily?  No.  He put in it

17    a sworn filing with the SEC, which, while Mr. Bernard

18    Madoff admitted a lot of lying and a lot of fraud and a lot

19    of deceit, the one thing he never said was that the

20    statement in the SEC form describing his brother as a

21    control person was not true and correct.

22         Now, given all of his functions, who's responsible

23    for sending out the monthly statements?  Who's responsible

24    for the confirms?  Who's responsible for the SEC filings?

25    Who's responsible for the financial statements?  All of

1    that is the responsibility we allege of Peter Madoff, not

2    because he's Bernard Madoff's brother but because he has

3    all of these functions.

4         When you have these functions and consciously avoid

5    doing them and recklessly disregard looking into the facts,

6    when you ignore the obvious, when you turn your back on

7    crimes that are being committed under your nose, not for a

8    week but for 20 years, we allege that's deceptive,

9    manipulative actions.  We allege that violates subsections

10   (A) and (B) of 10(b)(5).

11        So, this again, your Honor, we haven't had any

12   discovery.  We tried to take his deposition on an emergency

13   basis.  We did not succeed in getting his deposition.  He

14   has not submitted a word -- not that it's his obligation to

15   do so on a motion to dismiss -- but there's nothing from

16   Peter Madoff saying I wasn't a control person, I wasn't the

17   senior managing director, I'm not responsible for the

18   fraudulent monthly statements and confirms.

19        By the way, monthly statements and confirms are

20   generated by technology.  We allege in our complaint that

21   the technological genius behind BMIS was Peter Madoff.

22   We're not talking about an occasional confirmation

23   statement or monthly statement.  We're talking about over a

24   period of 20 years thousands of confirmation and monthly

25   statements.

1       Not one of those thousands of transactions ever
2   happened, and who's the cop on the beat while these
3   technologically-generated confirms and monthly statements
4   are going to customers?  Peter Madoff.  This conscious
5   avoidance of the obvious, reckless disregard to look into
6   how the business is going on, how could a compliance
7   officer even on a random sampling conclude that everything
8   was okay when not one customer, according to the confirms
9   and the monthly statements, lost a penny?  Statistically
10  impossible.
11      We say that's evidence of deceptive, manipulative
12  acts within the meaning of 10(b)(5)(A) and (C).
13      In addition, you have the red flags that we allege in
14  some detail in the complaint which are ignored by Peter
15  Madoff, and what do these red flags show?  These are not
16  casual matters that might require your Honor or I to look
17  into or not look into.  These are some glaring problems
18  that are front and center for 20 years which the co-control
19  person of BMIS did nothing about.
20      The 17th floor of the lipstick building where the
21  Ponzi scheme was operated was off limits to people at BMIS.
22  If you're the head of compliance, Judge, or the general
23  counsel or a control person, wouldn't you want to know why
24  the 17th floor was called the cage and nobody was allowed
25  there?  Wouldn't you want, maybe after the first or second

1    year, to look into that?

2         In addition, the returns, as I mentioned, the returns

3    on the monthly statements, nobody ever lost money.

4    Everybody, whether the market is up or down, everybody is

5    making money.  If you're the head of compliance, you can't

6    just turn your back on it.  That's the point.

7         THE COURT:  Let me ask you a question.

8         MR. RICCIO:  Yeah.

9         THE COURT:  If you bought into Berkshire Hathaway in

10   1960 and you kept it until 1990, I don't know when

11   Berkshire -- all right -- but let's say you kept it for 30

12   years, did Berkshire Hathaway ever lose money?

13        MR. RICCIO:  Every single month?  I don't know what

14   Berkshire Hathaway's --

15        MR. GREENBERG:  They lost money last year, your

16   Honor.

17        THE COURT:  Last year?  Before that, Mr. Greenberg.

18        MR. GREENBERG:  I don't know, but that's -- they were

19   investing in privately held companies.  They were totally

20   transparent.

21        Here, your Honor, as the dean is pointing out, year

22   in, year out, if Bernard Madoff met Judge Chesler, he'd

23   say, hmm, Judge Chesler, he needs 11 percent.  Every year

24   Judge Chesler gets 11 percent.  He meets Dean Riccio.  Hmm,

25   Dean Riccio, he needs 14 percent.  Every year he gets 14

1    percent.  With all due respect, that's not Warren Buffett,

2    your Honor.

3         MR. RICCIO:  And your Honor, if I might, we're not

4    talking about year-end performance.  We're talking about

5    every single month.

6         Here's another fact that was ignored.  No outside

7    brokers were ever used by BMIS.  In order for BMIS to

8    operate its Ponzi scheme, the monthly statements that went

9    out needed to show trades, buys and sells.  BMIS used no

10   outside brokers and they did not use the so-called

11   proprietary arm of BMIS to execute trades.

12        Well, if you're the compliance officer, wouldn't you

13   say to your brother, gee, Bernie, I see you're doing a lot

14   of trades here from the account statements that are going

15   out.  Who's executing the trades?  Answer, nobody.

16        Wouldn't Peter say to Bernie, well, somebody's got to

17   be doing it.  We're not doing it.  What outside broker are

18   you using?  Answer, none.

19        Of course we know now why there were no brokers

20   executing the trades, because there were no trades.  But

21   for 20 years you're asleep at the switch?  You don't ask a

22   question?  You turn your back?  You don't get your brother

23   alone and say what's going on here?

24        THE COURT:  All right.  Let me stop you for a second.

25   Let me hear what their response is to that.

1     MR. SPADA:   Thank you, your Honor.  I do think we

2  need the deposition of Mr. Buffett in this case to find

3  this out but, your Honor, I think plaintiff has conflated a

4  bunch of issues in the argument that was just made.  I

5  think the issues of scheme liability and misstatement,

6  omission have been conflated, as well as the issue of

7  control person, that designation and that form of

8  liability.

9     THE COURT:  Okay.  But let's take the basic argument

10 which I've heard -- all right -- which is essentially Peter

11 Madoff, who's there for 20, 30 years, whatever it is, the

12 complaint does say that he held specific positions, which

13 included general counsel, which included chief of

14 compliance.  He was named as a control person, let's see,

15 director of trading, senior managing director.  All right.

16 If I recall correctly, those are the positions which are

17 held.

18     MR. SPADA:   Yes, your Honor.

19     THE COURT:  Now, you have correctly pointed out in

20 your papers that saying that someone holds a position does

21 not in and of itself demonstrate culpable participation,

22 etc., or responsibility.  Right?

23     MR. SPADA:   Correct, your Honor.

24     THE COURT:  Okay.  In paragraph 15 of the complaint,

25 however, and I hope that we're all on the same page with

```
 1    the complaint, what's asserted is that his duties and
 2    responsibilities in these positions included directing the
 3    management and policies of BMIS, regularly verifying and
 4    accurately reporting the financial condition of BMIS,
 5    establishing, implementing, controlling, monitoring and
 6    enforcing a compliance program of internal controls
 7    designed to ensure BMIS's compliance with all laws, the
 8    detection, prevention and reporting of all violations of
 9    any laws or regulations by BMIS or its employees.  And
10    then it explains his varied experience.
11         Now, does that recitation of the duties that he has
12    cure any of the problems which you see with the complaint?
13         MR. SPADA:  No, your Honor, because --
14         THE COURT:  Why not?
15         MR. SPADA:  -- our position is that portion of
16    paragraph 15, those are legal conclusions, and as the
17    Supreme Court has said in Iqbal and the judge has recently
18    cited in one of his opinions, you essentially take those
19    legal conclusions for purposes of assessing the sufficiency
20    of the complaint and you can't rely on them.  You have to
21    look at well-pleaded factual allegations.
22         These are legal conclusions drawn, as far as I could
23    tell, made up just from what they think the title means
24    should be his responsibilities.  These are not well-pled
25    factual allegations.  They're purely legal conclusions and
```

1    they deserve no weight for purposes of assessing the merits

2    of the securities law claim.

3         THE COURT:  Now, if they weren't legal conclusions,

4    in fact they described what I set forth have been the job

5    responsibilities of Peter Madoff in some filings or

6    documentation, would that be different?

7         MR. SPADA:   I don't believe so, your Honor, because

8    it still doesn't talk about an affirmative.  It talks about

9    sort of a policing role, enforcing role.  It's still, for

10   purposes of whether he was involved in the misstatement or

11   omissions being made, it still says nothing as to what he's

12   actually doing with respect to the creation of those

13   misstatements or omissions.

14        It might be saying he had these responsibilities and

15   he didn't do them, but the securities laws, 10(b)(5), the

16   case law I think demands more.

17        THE COURT:  And what does it demand?

18        MR. SPADA:   I think here where, as we're saying, if

19   you look at the complaint carefully, they do not allege

20   scheme liability.  They allege misstatement and omission

21   liability.  The case law talks about that for the

22   misstatements, they have to have been involved in the

23   making of them.  The case law says were they a signer?

24   Were they involved in the preparation?  Were they involved

25   in sending the monthly reports out and such?

1      A mere compliance role where you're maybe responsible

2   for looking at something, I don't think under the 10(b)(5)

3   case law under a misstatement or omission case standing

4   alone is enough.  It's not enough participation.

5      THE COURT:  Let's ask Mr. Riccio about that.  First,

6   what misstatements is Peter Madoff alleged to have made?

7      MR. RICCIO:  The misstatements he's alleged to have

8   made pertain to the sales brochure which is exhibit, I

9   think it's A-1 or A-2, in which they talk about BMIS being

10   a highly ethical business.  Quality has been our hallmark.

11   The owner's name is on the door.  You can count on us to

12   treat you correctly.

13      That's a misstatement.  He's, as a control person,

14   he's responsible for that under the law as a control

15   person.  This is not a legal --

16      THE COURT:  Let's do 10(b)(5).  All right.

17      MR. RICCIO:  In addition, we have the monthly

18   statements.

19      THE COURT:  Okay.  Wait a second.  What is there in

20   the complaint which says that he said that, that he said

21   what is in --

22      MR. RICCIO:  He didn't say it but he is responsible

23   for the entity that promulgates the document.  Plus, your

24   Honor, we don't have everything that got filed with the

25   SEC.  I fully expect to see his name appear on audit forms

1    that you have to file with the SEC, on financial statements

2    and things of the like.

3           We don't need to show that he signed it.  We don't

4    need to show that it came out of his mouth under

5    10(b)(5)(A) and (C).

6           THE COURT:  No.  But I'm not talking about (A) and

7    (C). All right.  Right now I'm talking about --

8           MR. RICCIO:  (B).

9           THE COURT:  -- I'm talking about (B).  Under (B), I

10   want to know affirmative misrepresentations or omissions

11   where there's duty to speak.

12          MR. RICCIO:  All right.  Then your Honor, on that, if

13   I could, I would refer you for starters, paragraph 38 of

14   the complaint in which we describe not the scheme and not

15   the deceptive acts, but we describe what are the statements

16   that we say are attributable to him.  The statements

17   pertain to the sales literature.  It's the monthly

18   statements, it's the confirms, the financial statements,

19   the SEC filings.  These are all false.  We know they're

20   false statements.  There's no issue about materiality, no

21   issue about falsity.  The only issue is who gets blamed for

22   lying.

23          THE COURT:  Okay.  Now, this is paragraph 38, the

24   paragraph starts off notwithstanding the --

25          MR. RICCIO:  Yes, yes.

1        THE COURT:  And in it what you do is you say he

2  recklessly ignored and/or controlled and/or failed to

3  disclose and/or consciously disregarded.

4        MR. RICCIO:  And later on we say recklessly made and/

5  or acquiesced in the making of, he made or acquiesced in

6  the making of.  Your Honor, at the end of the day is

7  Bernard Madoff the only person to be responsible for lying

8  when the entity that is controlled by him and his brother

9  is filing false statements all over the place to which

10  Bernard Madoff pled guilty, to which he's serving 150 years

11  in jail?  I think not.  I think there's got to be joint

12  responsibility here when there's two people that are

13  identified unmistakably, undisputedly as in control of the

14  entity that's lying to the SEC, that's lying to customers.

15        THE COURT:  Okay.  And Mr. Riccio, don't I have to

16  have a complaint which complies with specificity

17  requirements as the Supreme Court has now interpreted Rule

18  8 and with the PSLRA?

19        MR. RICCIO:  Your Honor, we don't dispute that

20  there's got to be more specificity required when you're

21  pleading a claim under 10(b)(5), not under control person,

22  but under 10(b)(5).

23        THE COURT:  Right now we're talking about 10(b)(5).

24        MR. RICCIO:  And I would say to your Honor I don't

25  know what more specificity you can put into a complaint

than the document in which the lie appears, namely, the
sales literature, than the identification of the documents
where the lies occurred, the financial statements, than his
role as control person in a document that's sworn to and
filed with the SEC.

I mean, I think the only question for your Honor is
does Peter Madoff have no responsibility for lying to the
government and customers because he's not the entity, he's
only a co-control person.

To state the question is to answer it.  If you are a
co-control person of an entity that lies to your customers
and lies to the government and files false financial
statements, if that doesn't satisfy Rule 9(b), nothing
does.  Impossible to satisfy it short of starting a lawsuit
and taking depositions and then coming back and amending
the complaint, which is not what 9(b) requires.  They
require specificity so that they can know what it is we're
saying.

Is there any doubt that they know what we're accusing
Peter Madoff of?  Is there any doubt?  Are they saying what
documents did he lie in?  Of course not.  It's in the
complaint.  Are they saying we don't know how he lied?  We
say how he lied.  Bernard Madoff tells you how he lies.

So, the only question for your Honor is does Bernard
(sic) Madoff get a pass because he's a human being who

1   controlled an entity that filed the documents, and I don't

2   think he can hide behind -- Peter Madoff can't hide behind

3   the entity and he can't hide behind his brother.  He's got

4   to stand up for what he is and was at BMIS, control person,

5   chief compliance officer, senior managing director, general

6   counsel, director of trading.  What more responsibility can

7   a person have.  To say that he worked at BMIS, as I said at

8   the outset, is the understatement of the century.  He

9   controlled the entity.

10          THE COURT:  How, apart from the titles and the filing

11   as a control person, what pleads -- what pleads facts which

12   say that -- let me ask you this.  All right.  From this,

13   what I'd like to know is what do I have which does not --

14   which demonstrates, for example, that Bernard Madoff

15   concluded that Peter Madoff is his dumber younger brother

16   and we're going to give him some titles and stick him in an

17   office?

18          MR. RICCIO:  For you to conclude that he's the dumber

19   younger brother, your Honor, given the person's record in

20   the industry, he's a lawyer.  He's been in the business for

21   40 years and he's pleaded to be the technology expert is a

22   beginning premise that is flawed.

23          He's a highly intelligent, very skilled, very

24   experienced, very talented individual who had functions

25   that he ignored.  And if you read paragraph 15 in

1    conjunction with paragraph 38, and you read what we've

2    alleged his functions are, and when you read what we know

3    is false, the nexus is obvious.  He was the person who was

4    there on the job when these false statements were filed.

5    He was the person there.

6         If you were to say as between Bernard Madoff and

7    Peter Madoff who had responsibility for those statements,

8    it would be Peter Madoff.  Bernard Madoff wasn't head of

9    compliance.  He wasn't senior managing director.  He wasn't

10   a general counsel, director of trading.  He was none of

11   those things, so, why he is getting all the blame for this

12   and Peter has the potential for a pass because the entity

13   might have filed the form that he didn't sign.  That's not

14   the law.  That's not the law of control person.

15        When you are in control of an entity, you are

16   responsible for management and policies.  Management and

17   policies is the whole kit and caboodle for the entity.

18        THE COURT:  Are you arguing that I should throw out

19   the 10(b)(5) and I should simply maintain the Section 20

20   claim?

21        MR. RICCIO:  No.  What I'm saying is these claims are

22   pled in the alternative.  We have a 20(a) claim which we

23   haven't talked about yet.

24        THE COURT:  But you've been arguing Section 20.

25        MR. RICCIO:  No.

1          THE COURT:  You've been arguing control person.

2          MR. RICCIO:  No.  What I'm -- no, your Honor.  Under

3     control person you can be a control person without

4     performing all of the functions that Peter Madoff performed

5     here.  What we're saying under 10(b)(5) is that his control

6     person status, combined with the other functions that he

7     performed, hold him accountable at the pleading stage as a

8     primary violator.

9          THE COURT:  And their argument is that your

10    description of his responsibilities is purely legal

11    conclusion.

12         MR. RICCIO:  Your Honor, it is not a legal conclusion

13    to describe his functions.  I think your Honor's -- he

14    directed the management and policies of BMIS.  That's not a

15    legal conclusion.  He was responsible for verifying the

16    financial condition.  That's not a legal conclusion.  He

17    was responsible for internal controls.  That's not a legal

18    conclusion.  Detection, prevention and reporting of all

19    violations of any laws or regulations, that's not a legal

20    conclusion.  Those are all facts.  We've alleged those

21    facts.

22         If he wanted to, he could have come forward and said

23    something in response, but we're dealing with the facts in

24    this complaint and with the responsibility to allege them

25    with particularity under 10(b)(5), which I think we've done

1    in paragraph 38, but also, your Honor, under Iqbal, Iqbal

2    talks about plausibility on its face and talks about your

3    Honor using your judicial experience and common sense in

4    deciding whether the complaint goes forward.

5         I think that tells the whole story here.  What does

6    your Honor's common sense tell you about this complaint?

7    Does your Honor's common sense tell you that at the

8    pleading stage, Peter Madoff should be cut loose because

9    there isn't enough here or does your common sense tell you

10   there's something here, it's pled with a degree of

11   specificity?

12        Considering it's a fraud case and it's hard to learn

13   all the facts about a fraud from the defendant before the

14   depositions start, does your common sense tell you in a

15   case like that the complaint goes forward?  If it goes

16   forward and if we cannot substantiate these claims, then

17   there's always summary judgment or even a voluntary

18   dismissal for that matter, but at this juncture, given what

19   we have to work with, give what we know the undisputed

20   facts are, I can't imagine what more would be required by

21   way of particularity to hold Peter Madoff accountable in

22   the exact same way, perhaps even more so, than his brother

23   Bernard under 10(b)(5), because Bernard, while he may have

24   pleaded guilty, the reality is that the person running the

25   day-to-day operation of the Ponzi scheme was Peter Madoff.

1      That's our allegation, unrefuted.

2          THE COURT:  Well, I've got to tell you, I'm not

3      seeing that from this complaint, that Peter Madoff is

4      accused of running the day-to-day operations of the Ponzi

5      scheme.

6          MR. RICCIO:  Running the day-to-day operations of the

7      Ponzi scheme in the sense that the confirmation statements

8      are going out without any inquiry into the validity, the

9      monthly statements are going out, the financial statements

10     are going out.  He's facilitating it.  Perhaps the word

11     running is an overstatement.  He's facilitating it.  He's

12     allowing it to happen by a conscious avoidance of the

13     obvious.

14         THE COURT:  So, all right.  Now I've gotten down to

15     what is essentially you're arguing conscious avoidance.

16         MR. RICCIO:  From a scienter standpoint we're arguing

17     that his failure to monitor, which is what the cases say

18     under the Infinity case, Judge McKee's Infinity case, the

19     failure to monitor even in the belief that what was going

20     on was honest is not a good enough defense.

21         Even a neophyte, Judge McKee in Infinity says, even a

22     neophyte looking at this situation, looking at what was

23     going on for 20 years should know that something was amiss

24     at BMIS.

25         Peter Madoff found nothing amiss at BMIS.  We say

1    that constitutes a violation under 10(b)(5)(A) and (C), and

2    (B), the statements consist of the items that I identified

3    for your Honor.  That's our position.

4         THE COURT:  All right.  So, the PSLRA demonstration

5    of scienter you're relying upon is essentially that same

6    thing plus the flags.  I got it.

7         MR. RICCIO:  For the scienter?

8         THE COURT:  Yes.

9         MR. RICCIO:  We are alleging for scienter, your

10   Honor, well, much more than that, if I could.  I don't know

11   if your Honor wants me to go through it but I can.

12        THE COURT:  Yeah.

13        MR. RICCIO:  Certainly the existence of the

14   underlying fraud, the length of it and the magnitude of it.

15   I think, Judge, you have to look at this and, in fact,

16   Iqbal says this, you have to look at the complaint in a

17   context.  So, I've got to put in it a context to understand

18   where we are coming from at this juncture without there

19   having been any discovery.

20        You have the underlying fraud.  You have the various

21   functions that we allege in detail in paragraph 15.  You

22   have his technological expertise.  You have the fact that

23   we allege he worked side-by-side with his brother for 40

24   years, 20 of which were the Ponzi scheme.  We have the

25   sales literature which we've already talked about.  We have

 1     the ADV form in which Peter Madoff is identified as the
 2     control person, which I think is the most important
 3     document in the case at this juncture.  And what you then
 4     have is the cover-up, Peter Madoff cover-up.  How does he
 5     cover it up?  He covers it up, and this is where conscious
 6     avoidance, reckless disregard of the obvious, whatever,
 7     knowing indifference, what I describe it as the cop turning
 8     his back on a crime occurring in his presence and
 9     pretending it's not happening.  This is what Peter Madoff
10     did.
11         Compliance controls, nonexistent.  Enforcement of
12     compliance if there were any, none.  How could he allow the
13     17th floor to be off limits to people for 20 years?  How
14     could he allow the 17th floor to generate trades when there
15     was no broker executing the trades?  How could this be?
16     How could any person, reasonably thinking person who has
17     those functions ignore those obvious facts; the filings
18     with the SEC, the false financial statements.
19         But then look at the red flags.  He's got an
20     accountant doing the books of BMIS who operates out of a
21     strip mall.  He's now under indictment but at the time we
22     allege the complaint, it was a two-person accounting firm
23     auditing a billion dollar business and you're the control
24     person of that entity, you're the compliance officer,
25     general counsel, head of trading, and you have a strip mall

1    accountant now under indictment auditing your books?

2    That's the definition of conscious avoidance, if not actual

3    knowledge that something is amiss.

4         You want to have an accountant who's compliant, who

5    will do whatever you say or doesn't know the difference

6    between right and wrong.

7         In addition, you have the Markopolos correspondence.

8    This is the person, your Honor may have heard his name

9    before, this is the person who in 1999 and again in 2005

10   identified in detail the BMIS Ponzi scheme.

11        Well, if, your Honor, you're a control person of an

12   entity and somebody twice sends a 40-page missive to the

13   SEC explaining why your business enterprise is a Ponzi

14   scheme, wouldn't you do something to stop it or to find out

15   about it?  Nothing.  That gets ignored.

16        And then again, the trading patterns, the success all

17   the time.  We also have the commingling of funds.  Bernard

18   Madoff testified and, your Honor, this was in his plea

19   allocution so if you don't want to hear it, I'll push it --

20        THE COURT:  I don't want to hear it.

21        MR. RICCIO:  -- I'll push it to the side.  But in any

22   event, Judge, those are the factors that we believe show --

23   they certainly show a 20(a) valid cause of action as well

24   as the state common law claims.

25        All we're debating at the moment is 10(b)(5).  These

1     are the allegations on which we base 10(b)(5).  The

2     scienter requirement does not need to be an actual intent

3     to deceive.  It can be a reckless disregard.  Judge McKee

4     pointed that out in Infinity.  And when these two guys who

5     claimed we thought everything was on the up-and-up, Judge

6     McKee said your good faith in thinking everything was on

7     the up-and-up isn't the answer.  You have scienter because

8     you recklessly disregarded knowing the truth, and if you

9     recklessly disregard knowing the truth at least at the

10    pleading stage, you have scienter under 10(b)(5).  That's

11    the Infinity case.

12          In Re Able Labs says the same exact thing.  People

13    who have compliance functions, when the company is

14    violating the law and do nothing to stop it, cannot avoid

15    liability under 10(b)(5) by simply saying I didn't know, I

16    thought everything was on the up-and-up.  The answer is you

17    should have known.  You should have known everything was on

18    the up-and-up, and if you did what your job required you to

19    do, in even a modicum of carefulness, this Ponzi scheme

20    would have stopped 20 years ago.  It wouldn't have got more

21    than a week into operation if Peter Madoff did what he was

22    supposed to do.

23          THE COURT:  Let's hear from Mr. Spada.  Why is he

24    wrong?

25          MR. SPADA:  As your Honor correctly pointed out, the

1   conscious avoidance or the regular flags argument goes to

2   scienter.  It does not go to the issue we were talking

3   about before, which is can this defendant have been said to

4   made or had a duty to speak with regard to the omissions or

5   is scheme liability pled.

6        We submit they failed on both those accounts.  The

7   Court doesn't even need to reach scienter.  However, I will

8   address the scienter argument.  First off, plaintiff's

9   counsel pointed to this 40-page missive by Markopolos to

10  the SEC.

11       There's no allegation that the defendant saw what was

12  sent to the SEC or was made aware of it.  The complaint

13  makes no allegation of that at all.  Moreover, as the Court

14  is probably aware, that the conduct has to be so highly

15  unreasonable or an extreme departure from the standards of

16  ordinary care.

17       In a recent case involving the Bayou Hedge Fund,

18  which was also a Ponzi scheme, the court found that

19  purported red flags that were reported publicly or to a

20  regulatory agency and where you're saying they were alerted

21  to the fraud by then but the SEC didn't act or the IRS

22  didn't act, it doesn't rise to the level of creating

23  sufficient scienter.

24       Here even, the red flags they're pointing to,

25  investors were aware of, so to say that it's an extreme

1    departure from the standards of ordinary care where the SEC

2    is alerted to them, the red flags they're talking about are

3    obvious and open to the public, that they don't rise to the

4    level under the securities laws of an extreme departure

5    from the standards of ordinary care and, as I said, they do

6    not even allege in this complaint that this supposed

7    Markopolos complaint to the SEC, that the defendant was

8    ever made aware of this, so, as pled, they certainly don't

9    plead enough as to that, your Honor, and so, we don't think

10   scienter is met.  We don't even think you need to get to

11   that issue, however.

12        THE COURT:  Assuming that the complaint properly

13   pleads not as conclusory language but properly pleads his

14   duties with regard to BMIS, wouldn't a two-person

15   accounting firm be something which would be raising your

16   hackles a little bit for a multi-billion dollar fund?

17        MR. SPADA:   I don't believe that the complaint

18   pleads that the defendant was responsible for the audit of

19   the fund.

20        THE COURT:  It does plead he's responsible for

21   compliance, however.  Right?

22        MR. SPADA:   Yes.

23        THE COURT:  And verifying and accurately reporting

24   the financial condition of BMIS.  Correct?

25        MR. SPADA:   Correct.

1          THE COURT:  Okay.  I mean, if I am -- I see Dean

2     Riccio being very vigorous in his argument or whatever and

3     is certainly dramatic, but if I cut through some of the

4     dramatics and at least focus on his common sense argument,

5     which is does common sense at least sort of stop at the

6     door of a two-person accounting firm doing certified --

7     doing audits of this kind of operation?

8          MR. SPADA:  Your Honor, I don't know that that rises

9     to the level of being highly unreasonable, especially where

10    there are sparse allegations with respect to the defendant

11    having any responsibility for the auditing of the fund.

12         THE COURT:  Well, and their argument to a certain

13    degree is that, yeah, the only people who knew about this

14    are the people who are inside.  I mean, to a certain degree

15    and, I mean, there is no doubt that Iqbal does indeed

16    require specific pleading.

17         MR. SPADA:  Correct.

18         THE COURT:  All right.  In context.

19         MR. SPADA:  Correct, your Honor.

20         THE COURT:  But in some ways this is not my typical

21    10(b)(5), is it?

22         MR. SPADA:  That's correct.

23         THE COURT:  My typical 10(b)(5) ends up with

24    misrepresentations about cash flow, about, let's see, what

25    are the last few I've had --

```
1          MR. SPADA:   Loading.

2          THE COURT:  -- cash flow, the medical profile of a

3     pharmaceutical, channel stuffing allegations, so on and so

4     forth.

5          MR. SPADA:   Correct, your Honor.

6          THE COURT:  Here it is a very different fish, isn't

7     it?  It is Mr. Bernard Madoff's black box.

8          Question, is Iqbal going to in fact be a bar to

9     pleading where what's been occurring is indeed to be

10    extraordinarily different for anyone to get full specifics

11    about?

12         MR. SPADA:   Full specifics at this stage, your

13    Honor, for purposes of pleading it?

14         THE COURT:  Yeah.  Let me put it this way.  All

15    right.  I'm sure you folks on both sides, before you have

16    argument before a judge, run Lexis and Westlaw and run

17    every darn opinion that is ever issued, so, I'm sure you're

18    not in the least bit unaware of the fact that I've got a

19    securities fraud case which is going up to the Supreme

20    Court on statute of limitations.

21         Question, as the plaintiffs start walking an

22    incredibly fine line between having sufficient information

23    to be able to plead in a manner to satisfy both the PSLRA

24    and Iqbal and, on the other hand, waiting too long and

25    being told by a district judge that you are on inquiry
```

1   notice two years before you filed the complaint and that

2   you've blown the statute of limitations.

3         MR. SPADA:   Respectfully, your Honor, and I

4   understand the dilemma your Honor is talking about, I don't

5   think that's present here or what accounts for the lack of

6   specificity in the complaint.

7         THE COURT:  Then what do you think accounts for the

8   lack of specificity in the complaint?

9         MR. SPADA:   I believe what it accounts for, as your

10  Honor is aware and given the nature as your Honor points

11  out, this is a very unique, highly publicized biggest Ponzi

12  scheme ever.  The U.S. Attorney's Office is actively

13  investigating it and gathering the facts.

14        There is a SIPC trustee that is actively

15  investigating it and gathering the facts.  They're in

16  possession of all the records.  They've been talking to and

17  have access to the witnesses that are available.  These

18  plaintiffs wanted to get out in front for fear that either

19  the U.S. Attorney's Office or the SIPC trustee will, in

20  gathering and have facts, potentially be able to bring

21  claims where they won't be able to recover in this court

22  for their own behalf but, rather, assets will be gathered

23  for the benefit of all investors, so, I submit that's the

24  rush that's going on here.  That's why there are no facts

25  in the complaint and they're just legal conclusions being

1    pled.

2         THE COURT:  Doesn't that usually get resolved by

3    applications before the panel on multi-district litigation

4    to consolidate proceedings when push comes to shove?

5         MR. SPADA:   It may, although when you're dealing

6    with a SIPC trustee, you might not be dealing with

7    consolidation.  The SIPC trustee is going to be arguing

8    that they usurp the claim and essentially they have the

9    rights to the assets for the distribution to all creditors

10   and individual plaintiffs can't come in and make a claim

11   just for themselves.

12        THE COURT:  Well, then, that will resolve the whole

13   problem if they assert that, won't it?

14        MR. SPADA:   For them maybe.  But I think that is why

15   we see a complaint that was rushed to be filed with no

16   facts and only legal conclusions.  And I don't think, you

17   know, that it was filed because there is some danger of a

18   statute of limitations running.

19        THE COURT:  But there is, in fact, a set of

20   conflicting prerogatives or issues, is there not?

21        MR. SPADA:   That's correct, your Honor.

22        THE COURT:  Let's go to Section 20.

23        MR. SPADA:   Sure.  As your Honor is aware, we've

24   also moved to dismiss the Section 20 claim.

25        THE COURT:  Right.  And apparently, the bulk of my

1    colleagues in New Jersey conclude that pleading culpable

2    involvement is not a pleading requirement but is merely a

3    proof requirement.  Apparently, the bulk of the judges in

4    the Southern District of New York have held to the contrary

5    and there appear to be outliers in both districts which

6    have gone the other way.  Your position obviously is that

7    culpable participation is required to be pled.

8         MR. SPADA:   Yes, your Honor, and I know your Honor

9    has not ruled in a case --

10        THE COURT:  I have been totally out of that issue,

11   yes.

12        MR. SPADA:   So, I apologize to bring this mess now

13   to your doorstep.  We both agree that the Third Circuit has

14   said that culpable participation is an element that's

15   required under 20(a).  The Third Circuit has found that.

16   There's some difference of opinion out there but that's

17   been made clear in the Third Circuit.  It is an element of

18   20(a) and the plaintiffs concede that in their brief.

19        The question is, does it need to be pled in the

20   complaint, and I've read the cases.  Quite honestly, your

21   Honor, I don't understand the argument.  If something is an

22   element, I think that answers it, it needs to be pled.  And

23   the statute itself, in talking about controlling person

24   liability, talks about that the defendant must have been

25   alleged to directly or indirectly induce the act or the

1    acts.  It's not mere nonfeasance.  It requires an

2    inducement and a participation.

3         And so, I think it's clear, if, as the Third Circuit

4    says, it is an element, you have to plead your elements,

5    and the language of the statute is clear.  You need to

6    plead an act of inducement, a participation in the

7    underlying fraud.  So, here again, there is a fatal flaw in

8    that there is no inducing act being pled and, so, I

9    understand that certain of your colleagues have found that

10   at this stage you don't need to plead it but I would submit

11   that the Judge Lechner decision in In Re Nice Systems and

12   also the Southern District cases we cite to make more

13   sense.  If you're saying it is an element, you have to

14   plead it.  They're not -- the Third Circuit is not saying

15   it's not plaintiff's burden.

16        THE COURT:  And if it is an element, have they pled

17   it?

18        MR. SPADA:   No, your Honor.

19        THE COURT:  Their argument would be that the

20   pleadings which they've done in connection with the

21   10(b)(5) are -- those factual allegations would be more

22   than sufficient to plead culpable participation.

23        MR. SPADA:   And we don't believe they are, your

24   Honor, and that goes to a second layer of confusion in the

25   courts which is, does the 9(b) heightened pleading standard

1    apply to 20(a) or is it just the (A)(B) pleading standard,

2    and I would submit, and I think the cases follow this, if

3    you agree that culpable participation is an element, and

4    the Third Circuit does, if you agree that culpable

5    participation needs to be pled up front, then I think you

6    really have to conclude that the 9(b) heightened pleading

7    standard applies to that.

8         I would submit it only makes sense to apply the

9    federal Rule 8 standard if you're saying it doesn't need to

10   be pled.  And if you're talking about pleading culpable

11   participation under a 9(b) pleading standard, again, the

12   same issues we were talking about before, I think it's a

13   fatal flaw, which is what was the participation by the

14   defendant.

15        I'm hearing a lot of allegations of nonfeasance based

16   on title but I'm hearing nothing as to what did he do

17   directly or indirectly to induce the act constituting the

18   violation, induce the act, not merely let it happen, and

19   so, I would submit under the plain language of 20(a) and

20   the logical conclusion of the Third Circuit decision in

21   Rochez Brothers and In Re Suprema, that culpable

22   participation in is an element that plaintiffs are going to

23   require to prove for 20(a) liability.  It's only logical

24   you have to be able to plead it.

25        THE COURT:  Let me hear from Dean Riccio.

1          MR. RICCIO:  On the pleading versus proof dichotomy,

2     the decision in In Re Able Labs, which is a 2008 decision

3     from this district, Judge Greenaway I believe does a very

4     detailed careful analysis of all of the cases back and

5     forth and comes to the definite conclusion that, number

6     one, culpable participation need not even be pled at all if

7     the complaint says nothing about culpable participation.

8     It still satisfies the pleading standard which is not the

9     9(b) pleading standard but the 8(a)(2) pleading standard.

10    So, we don't even need to plead culpable participation,

11    although I think we did.

12         And while we were debating, your Honor, the

13    sufficiency of the factual allegations regarding 10(b)(5)

14    under the 9(b) standard, we're now only judged by the

15    8(a)(2) standard, which, as your Honor knows, is much less

16    demanding by way of detail than is the 9(b) standard.

17         As far as pleading -- I'm sorry -- as far as proving

18    culpable participation is concerned, the Rochez case out of

19    the Third Circuit may be the only -- and I don't want to

20    say it is the only case -- but it might be the only case

21    left in the circuit courts where culpable participation is

22    required to be proven by the plaintiff as an element of the

23    plaintiff's control person claim.  Most other circuits, if

24    not all others, say that the culpable participation is

25    interwoven with the good faith defense that would be

1    available to the defendant in defending the 20(a) claim,

2    so, where then does that leave us on Section 20(a)?

3           First of all, the underlying violation, which is an

4    element of Section 20(a), is admitted.  There's no dispute

5    about that.  Defendant's status as a control person is

6    admitted.  There's no argument about that.  So, most 20(a)

7    cases involve whether the person is a control person or

8    not.  We don't have that.  Or whether there's an underlying

9    violation that the control person controlled.  We don't

10   have that.

11          So, the only issue is pleading culpable

12   participation.  In Re Able Labs say you don't have to plead

13   it.  If you do have to plead it, it's under the 8(a)(2)

14   standard, not the 9(b) standard, which then takes us to

15   have we pled culpable participation.  And I don't want to

16   repeat everything I said before dramatically and non-

17   dramatically to your Honor about culpable participation

18   except to say that during my argument under 10(b)(5), your

19   Honor suggested I might be making the same argument under

20   20(a).  I am.  And everything I said in my argument about

21   10(b)(5), (A), (B) and (C) is the evidence of culpable

22   participation or the facts related to culpable

23   participation that are in the complaint.

24          Also, your Honor, I would point out that in our brief

25   we cited, in addition to In Re Able Labs, two other cases,

1    Kravitz and Henrickson, both of which recognize that a

2    compliance officer who fails to implement a compliance

3    program or doesn't enforce it, that is sufficient to

4    satisfy the culpable participation requirement, not at the

5    pleading stage but at the proof stage.  So, we've alleged

6    certainly -- I know counsel keeps saying we don't have much

7    facts here.  I mean, I beg to differ.  It's a very detailed

8    complaint.  There was no rush to file the complaint.  It

9    was carefully done, I can assure your Honor, before we

10    filed it.

11        We have certainly alleged that action and inaction

12    can equate to culpable participation.  As a matter of proof

13    to prove your claim at the pleading stage, we have alleged

14    action and inaction by the defendant made by virtue of his

15    control person, by virtue of his -- the underlying

16    violation we think that we have pled a culpable

17    participation element even though under the Able case and

18    others we don't need to plead it at all.

19        THE COURT:  Now, just as a matter of curiosity, since

20    certainly in taking that view the pleading and, indeed, the

21    proof requirements under Section 20 are an awfully lot

22    easier than 10(b)(5), why do we have these 10(b)(5)s here?

23        MR. RICCIO:  Your Honor, they're pled in the

24    alternative.  I learned a long time ago not to put all your

25    eggs in one basket.  I don't file frivolous claims but if

1    we have a claim, I think we're duty bound under the RPCs to

2    represent our client to the best of our ability.  If that

3    includes putting in claims that are harder to prove than

4    others, that's what it is.

5         Come time for trial, after there's been some

6    discovery and there's a scheduling order and pretrial order

7    put in place, we may decide to abandon one or more claims

8    to make our case simpler, but at this juncture at the

9    pleading stage, I think we would probably be close to

10   committing malpractice if we didn't put in all viable

11   claims that we thought would survive a motion to dismiss,

12   which is what we've done.

13        THE COURT:  But as a practical matter, the Section 20

14   claims are easier to prove --

15        MR. RICCIO:  As a practical matter using our common

16   sense, you are correct.

17        THE COURT:  And there's no distinction in remedy, is

18   there?

19        MR. RICCIO:  I'm not sure.  I don't want to say there

20   is.  I'm not aware of any but I don't know for sure, but I

21   will be, hasten to say that because one claim is better

22   than another doesn't mean that one should be dismissed

23   because the other claim is stronger.

24        THE COURT:  I'm not saying that.

25        MR. RICCIO:  I know, just being careful, your Honor.

1          THE COURT:  I'm just evaluating everything I've got

2     and --

3          MR. RICCIO:  Yeah, you're right.  I mean, if you're

4     asking me do I think the 20(a) claim is a better claim than

5     the 10(b)(5) claim, I do.  Some claims are better than

6     others.  But I also know what I think is the best claim

7     isn't always what the judge thinks the best claim is.

8          THE COURT:  All right.  Let's go on to, we've got

9     some state law claims here.

10          MR. RICCIO:  Yes.

11          THE COURT:  And in essence, what I've got from

12     defense is that under New York law, all the fiduciary

13     claims that you're asserting do not run to customers.  The

14     fiduciary duty of the officer runs to the corporation.

15     That's the gist of your argument, is it not, Mr. Spada?

16          MR. SPADA:  Correct, your Honor.

17          THE COURT:  And he's cited a whole bunch of very

18     distinguished Southern District judges who've interpreted

19     New York law in that way, if I recall correctly.

20          MR. RICCIO:  Well, your Honor, the first question, I

21     don't want to get you embroiled in a choice-of-law issue

22     but it is a choice-of-law question.

23          In their moving papers they said New York law governs

24     and that was the end of it.  I don't think that is the end

25     of it because I believe on a motion to dismiss, the Harper

1    decision in this district says that you really shouldn't

2    make ultimate choice-of-law determinations on a motion to

3    dismiss for very good reasons.  There's about 15 different

4    factors that the courts will look at in deciding whether or

5    not one particular state law or another state law governs.

6         At the end of the day, might New York law apply here?

7    It might.  It might as to some claims but not others.  But

8    you can really only decide what state law governs in this

9    case based on the complaint, not based on what they're

10   arguing.

11        But your Honor, you held me to the complaint and I

12   will hold them to the complaint on the choice of law.  And

13   in the complaint, in paragraph two, it's very clear that

14   relevant events and violations alleged in this complaint

15   have occurred within this district, that the defendant

16   transacts business in this district and is found in this

17   district.

18        Now, that's all we know at this point about choice of

19   law.  That's all we really know.  We also know, I guess,

20   that BMIS was located in New York, but we don't know a

21   whole lot more about the communications, the contacts with

22   New Jersey, the confirmation statements and monthly

23   statements.  Where did they go?  To the plaintiffs?

24        So, I think under Harper what you're supposed to do

25   is stick to the complaint, apply the law that the complaint

```
1    would suggest should be applied, but defer ultimate
2    determination until after discovery.  Or in the
3    alternative, you can order discovery, limit it to the issue
4    of choice of law and we'll be happy to depose Peter Madoff
5    on the issue of choice of law, but I suspect we'll
6    encounter the same resistance that we encountered when we
7    wanted to depose him previously.  Notwithstanding the
8    academic nicety of the choice-of-law issue, the reality is
9    that in this case, I don't think it matters whether you
10   apply New York or New Jersey state law to the state law
11   claims because I think all of the state law claims survive
12   under either jurisdiction's law.
13        Let me talk for a minute if I could, Judge, about the
14   issue of Peter Madoff's duty to the plaintiffs.  Their
15   position is -- and I agree with this part of it -- the
16   entity stands in the fiduciary relationship with the
17   plaintiffs because the accounts that the plaintiffs opened
18   with the entity were fully discretionary accounts and
19   there's a decision by Judge Pisano, Pasternak, which says
20   -- and New York decisions say the same thing -- that where
21   you open up a fully discretionary account, there is a
22   fiduciary relationship.  So then the question is whether or
23   not that fiduciary relationship between the entity and the
24   plaintiffs carries over to the control persons.
25        There's only one case I know of that addresses this
```

1    issue and it's the Francis case and it's a New Jersey case.

2    But there's nothing in New York saying otherwise.  And

3    here's what Francis says, and it's an interesting

4    fascinating decision taught in the law schools even today.

5          Francis says that while a director of a corporation

6    has a fiduciary duty to the shareholders, that director of

7    the corporation can also have a fiduciary duty to

8    nonshareholders who deposit money with the corporation that

9    the corporation is holding in trust.

10          If you think about that for a minute, what the court

11    is saying is that the fiduciary duty of the corporation --

12    strike that -- of the directors to the shareholders crosses

13    over to investors where the corporation is holding funds

14    that are deposited with the corporation to be held in trust

15    by the corporation.

16          That's exactly what happened here, only our case is

17    one step better than Francis.  We're not dealing with

18    directors of a corporation who have far less control over

19    the corporate affairs than a control person has in a

20    control person setting, so, what we've argued under

21    Francis -- and this is the theory -- that Peter Madoff, by

22    virtue of his control status of the entity, had a fiduciary

23    duty that derived from the entity's fiduciary duty because

24    the entity was holding plaintiff's monies in trust for the

25    benefit of the plaintiffs to be invested on a fully

1   discretionary basis, and where you have that unique type of

2   setting which existed in Francis and which exists even more

3   so here, Peter Madoff has a fiduciary relationship with the

4   plaintiffs by virtue of his control status and by virtue of

5   the fact that the funds invested by the plaintiffs were

6   held by the entity on a fully discretionary basis.  That's

7   the theory under the direct fiduciary duty.

8         THE COURT:  Mr. Spada, if I followed New Jersey law,

9   would Francis hold Mr. Madoff in?

10         MR. SPADA:  No, your Honor.  While we submit that

11   New York law does apply as laid out in our brief for the

12   relevant factors, it doesn't matter, according to us.  We

13   think even under New Jersey law and the Francis case,

14   there's still no duty owed based on the facts alleged here.

15         In the Francis case, it involved duty on the part of

16   directors to take reasonable steps to protect clients

17   against resulting misappropriation of entrusted funds.

18         There's no allegation in the complaint here that the

19   defendant is a director or whether there was even any board

20   of directors of what, according to the attachment to the

21   complaint, was a single member LLC, so, while Francis

22   involved a director, there's no allegation here that the

23   defendant was even a director of the entity.

24         In any event, in Francis also, the action was not

25   brought by an individual creditor.  It was actually brought

1    by the company's bankruptcy trustees for the benefit of

2    creditors.  So, that to me sounds more like it's a duty

3    derivative to the corporation, not a duty that an

4    individual creditor has against an individual director

5    because, again, the claim was being brought by the

6    bankruptcy trustees for the benefit of all creditors, not

7    for an individual creditor.

8         So, here not only don't we have a director, but we

9    have -- it's an individual plaintiff trying to sue an

10   individual defendant, which is a completely different

11   situation.  So, I don't believe that New Jersey law, the

12   Francis case, changes how you resolve the duty issue.

13        And there's a Second Circuit case, Shearson Lehman

14   vs. Wagner that talks about that a bankruptcy trustee has

15   no standing generally to sue third parties on behalf of the

16   estate's creditors but may only assert claims held by the

17   bankrupt entity itself, which supports what Francis stands

18   for, and also North American Catholic Education Programing

19   vs. Gheewalla, a Delaware Supreme Court case that held that

20   individual creditors of an insolvent corporation have no

21   right to assert direct claims for breach of fiduciary duty

22   against corporate directors.

23        So, you know, the Francis case, not only there was

24   there a director involved, there's no director here, no

25   allegation of a director, but also it was being brought on

1    behalf of all creditors, so, effectively on behalf of the

2    estate, which is exactly in line with the New York case law

3    which says while you may owe the duty to the corporation

4    and the corporation may have some right, you don't owe the

5    duty directly to the individual customers, clients,

6    creditors.

7            THE COURT:  All right.  Anything further?

8            MR. RICCIO:  Just one on the --

9            THE COURT:  Certainly.

10           MR. RICCIO:  We do allege that Peter Madoff is a

11   senior managing director.  We don't know exactly what that

12   means at this juncture but there is a director status and

13   we would also say, Judge, that, as I said a moment ago, the

14   directors have less control over the affairs of a

15   corporation than Peter Madoff did over BMIS by virtue of

16   his control status, so if the director has the fiduciary

17   relationship to nonshareholders by virtue of holding monies

18   in trust, it almost flows inevitably that a control person

19   who has greater control over the corporation should have a

20   fiduciary relationship even more so than a director would.

21           MR. SPADA:  And your Honor, I think the Court can

22   take judicial notice that a managing director is an officer

23   title in the corporation.  It is not the same as being a

24   director on a board of directors.

25           THE COURT:  Anything further?

1          MR. RICCIO:  And then if we're going to take judicial

2     notice of that, let's take judicial notice of Mr. Madoff's

3     duties and responsibilities.

4          THE COURT:  All right.  Thank you, folks.  You'll get

5     a decision as soon as possible.

6          MR. RICCIO:  Thank you.

7          (Whereupon the proceedings are adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25