# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE LAUTENBERG FOUNDATION, JOSHUA S. LAUTENBERG and ELLEN LAUTENBERG,<br><br>       Plaintiffs,<br><br>    -against-<br><br>PETER MADOFF,<br><br>       Defendants. | Civil Action No.: 09-00816 (SRC) (MCA)<br><br>*Document electronically filed.* |

---

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## NOT IN DISPUTE IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT
## AS TO COUNT THREE OF PLAINTIFFS' COMPLAINT

---

**MCELROY, DEUTSCH,**
**MULVANEY & CARPENTER, LLP**
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

A.    The Parties ........................................................................................................ 1

B.    Madoff's Employment And Securities Background ......................................... 2

C.    Facts Admitted By BMIS In Its SEC Filing As An Investment Advisor ......................... 2

D.    Bernard Madoff Confesses To The BMIS Ponzi Scheme And Violations Of Federal Securities Law ....................................................................................... 3

E.    BMIS' Securities Violations As Found By The Court At His Sentencing ....................... 4

F.    Red Flags About BMIS' Business Practices That Were Reported In 2001 By Reputable Financial Periodicals ........................................................................ 4

G.    Facts Learned From SEC Investigations And Reports About Peter  Madoff's Culpable Participation In The Ponzi Scheme. ................................................... 7

H.    Facts Learned From The Markopolos Complaint ........................................... 12

I.    Exorbitant Profits Received By Peter Madoff From His Personal  BMIS Accounts. ....................................................................................................... 13

J.    Madoff Invokes the Fifth Amendment On A Blanket Basis At His Deposition ............ 13

K.    Plaintiffs' Losses As Victims Of the BMIS Ponzi Scheme ........................... 30

#1499878 v2
104328-50061

Plaintiffs The Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg ("Plaintiffs") in support of their motion for summary judgment against Defendant Peter Madoff ("Madoff") with respect to Count Three of Plaintiffs' Complaint submit this statement of material facts in accordance with Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the United States District Court District of New Jersey Local Rules of Civil Procedure:

**A.    <u>The Parties</u>**

1.    The Lautenberg Foundation (the "Foundation") is a charitable foundation having its principal place of business in Cliffside Park, New Jersey.  The Foundation is a private foundation, and is a citizen of the State of New Jersey.  The Foundation contributes regularly to such charitable and non-profit institutions as museums, performing art centers, universities, Jewish organizations, Catholic Relief Services, medical research, hospitals, libraries, environmental organizations, public radio, NAACP, United Negro College Fund, Salvation Army and United Way.  The Foundation is a plaintiff in this proceeding and it had an investment account at Bernard L. Madoff Investment Securities LLC ("BMIS").  *See* Declaration of Eleanor Rigolosi, dated March 10, 2010, ("Rigolosi Dec."), submitted herewith at ¶¶1-2 and Declaration of Ronald J. Riccio, dated March 12, 2010 ("Riccio Dec."), submitted herewith, Exhibit A.

2.    Joshua S. Lautenberg is a plaintiff in this action and had an investment account at BMIS.  *See* Declaration of Joshua S. Lautenberg dated March 8, 2010, ("Joshua S. Lautenberg Dec."), submitted herewith at ¶¶1-2.

3.    Ellen Lautenberg is a plaintiff in this action and had an investment account at BMIS.  *See* Declaration of Ellen Lautenberg dated March 8, 2010, ("Ellen Lautenberg Dec."), submitted herewith at ¶¶1-2.

4.    Peter Madoff ("Madoff") is the defendant in this action.

**B.     Madoff's Employment And Securities Background.**

5.     Madoff worked at BMIS (or its predecessor) from approximately June 1969 until December 2008.  *See* Riccio Dec., Exhibit B at ¶11.  Madoff is the brother of Bernard L. Madoff.  *Id.*  BMIS had offices on the 17th-19th floors of the building located at 885 Third Avenue, New York, NY.  *Id.* at ¶7.  At various times, Madoff was a senior managing director and Chief Compliance Officer at BMIS.  *Id.* at ¶14.[1]  In addition to being an attorney, Madoff formerly served as vice chairman of the NASD, a member of its board of governors and chairman of its New York region.  *Id.* at ¶15.  Madoff was also a member of the NASDAQ stock market board of governors, its executive committee and chairman of its trading committee.  *Id.*  In addition, Madoff is past president of the Securities Traders Association of New York, a member of the board of directors of the Depository Trust and Clearing Corp, and a member of the board of the Securities Industry Association.  *Id.*

**C.     Facts Admitted By BMIS In Its SEC Filing As An Investment Advisor.**

6.     Madoff admitted that BMIS filed on or about January 7, 2008, with the SEC a Uniform Application for Investment Adviser Registration ("Form ADV").  *Id.* at ¶11; *see also* Riccio Dec., Exhibit D.  The Form ADV contains the following information:

(a)     there are only one to five employees at BMIS engaged in an investment advisory function.  *See* Riccio Dec., Exhibit D at p. 7.

(b)     BMIS's compensation arrangement for investment advisory services is only on a commissions basis and not, for example, as a percentage of assets under management.  *Id.* at p. 8.

(c)     BMIS held over $1.7 billion under management on a fully discretionary basis.  *Id.*

(d)     BMIS provides portfolio management for individual and/or small businesses as well as for businesses or institutional clients.  *Id.*

---

[1]     In BMIS' sale literature, Madoff is identified as "the" senior managing director.  Riccio Dec., Exhibit C at 1.

(e)     BMIS had custody of cash or bank accounts and securities of its advisory clients. *Id.* at p. 13.

(f)     Madoff was Chief Compliance Officer and the Director of Trading at BMIS since June 1969. *Id* at p. 20.

(g)     Bernard Madoff and Madoff are the only two controlling persons of BMIS. *Id.* (designating Bernard Madoff and Madoff as controlling persons); *see also id.* at pp. 21 and 23 (no further designation of any other controlling person).

**D.     Bernard Madoff Confesses To The BMIS Ponzi Scheme And Violations Of Federal Securities Law.**

7.     Bernard Madoff confessed in open court that "for many years until [his] arrest on December 11, 2008, [he] operated a Ponzi scheme through the investment advisory side of [BMIS]." Riccio Dec., Exhibit E at p. 23. Bernard Madoff explained that he "represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with [him] that [he] would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal." *Id.* at p. 24. Despite such representation, during an approximate twenty year span (*id.* at p. 25), the funds thought by the investors to be invested in securities were "*never* invested" but were merely deposited in a bank account in Chase Manhattan Bank. *Id.* at p. 24. Moreover, Bernard Madoff admitted that when BMIS "clients wished to receive the profits they believe they had earned . . . [he] used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds." *Id.* The victims of BMIS' Ponzi scheme included "individuals, charitable organizations, trusts, pension funds, and hedge funds." *Id.*

8.     Bernard Madoff admitted that the previously famous, now infamous, "split strike conversion strategy" that he said was the reason for his purported success was a complete sham

and that he "never made those investments." *Id.* at pp. 25-26.  Bernard Madoff further admitted

that the SEC had investigated the investment advisory business of BMIS in 2006 and that he

testified falsely under oath to the SEC advising them that he executed trades of common stock,

purchased and sold equities in European markets, and executed options contracts, all on behalf of

the investment advisory clients when in fact no such transactions ever took place.  *See id.* at pp.

26-27.

9.      In an attempt to hide the fact that BMIS never executed any trades whatsoever on

behalf of the investment advisory clients of BMIS, Bernard Madoff admitted that clients received

statements and confirmations that were totally false and reflected fictional, bogus transactions.

In an attempt to further conceal the fraud, BMIS filed false and misleading certified annual

reports and financial statements with the SEC.  *See id.* at pp. 27-28.

**E.      BMIS' Securities Violations As Found By The Court At His Sentencing.**

10.     When Bernard Madoff was sentenced on June 29, 2009 to 150 years in prison,

Judge Chin found that the "breach of trust was massive."  Riccio Dec., Exhibit F at p. 44.

Specifically, Judge Chin found that "[i]nvestors – individuals, charities, pension funds,

institutional clients – were repeatedly lied to, as they were told their moneys would be invested

in stocks when they were not." *Id.*  The Court further found that BMIS clients were sent millions

of pages of account statements confirming trades that never existed and that Bernard Madoff

repeatedly lied to the SEC.  *Id.*

**F.      Red Flags About BMIS' Business Practices That Were Reported In 2001 By
Reputable Financial Periodicals.**

11.     Barron's Article

a.      While Bernard Madoff only admitted to the fact that the investment

advisory business of BMIS was a multi-billion dollar Ponzi scheme in December 2008 (Riccio

Dec., Exhibit G at p. 4), there had been a number of news articles published in 2001 raising red flags regarding the business practices of BMIS.  For example, the financial periodical, Barron's, published an article on May 27, 2001 entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  Riccio Dec., Exhibit H.

        b.    The Barron's May 2001 article identified the following red flags about BMIS:

        i.    It manages more than $6 billion for wealthy individuals, rendering it one of the five largest hedge funds.  *Id.* at p. 1.

        ii.    It has "produced compound average annual returns of 15% or more for more than a decade.  Remarkably, some of the larger billion-dollar Madoff-run funds have never had a down year."  *Id.*

        iii.    "When Barron's asked [Bernard L.] Madoff how he accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming."  *Id.*

        iv.    A former BMIS investor stated that "Anybody who's a seasoned hedge-fund investor knows the 'split strike conversion' [strategy described in a hedge fund offering memorandum of BMIS] is not the whole story."  *Id.* at p. 2.

        v.    Three options strategists for major investment banks told Barron's "they couldn't understand how [Bernard L.] Madoff churns out such numbers using this strategy."  *Id.*

        vi.    Some on Wall Street "remain skeptical about how [Bernard] Madoff achieves such double-digit returns using" the split strike conversion strategy.  *Id.*

        vii.    BMIS charges no fees for its money management services and only earns commissions on the trades.  *Id.*

        viii.    BMIS investors "don't understand" how BMIS performs consistently well.  *Id.*

        ix.    Bernard Madoff "requests that his investors not reveal that he runs their money."  *Id.*

        x.    One investment manager stated that Bernard Madoff told him that when you invest with him, you should never reveal that publicly

and that when Bernard Madoff could not explain to his satisfaction "how they were up or down in a particular period," he pulled his money out. *Id.*

12.     MAR/Hedge Article

a.     In May 2001, an article by Michael Ocrant in MAR/Hedge (the "MAR/Hedge Article"), a widely circulated semi-monthly financial newsletter, revealed similar red flags regarding the operations of BMIS. Riccio Dec., Exhibit I.

      i.     For example, the MAR/Hedge Article disclosed the following:

      ii.     BMIS, with its $6-7 billion in assets under management is "at or near the top" of any well-known database [for hedge funds] defined by assets. *Id.* at p. 1.

      iii.     "Most of those who are aware of [BMIS'] status in the hedge fund world are baffled by the way the firm has obtained such consistent, nonvolatile returns month after month and year after year." *Id.*

      iv.     "[BMIS] has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry." *Id.*

      v.     "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets." *Id.*

      vi.     These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success." *Id.*

      vii.     "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period." *Id.* at p. 2.

      viii.     "Skeptics who express a mixture of amazement, fascination and curiosity about the program wonder, first, about the relative complete lack of volatility in the reported monthly returns." *Id.*

      ix.     "Experts ask why no one has been able to duplicate similar returns using the strategy. . . [and] why [BMIS] is willing to earn commissions off the trades but not set up a separate asset

management division to offer hedge funds directly to investors and keep all the incentive fees for itself." *Id.*

x. In explaining the success of BMIS, Bernard Madoff in an interview with MAR/Hedge "pointed to long experience, excellent technology that provides superb and low-cost execution capabilities, good proprietary stock and options pricing models, well established infrastructure, market making ability and market intelligence derived from the massive amount of order flow it handles each day." *Id.* at p. 3.

xi. "The strategy and trading, [Bernard Madoff] says, are done mostly by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals. 'I don't want to get on an airplane without a pilot in the seat,' says [Bernard] Madoff. 'I only trust the autopilot so much.'" *Id.* at pp. 3-4.

xii. "As for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, [Bernard] Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'" *Id.* at p. 4.

xiii. "[Bernard] Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'the strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time." *Id.* at p. 5.

**G.    Facts Learned From SEC Investigations And Reports About Peter Madoff's Culpable Participation In The Ponzi Scheme.**

13.     On August 31, 2009, the SEC Office of Inspector General issued a Report (the "OIG Report") regarding the failure of the SEC to uncover the BMIS Ponzi scheme. *See* Riccio Dec., Exhibit J. The OIG Report found that the SEC received "detailed and substantive complaints over the years to warrant a thorough and comprehensive examination and/or investigation of Bernard Madoff and BMIS for operating a Ponzi scheme." *Id.* at p. 20-21. Between June 1992 and the date in December 2008 when Bernard Madoff confessed, the SEC reported six substantive complaints (one of which came in three different versions from 2000-

2005 from Harry Markopolos and will be discussed in further detail below) that raised significant

red flags concerning BMIS operations.  *Id.* at p. 22.

        14.     The following is a summary taken from the OIG Report of the six complaints sent

to the SEC that raised red flags regarding BMIS:

>       The first complaint, brought to the SEC's attention in 1992, related to allegations that an unregistered investment company was offering "100%" safe investments with high and extremely consistent rates of return over significant periods of time to "special" customers. The SEC actually suspected the investment company was operating a Ponzi scheme and learned in their investigation that all of the investments were placed entirely through [Bernard] Madoff and consistent returns were claimed to have been achieved for numerous years without a single loss.
>
>       The second complaint was very specific and different versions were provided to the SEC in May 2000, March 2001 and October 2005. The complaint submitted in 2005 was entitled "The World's Largest Hedge Fund is a Fraud" and detailed approximately 30 red flags indicating that [Bernard] Madoff was operating a Ponzi scheme, a scenario it described as "highly likely." The red flags included the impossibility of [Bernard] Madoff's returns, particularly the consistency of those returns and the unrealistic volume of options [Bernard] Madoff represented to have traded.
>
>       In May 2003, the SEC received a third complaint from a respected Hedge Fund Manager identifying numerous concerns about [Bernard] Madoff's strategy and purported returns, questioning whether [Bernard] Madoff was actually trading options in the volume he claimed, noting that [Bernard] Madoff's strategy and purported returns were not duplicable by anyone else, and stating [Bernard] Madoff's strategy had no correlation to the overall equity markets in over 10 years. According to an SEC manager, the Hedge Fund Manager's complaint laid out issues that were "indicia of a Ponzi scheme."
>
>       The fourth complaint was part of a series of internal e-mails of another registrant that the SEC discovered in April 2004. The e-mails described the red flags that a registrant's employees had identified while performing due diligence on their own [Bernard] Madoff investment using publicly-available information. The red flags identified included [Bernard] Madoff's incredible and highly unusual fills for equity trades, his misrepresentation of his options trading and his unusually consistent, non-volatile returns over several years. One of the internal e-mails provided a step-by-step analysis of why [Bernard] Madoff must be misrepresenting his options trading. The e-mail clearly explained that [Bernard] Madoff could not be trading on an options exchange because of insufficient volume and could not be trading options over-the-counter because it was inconceivable that he

could find a counterparty for the trading. The SEC examiners who initially discovered the e-mails viewed them as indicating "some suspicion as to whether [Bernard] Madoff is trading at all."

The fifth complaint was received by the SEC in October 2005 from an anonymous informant and stated, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)."

The sixth complaint was sent to the SEC by a "concerned citizen" in December 2006, advising the SEC to look into [Bernard] Madoff and his firm as follows:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff . . . . Assets well in excess of $10 Billion owned by the late [investor], an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

In March 2008, the SEC Chairman's office received a second copy of the previous complaint, with additional information from the same source regarding [Bernard] Madoff's involvement with the investor's money, as follows:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records. The most interesting of which is on his computer which is always on his person.

*Id.* at pp. 21-22.

15.     While Bernard Madoff interacted with the SEC in connection with its investigations and examinations, so did his brother Peter Madoff.  For example, several document requests were directed by the SEC not to Bernard but to Peter Madoff, in his capacity as Chief Compliance Officer.  In one document request, dated January 6, 2004, the SEC sought the following information and documents to be produced by January 21, 2004:

> 1.     For the time period of January 1, 2001 through the present, provide the following:

> a.    monthly profit and loss statements by security (to be
>       provided electronically in an Excel spreadsheet);
> b.    monthly commission revenues segregated by customer and
>       by security (to be provided electronically in an Excel
>       spreadsheet);
> c.    identity of all institutional customers of Madoff Securities;
> d.    all commission rates charged to institutional customers,
>       including any changes to those commission rates, the
>       customers charged those rates, and the monthly totals of
>       commissions paid by customer;
> e.    a detailed organizational chart of Madoff Securities; and
> f.    the identity of each private equity investment held by
>       [BMIS], including, but not limited to, a description of the
>       investment vehicle (including whether or not the entity is a
>       hedge fund), the amount invested, the ownership interest of
>       the investment, the date of the investment, the date the
>       investment was either sold or transferred, and any
>       relationship between the investment vehicle or its affiliates
>       and [BMIS].

> 2.    Describe the "split-strike forward conversion" strategy used by
>       some customers of [BMIS], list the customers using that strategy,
>       list all securities traded as part of that strategy, and explain how
>       [BMIS] is compensated for executing that strategy.  Provide copies
>       of communications and disclosures from the customers using the
>       strategy to the investors or owners, or any prospective investors or
>       owners, since January 1, 2001.

> 3.    Identify all hedge funds managed or advised by any person or
>       entity affiliated with [BMIS], and include the name of each fund,
>       the identification of all advisers and managers of each fund, all
>       affiliated entities of each fund, the investment objective and
>       strategy of each fund, and all investors or owners of each fund
>       since January 1, 2001.

Riccio Dec., Exhibit K.

16.    Similarly, on February 18, 2004, the SEC sent the following request addressed to

Peter Madoff, Chief Compliance Officer of BMIS, demanding that the following information be

given to the SEC on or before March 3, 2004:

> 1.    For the time period January 2001 through the present, provide all
>       written communications between [BMIS] and those clients
>       utilizing the split-strike forward conversion strategy, their

affiliates, subsidiaries, agents, investors, or owners, including, but not limited to, correspondence, reports, memoranda, account statements, and e-mails.

2.      For the time period January 2001 through the present, provide the following documents and information relating to the accounts of those clients of [BMIS] utilizing the split-strike forward conversion strategy:

    a.      Records of all transactions (to the extent not already provided in the account statements and summaries);

    b.      Reports (internal or otherwise) identifying profits, losses, expenses, fees, or commissions or any monies equivalent to commissions (e.g., "commission equivalent"); and

    c.      Memoranda and reports relating to trading strategies, investment strategies, or research.

3.      Provide the following documents relating to any client of [BMIS] utilizing the split-strike forward document conversion strategy:

    a.      Agreements (including prime brokerage agreements and options trading agreements), and any amendments thereto;

    b.      New account opening documents, including any documents attached thereto, and any subsequently received documents relating to the new account opening;

    c.      Corporate and partnership documents; and

    d.      Trading authorizations.

Riccio Dec., Exhibit L.

    17.      The SEC also sent document requests directed to Peter Madoff in 2003 as well.

*See*, *e.g.*, Riccio Dec., Exhibit M.

    18.      In addition to the document requests directed to Madoff, during the course of the

SEC's examinations and investigations of BMIS, the SEC interviewed and spoke with Peter

Madoff in his capacity as Chief Compliance Officer.  Sometimes the principal contact person for

the SEC was Madoff (*see*, *e.g.*, Riccio Dec., Exhibit N at p. 31; Riccio Dec., Exhibit O at pp. 72-

73) and sometimes the SEC met with both Madoff and his brother (*see*, *e.g.*, Riccio Dec., Exhibit

P; Exhibit Q at n. 1; Exhibit R at 2).  One of these interviews took place as far back as 1993.  *See* Riccio Dec., Exhibit S at pp. 1, n.3, 15.

19.     Finally, in addition to the investigations conducted by the SEC, the OIG also cited to a report from the NASD concerning an investigation it did of BMIS.  *See* OIG Report at 175-176.  According to the NASD Report, "Bernard Madoff and **Peter Madoff** are involved in every aspect of the Firm's Business."  *See* Riccio Dec., Exhibit T at p. 10 (emphasis added).  The NASD also notes that Madoff is a minority owner of BMIS.  *Id.* at p. 2.  Finally, the report notes that since June 1969,  Madoff has been responsible for General Compliance and Written Supervisory Procedures.  *Id.*

**H.     Facts Learned From The Markopolos Complaint.**

20.     One of the complaints referenced above that was sent to the SEC came from Harry Markopolos.  After sending earlier versions of this complaint in May 2000 and March 2001, Markopolos sent a revised version to the SEC, dated November 7, 2005, entitled "World's Largest Hedge Fund is a Fraud" (the "Markopolos Complaint").  The Markopolos Complaint details approximately 30 red flags indicating that the investment advisory side of BMIS was in all probability a multi-billion dollar Ponzi scheme.  *See* Riccio Dec., Exhibit U.

21.     The red flags raised by the Markopolos Complaint generally fell into one of three categories:  (1) the obsessive secrecy surrounding BMIS, (2) the statistical impossibility of the returns recorded by BMIS, particularly the consistency of those returns, and (3) the unrealistic volume of options BMIS was supposedly trading.  *Id.*  For example, one of the red flags raised in the Markopolos Complaint was that BMIS does not permit "outside performance audits" and that when one hedge fund asked to send in a team of "Big 4" accountants to conduct an audit of BMIS, it was told that only the brother-in-law of Bernard Madoff, who has his own accounting firm, is allowed to audit BMIS.  *Id.* at p. 10.  Another red flag raised in the Markopolos

Complaint was that only Bernard Madoff family members were privy to the investment strategy. *Id.* at p. 12.

## I.   Exorbitant Profits Received By Peter Madoff From His Personal BMIS Accounts.

22.    The Trustee for the liquidation of the business of BMIS under the Securities Investor Protection Act (the "Trustee") found that from 2001-2008, Madoff was paid $20,067,920 in salary and bonus from BMIS.  Riccio Dec., Exhibit V at ¶65. In addition, Madoff had two of his own customer accounts in BMIS.  *Id.* at ¶66.  Madoff invested $32,146 in these two accounts – including only *fourteen dollars* after December 1995 – and yet he redeemed $16,252,004.  *Id.*

23.    The Trustee further found one account reflected a gain of $8,752,620 in a March 2002 statement despite the fact that there was *no* money or securities invested in that account and less than two months later Madoff redeemed nearly six million dollars from this account.  *Id.* at ¶67.  In addition, between April 2003 and May 2005, Madoff withdrew an additional $6.9 million.  *Id.* at ¶68.

## J.   Madoff Invokes the Fifth Amendment On A Blanket Basis At His Deposition.

24.    Pursuant to Magistrate Judge Arleo's November 6, 2009 order, Madoff was required to appear for a deposition.  Madoff did not seek to stay his deposition and did not appeal the November 6 Order.  Instead, Madoff appeared for his deposition and invoked the Fifth Amendment on a blanket basis.  Riccio Dec., Exhibit W.

25.    For example, Madoff did not offer an explanation concerning his designation in an SEC form as Chief Compliance Officer, Director of Trading and co-control person of BMIS. *Id.* at p. 24.  He did not say anything about precautionary measures he took to detect and prevent fraud, efforts he made to monitor trading activities, responses he made to regulatory inquiries,

reactions he had to countless red flags and/or other alerts of fraudulent activity, as well as efforts he made to promote a culture of ethical behavior and compliance. He did not even say "I don't know." Instead, he relied in a blanket fashion on the Fifth Amendment that included electing to invoke the Fifth rather than dispute or deny the allegations in Plaintiffs' Complaint. *See* Riccio Dec., Exhibit W.

26.    Defendant voluntarily chose to rely on the Fifth Amendment in response to the following questions relevant to his good faith and/or culpable participation in the Ponzi scheme that caused Plaintiffs' losses. Madoff's response "same answer" was stipulated by counsel at the deposition to be a shortened version of Madoff's lengthier scripted language invoking the Fifth Amendment, *id.* at p. 36:7-25:

Page 42

```
 9    Q    Mr. Madoff, do you deny having actual
10   knowledge of the Ponzi scheme referred into the
11   Complaint in this matter?
12    A    Same answer.
13    Q    Do you deny that for a period of at
14   least 20 years, you had actual knowledge of the Ponzi
15   scheme referred into the Complaint in this matter?
16    A    Same answer.
17    Q    Do you deny knowingly defrauding the
18   plaintiffs in this matter, to their great loss and
19   detriment, for the entire time that they were BMIS
20   customers?
21    A    Same answer.
22    Q    Do you deny having made material
23   affirmative misrepresentations to the plaintiffs in
24   this matter for the entire time that they were BMIS
25   customers?
```

Page 43

```
 1    A    Same answer.
 2    Q    Do you deny omitting to disclose
 3   material facts to the plaintiffs in this matter, to
 4   their great loss and detriment, for the entire time
```

14

5   that they were BMIS customers?
6      A    Same answer.
7      Q    Do you deny having a malicious intent to
8   harm the plaintiffs for the entire time that they
9   were BMIS customers?
10     A    Same answer.
11     Q    Do you deny substantially assisting your
12   brother Bernard in stealing money from the plaintiffs
13   during the entire time that they were BMIS customers?
14            MR. SPADA:  Objection to form.
15            You can respond.
16     A    Same answer.
17     Q    Do you deny being culpably involved and
18   participating in the Ponzi scheme to defraud the
19   plaintiffs?
20            MR. SPADA:  Objection to form.
21            You can respond.
22     A    Same answer.
23     Q    Do you deny personally stealing more
24   than $60 million from BMIS investors as a result of
25   the Ponzi scheme referred to in the Complaint?

                                    Page 44

1            MR. SPADA:  Objection to form.  You can
2   respond.
3      A    Same answer.
4      Q    Do you deny that Plaintiffs relied upon
5   your integrity, your trust, your knowledge, your
6   skill and training in [making] investments in BMIS?
7            MR. SPADA:  Objection to form.
8            You can respond.
9      A    Same answer.
10     Q    Do you deny that Plaintiffs relied upon
11   your ethics in making their investment in BMIS?
12            MR. SPADA:  Objection to form.
13            You can answer.
14     A    Same answer.
15     Q    What are your ethics as a businessman?
16            MR. SPADA:  Objection to form.
17            You can respond.
18     A    Same answer.
19     Q    Do you believe you have ethics?
20            MR. SPADA:  Objection to form.
21            You can respond.
22     A    Same answer.

                    15

23      Q     Do you -- strike that.
24            Do you deny that you had a fiduciary
25   relationship between yourself personally and

Page 45

1    Plaintiffs?
2       A     Same answer.
3       Q     Did you deny that because you had a
4    fiduciary relationship directly with Plaintiffs, that
5    you owed them duties of care and loyalty?
6       A     Same answer.
7       Q     Do you deny that during the entire time
8    Plaintiffs were investors at BMIS, that you breached
9    your duty of loyalty to them?
10      A     Same answer.
11      Q     Do you deny that during the entire
12   period of time that Plaintiffs were customers at
13   BMIS, that you were grossly negligent in protecting
14   their investment?
15      A     Same answer.
16      Q     Do you deny that for the period of time
17   that Plaintiffs were customers in BMIS, that you were
18   negligent in protecting their investments?
19      A     Same answer. (Tr. P.42 l. 9-25 to p.45, l 19.)
20      Q     Do you deny attempting to secretly
21   remove documents from BMIS' offices after law
22   enforcement personnel ordered the offices locked
23   down?
24            MR. SPADA:  Objection to form.
25            You can respond.

Page 64

11      Q     Can we agree that during a period of
12   20 years that BLMIS operated a Ponzi scheme and you
13   were a senior managing director and chief of
14   compliance for that firm?
15            MR. SPADA:  Objection to form.
16            You can respond.
17      A     Same answer.
18      Q     Do you deny that all of the statements
19   issued to the Plaintiffs by BLMIS were mailed to the
20   Plaintiffs in Cliffside Park, New Jersey?
21      A     Same answer.
22      Q     Do you deny that you went to the State

23   of New Jersey in your capacity as an employee of
24   BLMIS?
25       A    Same answer.

Page 65

1    Q    Do you deny that BLMIS advertised in New
2    Jersey?
3       A    Same answer.
4    Q    Do you deny that BLMIS had regular and
5    continuous contacts with the State of New Jersey?
6       A    Same answer. (Tr. P. 64 l. 11-25, P. 65 l. 1- ).

Page 66

16       Q    Do you deny that BLMIS had a significant
17   number of investors who were domiciled in New Jersey?
18       A    Same answer.
19       Q    Do you deny that BLMIS had a significant
20   business interest in New Jersey?
21       A    Same answer.
22       Q    Do you deny that BLMIS submitted false
23   and fraudulent records to investors of BLMIS
24   domiciled in New Jersey?
25       A    Same answer. (Tr. P. 66 l. 16-25).

Page 70

18       Q    Am I correct that you were not surprised
19   when your brother confessed to operating a Ponzi
20   scheme?
21       A    Same answer.
22       Q    And am I correct that the reason you
23   were not surprised that your brother confessed to
24   operating a Ponzi scheme is because you knew all
25   about it?  (Tr. P. 70 l. 18-25)

Page 72

20       Q    Am I correct that you knew that David
21   Freighling was the accountant for BLMIS?
22       A    Same answer.
23       Q    Am I correct that Mr. Freighling has
24   pleaded guilty to perpetrating a fraud?
25       A    Same answer.

Page  73

```
 1      Q     Am I correct that Mr. Freighling had his
 2  offices in a strip mall?
 3      A     Same answer.
 4      Q     Am I correct that for the period of time
 5  that Mr. Freighling was the accountant for BLMIS,
 6  that you worked with him in providing him with
 7  financial information about BLMIS?
 8      A     Same answer.
 9      Q     Am I correct that the audits performed
10  by David Freighling were fraudulent?
11      A     Same answer.
12      Q     Am I correct that when Mr. Freighling
13  prepared fraudulent audits, you knew those audits
14  were fraudulent?
15      A     Same answer.
16      Q     And is it fair to say that if I ask you
17  any further questions about Mr. Freighling or the
18  accounting functions performed by him, you will
19  invoke your Fifth Amendment privilege?
20      A     Yes.
21      Q     Do you understand that every time you
22  invoke your Fifth Amendment privilege here today that
23  it allows for the Court to make an adverse inference
24  against your interest in this litigation?
25            MR. SPADA:  I'm going to object to the
```

Page 74

```
 1  form of the question to the extent it calls for legal
 2  advice or legal discussions between witness and
 3  counsel and is not an appropriate question.
 4            I direct you not to answer.
 5      Q     Mr. Madoff, you do not deny -- strike
 6  that.
 7            Do you deny that you were solely
 8  responsible for the management and policies of BLMIS
 9  during the course of your employment there?
10            MR. SPADA:  Objection to form.
11      A     Same answer.
12      Q     Am I correct that you do not deny that
13  you verified the financial condition of BLMIS on a
14  regular basis?
15      A     Same answer.
16      Q     Am I correct that BLMIS maintained two
```

18

17   sets of books?
18            MR. SPADA:  Objection to form.
19      A      Same answer.
20      Q      Am I correct that you knew that BLMIS
21   maintained two sets of books?
22            MR. SPADA:  Objection to form.
23      A      Same answer.
24      Q      Am I correct that the reason BLMIS
25   maintained two sets of books was to defraud the

                                          Page 75

 1   investors and the regulators?
 2            MR. SPADA:  Objection to form.
 3      A      Same answer.
 4      Q      Am I correct that in your employment at
 5   BLMIS that you did not establish a compliance program
 6   of internal controls?
 7            MR. SPADA:  Objection to form.
 8      A      Same answer.
 9      Q      Am I correct that the reason you did not
10   establish a compliance program of internal controls
11   was so that the Ponzi scheme would go undetected?
12            MR. SPADA:  Objection to form.
13      A      Same answer.
14      Q      Am I correct that you did not implement,
15   even if you established a compliance program of
16   internal controls?
17            MR. SPADA:  Objection to form.
18      A      Same answer.
19      Q      Am I correct that you did not monitor a
20   compliance program of internal controls even if you
21   had established one?
22            MR. SPADA:  Objection to form.
23      A      Same answer.
24      Q      Am I correct that you did not enforce a
25   compliance program of internal controls even if you

                                          Page 76

 1   had established one?
 2            MR. SPADA:  Objection to form.
 3      A      Same answer.
 4      Q      Am I correct that you did absolutely
 5   nothing to prevent -- strike that.
 6            Am I correct that you did absolutely

                                    19

7   nothing to detect any violations of the securities

8   laws at BLMIS during the course of your entire

9   employment at that firm?

10       MR. SPADA:  Objection to form.

11    A   Same answer.

12    Q   Are you aware that the SEC promulgated a

13  report of an investigation into the failure of the

14  SEC to uncover the Ponzi scheme at BLMIS?

15    A   Same answer.

22  BY MR. RICCIO:

23    Q   Am I correct that in 1992, a complaint

24  was made regarding the business practices of BLMIS?

25       MR. SPADA:  Objection to form.

Page 77

1    A   Same answer.

2    Q   Am I correct that the SEC suspected that

3  BLMIS, in 1992, was operating a Ponzi scheme?

4       MR. SPADA:  Objection to form.

5    A   Same answer.

6    Q   Am I correct that you and your brother

7  intentionally concealed from the SEC information that

8  would allow them to have uncovered the Ponzi scheme

9  in 1992?

10       MR. SPADA:  Objection to form.

11    A   Same answer.

18      Do you know a person named Harry

19  Markopolos?

20    A   Same answer.

21    Q   Am I correct that in May 2000,

22  March 2001, and October 2005, Mr. Markopolos made a

23  complaint -- made complaints to the SEC about the

24  lawfulness of the business operations of BLMIS?

25    A   Same answer.

Page 78

1    Q   Am I correct that in his complaints he

2  detailed approximately 30 red flags indicating that

3  BLMIS was operating a Ponzi scheme?

4       MR. SPADA:  Objection to form.

5    A   Same answer.

6    Q   Am I correct that you were aware of

7  Mr. Markopolos' complaints?

8    A   Same answer.

20

9      Q     Am I correct that you, in conjunction
10   with your brother, intentionally hid from the SEC
11   evidence that would have uncovered the Ponzi scheme
12   at the time of Mr. Markopolos' complaints?
13           MR. SPADA:  Objection to form.
14      A     Same answer.
15      Q     Am I correct that you were aware of the
16   30 red flags identified by Mr. Markopolos?
17           MR. SPADA:  Objection to form.
18      A     Same answer.
19      Q     Am I correct that you consciously
20   avoided doing anything about those red flags?
21           MR. SPADA:  Objection to form.
22      A     Same answer.
23      Q     Am I correct that in May of 2003, a
24   hedge fund manager complained to the SEC about the
25   business practices of BLMIS?

Page 79

1            MR. SPADA:  Objection to form.
2       A     Same answer.
3       Q     Am I correct that you were aware of that
4    complaint?
5       A     Same answer.
6       Q     Am I correct that you intentionally hid
7    from the SEC evidence that would have caused the SEC,
8    in May of 2003, to uncover the BLMIS Ponzi scheme?
9            MR. SPADA:  Objection to form.
10      A     Same answer.
11      Q     Am I correct that there were, according
12   to the SEC's investigation of itself, as many as six
13   separate complaints filed with the SEC about BLMIS
14   and its business practices?
15           MR. SPADA:  Objection to form.
16      A     Same answer.
17      Q     Am I correct that had you not knowingly
18   cooperated with your brother in concealing the
19   information from the SEC, that as early as 1992 the
20   SEC would have discovered that BLMIS was a massive
21   Ponzi scheme?
22           MR. SPADA:  Objection to form.
23      A     Same answer.
24      Q     Am I correct that you, by virtue of your
25   control of BLMIS, perpetuated the Ponzi scheme for at

21

Page 80

1   least 20 years?
2           MR. SPADA:  Objection to form.
3     A     Same answer.
4     Q     Am I correct that you perpetuated the
5   scheme knowingly, willfully, and wantonly?
6           MR. SPADA:  Objection to form.
7     A     Same answer.
8     Q     Did you ever hear of a firm by the name
9   of Avellino, A-v-e-l-l-i-n-o, and Bienes,
10  B-i-e-n-e-s?
11    A     Same answer.
12    Q     Am I correct that BLMIS, through
13  yourself and your brother, used Avellino & Bienes to
14  defraud customers?
15          MR. SPADA:  Objection to form.
16    A     Same answer.
17    Q     Mr. Madoff, take a look at Exhibit D to
18  the Complaint.
19          MR. SPADA:  That's the document that's
20  entitled "The World's Largest Hedge Fund is a Fraud"
21  dated November 7, 2005?
22          MR. RICCIO:  That's it.
23          (Witness reviewing exhibit.)
24    Q     Am I correct, Mr. Madoff, that the
25  investors in BLMIS personally relied on you to

Page 81

1   operate BLMIS in an honest and ethical, law-abiding
2   manner?
3           MR. SPADA:  Objection to form.
4     A     Same answer.
5     Q     And am I correct that you, in your
6   capacity as a control person of BLMIS, breached that
7   reliance on you by the investors because you did not
8   operate BLMIS in an honest, ethical, law-abiding
9   manner?
10          MR. SPADA:  Objection to form.
11    A     Same answer.
12          (Article by Michael Ocrant, May 2001, is
13  received and marked as Plaintiffs' Exhibit 6 for
14  Identification.)
15          (Article by Erin Arvedlund, 5/7/01,
16  is received and marked as Plaintiffs' Exhibit 7 for

17   Identification.)
18      Q      Take a look at Exhibit D to the
19   Complaint.
20            That's a document that was filed with
21   the SEC by Mr. Markopolos, to my understanding.
22            MR. SPADA:  I'll object to the
23   characterization.  It is what it is.
24            MR. RICCIO:  Can't we stipulate that
25   that's an accurate statement of what the document is?

Page 82

1            MR. SPADA:  I don't know that he filed
2   it with the SEC.
3            MR. RICCIO:  Sent it.
4            MR. SPADA:  Submit, maybe.
5            MR. RICCIO:  Sent to it to the SEC.
6            MR. SPADA:  I mean, I don't know that to
7   be a fact, but you can...
8      Q      Do you recognize the document,
9   Mr. Madoff?
10     A      Same answer.
11     Q      Am I correct that you were aware of
12   Mr. Markopolos' complaint to the SEC as reflected in
13   Exhibit D to the Complaint?
14     A      Same answer.
15     Q      Am I correct that you knowingly ignored
16   Mr. Markopolos' complaint?
17     A      Same answer.
18     Q      Am I correct that the reason you
19   knowingly ignored Mr. Markopolos' complaint is
20   because you knew that BLMIS was operating a Ponzi
21   scheme?
22     A      Same answer.
23     Q      And am I correct that you knew that
24   Mr. Markopolos was correct in the allegations he was
25   making to the SEC?

Page 83

1            MR. SPADA:  Objection to form.
2     A      Same answer.
3     Q      Take a look at P-6 and P-7.
4            MR. SPADA:  Has the court reporter
5   marked these?
6            MR. RICCIO:  Yes, they've been marked.

23

7           (Witness reviewing exhibits.)
8      Q     All right.  You've taken a look at
9   Exhibits P-6 and P-7, correct?
10     A     Yes.
11     Q     And am I correct that P-6 is an article
12  written by Michael Ocrant, O-c-r-a-n-t?
13           MR. SPADA:  Objection to form.
14     A     Same answer.
15     Q     And this was published in May of 2001?
16           MR. SPADA:  Objection to form.
17     A     Same answer.
18     Q     And P-7 is an article written by Erin
19  Arvedlund, A-r-v-e-d-l-u-n-d?
20           MR. SPADA:  Objection to form.
21     A     Same answer.
22     Q     And this was written, am I correct, on
23  May 7, 2001?
24           MR. SPADA:  Objection to form.
25     A     Same answer.

Page 84

1      Q     You saw both P-6 and P-7 at or about the
2   time they appeared in public print, did you not?
3      A     Same answer.
4      Q     And am I correct that the suggestions
5   and observations contained in P-6 and P-7 about the
6   integrity and the honesty and the law -- strike
7   that -- about the integrity, honesty and law-abiding
8   nature of BLMIS were accurate?
9           MR. SPADA:  Objection to form.
10     A     Same answer.
11     Q     And am I correct that you discussed both
12  of these articles with your brother Bernard?
13           MR. SPADA:  Objection to form.
14     A     Same answer.
15     Q     And am I correct that the reason you
16  discussed them with your brother Bernard was because
17  it concerned you that the Ponzi scheme was going to
18  be detected?
19           MR. SPADA:  Objection to form.
20     A     Same answer.
21     Q     And, in fact, both you and your brother
22  Bernard took steps to make sure that the information
23  contained in these articles, P-6 and P-7, did not

24   uncover the Ponzi scheme?
25        MR. SPADA:  Objection to form.

Page 85

1     A     Same answer.
2     Q     Mr. Madoff, do you deny that it was your
3   responsibility to file reports with the SEC regarding
4   the business practices of BLMIS?
5     A     Same answer.
6     Q     And am I correct that you knowingly and
7   intentionally filed false documents with the SEC
8   regarding BLMIS' business practices?
9     A     Same answer.
10      Q     And am I correct that you knowingly and
11   intentionally filed false documents with the SEC in
12   order to materially mislead the SEC and the public
13   regarding the financial condition and business
14   operations of BLMIS?
15     A     Same answer.
16      Q     Am I correct that you knowingly and
17   intentionally cooperated with David Freighling,
18   BLMIS' accountant, in submitting materially false and
19   misleading information to the SEC?
20        MR. SPADA:  Objection to form.
21     A     Same answer.
22      Q     Based on your knowledge, training, and
23   experience, have you ever heard of the term "internal
24   controls"?
25     A     Same answer.

Page 86

1     Q     Am I correct that while you were
2   employed by BLMIS in your capacity as head of
3   compliance and as a control person, that you never
4   established any internal controls or internal
5   compliance programs at BLMIS?
6     A     Same answer.
7     Q     Have you ever heard of the term
8   "internal risk management controls"?
9     A     Same answer.
10      Q     Am I correct that during the course of
11   your employment at BLMIS and in your capacity as head
12   of the compliance and as a control person, that you
13   never instituted any internal risk management

25

14   controls at BLMIS?
15          MR. SPADA:  Objection to form.
16      A     Same answer.
17      Q     Am I correct that in your capacity as
18   head of compliance and as a control person of BLMIS,
19   that you did not communicate at any time with
20   department managers on a daily basis, on a monthly
21   basis, or on a yearly basis to ensure that proper
22   compliance procedures were being followed?
23          MR. SPADA:  Objection to form.
24      A     Same answer.
25      Q     Am I correct that BLMIS never had an

                                                Page 87

 1   audit committee?
 2          MR. SPADA:  Objection to form.
 3      A     Same answer.
 4      Q     Am I correct that the reason there was
 5   no audit committee was to make sure that the Ponzi
 6   scheme was not uncovered?
 7          MR. SPADA:  Objection to form.
 8      A     Same answer.
 9      Q     Am I correct that BLMIS never had an
10   investment advisory manual?
11          MR. SPADA:  Objection to form.
12      A     Same answer.
13      Q     And am I correct that the reason BLMIS
14   never had an investment advisory manual was to
15   conceal the Ponzi scheme?
16          MR. SPADA:  Objection to form.
17      A     Same answer.
18      Q     Am I correct that BLMIS was reviewed in
19   2007 pursuant to the Investment Advisory Act?
20          MR. SPADA:  Objection to form.
21      A     Same answer.
22      Q     Am I correct that in connection with the
23   2007 annual review of BLMIS under the Investment
24   Advisory Act, that you provided materially false and
25   misleading statements to the reviewers?

                                                Page 88

 1          MR. SPADA:  Objection to form.
 2      A     Same answer.
 3      Q     Am I correct that BLMIS did not have an

                        26

4   anti-money laundering compliance program?
5       A    Same answer.
6       Q    Am I correct that the reason that BLMIS
7   did not have an anti-money laundering compliance
8   program was in order to conceal the Ponzi scheme?
9           MR. SPADA:  Objection to form.
10      A    Same answer.
11      Q    Am I correct that BLMIS, with the
12  cooperation of yourself and your brother, engaged in
13  money laundering?
14          MR. SPADA:  Objection to form.
15      A    Same answer.
16      Q    Am I correct that the money laundering
17  involved BLMIS affiliates in Europe?
18          MR. SPADA:  Objection to form.
19      A    Same answer.
20      Q    Take a look at the Complaint again, P-1.
21          (Witness reviewing exhibit.)
22      Q    Would you take a look at paragraph 32 --
23  well, strike that -- paragraphs 31 through and
24  including 35 -- through and including 34 of P-1?
25          (Witness reviewing exhibit.)

                            Page 89

1       A    Yes.
2       Q    Am I correct that every allegation
3   contained in paragraphs 31 through and including 34
4   of the Complaint, P-1, is true and correct in every
5   respect?
6       A    Same answer.
7       Q    Am I correct that every allegation
8   contained in P-1, from the beginning of the Complaint
9   to the end of the Complaint, is true and correct in
10  every material respect?
11          MR. SPADA:  Objection to form.
12      A    Same answer.
13      Q    Am I correct that you admit the
14  allegations contained in P-1?
15          MR. SPADA:  Objection to form.
16      A    Same answer.
17      Q    Am I correct that the denials in your
18  Answer, which is P-2, are not true and correct?
19          MR. SPADA:  Objection to form.
20      A    Same answer.
21      Q    Did you have an account at BLMIS in your

22   own name?
23        A     Same answer.
24        Q     Am I correct that during the period of
25   time that you had an account at BLMIS, that you

                                        Page 90

1    redeemed from your investment over $16 million?
2         A     Same answer.
3         Q     Am I correct that in May of 2002 you
4    redeemed nearly $6 million?
5         A     Same answer.
6         Q     Am I correct that you redeemed
7    approximately $6.9 million between April 2003 and May
8    of 2005?
9              MR. SPADA:  Objection to form.
10        A     Same answer.
11        Q     Am I correct that you redeemed over
12   $3 million between September 2005 and April 2006?
13             MR. SPADA:  Objection to form.
14        A     Same answer.
15        Q     Am I correct that the total amount of
16   your investments in these accounts, which produced
17   over $16 million in returns, was $32,000?
18             MR. SPADA:  Objection to form.
19        A     Same answer.
20        Q     Do you consider an investment of $32,000
21   which produces a $16 million return a good
22   investment?
23             MR. SPADA:  Objection to form.
24        A     Same answer.
25        Q     Did you know that the $16 million that

                                        Page 91

1    you received from your investment at BLMIS came from
2    other BLMIS investors?
3              MR. SPADA:  Objection to form.
4         A     Same answer.
5         Q     Did you know that some of the BLMIS
6    investors whose money you were taking as a redemption
7    were charities?
8              MR. SPADA:  Objection to form.
9         A     Same answer.
10        Q     And hospitals?
11             MR. SPADA:  Objection to form.

                        28

12      A      Same answer.
13      Q      And pensions?
14            MR. SPADA:  Objection to form.
15      A      Same answer.
16      Q      Do you regret having taken that money?
17            MR. SPADA:  Objection to form.
18      A      Same answer.
19      Q      Do you now know that the money that you
20  took was, in fact, money that belonged to charities,
21  pensions, hospitals, and the like?
22            MR. SPADA:  Objection to form.
23      A      Same answer.
24      Q      Do you know that your brother admitted
25  that fact?

Page 92

1            MR. SPADA:  Objection.
2      A      Same answer.
3      Q      Have you offered to return any of that
4  money?
5            MR. SPADA:  Objection to form.
6      A      Same answer.
7            MR. RICCIO:  Do you want to just give us
8  five minutes?
9            MR. SPADA:  Sure.
10            (Recess.)
11            MR. RICCIO:  Okay, just a few more
12  questions.

15      Q      Mr. Madoff, do you admit that had you
16  not invoked your Fifth Amendment privilege today,
17  that you have sufficient personal knowledge to answer
18  all the questions that I've posed to you?
19            MR. SPADA:  Objection to form.
20      A      Same answer.
21      Q      And the "same answer" is the Fifth
22  Amendment, correct, the "same answer" as what you
23  read earlier?
24      A      Exactly, yes.
25      Q      And do you admit that you had sufficient

Page 93

1  personal knowledge to answer all of the questions
2  I've posed to you today and did not need access to

29

```
3    any of the documents in the possession of the United
4    States Attorney's office, the SIPC Trustee, or any
5    other person?
6            MR. SPADA:  Objection to form.
7       A     Same answer.
8            MR. RICCIO:  I have no further questions
9    at this time.
10           MR. SPADA:  Thanks.
11           (Deposition concluded 1:40 p.m.)
12           (Exhibits retained by court reporter.)
```

## K.    Plaintiffs' Losses As Victims Of the BMIS Ponzi Scheme.

27.    The Lautenberg Foundation (the "Foundation"), after accounting for all withdrawals, invested $6,322,000 in BMIS.  *See* Rigolosi Dec. at ¶¶2-4.  The Foundation received a $400,000 payment from the Trustee.  *Id.* at ¶3.  Consequently, the Foundation lost at least $5,922,000.  *Id.* at ¶4.

28.    Joshua S. Lautenberg, after accounting for all withdrawals, invested $930,000 in BMIS.  *See* Joshua S. Lautenberg Dec. at ¶¶ 2-4.  Joshua S. Lautenberg received a $500,000 payment from the Trustee.  *Id.* at ¶3.  Consequently, plaintiff Joshua S. Lautenberg lost at least $430,000.  *Id.* at ¶4.

29.    Ellen Lautenberg, after accounting for all withdrawals, invested $600,000 in BMIS.  *See* Ellen Lautenberg Dec. at ¶¶2-4.  Plaintiff Ellen Lautenberg received a $500,000 payment from the Trustee.  *Id.* at ¶3.  Consequently, plaintiff Ellen Lautenberg lost at least $100,000.  *Id.* at ¶4.

30.     Accordingly, in total, Plaintiffs lost at least $6,452,000 (*i.e.*, $5,922,000 +

$430,000 + $100,000) in BMIS.


Dated:  March 12, 2010
      Newark, New Jersey

By: s/ Michael R. Griffinger
    Michael R. Griffinger, Esq.
    Jonathan S. Liss, Esq.
    **GIBBONS P.C.**
    One Gateway Center
    Newark, New Jersey 07102-5310
    P (973) 596 4500
    F (973) 596 0545
    mgriffinger@gibbonslaw.com

    s/ Ronald J. Riccio
    Ronald J. Riccio, Esq.
    **MCELROY, DEUTSCH,**
    **MULVANEY & CARPENTER, LLP**
    1300 Mt. Kemble Avenue, Box 2075
    Morristown, New Jersey 07962-2075
    P (973) 993-8100
    rriccio@mdmc-law.com

    *Attorneys for Plaintiffs*