# EXHIBIT E

1

93CMMADP1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                          09 CR 213 (DC)

5   BERNARD L. MADOFF,

6              Defendant.

7   ------------------------------x

8                                      New York, N.Y.
                                       March 12, 2009
9                                      10:00 a.m.

10

    Before:
11
                       HON. DENNY CHIN,
12
                                       District Judge
13

14                       APPEARANCES

15  LEV L. DASSIN
         United States Attorney for the
16       Southern District of New York
    MARC O. LITT
17  LISA BARONI
         Assistant United States Attorneys
18
    DICKSTEIN SHAPIRO LLP
19       Attorneys for Defendant
    BY:  IRA LEE SORKIN
20       DANIEL J. HORWITZ
         NICOLE P. DE BELLO
21       MAURO M. WOLFE

22  ALSO PRESENT:  STEVEN GARFINKEL, FBI
                   KEITH KELLY, FBI
23                 JULIA SCHULTE HANISH, USDOJ, FBI
                   THEODORE V. CACIOPPI, FBI

24

25

93CMMADP1

1        (Case called)

2        MR. LITT:  Marc Litt for the United States.  With me

3  at counsel table are Lisa Baroni, an Assistant U.S. Attorney,

4  and four FBI agents:  Steven Garfinkel, Keith Kelly, Julia

5  Hanish, and Ted Cacioppi.  Good morning, your Honor.

6        MR. SORKIN:  Good morning, your Honor.  On behalf of

7  the defendant Bernard L. Madoff, the law firm of Dickstein

8  Shapiro LLP.  Mr. Madoff is sitting to my left.  To my right is

9  Daniel Horwitz of my firm.  To Mr. Madoff's left is Mauro Wolfe

10  from my firm, and to Mr. Wolfe's left is Nicole De Bello from

11  my firm.  Good morning.

12        THE COURT:  Good morning.

13        Mr. Sorkin, your client is still prepared to plead

14  guilty today as we discussed on Tuesday?

15        MR. SORKIN:  Yes, your Honor.

16        THE COURT:  Mr. Madoff, if you would stand, please,

17  and the deputy clerk will administer the oath.

18        (Defendant sworn)

19        MR. SORKIN:  Your Honor, before you begin the

20  allocution, we have provided the government and the court

21  reporter with a copy of the allocution that Mr. Madoff will

22  read, and we have a copy if the Court wishes to see it as well.

23        THE COURT:  Yes.  Thank you.

24        MR. SORKIN:  May I hand it up?

25        THE COURT:  Yes.

3

93CMMADP1

1        This statement is intended to cover all 11 counts?

2        MR. SORKIN:  Yes, your Honor.  After your Honor goes

3   through, he will give a statement which we believe will cover

4   all the elements.  Thank you.

5        THE COURT:  Mr. Madoff, do you understand that you are

6   now under oath and that if you answer my questions falsely,

7   your untrue answers may later be used against you in another

8   prosecution for perjury or making false statements?

9        THE DEFENDANT:  Yes, I do.

10       THE COURT:  Try to keep your voice up so that I can

11  hear you, please.

12       THE DEFENDANT:  Yes, I do, your Honor.

13       MR. SORKIN:  Can we get some water, your Honor?

14       THE COURT:  Yes.

15       MR. LITT:  I would note that the defendant has not yet

16  been arraigned on the information.

17       THE COURT:  All right.  That's true.  Technically, we

18  did the first part of it.  We never did the final part.  Let me

19  just ask the final question.

20       Mr. Madoff, the other day you waived indictment and

21  you consented to being charged by an information of the

22  government, correct?

23       THE DEFENDANT:  Yes.

24       THE COURT:  And how do you now plead to the

25  information, guilty or not guilty?

93CMMADP1

1          THE DEFENDANT:  Guilty.

2          THE COURT:  Before I accept the plea I will conduct

3     the allocution.

4          Would you state your full name for the record, please.

5          THE DEFENDANT:  Bernard L. Madoff.

6          THE COURT:  On Tuesday you told me your age and

7     educational background.  We talked a little bit about your

8     medical condition.  Has your medical condition changed since

9     Tuesday?

10          THE DEFENDANT:  No, it has not.

11          THE COURT:  In the past 24 hours, have you taken any

12     drugs, medicine, or pills, or have you drunk any alcohol?

13          THE DEFENDANT:  No.

14          THE COURT:  Is your mind clear today?

15          THE DEFENDANT:  Yes, it is.

16          THE COURT:  And are you feeling all right today under

17     the circumstances?

18          THE DEFENDANT:  Yes, I am.

19          THE COURT:  Do either counsel have any doubt as to Mr.

20     Madoff's competence to plead at this time?

21          MR. LITT:  The government does not.

22          MR. SORKIN:  No, your Honor.

23          THE COURT:  Now, Mr. Madoff, as I understand it, you

24     wish to plead guilty today to all 11 counts of the information,

25     is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93CMMADP1

1          THE DEFENDANT:  Yes, it is correct.

2          THE COURT:  Have you had a full opportunity to discuss

3     your case with Mr. Sorkin and to discuss the consequences of

4     pleading guilty?

5          THE DEFENDANT:  Yes, I have.

6          THE COURT:  You told me on Tuesday that you were

7     satisfied with Mr. Sorkin and his representation of you.  Are

8     you still satisfied?

9          THE DEFENDANT:  Yes, I am.

10          THE COURT:  On the basis of Mr. Madoff's responses to

11     my questions and my observations of his demeanor, I find that

12     he is fully competent to enter an informed plea at this time.

13          Now, Mr. Madoff, before I accept any plea from you I

14     am going to ask you some additional questions that are intended

15     to satisfy me that you wish to plead guilty because you are

16     guilty and that you fully understand the consequences of your

17     plea.  If you do not understand any of my questions, please ask

18     me or Mr. Sorkin to explain.

19          I am going to describe to you certain rights that you

20     have under the Constitution and laws of the United States.  You

21     will be giving up these rights if you plead guilty, so please

22     listen carefully.

23          Under the Constitution and laws of the United States,

24     you have a right to a speedy and public trial by a jury on the

25     charges against you which are contained in the information.  If

93CMMADP1

1   there were a trial, you would be presumed innocent and the

2   government would be required to prove your guilt by competent

3   evidence beyond a reasonable doubt.  You would not have to

4   prove that you were innocent if you were to go to trial.

5        If there were a trial, you would have the right to be

6   represented by an attorney.  And if you could not afford one,

7   an attorney would be provided for you free of cost.

8        If there were a trial, you would have a right to see

9   and hear all the witnesses against you and your attorney could

10  cross-examine them.  You would have a right to have your

11  attorney object to the government's evidence and to offer

12  evidence on your own behalf if you so desired, and you would

13  have the right to have subpoenas issued or other process used

14  to compel witnesses to testify in your defense.

15        If there were a trial, you would have the right to

16  testify if you wanted to, but no one could force you to testify

17  if you did not want to.  Furthermore, no inference or

18  suggestion of guilt could be drawn if you chose not to testify

19  at trial.

20        Mr. Madoff, do you understand each and every one of

21  these rights?

22        THE DEFENDANT:  Yes, I do.

23        THE COURT:  Do you understand that by pleading guilty

24  today you are giving up each and every one of these rights, you

25  are waiving these rights, and you will have no trial?

93CMMADP1

1              THE DEFENDANT:  I do.

2              THE COURT:  Do you understand that you have the right

3     even now to refuse to plead guilty?

4              THE DEFENDANT:  Yes, I do.

5              THE COURT:  You do not have to enter a plea of guilty

6     if you do not want to, for any reason.

7              Do you understand that?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Now, did you receive a copy of the

10    information?

11             THE DEFENDANT:  Yes, I have.

12             THE COURT:  And as we discussed on Tuesday and as we

13    discussed a moment ago, do you understand that you have waived

14    your right to be charged by an indictment, which is issued by a

15    grand jury, and you have consented to being charged by the

16    information which is issued by the prosecutor?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And did you waive that right voluntarily

19    and knowingly?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Now, I am going to review the counts with

22    you.  As we said, the information contains 11 counts.

23             Count One charges securities fraud.

24             Count Two charges investment adviser fraud.

25             Count Three charges mail fraud.

93CMMADP1

1          Count Four charges wire fraud.

2          Count Five charges international money laundering to

3     promote fraud in the sale of securities.

4          Count Six charges international money laundering to

5     conceal the proceeds of fraud in the sale of securities.

6          Count Seven charges money laundering.

7          Count Eight charges making false statements.

8          Count Nine charges perjury.

9          Count Ten charges making a false filing with the

10    Securities and Exchange Commission.

11         And Count Eleven charges theft from an employee

12    benefit plan.

13         Do you understand that those are the charges against

14    you?

15         THE DEFENDANT:  Yes, I do.

16         THE COURT:  I'll ask the government to advise the

17    defendant of the elements of the crimes.

18         MR. LITT:  Yes, your Honor.  With respect to Count

19    One, securities fraud --

20         THE COURT:  Hold on one second.

21         Mr. Madoff, you can be seated.  Pour yourself some

22    water.

23         THE DEFENDANT:  Thank you.

24         MR. LITT:  With respect to Count One, securities

25    fraud, in order to prove the crime of securities fraud, the

93CMMADP1

1    government must establish each of the following three elements

2    beyond a reasonable doubt:

3            First, that in connection with the purchase or sale of

4    a security, the defendant did any one or more of the following:

5    (1) employed a device, scheme, or artifice to defraud or (2)

6    made an untrue statement of a material fact or omitted to state

7    a material fact which made what was said under the

8    circumstances misleading; or (3) engaged in an act, practice,

9    or course of business that operated or would operate as a fraud

10   or deceit upon a purchaser or seller.

11           Second, that the defendant acted knowingly, willfully,

12   and with the intent to defraud;

13           And, third, that the defendant knowingly used or

14   caused to be used any means or instruments of transportation or

15   communication in interstate commerce or the use of the mails in

16   furtherance of the fraudulent conduct.

17           With respect to investment adviser fraud, the

18   government would have to prove beyond a reasonable doubt all

19   four of the following elements:  First, that the defendant was

20   an investment adviser; second, that the defendant either (A)

21   employed a device, scheme, or artifice to defraud clients and

22   prospective clients; (B) engaged in a transaction, practice, or

23   course of business which operated as a fraud or deceit upon

24   those clients and prospective clients; or (C) engaged in an

25   act, practice, and course of business that was fraudulent,

93CMMADP1

1    deceptive, and manipulative.

2          Third, that the defendant devised or participated in

3    such alleged device, scheme, or artifice to defraud or engaged

4    in such alleged transaction, practice, or course of business,

5    knowingly, willfully, and with intent to defraud.

6          And, fourth, that the defendant employed such alleged

7    device, scheme, or artifice to defraud or engaged in such

8    alleged transaction, practice, or course of business by use of

9    the mails or other instrumentality of interstate commerce.

10         In order to prove the crime of mail fraud, the

11   government must establish beyond a reasonable doubt the

12   following four elements:

13         First, that at or about the time alleged in the

14   indictment there was a scheme or artifice to defraud in order

15   to obtain property or money by false and fraudulent pretenses,

16   representations, or promises;

17         Second, that the false or fraudulent statements and

18   representations concerned material facts;

19         Third, that the defendant knowingly and willfully

20   devised or participated in the scheme or artifice to defraud

21   with knowledge of its fraudulent nature and with specific

22   intent to defraud;

23         And, fourth, that the United States Mails were used in

24   furtherance of the scheme as specified in the information.

25         In order to prove the crime of wire fraud the

11

93CMMADP1

1  government must establish the following four essential

2  elements:

3          First, that at or about the time alleged in the

4  information there was a scheme or artifice to defraud in order

5  to obtain property or money by false and fraudulent pretenses,

6  representations, or promises;

7          . Second, that the false or fraudulent statements and

8  representations concerned material facts;

9          Third, that the defendant knowingly and willfully

10  devised or participated in the scheme or artifice to defraud

11  with knowledge of its fraudulent nature and with specific

12  intent to defraud

13          And, fourth, that interstate or foreign wire

14  facilities were used in furtherance of the scheme to defraud as

15  specified in the information.

16          In order to prove the crime of unlawful transportation

17  of funds or monetary instruments with the intent to promote the

18  carrying on of specified unlawful activity, in violation of

19  Section 1956(a)(2)(A), the government must establish beyond a

20  reasonable doubt each of the following elements:

21          First, that the defendant transported a monetary

22  instrument or funds from a place in the United States to or

23  through a place outside the United States, or to a place in the

24  United States from or through a place outside the United

25  States;

93CMMADP1

1          And, second, that the defendant did so with the intent

2     to promote the carrying on of specified unlawful activity.

3          In order to prove the crime of unlawful transportation

4     of funds or monetary instruments to conceal and disguise the

5     proceeds of specified unlawful activity, the government must

6     establish beyond a reasonable doubt each of the following:

7          First, that the defendant transported a monetary

8     instrument or funds from a place in the United States to or

9     through a place outside the United States, or to a place in the

10    United States from or through a place outside the United

11    States;

12         And, second, that the defendant did so with the

13    knowledge that the monetary instrument or funds involved

14    represent the proceeds of some form of unlawful activity;

15         And, third, that the defendant did so with knowledge

16    that the transportation was designed in whole or in part to

17    conceal or disguise the nature, location, source, ownership, or

18    control of the proceeds of securities fraud, mail fraud, wire

19    fraud, and theft from an employee benefit plan.

20         In order to prove the crime of engaging in monetary

21    transactions in property derived from specified unlawful

22    activity in violation of Section 1957, the government must

23    establish the following beyond a reasonable doubt:

24         First, that the defendant engaged or attempted to

25    engage in a monetary transaction in or affecting interstate

93CMMADP1

1    commerce;

2         Second, that the monetary transaction involved

3    criminally derived property of a value greater than $10,000;

4         Third, that the property was derived from specified

5    unlawful activity; in this case, from securities fraud, mail

6    fraud, wire fraud, or theft from a pension benefit plan;

7         Fourth, that the defendant acted knowingly; that is,

8    with knowledge that the transaction involved proceeds of a

9    criminal offense;

10        And, fifth, that the transaction took place in the

11   United States or that the defendant is a United States person.

12        In order to prove the crime of making false statements

13   to the SEC, in violation of 18 U.S.C. 1001, the government must

14   establish the following elements beyond a reasonable doubt:

15        First, that the defendant made a statement or

16   representation;

17        Second, that the statement or representation was

18   material;

19        Third, that the statement or representation was false,

20   fictitious or fraudulent;

21        Fourth, that the false, fictitious or fraudulent

22   statement was made knowingly or willfully;

23        And, fifth, that the statement or representation was

24   made in a matter within the jurisdiction of the government of

25   the United States.

93CMMADP1

1          To prove the crime of perjury the government must

2    prove beyond a reasonable doubt each of the following:

3          First, that the defendant took an oath to testify

4    truly before the Securities and Exchange Commission, a body

5    authorized by law to administer oaths;

6          Second, that the defendant made false statements as to

7    matters about which the defendant testified under oath as set

8    forth in the information;

9          Third, that the matters as to which it is charged that

10   the defendant made false statements were material to the issues

11   under inquiry by the Securities and Exchange Commission;

12         And, fourth, that such false statements were willfully

13   made.

14         To prove the offense of making a false filing with the

15   SEC the government must prove beyond a reasonable doubt each of

16   the following:

17         First, that the defendant was required to file an

18   application, report, or document with the SEC under the

19   Securities Exchange Act of 1934 and the rules and regulations

20   thereunder;

21         Second, that the application, report, or document

22   filed with the SEC contained false or misleading statements;

23         Third, that the false or misleading statements were

24   material;

25         And, fourth, that the defendant acted knowingly and

93CMMADP1

1   willfully.

2        To prove the offense of theft from an employee pension

3   benefit plan the government must prove beyond a reasonable

4   doubt the following elements:

5        First, that the defendant abstracted or converted to

6   his own use or the use of others the monies, funds, securities,

7   premiums, credits, property, or other assets of an employee

8   welfare benefit plan;

9        Second, that the funds abstracted or converted from --

10   excuse me, that the fund abstracted or converted from was an

11   employee welfare benefit plan within the meaning of the

12   statute;

13        And, third, that the defendant acted knowingly and

14   willfully.

15        THE COURT:  Thank you.

16        Mr. Madoff, would you rise again, please.

17        Mr. Madoff, do you understand that if you were to go

18   to trial the government would have to prove all of those

19   elements beyond a reasonable doubt?

20        THE DEFENDANT:  Yes, I do.

21        THE COURT:  Now I am going to review with you the

22   maximum possible penalties for the crimes in question.

23        Count One charging securities fraud carries a maximum

24   sentence of 20 years' imprisonment, a maximum fine of the

25   greatest of $5 million, or twice the gross gain or twice the

93CMMADP1

1    gross loss, a mandatory special assessment of $100, and a

2    maximum term of supervised release of three years.

3          In fact, each count carries a mandatory special

4    assessment of $100, so I am not going to repeat that for each

5    of the 11 counts.

6          Count Two charges investment adviser fraud.  It

7    carries a maximum sentence of five years' imprisonment, a

8    maximum fine of the greatest of $10,000, or twice the gross

9    gain or twice the gross loss, and a maximum term of supervised

10   release of three years.

11         Count Three, the mail fraud count, charges a maximum

12   sentence of 20 years' imprisonment, a maximum fine of the

13   greatest of $250,000, or twice the gross gain or twice the

14   gross loss, and a maximum term of supervised release of three

15   years.

16         In fact, all 11 counts carry the same maximum term of

17   supervised release of three years, so I won't repeat that

18   either.

19         I'm up to Count Four, the wire fraud count.  That

20   carries a maximum sentence of 20 years' imprisonment, a maximum

21   fine of the greatest of $250,000, or twice the gross gain or

22   twice the gross loss.

23         Count Five, the international money laundering count,

24   the first of those counts, carries a maximum sentence of 20

25   years' imprisonment, a maximum fine of the greatest of

93CMMADP1

1   $500,000, twice the value of the funds involved, or twice the

2   gross gain to any person or twice the pecuniary loss to any

3   person other than yourself.

4        Count Six, the second international money laundering

5   count, carries a maximum sentence of 20 years' imprisonment, a

6   maximum fine of the greatest of $500,000, or twice the value of

7   the funds involved or twice the gross gain or twice the

8   pecuniary loss.

9        Count Seven, a money laundering count, charges a

10  maximum sentence of ten years' imprisonment, a maximum fine of

11  the greatest of $250,000, or twice the gross gain or twice the

12  pecuniary loss.

13       Count Eight, which charges making false statements,

14  carries a maximum sentence of five years' imprisonment, a

15  maximum fine of $250,000, or twice the gross gain or twice the

16  pecuniary loss.

17       Count Nine charges perjury.  It carries a maximum

18  sentence of five years' imprisonment, a maximum fine of the

19  greatest of $250,000, or twice the gross gain or twice the

20  pecuniary loss.

21       Count Ten charges making a false filing with the SEC.

22  It carries a maximum sentence of 20 years' imprisonment, a

23  maximum fine of the greatest of $5 million, or twice the gross

24  gain or twice the pecuniary loss.

25       Finally, Count Eleven, which charges theft from an

93CMMADP1

1    employee benefit plan, carries a maximum sentence of five

2    years' imprisonment, a maximum fine of the greatest of

3    $250,000, or twice the gross gain or twice the pecuniary loss.

4            Do you understand that those are the possible maximum

5    sentences?

6            THE DEFENDANT:  Yes, I do.

7            THE COURT:  Now, taking all the counts together, do

8    you understand that the total maximum sentence of incarceration

9    that you face is 150 years' imprisonment?

10            THE DEFENDANT:  I do.

11            THE COURT:  In addition, do you understand that as

12    part of your sentence I can order restitution to any person or

13    entity injured as a result of your criminal conduct?

14            THE DEFENDANT:  Yes.

15            MR. LITT:  Your Honor, I would just note that

16    restitution is mandatory, not discretionary.

17            THE COURT:  I will order restitution if it's

18    mandatory.

19            You understand that?

20            THE DEFENDANT:  I do.

21            THE COURT:  I mentioned supervised release.  By that I

22    mean that you would be subject to monitoring when you were

23    released from prison under terms and conditions that could lead

24    to reimprisonment without a jury trial if you were to violate

25    them.  And if you were to violate the terms of your supervised

93CMMADP1

1    release you could be sent back to prison for the entire term of

2    your supervised release.

3         Do you understand that?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Are you a citizen of the United States?

6         THE DEFENDANT:  Yes, I am.

7         THE COURT:  Do you understand that as a result of your

8    guilty plea you may lose certain valuable civil rights, such as

9    the right to vote, the right to hold public office, the right

10   to serve on a jury, and the right to possess any kind of

11   firearm?

12        THE DEFENDANT:  Yes, I do.

13        THE COURT:  Now, have you talked to Mr. Sorkin about

14   the federal sentencing guidelines?

15        THE DEFENDANT:  Yes, I have.

16        THE COURT:  Do you understand that the guidelines are

17   now advisory only and that they are no longer mandatory?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Nonetheless, before I can sentence you I

20   still have to determine what your sentencing range is under the

21   guidelines.  I can't do that until after the probation

22   department prepares a presentence report and you, your lawyer,

23   and the government have had a chance to review the report and

24   to make any objections.

25        Do you understand that?

93CMMADP1

1            THE DEFENDANT:  Yes.

2            THE COURT:  And even after I decide what your

3    guideline range is, I still have the authority in appropriate

4    circumstances to impose a sentence that is above or below the

5    guideline range.

6            Do you understand that?

7            THE DEFENDANT:  I do.

8            THE COURT:  Do you understand that parole has been

9    abolished in the federal system and, thus, you would not be

10   released from prison any earlier on parole?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Do you understand that if your attorneys

13   or anyone else has attempted to predict what your sentence will

14   be that the prediction could be wrong?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And that is because no one, not your

17   attorney, not the government, can or should make any promises

18   to you as to what your sentence will be as your sentence cannot

19   be decided until after the presentence report is completed, I

20   have ruled on any objections, and I have decided whether there

21   is any basis to go above or below the guideline range.

22           Do you understand that?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Finally, do you understand that even if

25   your sentence turns out to be different from what your attorney

93CMMADP1

1   or anyone else has told you it might be, or even if your

2   sentence turns out to be different from what you expect, you

3   will still be bound to your guilty plea and you will not be

4   allowed to withdraw your plea of guilty?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that by pleading guilty

7   you may be giving up or waiving certain aspects of your right

8   to appeal?

9          THE DEFENDANT:  Yes.

10          THE COURT:  The government provided your lawyers with

11   a letter, dated March 10, 2009, which we call a Pimentel

12   letter?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Did you review that with your lawyers?

15          THE DEFENDANT:  I did.

16          THE COURT:  And that Pimentel letter explains that

17   your guideline sentence is 150 years.

18          Do you understand that?

19          THE DEFENDANT:  I do.

20          THE COURT:  That's the government's calculation.

21   That's the government's position and you and your lawyers will

22   have the opportunity to comment on that.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And do you understand also that this

93CMMADP1

1    calculation that's set forth in the government's letter is not

2    binding on the Court?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Has anyone offered you any inducements or

5    threatened you or forced you to plead guilty?

6            THE DEFENDANT:  No.

7            THE COURT:  Mr. Sorkin, do you know of any valid

8    defense that would prevail at trial, or do you know any reason

9    why your client should not be permitted to plead guilty?

10           THE DEFENDANT:  I do not, your Honor.

11           THE COURT:  Mr. Madoff, tell me what you did.

12           MR. SORKIN:  Your Honor, may I make one,

13   respectfully -- according to the Pimentel letter, we agree that

14   while the maximum statutory penalty in terms of imprisonment is

15   150 years, the guideline range -- and this can be found on page

16   6 of the Pimentel letter -- is life imprisonment.  The criminal

17   history category I yields a sentencing range of life

18   imprisonment.

19           THE COURT:  I understand.  But the government goes on

20   further to take the position that when a count does not permit

21   life, then you look at the statutory maximum.  That's the

22   government's position.

23           MR. SORKIN:  I just want to make sure Mr. Madoff

24   understood that.  Thank you, your Honor.

25           THE COURT:  Mr. Madoff, you understand that?

93CMMADP1

1         THE DEFENDANT:  Yes, I do.

2         THE COURT:  Technically, the guideline range is life,

3    but none of the counts in question carries a sentence that can

4    go up to life.  The top is 20 years.  According to the

5    government, in that circumstance then the guideline range is

6    the maximum and the government's position is that the guideline

7    range is 150 years.  Again, I don't know whether Mr. Sorkin

8    agrees or disagrees, but we will deal with that before

9    sentencing.

10         MR. SORKIN:  Thank you, your Honor.

11         THE COURT:  Mr. Madoff, would you tell me what you

12    did, please.

13         THE DEFENDANT:  Yes, your Honor.

14         Your Honor, for many years up until my arrest on

15    December 11, 2008, I operated a Ponzi scheme through the

16    investment advisory side of my business, Bernard L. Madoff

17    Securities LLC, which was located here in Manhattan, New York,

18    at 885 Third Avenue.  I am actually grateful for this

19    opportunity to publicly speak about my crimes, for which I am

20    so deeply sorry and ashamed.  As I engaged in my fraud, I knew

21    what I was doing wrong, indeed criminal.  When I began the

22    Ponzi scheme I believed it would end shortly and I would be

23    able to extricate myself and my clients from the scheme.

24    However, this proved difficult, and ultimately impossible, and

25    as the years went by I realized that my arrest and this day

93CMMADP1

1    would inevitably come.   I am painfully aware that I have deeply

2    hurt many, many people, including the members of my family, my

3    closest friends, business associates, and the thousands of

4    clients who gave me their money.   I cannot adequately express

5    how sorry I am for what I have done.   I am here today to accept

6    responsibility for my crimes by pleading guilty and, with this

7    plea allocution, explain the means by which I carried out and

8    concealed my fraud.

9         The essence of my scheme was that I represented to

10   clients and prospective clients who wished to open investment

11   advisory and individual trading accounts with me that I would

12   invest their money in shares of common stock, options, and

13   other securities of large well-known corporations, and upon

14   request, would return to them their profits and principal.

15   Those representations were false for many years.   Up until I

16   was arrested on December 11, 2008, I never invested these funds

17   in the securities, as I had promised.   Instead, those funds

18   were deposited in a bank account at Chase Manhattan Bank.   When

19   clients wished to receive the profits they believed they had

20   earned with me or to redeem their principal, I used the money

21   in the Chase Manhattan bank account that belonged to them or

22   other clients to pay the requested funds.   The victims of my

23   scheme included individuals, charitable organizations, trusts,

24   pension funds, and hedge funds.   Among other means, I obtained

25   their funds through interstate wire transfers they sent from

93CMMADP1

1   financial institutions located outside New York State to the

2   bank account of my investment advisory business, located in

3   Manhattan, New York, and through mailings delivered by the

4   United States Postal Service and private interstate carriers to

5   my firm here in Manhattan.

6        I want to emphasize today that while my investment

7   advisory business, the vehicle of my wrongdoing, was part of my

8   firm, Bernard L. Madoff Securities, the other businesses my

9   firm engaged in, proprietary trading and market making, were

10  legitimate, profitable, and successful in all respects.  Those

11  businesses were managed by my brother and two sons.

12       To the best of my recollection, my fraud began in the

13  early 1990s.  At that time, the country was in a recession and

14  this posed a problem for investments in the securities markets.

15  Nevertheless, I had received investment commitments from

16  certain institutional clients and understood that those

17  clients, like all professional investors, expected to see their

18  investments out-perform the market.  While I never promised a

19  specific rate of return to my client, I felt compelled to

20  satisfy my clients' expectations, at any cost.  I therefore

21  claimed that I employed an investment strategy I had developed,

22  called the split strike conversion strategy, to falsely give

23  the appearance to clients that I had achieved the results I

24  believed they expected.

25       Through the split strike conversion strategy I

93CMMADP1

1    promised to clients and prospective clients that client funds

2    would be invested in a basket of common stocks within the

3    Standard & Poors 100 index, a collection of the 100 largest

4    publicly-traded companies in terms of their market

5    capitalization.  I promised that I would select a basket of

6    stocks that would closely mimic the price movements of the

7    Standard & Poors 100 index.  I promised that I would

8    opportunistically time those purchases and would be out of the

9    market intermittently, investing client funds during these

10   periods in United States Government-issued securities, such as

11   United States Treasury bills.  In addition, I promised that as

12   part of the split strike conversion strategy, I would hedge the

13   investments I made in the basket of common stocks by using

14   client funds to buy and sell option contracts related to those

15   stocks, thereby limiting potential client losses caused by

16   unpredictable changes in stock prices.  In fact, I never made

17   those investments I promised clients, who believed they were

18   invested with me in the split strike conversion strategy.

19        To conceal my fraud, I misrepresented to clients,

20   employees, and others that I purchased securities for clients

21   in overseas markets.  Indeed, when the United States Securities

22   and Exchange Commission asked me to testify as part of an

23   investigation they were conducting about my investment advisory

24   business, I knowingly gave false testimony under oath to the

25   staff of the SEC on May 19, 2006 that I executed trades of

27

93CMMADP1

1    common stock on behalf of my investment advisory clients and

2    that I purchased and sold the equities that were part of my

3    investment strategy in European markets.  In that session with

4    the SEC, which took place here in Manhattan, New York, I also

5    knowingly gave false testimony under oath that I had executed

6    options contracts on behalf of my investment advisory clients

7    and that my firm had custody of the assets managed on behalf of

8    my investment advisory clients.

9            To further cover up the fact that I had not executed

10   trades on behalf of my investment advisory clients, I knowingly

11   caused false trading confirmations and client account

12   statements that reflected the bogus transactions and positions

13   to be created and sent to clients purportedly involved in the

14   split strike conversion strategy, as well as other individual

15   clients I defrauded who believed they had invested in

16   securities through me.  The clients receiving trade

17   confirmations and account statements had no way of knowing by

18   reviewing these documents that I had never engaged in

19   transactions represented on the statements and confirmations.

20   I knew those false statements and account statements would be

21   and were sent to clients through the U.S. Mails from my office

22   here in Manhattan.

23           Another way that I concealed my fraud was through the

24   filing of false and misleading certified annual reports and

25   financial statements -- excuse me.  Another way that I

93CMMADP1

 1   concealed my fraud was through the filing of false and

 2   misleading certified audit reports and financial statements

 3   with the SEC.  I knew that these audit reports and financial

 4   statements were false and that they would also be sent to

 5   clients.  These reports, which were prepared here in the

 6   Southern District of New York, among other things, falsely

 7   reflected my firm's liabilities as a result of my intentional

 8   failure to purchase securities on behalf of my advisory

 9   clients.

10           Similarly, when I recently caused my firm in 2006 to

11   register as an investment adviser with the SEC, I subsequently

12   filed with the SEC a document called the form ADV uniform

13   application for investment adviser registration.  On this form

14   I intentionally and falsely certified under penalty of perjury

15   that Bernard L. Madoff Investment Securities had custody of my

16   advisory clients' securities.  That was not true, and I knew it

17   when I completed and filed the form with the SEC, which I did

18   from my office on the 17th floor of 885 Third Avenue, here in

19   Manhattan.

20           In more recent years, I used yet another method to

21   conceal my fraud.  I wired money between the United States and

22   the United Kingdom to make it appear as though there were

23   actual securities transactions executed on behalf of my

24   investment advisory clients.  Specifically, I had money

25   transferred from the U.S. bank account of my investment

93CMMADP1

1   advisory business to the London bank account of Madoff

2   Securities International Limited, a United Kingdom corporation

3   that was an affiliate of my business in New York.  Madoff

4   Securities International Limited was principally engaged in

5   proprietary trading and was a legitimate, honestly run and

6   operated business.  Nevertheless, to support my false statement

7   that I purchased and sold securities for my investment advisory

8   clients in European markets, I caused money from the bank

9   account of my fraudulent advisory business, located here in

10  Manhattan, to be wire transferred to the London bank account of

11  Madoff Securities International Limited.

12        There were also times in recent years when I had

13  money, which had originated in the New York Chase Manhattan

14  bank account of my investment advisory business, transferred

15  from the London bank account of Madoff Securities International

16  Limited to the Bank of New York operating bank account of my

17  firm's legitimate proprietary and market making business.  That

18  Bank of New York account was located in New York.  I did this

19  as a way of ensuring that the expenses associated with the

20  operation of the fraudulent investment advisory business would

21  not be paid from the operations of the legitimate proprietary

22  trading and market making businesses.

23        In connection with the purported trades, I caused the

24  fraudulent investment advisory side of my business to charge

25  the investment advisory clients four cents per share as a

93CMMADP1

1    commission.  At times in the last few years, these commissions

2    were transferred from Chase Manhattan bank account of the

3    fraudulent investment advisory side of my firm to the account

4    at Bank of New York, which was the operating account for the

5    legitimate side of Bernard L. Madoff Investment Securities, the

6    proprietary trading and market making side of my firm.  I did

7    this to ensure that the expenses associated with the operation

8    of my fraudulent investment advisory business would not be paid

9    from the operations of the legitimate proprietary trading and

10   market making business.  It is my belief that the salaries and

11   bonuses of the personnel involved in the operation of the

12   legitimate side of Bernard L. Madoff Investment Securities were

13   funded by the operations of the firm's successful proprietary

14   trading and market making businesses.

15          Your Honor, I hope I have conveyed with some

16   particularity in my own words the crimes I committed and the

17   means by which I committed them.  Thank you, your Honor.

18          THE COURT:  Thank you, Mr. Madoff.

19          Mr. Sorkin, I don't think there was mention of an

20   employee benefit plan.

21          MR. SORKIN:  The pension fund was mentioned, your

22   Honor.

23          THE COURT:  What page that?

24          MR. SORKIN:  I think it's page 2.  If you look at the

25   top, the victim -- I'm quoting -- the victims of my scheme

93CMMADP1

1  included individuals, charitable organizations, trusts, pension

2  funds, and hedge funds.

3         THE COURT:  I see.

4         And those pension funds include employee welfare

5  benefit plans?

6         MR. SORKIN:  Yes, your Honor.

7         Is that correct?

8         THE DEFENDANT:  Yes.

9         THE COURT:  Mr. Madoff, you can be seated for a

10 moment.

11        Does the government believe that Mr. Madoff's

12 admissions cover the elements of the crimes of each count?

13        MR. LITT:  Yes, your Honor.  The government does not

14 entirely agree with all of the defendant's description of his

15 conduct.  However, the government does believe that his

16 allocution does cover each of the elements of the charged

17 offenses.

18        THE COURT:  Would you summarize what the government's

19 evidence would be if the defendant were to go to trial?

20        MR. LITT:  Yes.

21        Had this case proceeded to trial, the government would

22 have proven through testimony and evidence beyond a reasonable

23 doubt all of the facts set forth in the criminal information.

24        In summary, the government would have proven the

25 following:  The defendant operated a massive Ponzi scheme

93CMMADP1

1   through his company, Bernard L. Madoff Investment Securities,

2   beginning at least as early as the 1980s.  Over the decades

3   working from his New York City office and elsewhere, Madoff

4   solicited and caused others to solicit prospective clients to

5   open accounts with his company.  His clients included

6   individuals, charitable organizations, trusts, pension funds,

7   and hedge funds, among others, and those clients were also his

8   victims.

9        Madoff told those clients that he would invest their

10  funds in publicly-traded securities, options, and treasury

11  bills.  In fact, over the life of his scheme Madoff did not buy

12  stocks or options as he had promised.  Instead, Madoff used

13  client funds to pay other clients who sought to redeem their

14  investments, and used so-called commission revenue generated by

15  charging clients four cents per share for shares that he never,

16  in fact, purchased to generate revenue for his firm.  At times,

17  his firm would have been unable to operate but for the cash

18  generated from this Ponzi scheme.  Madoff repeatedly lied to

19  clients in person, on telephone calls, and through mailings,

20  including account statements and confirmations of purchases and

21  sales of securities that he mailed through the U.S. Postal

22  Service.

23       Some investors sent checks to Madoff through the

24  mails, others wired money to Madoff, and many of those wires

25  came from outside New York State into the Southern District of

93CMMADP1

1   New York.  Madoff also caused hundreds of millions of dollars

2   of client funds to be wired overseas to accounts in London.

3   Some of that money was sent back to his firm and used to pay

4   its expenses.  Other money was sent back and forth between New

5   York and London to give the false impression that he was

6   actually buying and selling securities in European markets

7   when, in fact, he was not.

8         Madoff also used some of the money funneled through

9   London to support his lavish lifestyle.  Madoff also used other

10  means of deception to hide his scheme.  He lied when he told

11  clients that he was purchasing securities on their behalf.

12        He also lied to regulators, including the SEC.  He

13  filed false and fraudulent certified financial statements with

14  the SEC that failed to disclose his fraud scheme, failed to

15  disclose his liabilities to the victims of his Ponzi scheme,

16  and contained false certifications that the audited statements

17  had been prepared in accordance with generally-accepted

18  auditing standards and principles.

19        Mr. Madoff lied in a form that he was required to file

20  with the SEC as an investment adviser, claiming that his

21  company had custody of client securities when, in fact, he had

22  not purchased any securities for those clients.

23        He also lied at least seven separate times in an SEC

24  deposition in 2006.

25        At the end, Madoff told his clients that he was

93CMMADP1

1    holding nearly $65 billion in securities on behalf of those

2    clients.  In fact, he had only a small fraction of that amount.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93CGMADP2

1          THE COURT:  Thank you.  Mr. Madoff, please stand.

2          When you did the things you told me you did in your

3   statement, did you know that what you were doing was wrong and

4   illegal?

5          THE DEFENDANT:  Yes, I did, your Honor.

6          THE COURT:  How do you now plead to Count One of the

7   information, guilty or not guilty?

8          THE DEFENDANT:  Guilty.

9          THE COURT:  How do you now plead to Count Two of the

10  information, guilty or not guilty?

11         THE DEFENDANT:  Guilty.

12         THE COURT:  How do you now plead to Count Three,

13  guilty or not guilty?

14         THE DEFENDANT:  Guilty.

15         THE COURT:  How do you now plead to Count Four, guilty

16  or not guilty?

17         THE DEFENDANT:  Guilty.

18         THE COURT:  How do you now plead to Count Five, guilty

19  or not guilty?

20         THE DEFENDANT:  Guilty.

21         THE COURT:  How do you now plead to Count Six, guilty

22  or not guilty?

23         THE DEFENDANT:  Guilty.

24         THE COURT:  How do you now plead to Count Seven,

25  guilty or not guilty?

93CGMADP2

1          THE DEFENDANT:  Guilty.

2          THE COURT:  How do you plead to Count Eight, guilty or

3    not guilty?

4          THE DEFENDANT:  Guilty.

5          THE COURT:  How do you plead to Count Nine, guilty or

6    not guilty?

7          THE DEFENDANT:  Guilty.

8          THE COURT:  How do you now plead to Count Ten, guilty

9    or not guilty?

10         THE DEFENDANT:  Guilty.

11         THE COURT:  And finally, how do you now plead to Count

12   Eleven, guilty or not guilty?

13         THE DEFENDANT:  Guilty, your Honor.

14         THE COURT:  Did you do the things that you are charged

15   with doing in all 11 counts of the information?

16         THE DEFENDANT:  Yes, I did, your Honor.

17         THE COURT:  And are you pleading guilty because you

18   are guilty?

19         THE DEFENDANT:  Yes, I am.

20         THE COURT:  Are you pleading guilty voluntarily and of

21   your own free will?

22         THE DEFENDANT:  Yes, I am.

23         THE COURT:  All right.  Mr. Madoff, you may be seated.

24         Based on what I have heard, I am inclined to accept

25   Mr. Madoff's guilty plea.

93CGMADP2

1      As I stated the other day, the government received a

2   number of e-mails from victims objecting to any plea bargain or

3   any plea deal.  As it is clear that there is no plea bargain or

4   plea deal, there is no basis for these objections.  At this

5   time, nonetheless, if there is any victim who signed our

6   sign-in sheet who wishes to be heard on the question of whether

7   I should accept Mr. Madoff's guilty plea, you can have a chance

8   to speak now.  We have a list.

9      Mr. Nierenberg, do you want to speak?

10      MR. NIERENBERG:  Yes.

11      THE COURT:  All right, sir.  Come to the microphone.

12   And remember that today is not the sentencing.  Victims will

13   have a chance to speak at sentencing.  Go ahead.

14      MR. NIERENBERG:  I am one of the many victims of

15   Madoff's egregious crimes.  I don't know whether you had a

16   chance to turn around and look at the victims --

17      THE COURT:  Mr. Nierenberg, Mr. Nierenberg --

18      MR. NIERENBERG:  I just wanted to --

19      THE COURT:  Remain at the podium, please.

20      MR. NIERENBERG:  All right.  I know that the

21   operation -- Madoff's operation was massive, that he didn't

22   commit these crimes alone, and I don't understand why

23   conspiracy is not a part of one of his pleas.  Just to produce

24   the reams of documents that were received and the elaborate

25   data that went into them must have required an army of people

93CGMADP2

1   to produce.  And we all know that Madoff wasn't around a lot at

2   his operation.  There were other people that were there who

3   handled it when he was gone.  I --

4           THE COURT:  I gather your point is that I should

5   reject the plea because the government has not charged

6   conspiracy?

7           MR. NIERENBERG:  No.  The question is -- I'm not

8   suggesting that you reject the plea.  What I'm suggesting is

9   that there's an additional crime that was committed that wasn't

10  included in the plea that needs to be considered.

11          THE COURT:  All right.  What I want to hear from now

12  are victims who object to my accepting the plea.

13          MR. NIERENBERG:  Okay.

14          THE COURT:  Do you object to my accepting the plea?

15          MR. NIERENBERG:  No, I don't.

16          THE COURT:  Well, thank you, then.  You can have your

17  seat.

18          MR. NIERENBERG:  Okay.

19          THE COURT:  Mark Labianca?  No.

20          Brian Felsen?  Mr. Felsen, do you want to be heard?

21          MR. FELSEN:  I would like to be heard, but I do not

22  object to the plea.

23          THE COURT:  All right.  If you want to be heard with

24  respect to sentencing, we will make sure we have procedures to

25  give victims an opportunity to be heard at sentencing.

93CGMADP2

1        MR. FELSEN:  Okay.

2        THE COURT:  All right.  Thank you.

3        Bennett Goldwait?  I can't quite read the handwriting.

4        MR. GOLDWORTH:  Goldworth.  No thank you.

5        THE COURT:  Ronnie Sue and Dominic Ambrosino, do you

6   wish to be heard?

7        MS. AMBROSINO:  Yes, I do.

8        THE COURT:  All right.  Come forward, please.  And say

9   your name again when you get to the microphone.

10       MS. AMBROSINO:  My name is Ronnie Sue Ambrosino, and I

11   would object to the plea -- I just need to find a spot.  I have

12   taken a lot of notes.  Judge, I believe that you have the

13   opportunity today to find out information as to where the money

14   is and to find out who else may be involved in this crime.  And

15   if that plea is accepted without those two pieces of

16   information, then I do object.  If you can ascertain that you

17   can get those two pieces of information, I would love to see

18   this man, who admits that he lied under oath in May of 2006 and

19   sat here and took an oath today -- I would like to see him

20   guilty.

21       THE COURT:  All right.  Thank you.

22       MS. AMBROSINO:  Thank you, sir.

23       THE COURT:  Maureen Aebel?  Go ahead.

24       MS. AEBEL:  Judge Chin, I would like to present you

25   with a different scenario that our country could witness if you

93CGMADP2

1   reject Mr. Madoff's plea.  If we go to trial, we will show our

2   people in this struggling country and the world, who looks to

3   us as the global moral leader, that we hold all people

4   accountable.  If we go to trial, we can show all our world that

5   all crimes, all crimes, including crimes of greed, can be

6   dissected, ruled upon, and punished.  And we can demonstrate

7   that we are a country that can learn from our mistakes, and we

8   will be then able to reexamine and improve the mechanisms that

9   exist for our protection that have failed so completely.  If we

10  go to trial, we have more a chance to comprehend the global

11  scope of this horrendous crime.  At trial we can hear and bear

12  witness to the pain that Mr. Madoff has inflicted on the young,

13  the old, and the infirmed.  No man, no matter who he knows or

14  who he is able to influence, is above the law.  Thank you,

15  Judge Chin.

16          THE COURT:  Thank you.  All right.  That is it with

17  respect to the victims who signed up on the acceptance of the

18  plea.  Does the government or the defense want to respond to

19  anything?  Does the government want to respond to anything?

20          MR. LITT:  May I just have a moment?

21          THE COURT:  Yes.

22          MR. LITT:  I think the only thing the government would

23  say is that the government's investigation continues.  It is

24  continuing.  A lot of resources and effort are being expended,

25  both to find assets and to find anyone else who may be

93CGMADP2

1   responsible for this fraud.

2              THE COURT:  Thank you.  Mr. Sorkin?

3              MR. SORKIN:  Nothing at this time, your Honor.  Thank

4   you.

5              THE COURT:  First of all, I appreciate the comments

6   from the victims.  With respect to Ms. Ambrosino's comments

7   about where the money is, as the government has just said, it

8   is continuing its investigation, and this guilty plea certainly

9   does not preclude the government from proceeding.

10             With respect to Ms. Aebel's comment about how a trial

11  would show the world that we hold all people accountable, I

12  believe that these proceedings will do the same thing.

13             Mr. Madoff, please stand.  I am accepting the plea.

14  Mr. Madoff, because you acknowledge that you are guilty as

15  charged in Counts One through Eleven of the information,

16  because you know your rights and are waiving them, because your

17  plea is entered knowingly and voluntarily and is supported by

18  an independent basis in fact for each of the elements of the 11

19  offenses, I accept your guilty plea and adjudge you guilty on

20  Counts One through Eleven of the information.  You can be

21  seated.

22             Mr. Madoff, the probation department will prepare a

23  presentence report to assist me in sentencing you.  You will be

24  interviewed by the probation department, and it is important

25  that you give the probation officer truthful and accurate

93CGMADP2

1   information, for the report is important in my decision as to

2   what your sentence will be.  You and your attorney have a right

3   and will have an opportunity to review the report, to challenge

4   or comment upon it and to speak on your behalf before

5   sentencing.

6        Sentencing is set for June 16th at 1:30 p.m.

7        Turning to bail, is the government requesting that I

8   remand Mr. Madoff pending sentencing?

9        MR. LITT:  Yes.  The government moves for remand at

10  this time pursuant to 18 USC 3143, which puts the burden on the

11  defendant to show by clear and convincing evidence that he can

12  be trusted to appear for future court appearances.

13       The defendant has now pled guilty and been found

14  guilty of 11 -- or does the Court wish to hear argument now

15  or --

16       THE COURT:  Well, let me ask Mr. Sorkin whether he

17  opposes remand.

18       MR. SORKIN:  We do, your Honor, and I'd like to be

19  heard on that point.

20       THE COURT:  Let me hear from Mr. Sorkin.

21       MR. SORKIN:  Thank you, your Honor.  May I go to the

22  podium, your Honor?

23       THE COURT:  Yes, wherever you would like.

24       MR. SORKIN:  Thank you.  Thank you, your Honor.  Your

25  Honor, let me take just a little bit of while, because I want

43

93CGMADP2

1   to review the history of the bail as it related to this case.

2          THE COURT:  Yes.  The government provided me with the

3   transcripts and the letter briefs, and I've reviewed them too.

4          MR. SORKIN:  I'm not going to go through every one of

5   them, but I think it's important that I list the chronology and

6   how we got to this point today.

7          THE COURT:  That's fine.  That's fine.

8          MR. SORKIN:  Your Honor, this case started when

9   Mr. Madoff on December 10th confessed his wrongdoing to his two

10  sons, knowing full well that his two sons were going to turn

11  him in.  He didn't run.  He didn't attempt to flee at that

12  time.  When he was arrested by the FBI the next morning, he

13  confessed to the FBI.

14         He appeared on December 11th before Magistrate Judge

15  Eaton, and a personal recognizance bond of ten million dollars

16  was signed by Mr. Madoff and his wife.  There were three

17  additional cosigners that were required, and it was secured by

18  Mr. Madoff's residence in Manhattan.  Surrender of Mr. Madoff's

19  travel documents took place, and his travel was restricted to

20  the Southern and Eastern Districts of New York and the District

21  of Connecticut.

22         The Pretrial Services at the time, your Honor, did not

23  recommend in its initial recommendation that Mr. Madoff be

24  remanded, and I add additionally that the government had no

25  difference and no objection with any of the conditions that

93CGMADP2

1   were imposed on December 11th.  That was before Magistrate

2   Judge Eaton.

3          On December 17th, your Honor, before another

4   magistrate judge, Magistrate Judge Gorenstein, Mr. Madoff --

5   and it was ratcheted up -- was placed on home detention in his

6   apartment with electronic ankle bracelet monitoring.  He was

7   permitted to travel only to his attorney's offices and to the

8   court.  A curfew of 7:00 p.m. through 9:00 a.m. was imposed,

9   and this was done in addition to the entry of confession of

10  judgments with respect to his wife's properties on Montauk, New

11  York, and Palm Beach, Florida, a surrender of Mrs. Madoff's

12  passport and a reduction of the number of cosigners on the bond

13  from four to two.  This, too, your Honor, was consented to by

14  the government.  Indeed, I believe it was done by stipulation

15  without argument before Magistrate Judge Gorenstein.

16         On December 19th, again, on consent of the government,

17  a ten million dollar personal recognizance bond was signed by

18  Mr. Madoff, his wife, and his brother, secured by confessions

19  of judgment on his wife's properties in Montauk, in New York,

20  and Palm Beach.  The passports of both Mrs. Madoff had already

21  been surrendered, and other than scheduled court appearances,

22  Mr. Madoff was confined to his home 24 hours a day.  He was no

23  longer permitted to visit his counsel.  And they had, in

24  addition to the 24-hour-a-day confinement, an electronic

25  monitoring device, which is still attached to his ankle.

93CGMADP2

1          At his wife's own expense --

2          THE COURT:  Would the audience please remain quiet.

3    Go ahead.

4          MR. SORKIN:  Because Mr. Madoff's assets were all

5    frozen, but his wife's were not, although she later voluntarily

6    committed to a freeze of her assets under certain restrictions.

7    So with the government's consent, Mrs. Madoff's own assets,

8    which were not frozen by Judge Stanton or any judge in this

9    court -- she agreed to pay a security firm acceptable to the

10   government to provide the following services to prevent harm or

11   flight.

12         And with these unfrozen assets, not objected to by the

13   government, Mr. Madoff has round-the-clock monitoring at his

14   building 24 hours a day, including video monitoring of all of

15   his apartment, doors, communications devices, and services

16   permitting security to send a direct signal from an observation

17   post to the FBI in the event of even the suspicion of harm or

18   flight.  This is known as a panic button.  There are additional

19   guards available on request, if necessary, to prevent flight or

20   harm, both inflicted by Mr. Madoff -- I'm dealing with the

21   danger to the community issue -- and also harm to Mr. Madoff.

22         On January 12th, your Honor -- and again, this was by

23   consent of the government.  On January 12th, Magistrate Judge

24   Ronald Ellis imposed additional restrictions.  This was

25   briefed, as your Honor well knows.  It was argued by Magistrate

93CGMADP2

1   Judge Ellis.  And on that date, Magistrate Judge Ellis

2   incorporated the restrictions set forth in the order of Judge

3   Stanton, who has jurisdiction over the SEC matter, including

4   restrictions on the transfer of all property whatsoever

5   wherever located in the possession or under the control of

6   Mr. Madoff.  And that was part of the SEC consent under the TRO

7   and also the consent under the preliminary injunction, which

8   Mr. Madoff consented to.  Magistrate Judge Ellis incorporated

9   these restrictions to a voluntary restraint agreement, which

10  the government agreed to, involving Mrs. Madoff's assets and

11  restricted the transfer of all assets owned by her voluntarily,

12  your Honor.

13       Additionally, Magistrate Judge Ellis directed the

14  compilation of an inventory of all valuable portable items in

15  the Manhattan home, which is to be checked once every two weeks

16  by government-approved security, who are also required to

17  inspect all outgoing mail.

18       The government appealed Magistrate Judge Ellis'

19  ruling, and before District Judge Lawrence McKenna on January

20  16th, 2009, argument was held.  The matter was briefed, and

21  Judge McKenna added additional conditions:  One, a compilation

22  of any inventory of all valuable portable items in the homes in

23  Montauk, Palm Beach, as well as any property owned by

24  Mrs. Madoff in a small residence in France.

25       I quote, which your Honor, I'm sure, has read, from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93CGMADP2

1   Judge McKenna's statement in court after hearing argument and

2   seeing papers, that, quote -- and this is from Judge McKenna --

3   I think the chances of Mr. Madoff fleeing at this point are as

4   close to nil as you can get in any bail package, period,

5   unquote.

6           Now, nothing has changed, your Honor, and I agree it

7   has changed substantially in terms of the plea.  And I agree

8   with Mr. Litt that the burden is upon us to show by clear and

9   convincing evidence that Mr. Madoff is neither a flight risk

10  nor a risk to the community.

11          As far as we are aware, your Honor, Pretrial Services

12  has not found that Mr. Madoff has been negligent or careless in

13  complying with all of the bail conditions.  There has been no

14  incident at all, as far as we are aware, that has been conveyed

15  to us by Pretrial or the government that Mr. Madoff has

16  attempted at any time to flee or certainly, which the

17  government conceded before Magistrate Judge Ellis and Judge

18  McKenna, posed any risk of harm.  The argument before Judge

19  Ellis and Judge McKenna was the risk of harm was in the

20  financial world, that he would dissipate assets.  That was

21  taken care of, your Honor, respectfully, by Magistrate Judge

22  Ellis and by Judge McKenna.  All mail going out, all packages

23  going out are inspected by the security firm approved by the

24  government.

25          I respectfully submit, your Honor, that the change has

93CGMADP2

1    been the media attention and the increased and, in many cases,

2    justifiable anger by people who claim they lost money, but the

3    Bail Reform Act doesn't deal with those two issues.  I do not

4    believe, your Honor, that the precedent set in this court where

5    such individuals as Rigas in the Adelphia case, Ebbers in the

6    WorldCom case, Messrs. Skilling and Lay -- Mr. Lay passed away

7    before sentencing -- all of whom were facing substantial years

8    in prison, Rigas and Ebbers in this court, Mr. Skilling in

9    Texas.  All were released on bail pending sentence.  All went

10   to trial but did not plead guilty, and all, your Honor, as far

11   as I am aware, never once confessed at the get-go to the

12   wrongdoing that you heard Mr. Madoff confess to today.

13        So I would respectfully submit, your Honor, that there

14   is no chance that Mr. Madoff will certainly be a risk to the

15   community, a danger to the community.  And his risk of

16   flight -- and I agree with Judge McKenna -- is virtually nil

17   with all of the restrictions that have been imposed on him.  So

18   I respectfully request that his bail be continued.

19        I would also add, your Honor -- again, I refer to the

20   Bail Reform Act as not being relevant on those two other

21   issues.  What is also relevant, your Honor, is that Mr. Madoff

22   is going to have the opportunity, I am sure, if the government

23   and the defense can come to some agreement, to review literally

24   thousands of thousands of documents which the trustee and the

25   government have been reviewing to discover where this

93CGMADP2

1    forfeiture number comes from.  And we've been able to

2    communicate with him in his apartment, and I think that is a

3    factor that your Honor should consider, even though that is not

4    my argument with respect to the Bail Reform Act.  I think we

5    have met all the conditions under the act.

6              So by clear and convincing evidence, I don't think he

7    is a risk of either danger to the community, flight, and I

8    would respectfully request that his bail be continued.  Thank

9    you, your Honor.

10             THE COURT:  I don't need to hear from the government.

11   It is my intention to remand Mr. Madoff.

12             Please, ladies and gentlemen, please.

13             Now, I have a number of people who signed in who

14   wanted to be heard on the issue of bail, and I think you should

15   only be heard if you object to remand.

16             Adriane Biondo?  Mr. Ross?  Helen Chaitman?

17             MS. CHAITMAN:  No objection.

18             THE COURT:  Donald Schupak?

19             MR. SCHUPAK:  I do not object.

20             THE COURT:  Mark Labianca?

21             MR. LABIANCA:  I do not object.

22             THE COURT:  Sharon Lissauer?

23             As Mr. Madoff has pled guilty, he is no longer

24   entitled to the presumption of innocence.  The exposure is

25   great, 150 years in prison.  In light of Mr. Madoff's age, he

93CGMADP2

1    has an incentive to flee, he has the means to flee, and thus,

2    he presents a risk of flight.  Bail is revoked, and the

3    defendant is remanded.

4         MR. SORKIN:  Your Honor, would your Honor consider,

5    respectfully, a stay so that we might appeal your Honor's bail

6    decision?  We intend to do it expeditiously.

7         THE COURT:  The request for a stay is denied.

8         MR. SORKIN:  Thank you.

9         THE COURT:  Sentencing, as I said, is set for June

10   16th, 1:30 p.m.  Some of the victims may wonder why do we need

11   so much time.  Well, the probation department has to prepare a

12   presentence report.  By law, the defendant is entitled to 35

13   days to review the presentence report before sentencing.  We

14   also have to give the parties an opportunity to submit written

15   materials.

16        Mr. Madoff, I will see you at sentencing.  We are

17   adjourned.

18                          oOo

19

20

21

22

23

24

25

# EXHIBIT F

1

96TJMADF                        Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - - - - - - - - - - - -x

3    UNITED STATES OF AMERICA,

4              v.                          09 CR 213 (DC)

5    BERNARD L. MADOFF,

6                   Defendant.

7    - - - - - - - - - - - - - - - - - - - - - - - - -x

                                          New York, N.Y.
8                                         June 29, 2009
                                          10:00 a.m.
9

10

     Before:
11
                         HON. DENNY CHIN,
12
                                       District Judge
13

14                           APPEARANCES

15   LEV L. DASSIN
          Acting United States Attorney for the
16        Southern District of New York
     MARC O. LITT
17   LISA A. BARONI
     BARBARA A. WARD
18        Assistant United States Attorneys

19   DICKSTEIN SHAPIRO LLP
          Attorneys for Defendant
20   IRA LEE SORKIN
     DANIEL J. HORWITZ
21   MAURO M. WOLFE
     NICOLE P. DE BELLO
22

23   ALSO PRESENT:  KEITH D. KELLY, FBI
                    JULIA SCHULTE HANISH, USDOJ, FBI
24

25

2

96TJMADF                           Sentence

1                (In open court)

2                (Case called)

3                THE COURT:  Please be seated.  Good morning.  Mr.

4     Madoff, would you please stand.

5                Mr. Madoff, you pled guilty on March 12th, 2009 to 11

6     counts of securities fraud, investment advisor fraud, wire and

7     mail fraud, money laundering, making false statements, perjury,

8     filing false documents with the SEC and theft from employee

9     benefit funds  You are here this morning to be sentenced for

10    those crimes.

11               Have you reviewed the presentence report?

12               THE DEFENDANT:  Yes, I have, your Honor.

13               THE COURT:  Did you discuss it with your lawyers?

14               THE DEFENDANT:  I have.

15               THE COURT:  Mr. Sorkin, have you reviewed the

16    presentence report and discussed it with your client?

17               MR. SORKIN:  Yes, your Honor, we have.

18               THE COURT:  Do you or your client have any objections

19    to the factual recitations or the guidelines calculation?

20               MR. SORKIN:  We do not, your Honor.

21               THE COURT:  Thank you.  You can be seated.

22               Ms. Baroni, does the government have any objections to

23    the presentence report?

24               MS. BARONI:  No, your Honor.

25               THE COURT:  Thank you.

96TJMADF                        Sentence

1          I accept and adopt the factual recitations set forth

2     in the presentence report.  I accept and adopt the guidelines

3     calculation set forth in the presentence report with one

4     clarification which I will discuss in a moment.

5          The total offense level is 52, the criminal history

6     category is I.  The PSR concludes that the guideline range is

7     life imprisonment.  That is not quite accurate, however,

8     because the guidelines range cannot be life imprisonment as no

9     count carries the possibility of a life sentence.  Rather the

10    most serious counts carry a maximum of 20 years' imprisonment.

11         I look then to Section 5G1.2(d) of the guidelines,

12    which tells us that where there are multiple counts, and the

13    guideline range exceeds the statutory maximum for the most

14    serious count, the court must impose consecutive terms of

15    imprisonment to the extent necessary to achieve the total

16    punishment.

17         There is a little bit of ambiguity, however, as to

18    what is meant by "total punishment" where the guideline

19    calculation calls for life imprisonment, but Second Circuit

20    case law makes clear that in such a situation, the district

21    court is to stack or add up the maximum sentences for all the

22    counts.

23         In United States v. Evans, for example, 352 F.3d 65,

24    where the guideline calculation called for life imprisonment

25    but no count carried a life sentence, the court held that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96TJMADF                    Sentence

1    guideline range is 240 years, the maximum sentences for all the

2    counts added together.

3           Accordingly, here the guideline range is not life

4    imprisonment, but 150 years, the maximum sentences for each of

5    the 11 counts added together.  Of course, in light of Booker

6    and the case law that followed, the guideline range is advisory

7    only.  While I must give the guideline range fair and

8    respectful consideration, I am not bound by it.  In fact, the

9    Probation Department recommends a sentence of 50 years.

10   Instead I must make an individualized assessment based on all

11   the facts and circumstances, including the factors set forth in

12   the statute.  In the end, I must impose a sentence that is

13   reasonable.

14          We will proceed as follows:

15          First we will hear from the victims.  Then Mr. Sorkin

16   will speak on behalf of Mr. Madoff.  Next Mr. Madoff may speak

17   if he wishes.  Finally, I will hear from the government.

18          First the victims.  I have received several hundred

19   written statements from victims including the e-mails and

20   letters submitted back in March.  Every victim who made a

21   timely request to speak will be permitted to speak today except

22   in two instances.  Two members of the same family asked to

23   speak, and we will permit one person to speak on behalf of the

24   family.  Two victims have now withdrawn their request.

25   Accordingly, we will hear from 9 victims today.

5

96TJMADF                    Sentence

1          First we will hear from Mr. and Mrs. Ambrosino.  The

2    Ambrosinos can step up to the microphone.  Go ahead.

3    Mr. Ambrosino, go ahead.  Come up to the microphone so everyone

4    can hear you.

5          MR. AMBROSINO:  Thank you, your Honor.  My name is

6    Dominic Ambrosino and my --

7          THE COURT:  Sir, just keep your voice up.

8          MR. AMBROSINO:  I thank the court for allowing me to

9    speak today.  As a retired New York City Correction Officer, I

10   am very familiar with the inside of a courtroom.  However, I

11   never in my wildest dreams ever expected to be sitting in one

12   as a victim of an indescribably heinous crime --

13         THE COURT:  Mr. Ambrosino, slow down a touch so our

14   Court Reporter can transcribe what you're saying.

15         MR. AMBROSINO:  That dream came true on March 12th as

16   I watched Bernie Madoff stand and be cuffed.  However, the

17   dream really started as a nightmare on December 11th.  I can

18   remember the exact second my wife told me the news.  I

19   immediately knew all the ramifications, but I don't think she

20   did.  The fallout from having your entire life savings drop

21   right out from under your nose is truly like nothing you can

22   ever describe.  At first it was the obvious, and how will we

23   pay our bills?  How can someone do this to us?

24         We worked honestly and we worked so hard.  This can't

25   be real.  We did nothing wrong.

6

96TJMADF                          Sentence

1           I don't know if anyone other than another victim can

2     explain what the less obvious effects are, how every decision

3     directly and indirectly hinged on the fact that we had the

4     security of our savings.  When I was able to leave the job, we

5     bought a motor home to travel the country.  We took out a

6     mortgage since it was better to keep our savings in Madoff.  We

7     sold the house my wife lived in for 27 years and also put all

8     those profits -- and they were high -- into our Madoff account.

9     We trusted that the savings and planning would see us through

10    our retirement.

11          We had ideas of traveling the country.  It all stopped

12    abruptly on December 11th.  As a result, we are left with no

13    permanent house, a depreciating motor home, we are upside down

14    on the loan and an income from my pension that is our life.

15    This pension used to be perceived as spending money before

16    December 11th, and now although it doesn't cover our monthly

17    expenses, we rely on it fully.  It is all we have.

18          I sustained a 52 percent hearing loss on my job, and

19    at 49 years' old I can't go back to my previous career so I

20    have taken on a job this summer in Arizona as an construction

21    project coordinator.  The job will only last until August.

22    Then I don't know what I am going to do.

23          My wife's foot was run over by a van while in New York

24    City.  There was a plea hearing in March.  She had a job lined

25    up before the trip.  The expenses of the trip were given to us

7

96TJMADF                    Sentence

1   and we had to let it go since she was in a cast for eight

2   weeks.  She is now rehabilitating and still feels pain when she

3   stands for long periods of time.

4        With that background as to who I am, I would like to

5   share some of the specific problems Madoff's crime brought to

6   us.  My pension distribution, a one-time decision, and our

7   health insurance plan, also one-time decision, were based on

8   the fact that we had savings and security with Madoff.  If I

9   should die, my wife is left without my income or health

10  insurance.

11       We sold our home in New York with the expectation that

12  someday we would have the finances to purchase another one.  We

13  have no credit now and can't get a mortgage.  We have been

14  forced to take care of people's homes while they are traveling

15  for the summer, as we used to do prior to December 11th.

16       We have through the generosity of friends been able to

17  stay rent free on the RV lots of people in the community.  This

18  will come to a screeching halt in October when the owners

19  return for the winter season.  We don't know where we'll go at

20  that time.  We don't have enough income from my pension to pay

21  monthly rent.

22       The most devastating to us is we lost our freedom.  We

23  lost the ability to share our life every day as we explore the

24  country every day.  We lost the time to hold hands as we

25  walked.  As they say in the commercial, this is priceless.

96TJMADF                    Sentence

1           In closing, I would like to say, Judge Chin,

2     sentencing Bernard L. Madoff to the fullest extent will

3     certainly not eliminate any of the issues I wrote about.  It

4     probably won't even gain me satisfaction.  As the guard who

5     used to be on the right side of the prison bars, I'll know what

6     Mr. Madoff's experience will be and will know that he is in

7     prison in much the same way he imprisoned us as well as others.

8           He took from us the freedom that we held so preciously

9     close to our lives, the very thing I always valued and never

10    took for granted.  In a sense, I would like someone in the

11    court today to tell me how long is my sentence.

12          Thank you very much.

13          THE COURT:  Thank you.  Next we'll hear from Mr. and

14    Mrs. FitzMaurice.

15          MS. EBEL:  No, Judge Chin.  I am next.

16          THE COURT:  I saw the gentleman standing up next and I

17    thought -- you are Maureen Ebel?

18          MS. EBEL:  Yes, I am.  I am here with may brother,

19    William Thomas McDonough.

20          THE COURT:  All right.

21          MS. EBEL:  My name is Maureen Ebel and I am a victim

22    of Bernard L. Madoff.

23          I have lost all of my life's hard-earned savings.  I

24    have lost my life savings because our government has failed me

25    and thousands and thousands of other citizens.  There are many

96TJMADF                    Sentence

1    levels of government complicity in this crime.  The Securities

2    & Exchange Commission, by its total incompetence and criminal

3    negligence, has allowed a psychopath to steal from me and steal

4    from the world.

5            I am a 61-year-old widow and I am now working full

6    time.  I have done many things to survive since December 11th,

7    including selling a lot of my possessions and working three

8    jobs at the same time.  I have lost a home that my husband and

9    I had owned for 25 years because of this theft.

10           I have lost my ability to care for myself in my old

11   age.  I have lost the ability to donate to charity, especially

12   the Leukemia & Lymphoma Society.  I have lost my ability to

13   donate my time working for that charity as I had done in the

14   past because now I must work full time in order to eat.

15           I have lost the ability to help future generations of

16   my family get an education.  I have lost the ability to help

17   them with their housing needs.  It pains my so much to remember

18   my husband getting up in the middle of the night.  He was a

19   very fine physician.  He would get up in the middle of the

20   night year after year in all kinds of weather to go to the

21   hospital to save someone's life in rain, ice and snow.

22           He would save someone's life so that Bernie Madoff

23   could buy his wife another party rock.  I have lost the ability

24   to move around the world freely at this stage in my life using

25   the money my husband and I have worked so hard to earn.  We had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96TJMADF                    Sentence

1    worked, saved and planned for our old age so that we could

2    leave something behind and not be a burden when we became sick

3    and old.

4          The emotional toll that this has taken on me has been

5    devastating. I have had great pain and suffering at the hands

6    of Bernie Madoff. My health deteriorated rapidly after

7    December 11th. I could not eat or sleep. I was very agitated

8    and hyperactive. I had all the signs and symptoms of someone

9    undergoing great stress. I suffered rapid weight loss, rapid

10   heart rate, sweating, insomnia and sometimes spells.

11         I had the horrible feeling that I had been pushed into

12   the great black abyss, but I could not indulge these paralyzing

13   feelings too long. I had work to do. While experiencing all

14   these symptoms, I had to sell my home of 25 years, sell may

15   car, sell may possessions and go to work full time. I accepted

16   gifts of money from family and friends to pay for heat,

17   electricity, gasoline and food.

18         I was the recipient of so many kindnesses and saw so

19   much goodness in people. Goodness in people is something that

20   you, Mr. Madoff, have been blind to your whole life, and that

21   goodness is better than all the yachts and all the French homes

22   in all the world put together.

23         Sadly, Mr. Madoff not only defrauded thousands of

24   investors, he mastered the art of manipulating our government.

25   FINRA and the Securities & Exchange Commission became his

96TJMADF                    Sentence

1   tools.  They were willing to relax all regulations that would

2   have uncovered his fraud.  The justification for relaxing the

3   regulations was to ease the burden on Wall Street firms, the

4   very firm that bankrupted the world economy.

5         THE COURT:  Ms. Ebel, this is not the time to

6   criticize the agencies.  That is not before me.  What is before

7   me is what sentence to impose, so if you would address that,

8   please.

9         MS. EBEL:  I will, Judge Chin.

10        Mr. Madoff, I have read you will be making a statement

11  about your guilt and shame.  I do not believe you.  Judge Chin,

12  Mr. Madoff should stay in jail until every person who enabled

13  him to cause such a massive devastation is brought to justice.

14  He should stay in jail until the families of every one of his

15  victims are able to restore their financial stability.  That

16  could easily take 150 years.  Thank you.

17        THE COURT:  Thank you.  Next we'll hear from Mr. and

18  Mrs. FitzMaurice.

19        MR. FITZMAURICE:  Thank you, Judge Chin, for allowing

20  us to be heard in your courtroom today.

21        My wife and I here are today representing the

22  thousands of Madoff victims.  We have all suffered extensively

23  as a result of his actions.  It has been well chronicled that

24  Madoff did not limit his treachery to a few.  He stole from the

25  rich, he stole from the poor and he stole from the in-between.

96TJMADF                    Sentence

1   He had no boundaries.  He stole from individuals as well as

2   charitable organizations of all types and denominations.

3         My wife and I are not millionaires.  He has taken our

4   entire life savings.  We have not been overlooked just as many

5   of his other victims.  We have worked hard, long and hard for

6   all of our lives to provide for our family and to be in a

7   position to retire someday.  I am now forced to work three

8   jobs.  My wife is working a full-time job only to make ends

9   meet, to allow us to pay our mortgage and put food on the

10  table.

11        We are 63 years' old.  It will be no retirement for us

12  in the next two or three years.  There will be no trips to

13  California to visit our one-year-old grandson.  There will be

14  no vacations of any type.  Again we are too old to recoup the

15  monies that he has taken from us.  We can only work as long as

16  our health will hold up and then we will have to sell our home

17  and hope to survive on social security alone.

18         Madoff has shown no remorse.  Please do not confuse

19  his prepared statement as remorse.  His crime was premeditated

20  and calculated.  He was attempting to scam investors only days

21  before his arrest.  If he had the opportunity, he would still

22  be stealing from innocent investors.  He has not truly

23  cooperated with the authorities to recover the money that

24  rightfully belongs to his investors, whom we are now known as

25  victims.

96TJMADF                        Sentence

1          He cheated his victims out of their money so that he

2     and his wife Ruth and their two sons could live a life of

3     luxury beyond belief.  This life is normally reserved for

4     royalty, not for common thieves.

5          Your Honor, we implore you to give him the maximum

6     sentence at a maximum prison for this evil lowlife.  This would

7     be true justice.  Minimum security prison would only allow

8     Madoff too many freedoms that he does not deserve.  He would be

9     leading a life better than a lot of his victims.  That is not

10    true justice.  His was a violent crime without the use of a

11    tangible weapon.

12         His attorney will argue for a lenient sentence of up

13    to twelve years.  That is both insulting and another example of

14    Madoff's arrogance.  The scope of the devastation he has

15    wreaked is unparalleled.  It is impossible to compare his crime

16    to any past criminal act.  The pain he has inflicted will

17    continue for many years.  My life will never be the same.  I am

18    financially ruined and will worry every day about how I will

19    take care of my wife.

20         Where will we be able to live?  How will we pay our

21    bills?  How will we get medical insurance?

22         All of his victims worldwide will be waiting to see

23    that true justice is served.  True justice is a maximum

24    sentence in a maximum security prison.  I have a quotation from

25    my wife, since only one of us could speak.  She wants to say:

14

96TJMADF                    Sentence

1          "I cry every day when I see the look of pain and

2     despair in my husband's eyes.  I cry for the life we once had

3     before that monster took it away.  Our two sons and

4     daughter-in-law have rallied with constant love and support.

5     You, on the other hand, Mr. Madoff, have two sons that despise

6     you.  Your wife, rightfully so, has been vilified and shunned

7     by her friends in the community.  You have left your children a

8     legacy of shame.  I have a marriage made in heaven.  You have a

9     marriage made in hell, and that is where you, Mr. Madoff, are

10    going to return.  May God spare you no mercy."

11          THE COURT:  Thank you.

12          Next we will hear from Carla Hirschhorn.

13          MS. HIRSCHHORN:  Good morning and thank you, your

14    Honor, for allowing me to address you.

15          My husband and I write to you to explain the

16    devastation caused by Bernard L. Madoff to our lives.  Since

17    1992 we were invested with Bernard L. Madoff Investment

18    Securities.  We have never been rich people.  We have worked

19    throughout all our adult lives.  Over the years my husband has

20    worked hard to learn a trade as a glazer which afforded him the

21    opportunity to start a small business.  I have been a physical

22    therapist and worked through to the day I was graduated from

23    college in 1980.  We have both diligently saved our hard-earned

24    money to invest with Bernard Madoff over the years.  We used

25    our money to raise our children, purchase our home and put our

96TJMADF                    Sentence

1   savings in Bernard Madoff Securities.

2       On December 11th, 2008, our world crumbled beneath us

3   as news of the Bernard Madoff ponzi scheme became public.  This

4   turn of events has been devastating to our family.  We lost our

5   entire life savings.  This money was being used to provide our

6   children with a college education they have worked so hard to

7   deserve and to provide us with savings for a secure retirement.

8       Since December 11th, 2008 life has been a living hell.

9   It feels like a nightmare that we can't wake from.  I am so

10  thankful that my father died two years ago and was spared from

11  having to live in his terminal condition without the money to

12  provide him 24/7 health care which allowed him to die with

13  indignity.

14      My father died and left my mother believing she would

15  be able to live a safe and secure life with the money in her

16  Bernard Madoff accounts.  Now all she has to live on is a

17  sparce social security check and a small pension which will

18  last less than one year.  She may not have enough money to

19  maintain her home and living expenses.

20      It is our hope and in our prayers she does not become

21  ill and require extraordinary means to sustain her.  Our

22  daughter who sits in this courtroom today to witness this

23  horrific event is a junior at college and has worked two jobs

24  since our Madoff accounts were stolen while going to school

25  full time.  The stress and worry about her family's financial

96TJMADF                    Sentence

1  situation and health of her parents has been devastating to

2  her.  We have no idea how we will continue to pay for college

3  without it being a terrible financial burden and worry on all

4  of us.

5        Immediately after hearing the news of the ponzi

6  scheme, we filed papers for financial aid to sustain our

7  daughter through college.  We were informed we were not

8  eligible for any grant money, that our only hope would be to

9  take out loans.  However, in this financial environment,

10  without SIPIC insurance and with concern about claw-back

11  litigation, we can't possibly take loans out to send our

12  daughter to college.  The turmoil caused by our financial

13  devastation has caused us serious physical and emotional

14  problems from which we need medical treatment.

15        Your Honor, please understand that we, the investors,

16  have been punished by Madoff's crime.  We were devastated by

17  the SEC's failure to uncover Madoff's fraud and its continued

18  stamp of approval behind Madoff over the decades of his crime.

19  We have been abandoned by our elected officials which refuse to

20  require the SEC to find income.  We have been betrayed by

21  SIPIC, which in order to save money, has invented a new

22  definition of net equity to deprive us of the $500,000 of

23  insurance of which we were assured.

24        Please, your Honor, do not fail us.  Please assure

25  that Madoff is sentenced with the maximum possible time and he

17

96TJMADF                    Sentence

1    is required to serve his sentence in a maximum security prison.

2    This is not a man who deserves a federal country club.

3           Respectfully, Carla Hirschhorn.

4           THE COURT:  Thank you.

5           It is not up to me, by the way, where Mr. Madoff will

6    be designated.  A number of people have made that suggestion,

7    but it is up to the Bureau of Prisons.

8           Next we'll hear from Sharon Lissauer.

9           MS. LISSAUER:  My name is Sharon Lissauer.  Thank you,

10   your Honor, for letting me speak.  I am very emotional, so

11   please bear with me if I break down into tears.  As everyone

12   knows, this nightmare has begun six and a half months ago and

13   yet it seems like a lifetime.

14          I keep on thinking I am going to wake up from it.  It

15   keeps on getting worse.  My life and my future have been

16   ruined.  I was always so careful with my money, but I entrusted

17   everything I had to Mr. Madoff, my whole life savings from

18   modeling and the inheritance of my mom.  She just died last

19   year, and as soon as I got the money, because I just miss her

20   and I trusted Mr. Madoff so much, I gave it all to him, but now

21   I don't have my mom or the money.

22          I know I am not alone.  I know he has ruined thousands

23   of people's lives.  In the March hearing he said that he was

24   truly sorry, which I don't really believe, but even if it is a

25   little bit true, then I am not asking him, I am begging him, if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96TJMADF                    Sentence

1   he has any money from the offshore accounts or his family has

2   any money obtained from this horrible fraud, that they disgorge

3   it and give it back to the victims so they can have a little

4   bit of their lives back.

5           With respect to his sentencing, I used to think that

6   it didn't matter if he got 150 years, what would that do for

7   the victims?  It wouldn't get their money back.  But now upon

8   reflection, I think he should spend his whole life in jail

9   because what he has done is just despicable.  He has ruined so

10  many people's lives.  He killed my spirit and shattered my

11  dreams.  He destroyed my trust in people.  He destroyed my

12  life, and I have no other assets.  I make very little money

13  from modeling and he left me in a very difficult position to

14  pay my bills and support myself.  For the first time in my life

15  I am very, very frightened of my future.

16          Thank you, your Honor.

17          THE COURT:  Thank you.

18          Next we'll hear from Burt Ross.  Mr. Ross.

19          MR. ROSS:  Your Honor, my name is Burt Ross and my

20  wife Joan and I lost $5 million because of the criminal acts of

21  Bernard Madoff.  Not only have I lost the inheritance of my

22  father who worked his entire life, not only have I lost the

23  inheritance of my father who worked for his entire life so that

24  his children and his children's children can leave a better

25  life, I have lost our retirement accounts and funds in trust

96TJMADF                    Sentence

1   for our children.

2          The fact is though we are one of the fortunate ones

3   because we still have a roof over our heads, food on our table,

4   unlike so many others who have been forced to sell their homes,

5   who have been forced to sell their homes and pick up the pieces

6   of their lives.

7          Years ago I attended a Friends secondary school where

8   we thought that in each person there was an inner light, that

9   of God and everyone.  For the life of me, as far as I have

10  searched, I cannot find that inner light in Bernard Madoff.

11         What can we possibly say about Madoff, that he was a

12  philanthropist, when the money he gave to charities he stole

13  from the very same charities he ultimately devastated; that he

14  was a good family man when he leaves his grandchildren a name

15  that mortifies them, a name which will live in infamy; that he

16  is genuinely remorseful for his conduct when the statement he

17  read in this very court was totally without emotion, when even

18  after confessing he fought to keep assets away from those he

19  hurt, when we all know his only regret was getting caught.

20         Can we say Madoff was a righteous Jew who served on

21  the boards of Jewish institutions when he sank so low, when he

22  sank so low as to steal from Elie Weisel, as if Weisel hasn't

23  already suffered enough in his lifetime.

24         A righteous Jew, when in reality nobody has done more

25  to reinforce the ugly stereotype that all we care about is

96TJMADF                    Sentence

1   money the fact is there are no people on this earth more

2   charitable?  But we will survive.  We have survived worse than

3   Madoff.

4         What Bernard L. Madoff did far transcends the loss of

5   money.  It involves his betrayal of the virtues people hold

6   dearest -- love, friendship, trust -- and all so he can eat at

7   the finest restaurants, stay at the most luxurious resorts, and

8   travel on yachts and private jets.  He has truly earned his

9   reputation for being the most despised person to be in America

10  today.

11        Several hundred years ago the Italian poet Dante in

12  his "The Divine Comedy" recognized fraud as the worst of sins,

13  the ultimate evil more than any other act contrary to God's

14  greatest gift to mankind -- love.  In fact, he placed the

15  perpetrators of fraud in the lowest depths of hell, even below

16  those who had committed violent acts.  And those who betrayed

17  their benefactors were the worst sinners of all, so in the

18  three mouths of Satan struggle Judas for betraying Jesus

19  Christ, and Brutus and Cassius for betraying Julius Caesar.

20        Please Allow me to take a liberty now by speaking for

21  many of those victims who because of frailty, privacy,

22  distance, or other reasons are unable to bear witness today.

23  We urge your Honor to commit Madoff to prison for the remainder

24  of his natural life, and when he leaves this earth virtually

25  unmourned, may Satan grow a forth mouth where Bernard L. Madoff

96TJMADF                    Sentence

1    deserves to spend the rest of eternity.

2           Thank you.

3           THE COURT:  Thank you.  Next we'll hear from Michael

4    Schwartz.

5           MR. SCHWARTZ:  Can everyone hear me?

6           My name is Michael Schwartz.  I am 33 yearS' old.  It

7    was my family's trust fund that helped fund the money for

8    Bernard Madoff's organization.  Since I was a teenager, I

9    invested into what I thought was a forthright and legitimate

10   investment firm.  During this time I made sure I lived well

11   within my means, nothing extravagant.  I viewed my investment

12   as a safety net in case I should hit hard times or perhaps face

13   medical issues.

14          Unfortunately, several months ago, my job was

15   regionalized, eliminated.  I was handed a letter of

16   recommendation and sent on my way.  It didn't hit me until I

17   got home that the company that you ran had already taken my

18   life savings.  At 33, I was wiped out.

19          I am one of the lucky ones by far.  I have my health.

20   I am young, I have great friends, got a loving wife.

21   Unfortunately, the money you took from other members of my

22   family wasn't a minor setback.  It was quite a bit more.  Your

23   Honor, part of the trust fund wasn't set aside for a house in

24   the Hamptons, a large yacht or box seat to the Mets.  No, part

25   of that money was set aside to take care of my twin brother who

96TJMADF                     Sentence

1    is mentally disabled, who at 33, he lives at home with my

2    parents and will need care and supervision for the rest of his

3    life.

4         In the final analysis, my family wants to remember

5    that in addition to stealing from retirees, veterans, widows,

6    Bernard Madoff stole from the disabled.  Every time he cashed a

7    check and paid for his family's decadent lifestyle, he killed

8    dreams.  My parents had a simple dream for my brother, a week

9    at summer camp, someday being able to live in a good, a good

10   group home.  Thanks to Bernard Madoff's greed, complete lack of

11   ethics, that dream will be delayed.

12        At the end of the day my twin brother will be taken

13   care of.  My family is strong enough to weather this storm but,

14   your Honor, I say this without any malice, Bernard Madoff

15   should no longer be allowed back in society.  I only hope that

16   his prison sentence is long enough so that his jail cell

17   becomes his coffin.  Thank you.

18        THE COURT:  Thank you.

19        We'll hear next from Miriam Siegman.

20        MS. SIEGMAN:  I was born a few blocks from this

21   courthouse.  I still live here.  On a cold winter's day just

22   before my 65th birthday, the man sitting in front of me

23   announced to the world that he had stolen everything I had.

24   After that he refused to say another word to his victims.  I am

25   here today to bear witness for myself and others, silent

96TJMADF                     Sentence

1  victims.

2          The streets of my childhood felt safe.  The streets I

3  wander now feel threatening.  The man sitting in this courtroom

4  robbed me.  In an instant his words and deeds beat me to near

5  senselessness.  He discarded me like road kill.  Victims became

6  the byproduct of his greed.  We are what is left over, the

7  remnants of stunning indifference and that of politicians and

8  bureaucrats.

9          Six months have passed.  I manage on food stamps.  At

10  the end of the month I sometimes scavage in dumpsters.  I

11  cannot afford new eyeglasses.  I long to go to a concert, but I

12  never do.  Sometimes my heartbeats erratically for lack of

13  medication when I cannot pay for it.

14          I shine my shoes each night, afraid they will wear

15  out.  My laundry is done by hand in the kitchen sink.  I have

16  collected empty cans and dragged them to redemption centers.

17          I do this.  People ask how are you?  My answer always

18  is I'm fine, but it is not always true.  I have lived with

19  fear.  It strikes me at all hours.  I calculate again and again

20  how long I can hold out.

21          It is only a matter of time.  I will be unable to meet

22  my own basic needs, food, shelter, medicine.  I feel grief at

23  no longer being able to help support my beloved sister.  I feel

24  shame and humiliation asking for help.

25          I also feel overwhelming sadness.  I know that another

96TJMADF                    Sentence

1   human being did this to me and to all victims, but I don't know

2   why.  What I do understand frightens me.  The man who did this

3   had deep contempt for his victims.

4        There are many victims including those we never hear

5   from or see; union members, pipe-fitters, laborers, women who

6   work in nursing homes, bricklayers, firemen, working people.

7   One victim shot himself.  The inquest informs us he was a

8   highly decorated former soldier who could not face the shame of

9   his ruin, his last words on a humanitarian mission in

10  Afghanistan.  By self-admission, this thief among us knew his

11  victims were facing a kind of death at his hands, yet he

12  continued to play with us as a cat would with a mouse.

13       What shall be the punishment for such a man?  What

14  sentence?  Carry the burden we carry, feel his shame,

15  humiliation and isolation as I do.  Feel it each day wherever

16  you are until life ends.

17       Face an acknowledge the murderous effects of your

18  life's work.  I long for the truth that might become of a trial

19  and hope justice had placed a higher premium on truth and

20  expediency.  Forgiveness for now, it will have to come from

21  someone other than me.

22       THE COURT:  Thank you.  Finally we'll hear from Sheryl

23  Weinstein.

24       MS. WEINSTEIN:  Hello, your Honor.

25       THE COURT:  Good morning.

96TJMADF                    Sentence

1           MS. WEINSTEIN:  I was introduced to Bernard Madoff 21

2   years ago at a business meeting.  At the time I was the chief

3   financial officer of Hadassah, a charitable women's

4   organization.  I now view that day as perhaps the unluckiest

5   day of my life because of the many events set into motion that

6   would eventually have the most profound and devastating effect

7   on me, my husband, my child, my parents, my in-laws and all

8   those who depended upon us for their liveliness.

9           You have read and you appear from many of us, the old,

10  the young, the healthy and infirm about the unimaginable extent

11  of human tragedy and devastation.  According to a Time Magazine

12  article, there are over 3 million individuals worldwide who

13  have been directly or indirectly affected.  They, the press and

14  the media, speak of us as being greedy and rich.  Most of us

15  are just ordinary working people, worker bees, as I like to

16  refer to us.

17          My husband and I are now both in our 60's and have

18  been married for 37 years.  We have saved for most of our lives

19  by living beneath our means in order to provide for our

20  retirement.  This past Thursday at 2:00 o'clock my husband and

21  I sold our home of 20 years.  People are always asking how much

22  did we lose?  My reply is that when you lose everything, it

23  really doesn't matter because you have nothing left, and we

24  have lost everything.

25          Many have told us we were lucky -- I no longer know --

96TJMADF                    Sentence

1   to be able to sell in this depressed market although at a

2   greatly reduced amount. We had to sell because four years ago

3   we refinanced our mortgage and gave the excess cash to Bernie

4   Madoff. There was very little left over after all was said and

5   done at the closing.

6          It is difficult to describe how it feels due to

7   circumstances outside of your control to be virtually forced

8   out of your home, to leave unwillingly. Last Tuesday I walked

9   out following the movers with a thought I would be back before

10  the closing, but knowing in the back of my mind that I

11  wouldn't.

12         My husband was the last to be in our home. He shared

13  with me his hesitation of not wanting to leave, of wanting to

14  remain, but realizing that staying was no longer an option. We

15  chose not to go to the closing because it would have been too

16  difficult and painful for either of us to be there. For months

17  after December 11th I would wake in the dark hours of the night

18  and early morning and to my horror realize that there were no

19  calming, soothing words I could say to myself because it wasn't

20  a dream. The monster who visited me was true, a reality.

21  Those same thoughts would occur to me upon waking in the

22  morning and during the day and a deep, heavy depression would

23  surround me and not lift.

24         This went one for many months. I went on after bad

25  dreams, virtually not unable to eat. The sight of food was

96TJMADF                          Sentence

1    making me feel sick, unable to escape the reality of my

2    personal devastation.  At times I could not even bear to be

3    alone.  I would ask my friends to either stay with me at the

4    office even if there was very little work to do.  It would

5    prompt me to pick up the phone to call my husband to be

6    reassured I was not alone.

7         This continued until March 12th when Madoff entered

8    his plea of guilty.  I began to speak out to the media, and the

9    helpless and hopeless feelings began to retreat and I began to

10   feel empowered.  It came together for me while being

11   interviewed by Katie Couric.  She asked me wasn't I embarrassed

12   being a CPA losing all my money?  At that moment I realized and

13   responded no, I am not embarrassed because I did not lose my

14   money.  My money was stolen from me.

15        Ms. Couric said to me you sound angry, and I said yes,

16   you're right.  When someone steals from you, you get angry.

17   That was the beginning of my healing process.

18        I felt it was important for somebody who as personally

19   acquainted with Madoff to speak.  My family and I are not

20   anonymous people to him.  He knows my husband's name is Rob and

21   my son's name is Eric.  In fact, Eric worked for him one summer

22   while in college many years ago.  Eric would continue to call

23   him over the years to ask for his advice and input.  Eric

24   entrusted him with his money that he worked and saved. a few

25   months before all this happened Eric had spoken to him and

96TJMADF                        Sentence

1    thanked him for doing such a good job.

2          I would now like to have the opportunity to share with

3    you my personal feelings about Madoff and to speak to his

4    sentencing.

5          I remember when my son was perhaps a few weeks' old

6    and I would watch him as he slept and he would whimper, not a

7    cry of hunger, but a whimper.  Even at a few weeks' old there

8    was something in his subconscious that could frighten him.  It

9    amazed me such a young child, an infant can have nightmares.

10          All of us from our earliest ages remember those times

11    when the terror, the monsters and goblins would come visit us

12    in those dark hours.  Eventually we would be so frightened that

13    we would awake sometimes calling out to our parents because of

14    the fear.

15          It was calming to have our parents remind us it was

16    only a dream.  As we got older, we could wake ourselves and

17    self-assure ourselves it was only a dream.  That terror, that

18    monster, that horror, that beast has a name to me, and it is

19    Bernard L. Madoff.  I will now attempt to explain to you the

20    nature of this beast who I called Madoff.

21          He walks among us.  He dresses like us.  He drives and

22    eats and drinks and speaks.  Under the facade there is truly a

23    beast.  He is a beast that has stolen for his own needs the

24    livelihoods, savings, lives, hopes and dreams and futures of

25    others in total disregard.  He has fed upon us to satisfy his

96TJMADF                    Sentence

1   own needs.  No matter how much he takes and from whom he takes,

2   he is never satisfied.  He is an equal opportunity destroyer.

3          I felt it important for you to know in appearance, he

4   would be just like everybody else and it is for this reason I

5   am asking your Honor to keep him in a cage behind bars because

6   he has lost the privilege of walking and being among us mortal

7   human beings.  He should not be given the opportunity to walk

8   into our society again.

9          I would like to suggest that while any man, woman or

10  child that has been affected by his heinous crime still walks

11  this earth, Madoff the beast should not be free to walk among

12  them.  You should protect society from the likes of him.  I

13  have reread Madoff's March 12th statement to you.  Certain

14  quotes jumped out at me.  His continuing self-serving

15  references, and I quote, that his proprietary trading in the

16  market making business managed by his brother and two sons was

17  legitimate, profitable and successful in all respects, or that

18  he felt, "compelled to satisfy my clients' expectations at any

19  cost."

20         It sounds as if he is laying the blame on his clients'

21  expectations and never admitting the truth he was stealing from

22  these clients and the lives he ruined.  If he was attempting to

23  protect his family, he should not be given that opportunity

24  because we, the victims, did not have the same opportunity to

25  protect our families.  Madoff the beast has stolen our ability

96TJMADF                    Sentence

1    to protect our loved ones away from us.  He should have no

2    opportunity to protect his family.

3            We, the victims, are greatly disappointed by those

4    agencies that were set up to protect us.  SIPIC has now

5    redefined what we are entitled to.  The IRS approved their

6    office request to be a custodian of our IRAs and pension funds

7    and the SEC appears to have looked the other way on numerous

8    occasions.  This is a human tragedy of historic proportions and

9    we ask -- no, we implore -- that those whose agencies may have

10   failed us in the past through acts of omissions, step up to the

11   plate, fulfill their responsibilities.  I thank your Honor for

12   your indulgence and I feel comfortable you will make sure

13   justice is served.

14           Thank you.

15           THE COURT:  Thank you.

16           Thanks to all the victims who spoke today and to all

17   those who wrote.  I appreciate hearing your views.

18           Mr. Sorkin.

19           MR. SORKIN:  Good morning, your Honor.

20           THE COURT:  Good morning.

21           MR. SORKIN:  Before I speak, would your Honor

22   respectfully acknowledge you have received both the

23   government's sentencing memorandum and two responses?

24           THE COURT:  Yes, I have your initial letter.  I

25   received yesterday your reply brief.  I have the government's

96TJMADF                    Sentence

1   memorandum as well.

2          MR. SORKIN:  Thank you.

3          THE COURT:  I have read them all.

4          MR. SORKIN:  Thank you, your Honor.

5          May I proceed?

6          THE COURT:  Yes.

7          MR. SORKIN:  Your Honor, I know I speak on behalf of

8   all Mr. Madoff's counsel as well as Mr. Madoff who will speak.

9   We cannot be unmoved by what we heard.  There is no way that we

10  cannot be insensitive to the victims' suffering.

11         This is a tragedy as some of the victims have said at

12  every level.  There is no doubt Mr. Madoff will speak.  We

13  represent a deeply flawed individual, but we represent, your

14  Honor, a human being.  We don't represent a statistic.  We

15  don't represent a number.  We speak to the victims.  We have

16  heard what they've had to say and we can only imagine, your

17  Honor, what we would have heard from others.

18         I say again, forgive me for being redundant, we

19  represent a very flawed individual, an individual who appears

20  before this court facing a sentence that is sufficient but not

21  unreasonably necessary to carry out the mandate that this court

22  has to carry out.

23         The magnificence of our legal system, your Honor, is

24  that we do not seek an eye for an eye.  To be sure, if it is

25  any consolation to the victims, we have worked hopefully

96TJMADF                    Sentence

1   diligently with the U.S. Attorney's Office in an atmosphere of

2   trying to recover assets.  To that extent, your Honor, we have

3   provided the government with what we believe to be the assets

4   that Mr. Madoff has gathered over the years which the victims

5   have referred to, and again if it is any consolation to them,

6   to the extent that the government has left him and his family,

7   his wife impoverished, we are just about there with respect to

8   everything the government believes it can show in order to

9   obtain the appropriate assets for forfeiture.

10          Vengeance is not the goal of punishment.  Our system

11  of justice, your Honor, has recognized that justice is and must

12  always be blind and fair -- not blind to the criminal acts that

13  Mr. Madoff pleaded guilty to and certainly not blind to the

14  suffering of the victims, but blind to the extent that it will

15  achieve a sentence that has been set out over the years in the

16  guidelines and the cases interpreting the guidelines, and the

17  guidelines and the courts and the statutes, your Honor, do not

18  speak of vengeance and revenge.

19          There is something bordering on the absurd,  and we

20  cited United States versus Ellison on this point, your Honor.

21  For the government to ask for 150 years so that Mr. Madoff gets

22  out of jail at the age of 221 because he is 71 now, he will

23  face supervised release.  By the same token, your Honor, it

24  defies reason for the Probation Department to suggest that he

25  be sentenced to 50 years in prison for the very same reasons.

96TJMADF                          Sentence

1      I point out to the court, and forgive me, your Honor,

2  for repeating what is in the letter we sent you most recently,

3  that Mr. Madoff, as he pleaded to, as appears in the

4  presentence report and appears in the information in which the

5  government agrees, for most of the period of time that Mr.

6  Madoff is alleged to have engaged in this ponzi scheme and, in

7  fact, it was a ponzi scheme, it was money in and money out.

8      Most of the money, and I am quoting from the PSR, went

9  for redemptions.  People who invested money were given back

10 money.  To be sure, it was a fraud.  To be sure, it was a ponzi

11 scheme.  To be sure, it was a crime, but nevertheless, your

12 Honor, I point out, and in response respectfully to some of the

13 victims, the PSR noted, and I think it is common knowledge in

14 the industry that Mr. Madoff built up this firm on the

15 proprietary trading side to the point in 1991, as the

16 presentence report points out, the proprietary trading side

17 which at the point of his arrest had approximately 200

18 employees separate and apart from the fraudulent advisory

19 business, a hundred traders making markets and in 1991, your

20 Honor, accounted for almost 10 percent of all transactions on

21 the New York Stock Exchange.

22     Sufficient to provide revenue at the same time Mr.

23 Madoff engaged in taking money in and taking money out, most of

24 that money went for redemptions.  As we point out in our letter

25 of yesterday, and as the government notes and as the PSR notes,

96TJMADF                    Sentence

1   the loans, the comingling, and we we do dispute this with the

2   government, but I don't think it is a relevant issue, the

3   comingling, the loans.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

96T8MAD2

1          MR. SORKIN:  The loans, the commingling, commenced

2     within the last eight to ten years.  And as Mr. Madoff will

3     say, things began to collapse.  And there was commingling with

4     $250 million over the last eight or so years, of advisory

5     money, as well as money in, money out of investments.

6          I think it's important to note, your Honor, again that

7     Mr. Madoff stepped forward.  He chose not to flee.  He chose

8     not to hide money.  To the extent money is overseas, we are

9     still actively engaged -- we, his defense counsel -- in

10     assisting the government, at the request of the government, to

11     obtain assets located overseas, as we speak, and we submitted

12     that voluntarily, and we have been trying to help, with

13     Mr. Madoff's authorization, permission, and blessing.

14          Mr. Madoff is 71 years old, your Honor.  Based upon

15     his health, which is in the PSR, his family history, his life

16     expectancy, that is why we ask for a sentence of 12 years, just

17     short, based upon the statistics that we have, of a life

18     sentence.

19          We also said, if your Honor is inclined, your Honor

20     obviously makes the decision, 15 to 20 years.  So that if

21     Mr. Madoff ever sees the light of day, in his 90s, impoverished

22     and alone, he will have paid a terrible price.  He expects,

23     your Honor, to live out his years in prison.

24          The PSR points out, your Honor, as we noted in our

25     letter to you, that the loss in this case is $13,226,000,000.

96T8MAD2

1    The exact numbers are in the PSR.  What has not been heard

2    publicly, your Honor, is the fact that over $1,276,000,000 is

3    held by the SIPC trustee, and we have no control over how that

4    money is disbursed.  And I say this for the victims we have

5    heard.  Again, we have no control over what the SIPC trustee

6    does with the money that he obtains, nor do we have any control

7    over what the SEC will do, nor do we have any control as to how

8    the government to whom we have forfeited all of the assets but

9    a few, which the government and we have agreed were weighed

10   against the risk of litigation, we have no control how that

11   money is disbursed.

12        Additionally to the $1,276,000,000, the SIPC trustee,

13   according to the PSR, has recovered $1,225,000,000, has sent

14   demand letters to individuals for 735 million, and has

15   commenced litigation to seek a clawback from some very large

16   funds to obtain redemptions and interest payments in the amount

17   of $10,100,000,000.  It is our hope, your Honor, our sincerest

18   hope, that all that money is collected, in an amount in excess

19   of $13,226,000,000, that that will be provided to investors.

20        The frenzy, the media excitement, that Mr. Madoff

21   engaged in a Ponzi scheme involving $65 billion and that he has

22   ferreted money away, as far as we know, your Honor, that is

23   simply not true, and it is not borne out either by the

24   government or by the PSR, and we take no issue with the PSR.

25        In closing, your Honor, there is no question that this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96T8MAD2

1   case has taken an enormous toll, not only on Mr. Madoff and his

2   family, but to the victims to be sure.  But it has also taken a

3   toll, your Honor, as Mr. Madoff will say, on the industry that

4   he helped revolutionize, that he helped grow, and now has

5   become the object of disrespect and abomination, and that is a

6   tragedy as well.

7          We ask only, your Honor, that Mr. Madoff be given

8   understanding and fairness, within the parameters of our legal

9   system, and that the sentence that he be given be sufficient,

10  but not greater than necessary, to carry out what this Court

11  must carry out under the rules, statutes and guidelines.

12          Thank you, your Honor.

13          THE COURT:  Thank you.

14          Mr. Madoff, if you would like to speak, now is the

15  time.

16          THE DEFENDANT:  Your Honor, I cannot offer you an

17  excuse for my behavior.  How do you excuse betraying thousands

18  of investors who entrusted me with their life savings?  How do

19  you excuse deceiving 200 employees who have spent most of their

20  working life working for me?  How do you excuse lying to your

21  brother and two sons who spent their whole adult life helping

22  to build a successful and respectful business?  How do you

23  excuse lying and deceiving a wife who stood by you for 50

24  years, and still stands by you?  And how do you excuse

25  deceiving an industry that you spent a better part of your life

96T8MAD2

1   trying to improve?  There is no excuse for that, and I don't

2   ask any forgiveness.

3        Although I may not have intended any harm, I did a

4   great deal of harm.  I believed when I started this problem,

5   this crime, that it would be something I would be able to work

6   my way out of, but that became impossible.  As hard as I tried,

7   the deeper I dug myself into a hole.  I made a terrible

8   mistake, but it wasn't the kind of mistake that I had made time

9   and time again, which is a trading mistake.  In my business,

10  when you make a trading error, you're expected to make a

11  trading error, it's accepted.  My error was much more serious.

12  I made an error of judgment.  I refused to accept the fact,

13  could not accept the fact, that for once in my life I failed.

14  I couldn't admit that failure and that was a tragic mistake.

15       I am responsible for a great deal of suffering and

16  pain.  I understand that.  I live in a tormented state now

17  knowing of all the pain and suffering that I have created.  I

18  have left a legacy of shame, as some of my victims have pointed

19  out, to my family and my grandchildren.  That's something I

20  will live with for the rest of my life.

21       People have accused me of being silent and not being

22  sympathetic.  That is not true.  They have accused my wife of

23  being silent and not being sympathetic.  Nothing could be

24  further from the truth.  She cries herself to sleep every night

25  knowing of all the pain and suffering I have caused, and I am

96T8MAD2

1    tormented by that as well.  She was advised to not speak

2    publicly until after my sentencing by our attorneys, and she

3    complied with that.  Today she will make a statement about how

4    she feels about my crimes.  I ask you to listen to that.  She

5    is sincere and all I ask you is to listen to her.

6           Apologizing and saying I am sorry, that's not enough.

7    Nothing I can say will correct the things that I have done.  I

8    feel terrible that an industry I spent my life trying to

9    improve is being criticized terribly now, that regulators who I

10   helped work with over the years are being criticized by what I

11   have done.  That is a horrible guilt to live with.  There is

12   nothing I can do that will make anyone feel better for the pain

13   and suffering I caused them, but I will live with this pain,

14   with this torment for the rest of my life.

15          I apologize to my victims.  I will turn and face you.

16   I am sorry.  I know that doesn't help you.

17          Your Honor, thank you for listening to me.

18          THE COURT:  Thank you.

19          Mr. Sorkin, did I understand Mr. Madoff to say that

20   Mrs. Madoff wanted to speak?

21          MR. SORKIN:  No, your Honor.  Mrs. Madoff after the

22   sentencing will be giving a statement.  And I add what

23   Mr. Madoff said about belaboring it, that she was advised by

24   counsel to wait till after sentence.

25          THE COURT:  I thought he was saying she wanted to

96T8MAD2

1    speak.  Thank you.

2         I will hear from the government.

3         MS. BARONI:  This defendant carried out a fraud of

4    unprecedented proportion over the course of more than a

5    generation.  For more than 20 years he stole ruthlessly and

6    without remorse.  Thousands of people placed their trust in him

7    and he lied repeatedly to all of them.  And as the Court heard

8    from all of the victims, in their words and in the letters, he

9    destroyed a lifetime of hard work of thousands of victims.  And

10   he used that victims' money to enrich himself and his family,

11   with an opulent lifestyle, homes around the world, yachts,

12   private jets, and tens of millions of dollars of loans to his

13   family, loans of investors' money that has never been repaid.

14        The guideline sentence in this case, as your Honor

15   knows, is 150 years and the government respectfully submits

16   that a sentence of 150 years or a substantial term of

17   imprisonment that will ensure that he spends the rest of his

18   life in jail is appropriate in this case.

19        This was not a crime born of any financial distress or

20   market pressures.  It was a calculated, well orchestrated,

21   long-term fraud, that this defendant carried out month after

22   month, year after year, decade after decade.  He created

23   literally hundreds and hundreds of thousands of fake documents

24   every year.  Every time he told his clients that he was making

25   trades for them he sent them trade confirmations filled with

40

96T8MAD2

1   lies.  At every month end he sent them account statements that

2   were nothing but lies.  And the defendant knew that his clients

3   made critically important life decisions, as your Honor heard

4   today, based on these lies.  Decisions about their children's

5   education, their retirement, how to care for elderly relatives,

6   and how to provide for their families.  He knew this, and he

7   stole from them anyway.

8            In doing so, he drove charities, companies, pension

9   plans and families to economic ruin.  And even on the most

10  dispassionate view of the evidence, the scale of the fraud,

11  which is at a conservative estimate, your Honor, $13 billion,

12  when you look at the duration of the fraud, which is more than

13  20 years, when you look at the fact that the defendant could

14  have stopped this fraud and saved the victims' losses, all of

15  these facts justify a guideline sentence of 150 years.

16           And to address briefly some of Mr. Sorkin's arguments,

17  despite Mr. Sorkin's arguments, the defendant here deserves no

18  leniency and certainly does not deserve a sentence of 12 years'

19  imprisonment.

20           Mr. Sorkin tries to argue that the loss amount is

21  actually going to be less than 13 billion because the trustee

22  may recover some assets in clawback proceedings.  As your Honor

23  knows, that has nothing to do with the loss amount in this

24  case.  Further, the defendant shouldn't get any credit for

25  anything the government or the trustee does after the fraud to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

96T8MAD2

1    recover money.

2            In asking for 12 years, your Honor, the defendant is

3    asking you to impose a sentence that a defendant would receive

4    in a garden variety fraud case in this district, a case with

5    about $20 million of losses and far fewer victims.  In imposing

6    a 12 year sentence in this case, on the facts and circumstances

7    here, would be profoundly unfair.  Not only would it not

8    reflect the seriousness and the scope of the defendant's

9    crimes, but, also, it would not promote the goals of general

10   deterrence going forward.

11           Mr. Sorkin's argument that the defendant should get

12   some credit for coming forward and turning himself in is also

13   entirely meritless.  The defendant continued his fraud scheme

14   until the very end, when he knew the scheme was days away from

15   collapse, when he was almost out of money and when he was faced

16   with redemption requests from clients that he knew he could not

17   meet.  And even at that point, rather than turning himself in,

18   he tried to take the last of his victims' money.  He prepared

19   $173 million in checks that he planned to give to his family,

20   his friends, and some preferred clients.  It was his final

21   effort to put his interests above those of his clients, and had

22   the FBI not arrested him when they did, he might well have

23   succeeded.

24           Your Honor, in sum, for running an investment advisory

25   business that was a complete fraud, for betraying his clients

96T8MAD2

1    for decades, and for repeatedly lying to regulators to cover up

2    his fraud, for the staggering harm that he has inflicted on

3    thousands of people, for all of these reasons and all of the

4    reasons your Honor heard so eloquently from the victims, the

5    government respectfully requests that the Court sentence the

6    defendant to 150 years in prison or a substantial term of

7    imprisonment that ensures that he will spend the rest of his

8    life in jail.

9        Thank you.

10       THE COURT:  Thank you.

11       I take into account what I have read in the

12   presentence report, the parties' sentencing submissions, and

13   the e-mails and letters from victims.  I take into account what

14   I have heard today.  I also consider the statutory factors as

15   well as all the facts and circumstances in the case.

16       In his initial letter on behalf of Mr. Madoff, Mr.

17   Sorkin argues that the unified tone of the victims' letters

18   suggests a desire for mob vengeance.  He also writes that

19   Mr. Madoff seeks neither mercy nor sympathy, but justice and

20   objectivity.

21       Despite all the emotion in the air, I do not agree

22   with the suggestion that victims and others are seeking mob

23   vengeance.  The fact that many have sounded similar themes does

24   not mean that they are acting together as a mob.  I do agree

25   that a just and proportionate sentence must be determined,

96T8MAD2

1  objectively, and without hysteria or undue emotion.

2       Objectively speaking, the fraud here was staggering.

3  It spanned more than 20 years.  Mr. Madoff argues in his reply

4  letter that the fraud did not begin until the 1990s.  I guess

5  it's more that the commingling did not begin until the 1990s,

6  but it is clear that the fraud began earlier.  And even if it

7  is true that it only started in the 1990s, the fraud exceeded

8  ten years, still an extraordinarily long period of time.  The

9  fraud reached thousands of victims.

10       As for the amount of the monetary loss, there appears

11 to be some disagreement.  Mr. Madoff disputes that the loss

12 amount is $65 billion or even $13 billion.  But Mr. Madoff has

13 now acknowledged, however, that some $170 billion flowed into

14 his business as a result of his fraudulent scheme.  The

15 presentence report uses a loss amount of $13 billion, but as I

16 understand it, that number does not include the losses from

17 moneys invested through the feeder funds.  That's what the PSR

18 states.  Mr. Madoff argues that the $13 billion amount should

19 be reduced by the amounts that the SIPC trustee may be able to

20 claw back, but that argument fails.  Those clawbacks, if they

21 happened, will result in others who suffered losses.  Moreover,

22 Mr. Madoff told his sons that there were $50 billion in losses.

23 In any event, by any of these monetary measures, the fraud here

24 is unprecedented.

25       Moreover, the offense level of 52 is calculated by

96T8MAD2

1   using a chart for loss amount that only goes up to $400

2   million.  By any of these measures, the loss figure here is

3   many times that amount.  It's off the chart by many fold.

4        Moreover, as many of the victims have pointed out,

5   this is not just a matter of money.  The breach of trust was

6   massive.  Investors -- individuals, charities, pension funds,

7   institutional clients -- were repeatedly lied to, as they were

8   told their moneys would be invested in stocks when they were

9   not.  Clients were sent these millions of pages of account

10  statements that the government just alluded to confirming

11  trades that were never made, attesting to balances that did not

12  exist.  As the victims' letters and e-mails demonstrate, as the

13  statements today demonstrate, investors made important life

14  decisions based on these fictitious account statements -- when

15  to retire, how to care for elderly parents, whether to buy a

16  car or sell a house, how to save for their children's college

17  tuition.  Charitable organizations and pension funds made

18  important decisions based on false information about fictitious

19  accounts.  Mr. Madoff also repeatedly lied to the SEC and the

20  regulators, in writing and in sworn testimony, by withholding

21  material information, by creating false documents to cover up

22  his scheme.

23        It is true that Mr. Madoff used much of the money to

24  pay back investors who asked along the way to withdraw their

25  accounts.  But large sums were also taken by him, for his

96T8MAD2

1   personal use and the use of his family, friends, and

2   colleagues.  The PSR shows, for example, that Mr. Madoff

3   reported adjusted gross income of more than $250 million on his

4   tax returns for the ten year period from 1998 through 2007.  On

5   numerous occasions, Mr. Madoff used his firm's bank accounts

6   which contained customer funds to pay for his personal expenses

7   and those of his family, including, for example, the purchase

8   of a Manhattan apartment for a relative, the acquisition of two

9   yachts, and the acquisition of four country club memberships at

10  a cost of $950,000.  Billions of dollars more were paid to

11  individuals who generated investments for Mr. Madoff through

12  these feeder funds.

13          Mr. Madoff argues a number of mitigating factors but

14  they are less than compelling.  It is true that he essentially

15  turned himself in and confessed to the FBI.  But the fact is

16  that with the turn in the economy, he was not able to keep up

17  with the requests of customers to withdraw their funds, and it

18  is apparent that he knew that he was going to be caught soon.

19  It is true that he consented to the entry of a $170 billion

20  forfeiture order and has cooperated in transferring assets to

21  the government for liquidation for the benefit of victims.  But

22  all of this was done only after he was arrested, and there is

23  little that he could have done to fight the forfeiture of these

24  assets.  Moreover, the SIPC trustee has advised the Court

25  Mr. Madoff has not been helpful, and I simply do not get the

46

96T8MAD2

1    sense that Mr. Madoff has done all that he could or told all

2    that he knows.

3         Mrs. Madoff has stipulated to the transfer of some $80

4    million in assets to the government for the benefit of victims,

5    but the record also shows that as it became clear that

6    Mr. Madoff's scheme was unraveling, he made substantial loans

7    to family members, he transferred some $15 million of firm

8    funds into his wife's personal accounts, and he wrote out the

9    checks that the government has just described.

10        I have taken into account the sentences imposed in

11   other financial fraud cases in this district.  But, frankly,

12   none of these other cases is comparable to this case in terms

13   of the scope, duration and enormity of the fraud, and the

14   degree of the betrayal.

15        In terms of mitigating factors in a white-collar fraud

16   case such as this, I would expect to see letters from family

17   and friends and colleagues.  But not a single letter has been

18   submitted attesting to Mr. Madoff's good deeds or good

19   character or civic or charitable activities.  The absence of

20   such support is telling.

21        We have heard much about a life expectancy analysis.

22   Based on this analysis, Mr. Madoff has a life expectancy of 13

23   years, and he therefore asks for a sentence of 12 years or

24   alternatively 15 to 20 years.  If Mr. Sorkin's life expectancy

25   analysis is correct, any sentence above 20 or 25 years would be

47

96T8MAD2

1    largely, if not entirely, symbolic.

2           But the symbolism is important, for at least three

3    reasons.  First, retribution.  One of the traditional notions

4    of punishment is that an offender should be punished in

5    proportion to his blameworthiness.  Here, the message must be

6    sent that Mr. Madoff's crimes were extraordinarily evil, and

7    that this kind of irresponsible manipulation of the system is

8    not merely a bloodless financial crime that takes place just on

9    paper, but that it is instead, as we have heard, one that takes

10   a staggering human toll.  The symbolism is important because

11   the message must be sent that in a society governed by the rule

12   of law, Mr. Madoff will get what he deserves, and that he will

13   be punished according to his moral culpability.

14          Second, deterrence.  Another important goal of

15   punishment is deterrence, and the symbolism is important here

16   because the strongest possible message must be sent to those

17   who would engage in similar conduct that they will be caught

18   and that they will be punished to the fullest extent of the

19   law.

20          Finally, the symbolism is also important for the

21   victims.  The victims include individuals from all walks of

22   life.  The victims include charities, both large and small, as

23   well as academic institutions, pension funds, and other

24   entities.  Mr. Madoff's very personal betrayal struck at the

25   rich and the not-so-rich, the elderly living on retirement

96T8MAD2

1   funds and social security, middle class folks trying to put

2   their kids through college, and ordinary people who worked hard

3   to save their money and who thought they were investing it

4   safely, for themselves and their families.

5       I received letters, and we have heard from, for

6   example, a retired forest worker, a corrections officer, an

7   auto mechanic, a physical therapist, a retired New York City

8   school secretary, who is now 86 years old and widowed, who must

9   deal with the loss of her retirement funds.  Their money is

10  gone, leaving only a sense of betrayal.

11      I was particularly struck by one story that I read in

12  the letters.  A man invested his family's life savings with

13  Mr. Madoff.  Tragically, he died of a heart attack just two

14  weeks later.  The widow eventually went in to see Mr. Madoff.

15  He put his arm around her, as she describes it, and in a kindly

16  manner told her not to worry, the money is safe with me.  And

17  so not only did the widow leave the money with him, she

18  eventually deposited more funds with him, her 401(k), her

19  pension funds.  Now, all the money is gone.  She will have to

20  sell her home, and she will not be able to keep her promise to

21  help her granddaughter pay for college.

22      A substantial sentence will not give the victims back

23  their retirement funds or the moneys they saved to send their

24  children or grandchildren to college.  It will not give them

25  back their financial security or the freedom from financial

96T8MAD2

1   worry.  But more is at stake than money, as we have heard.  The

2   victims put their trust in Mr. Madoff.  That trust was broken

3   in a way that has left many -- victims as well as others --

4   doubting our financial institutions, our financial system, our

5   government's ability to regulate and protect, and sadly, even

6   themselves.

7        I do not agree that the victims are succumbing to the

8   temptation of mob vengeance.  Rather, they are doing what they

9   are supposed to be doing -- placing their trust in our system

10  of justice.  A substantial sentence, the knowledge that

11  Mr. Madoff has been punished to the fullest extent of the law,

12  may, in some small measure, help these victims in their healing

13  process.

14       Mr. Madoff, please stand.

15       It is the judgment of this Court that the defendant,

16  Bernard L. Madoff, shall be and hereby is sentenced to a term

17  of imprisonment of 150 years, consisting of 20 years on each of

18  Counts 1, 3, 4, 5, 6, and 10, 5 years on each of Counts 2, 8,

19  9, and 11, and 10 years on Count 7, all to run consecutively to

20  each other.  As a technical matter, the sentence must be

21  expressed on the judgment in months.  150 years is equivalent

22  to 1,800 months.

23       Although it is academic, for technical reasons, I must

24  also impose supervised release.  I impose a term of supervised

25  release of 3 years on each count, all to run concurrently.  The

50

96T8MAD2

1    mandatory, standard, and special conditions are imposed, as set

2    forth on pages 58 and 59 of the PSR.

3           I will not impose a fine, as whatever assets

4    Mr. Madoff has, as whatever assets may be found, they shall be

5    applied to restitution for the victims.

6           As previously ordered, I will defer the issue of

7    restitution for 90 days.

8           Finally, I will impose the mandatory special

9    assessment of $1,100, $100 for each count.

10          Mr. Sorkin, any requests?

11          MR. SORKIN:  Yes, your Honor.

12          As you pointed out to one of the victims, you cannot

13   designate a prison, but we would ask, based upon an analysis

14   that we have done that in 75 percent of the cases

15   recommendations made by the court are followed by the Bureau of

16   Prisons, we respectfully request that your Honor recommend to

17   the Bureau of Prisons that Mr. Madoff be designated to

18   Otisville.

19          THE COURT:  I will recommend to the Bureau of Prisons

20   that Mr. Madoff be designated to an appropriate facility in the

21   northeast region of the United States.

22          MR. SORKIN:  Thank you.

23          THE COURT:  Ms. Baroni?

24          MS. BARONI:  Two issues.  If you can specifically

25   incorporate by reference the forfeiture order of Friday,

51

96T8MAD2

1    pronounce it as part of the sentence.

2              THE COURT:  The forfeiture order is hereby

3    incorporated.

4              MS. BARONI:  Special assessment.

5              THE DEFENDANT:  I did the special assessment of

6    $1,100.

7              MS. BARONI:  Thank you.

8              THE COURT:  Mr. Madoff, please stand one more time.

9              Mr. Madoff, you have the right to appeal at least

10   certain aspects of this judgment and conviction.  If you wish

11   to appeal, you must do so within ten days.  If you cannot

12   afford an attorney, the court will appoint one for you.

13             We are adjourned.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT G**

JAMES CLARKSON (JC-7697)
ACTING REGIONAL DIRECTOR
Andrew M. Calamari (AC-4864)
Alexander M. Vasilescu (AV-2575)
Israel Friedman (IF-1958)
Preethi Krishnamurthy (PK-2809)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100

**U8 CIV 10791**

**JUDGE STANTON**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                        **Plaintiff,**

- against -

BERNARD L. MADOFF,
BERNARD L . MADOFF INVESTMENT
    SECURITIES LLC,

                      **Defendants.**

------------------------------------------------------------------ x

RECEIVED
DEC 11 2008
U.S.D.C. S.D. N.Y.
CASHIERS

___ Civ. ____

## COMPLAINT

    Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment Securities LLC

("BMIS"), alleges:

### SUMMARY

    1.    The Commission brings this emergency action to halt ongoing fraudulent

offerings of securities and investment advisory fraud by Madoff and BMIS, a broker dealer and

investment adviser registered with the Commission.  From an indeterminate period through the

present, Madoff and BMSI has committed fraud through the investment adviser activities of

BMIS. Yesterday, Madoff admitted to one or more employees of BMIS that for many years he has been conducting a Ponzi-scheme through the investment adviser activities of BMIS and that BMIS has liabilities of approximately $50 billion. Madoff told these employees that he intends to distribute any remaining funds at BMIS to employees and certain investors in the investment advisor business, such as family and friends. Such a distribution will be unfair and inequitable to other investors and creditors of BMIS.

 2. Expedited relief is needed to halt the fraud and prevent the Defendants from unfairly distributing the remaining assets in an unfair and inequitable manner to employees, friend and relatives, at the expense of other customers.

 3. To halt the ongoing fraud, maintain the status quo and preserve any assets for injured investors, the Commission seeks emergency relief, including temporary restraining orders and preliminary injunctions, and an order: (i) imposing asset freezes against the Defendants; (ii) appointing a receiver over BMIS; (iii) allowing expedited discovery and preventing the destruction of documents; and (iv) requiring the Defendants to provide verified accountings. The Commission also seeks permanent injunctions, disgorgement of ill-gotten gains, plus prejudgment interest and civil monetary penalties against all of the Defendants.

## VIOLATIONS

 4. By virtue of the conduct alleged herein:

  a. All Defendants directly or indirectly, singly or in concert, have engaged, and are engaging, in acts, practices, schemes and courses of business that constitute violations of Sections 206(1) and 206(2) of the Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)], and Section 17(a) of

the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a) and

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.    The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange

Act, 15 U.S.C. § 78u(d)(1), seeking to restrain and enjoin permanently the Defendants from

engaging in the acts, practices and courses of business alleged herein.

8.    In addition to the injunctive and emergency relief recited above, the Commission

seeks: (i) final judgments ordering Defendants to disgorge their ill-gotten gains with prejudgment

interest thereon; and (ii) final judgments ordering the Defendants to pay civil penalties pursuant

to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange

Act, 15 U.S.C. § 78u(d)(3).

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to Section 214 of the

Advisers Act [15 U.S.C. § 80b-14], Section 22(a) of the Securities Act [ 15 U.S.C. § 77v(a)] and

Sections 21(e) and 27 of the Exchange Act [ 15 U.S.C. §§ 78u(e) and 78aa].

11.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391. The Defendants, directly and indirectly, have made use of the means and

instrumentalities of interstate commerce, or of the mails, in connection with the transactions,

acts, practices and courses of business alleged herein. A substantial part of the events

3

comprising Defendants' fraudulent scheme that gives rise to the Commission's claims occurred in the Southern District of New York, including that BMIS is located and headquared in this District and certain of Madoff and BMIS committed their fraudulent securities and adviser activities in this District.

## THE DEFENDANTS

12.     **Madoff** is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney. Madoff is a former Chairman of the board of directors of the NASDAQ stock market. BMIS is both a broker-dealer and investment adviser registered with the Commission. Madoff oversees and controls the investment adviser services at BMIS as well at the overall finances of BMIS.

13.     **BMIS** is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading. BMIS' website states that it has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960;" and that BMIS,"[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms." The most recent Form ADV for BMIS filed in January 2008 with the Commission stated that BMIS had over $17 billion in assets under management, and 23 clients. BMIS represented that its trading strategy for adviser accounts involved trading in baskets of equity securities and options thereon.

## FACTS

14.     From an indeterminate time to the present, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.

4

15.    Madoff conducts certain investment advisory business for clients that is separate from the BMIS' proprietary trading and market making activities.

16.    Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS.

17.    Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.

18.    In or about the first week of December 2008, Madoff told a senior employee that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. According to this senior employee, he had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.

19.    On or about December 9, 2008, Madoff informed another senior employee that he wanted to pay 2008 bonuses to employees of the firm in December, which was earlier than employee bonuses are usually paid.

20.    Bonuses traditionally have been paid at BMIS in February of each year for the pervious year's work.

21.    On or about December 10, 2008, the two senior employees referenced above visited Madoff at the offices of BMIS to discuss the situation further, particularly because Madoff had appeared to these two senior employees to have been under great stress in the prior weeks.

5

22.    At that time, Madoff informed the senior employees that he had recently made profits through business operations, and that now was a good time to distribute it. When the senior employee challenged his explanation, Madoff said that he did not want to talk to them at the office, and arranged a meeting at Madoff's apartment in Manhattan. At that meeting Madoff stated, in substance, that he "wasn't sure he would be able to hold it together" if they continued to discuss the issue at the office.

23.    At Madoff's Manhattan apartment, Madoff informed the two senior employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion. One of the senior employees has a personal account at BMIS in which several million had been invested under the management of Madoff.

24.    At Madoff's Manhattan apartment, Madoff further informed the two senior employees referenced above that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

6

### FIRST CLAIM FOR RELIEF

**Violations of Sections 206(1) and 206(2) of the Advisers Act**
(Against Madoff and BMIS)
(Fraud Upon Advisory Clients and Breach of Fiduciary Duty
by Investment Adviser)

25.     Paragraphs 1 through 24 are realleged and incorporated by reference as if set forth

fully herein.

26.     Madoff and BMIS at all relevant time were investment advisers within the

meaning of Section 201(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]

27.     Madoff and BMIS directly or indirectly, singly or in concert, knowingly or

recklessly, through the use of the mails or any means or instrumentality of interstate commerce,

while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act

[15 U.S.C. §80b-2(11)]: (a) have employed, are employing, or are about to employ devices,

schemes, and artifices to defraud any client or prospective client; or (b) have engaged, are

engaging, or are about to engage in acts, practices, or courses of business which operates as a

fraud or deceit upon any client or prospective client.

28.     As described in the paragraphs above, Madoff and BMIS violated Sections 206(1)

and 206(2) of the Advisers Act[15 U.S.C. §§ 80b-6(1), (2)] and unless enjoined will continue to

violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### SECOND CLAIM FOR RELIEF

**Violations of Section 17(a)(1) of the Securities Act**
(Against all Defendants)
(Antifraud violations)

29.     Paragraphs 1 through 24 are realleged and incorporated by reference as if set forth

fully herein.

30.    From at least 2005 through the present, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud.

31.    The Defendants knew or were reckless in not knowing of the activities described above.

32.    By reason of the activities herein described, the Defendants have violated and are violating Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

### THIRD CLAIM FOR RELIEF

**Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act**
(Against all Defendants)
(Antifraud violations)

33.    Paragraphs 1 through 24 are realleged and incorporated by reference as if set forth fully herein.

34.    From at least 2005, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have obtained and are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged and are engaging in transactions, practices or courses of business which have operated and will operate as a fraud and deceit upon investors.

35.    By reason of the activities herein described, the Defendants have violated and are

violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2) and §77q(a)(3)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against all Defendants)
(Antifraud violations)

36.     Paragraphs 1 through 24 are realleged and incorporated by reference as if set forth fully herein.

37.     From at least 2005 through the present, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated as a fraud and deceit upon investors.

38.     Defendants knew or were reckless in not knowing of the activities described above.

39.     By reason of the activities herein described, the Defendants have violated and are violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Enter judgment in favor of the Commission finding that the Defendants each violated the securities laws and rules promulgated thereunder as alleged herein;

### II.

An Order temporarily and preliminarily, and Final Judgments permanently, restraining and permanently enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Section Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) and 80b-6(2)].

### III.

An Order temporarily and preliminarily, and Final Judgments permanently, restraining and permanently enjoining the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

IV.

An order directing the Defendants to disgorge their ill-gotten gains, plus prejudgment interest thereon.

V.

Final Judgments directing the Defendants to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

VII.

Granting such other and further relief as to this Court seems just and proper.

Dated:  New York, New York
        December 11, 2008

By: _James A. Clarkson_
      James Clarkson (JC-7697)
      Associate Regional Director
      Attorney for Plaintiff
      SECURITIES AND EXCHANGE COMMISSION .
      3 World Financial Center
      New York, NY 10281-1022
      (212) 336-0178

Of Counsel:
Andrew M. Calamari
Alexander M. Vasilescu
Israel Friedman
Preethi Krishnamurthy