# EXHIBIT N

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )

                                 )   File No. OIG-509

OIG-509                          )



WITNESS:   Number 27 31

PAGES:     1 through 145

PLACE:     Securities and Exchange Commission

           100 "F" Street, N.E.

           3rd Floor Conference Room

           Washington, D.C. 20549

DATE:      Monday, April 27, 2009


           The above-entitled matter came on for hearing,

pursuant to notice, at 9:45 a.m.


           Diversified Reporting Services, Inc.

                  (202) 467-9200

EARANCES:


On behalf of the Securities and Exchange Commission:

H. DAVID KOTZ, ESQ.   Inspector General

HEIDI STEIBER, ESQ.   Investigator

6    CHRISTOPHER WILSON, ESQ.   Investigator

7    Office of the Inspector General

8    Securities and Exchange Commission

9    100 "F" Street, N.E.

10    Washington, D.C. 20549

11    (202) 551-6037

12

13  On behalf of the Witness:

14    TY COBB, ESQ.

15    Hogan & Hartson LLP

16    Columbia Square

17    555 Thirteenth Street, N.W.

18    Washington, D.C. 20004

19    (202) 637-5600

20

21

22

23

24

25

```
                                                           Page 3
 1                     C O N T E N T S

 2

 3    WITNESS:                                    EXAMINATION

 4    John McCarthy                                        9

 5

 6    EXHIBITS:      DESCRIPTION                    IDENTIFIED

 7        1          Non-Disclosure and Confidentiality      9

 8                   Agreement - McCarthy

 9        2          Appendix A, List of Examinations

10                   and Staff                              26

11        3a         8/3/2000 Memo, Richards and McCarthy    29

12                   to Walker and Cutler

13        3b         12/20/2000 Letter, Richards to          29

14                   S. Madoff Skoller

15        3c         3/8/2001 Memo, McCarthy to Richardson   29

16        4          3/3/03 Memo with attachment            32

17        5          10/20/2002 E-mail                       33

18        6          8/27/03 E-mail, ▮▮▮▮ to Daugherty       36

19        7          10/29/03 E-mail, McCarthy to Swanson    36

20                   Entitled: Call Madoff Re: Fleet ASAP

21        8          11/10/03 Memo, ▮▮▮▮ to Swanson          37

22        9          Barron's Article 5/7/01                 42

23        10         12/11/03 E-mail, McCarthy to Swanson    48

24        11         5/21/03 E-mail with attachments,        49

25                   ▮▮▮▮▮▮▮ to Kelly
```

| | | | Page 4 |
|---|---|---|---|
| 1 | EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 2 | 12a | 12/18/03 E-mail, McCarthy to Richards | 51 |
| 3 | 12b | 12/2003 Planning Memorandum | 52 |
| 4 | 13 | 12/17/03 Draft Letter, Swanson | 65 |
| 5 | | to NASD | |
| 6 | 14 | 12/10/03 E-mail, Richards to | 67 |
| 7 | | McCarthy | |
| 8 | 15 | 12/18/03 E-mail, Richards to McCarthy | 73 |
| 9 | 16 | 12/19/03 E-mail, Donohue to Daugherty | 73 |
| 10 | 17 | Madoff Document Request | 76 |
| 11 | 18 | 1/6/04 E-mail, Swanson to P. Madoff | 76 |
| 12 | 19 | 1/16/04 Letter, B. Madoff to Swanson | 82 |
| 13 | 20 | 1/29/04 Notes from call with ▇▇▇▇ | 87 |
| 14 | | ▇▇▇▇ | |
| 15 | 21 | 2/4/04 Notes from Conference Call with | 91 |
| 16 | | B. Madoff | |
| 17 | 22 | Handwritten notes | 92 |
| 18 | 23 | 2/4/04 E-mail from Walker to Donohue | 94 |
| 19 | | and Wood | |
| 20 | 24 | 3/11/04 Memo from Richards, McCarthy, | 94 |
| 21 | | Swanson, Donohue, and Daugherty to Gray | |
| 22 | 25 | Document Requests to B. Madoff, Drafts | 95 |
| 23 | | 1-10 and Final | |
| 24 | 26 | Draft Letter from Swanson to P. Madoff | 96 |
| 25 | 27 | 3/11/04 Letter from B. Madoff to Swanson | 97 |

MADOFF_EXHIBITS-00852

Page 5

| | EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|---|
| 1 | | | |
| 2 | 28 | Madoff Investment Securities | 98 |
| 3 | | Account Statements | |
| 4 | 29 | 3/9/04 Letter, McCarthy to Firestone | 103 |
| 5 | 30 | 4/6/04 E-mail, Walker to Sadowski | 107 |
| 6 | 31 | 4/7/04 E-mail, Donohue to Walker | 107 |
| 7 | 32 | 3/16/05 E-mail, Donohue to Swanson | 110 |
| 8 | 33 | 2/28/06 E-mail, McCarthy to Swanson | 117 |
| 9 | 34 | 2/28/06 E-mail, Nee to Swanson | 117 |
| 10 | | CC: Lamore | |
| 11 | 35 | 3/1/06 E-mail Exchange, McCarthy | 118 |
| 12 | | and Swanson | |
| 13 | 36 | 12/19/05 E-mail, Buchmueller to | 120 |
| 14 | | McCarthy | |
| 15 | 37 | 3/19/06 E-mail Exchange, S. Madoff | 121 |
| 16 | | and McCarthy | |
| 17 | 38 | 4/17/06 E-mail, S. Madoff to McCarthy | 122 |
| 18 | 39 | 4/21/06 E-mail, Sadowski to McCarthy | 123 |
| 19 | 40 | 4/6/06 E-mail Exchange, Sadowski and | 128 |
| 20 | | McCarthy | |
| 21 | 41 | 4/23/06 E-mail, Swanson to McCarthy | 131 |
| 22 | 42 | 4/27/06 E-mail Exchange, McCarthy and | 133 |
| 23 | | Swanson | |
| 24 | | | |
| 25 | | | |

MADOFF_EXHIBITS-00853

1                    P R O C E E D I N G S

2              MR. KOTZ:  On the record.  Okay, we are on the

3    record at 9:45 a.m. on April 27, 2009, United States

4    Securities and Exchange Commission.

5              I'm going to swear you in, if that's all right?

6    Could you please raise your right hand?

7    Whereupon,

8                    JOHN ANDREW MCCARTHY

9    was called as a witness and, having been first duly sworn,

10   was examined and testified as follows:

11             MR. KOTZ:  Okay.  Could you state and spell your

12   full name for the record?

13             THE WITNESS:  John Andrew McCarthy, J-o-h-n

14   A-n-d-r-e-w M-c-C-a-r-t-h-y.

15             MR. KOTZ:  Okay.  Mr. McCarthy, my name is David

16   Kotz; I'm the Inspector General of the United States

17   Securities and Exchange Commission.  And I have my colleagues

18   here, Heidi Steiber and Chris Wilson and you have your

19   attorney here, Mr. Ty Cobb.  This is an investigation by the

20   Office of Inspector General, case number OIG-509.

21             I'm going to ask you certain questions and you'll

22   have to provide answers under oath.  The court reporter will

23   record and later transcribe everything that is said.

24   Therefore, please provide verbal answers to the questions, a

25   nod of the head or another non-verbal response won't be able

Page 7

1   to be picked up by the court reporter.

2       Also, so the record will be clear, please let me

3   finish my question before you provide your response and I'll

4   try to let you finish your response before I ask my next

5   question.  In addition, it is important you understand the

6   questions and give accurate answers.  If there's anything you

7   don't understand or anything you do not know or are not sure

8   about, please let me know, otherwise, I will assume that you

9   heard and understood the question.

10      Do you understand those instructions?

11      THE WITNESS:  Yes.

12      MR. KOTZ:  Okay.  I'm going to give you the

13  standard perjury language.  As you can see, your response to

14  statements given today are provided after you've sworn an

15  oath and will be taken down verbatim by the court reporter.

16      This is an official U.S. government law enforcement

17  investigation.  The claims asserted in this case are serious

18  ones.  It is very important that you tell me everything you

19  know about the matter at hand and are completely forthcoming

20  and truthful with me.

21      I'm formally advising you that your testimony today

22  is subject to the laws of perjury.  Providing false or

23  misleading testimony under oath is a very serious offence.

24  If the evidence shows the testimony you have given is false,

25  we may refer it as appropriate.

1     A    I went to the University of Michigan,

2   undergraduate.  Got a master's from the London School of

3   Economics and then went to law school at the University of

4   Maryland.

5     Q    Okay.  What year did you get your degree from

6   Michigan?

7     A    1986.

8     Q    And then what year did you go to the London School

9   of Economics?

10    A    The following two years, so 1989 I got the degree.

11    Q    Okay.  And then where did you go to law school?

12  Maryland?

13    A    University of Maryland.

14    Q    And what year did you graduate law school?

15    A    '92.

16    Q    Okay.  What was your first job after graduating law

17  school?

18    A    Clerk for the --

19         (Interruption to proceedings.)

20    Q    How long did you do that for?

21    A    For the year clerkship.

22    Q    Okay.  What kind of things did you do for them?

23    A    I wrote draft opinions for the judge.

24    Q    Okay.  Anything to do with securities issues?

25    A    No, it was mainly -- criminal law was the vast

Page 11

1    majority of my opinions.

2        Q    What about in 1993, what did you do after the

3    clerkship?

4        A    Then I joined the SEC.

5        Q    Okay.  What was your first position for the SEC?

6        A    I worked as a staff attorney in the Division of

7    Market Regulation.

8        Q    What was the -- was that -- what other division was

9    it in?  Office of Compliance, Inspections Examinations?  I'm

10   sorry, what was the division that it was in?

11       A    The -- I first worked at the SEC for the Division

12   of Market Regulation.

13       Q    Oh, okay.  I'm sorry, Division of Market

14   Regulation.  For how long did you work for the Division of

15   Market Regulation?

16       A    The -- that -- the area I worked in was made into a

17   separate office and I can't recall the date, '95 I think.  So

18   I stayed in the same position but there was a change in --

19   so, where I worked was turned into a separate office, the

20   Office of Compliance Inspections and Examinations.

21       Q    Okay.  All right.  So officially, you didn't start

22   working for OC until '95 but your office --

23       A    And the dates I'm not exactly sure, but yeah, until

24   it was first formed by Chairman Levitt at the time.

25       Q    Okay.  And who was your initial supervisor?

Page 12

1     A    When I first started at the SEC my branch chief was

2   named [Personal Privacy]

3     Q    And then do you get a promotion over time at the

4   SEC?

5     A    Yes.

6     Q    When was that?

7     A    I became a branch chief, again, the dates aren't --

8   I think in '96, something along those lines.

9     Q    Okay.  What kind of duties did you have as a staff

10  attorney?

11    A    I was in the office of SRO Inspections, so I was

12  responsible for, you know, conducting inspections as part of

13  a inspection team.

14    Q    And then as a branch chief, what were your duties

15  there?

16    A    Basically, managing the inspection, managing a team

17  of attorneys to conduct the inspections.

18    Q    How long did you serve as a branch chief?

19    A    Again, I'm not exactly sure, but approximately four

20  years maybe.

21    Q    Okay.  So until approximately 2000?

22    A    Yes.

23    Q    Okay.  And then in 2000 you left the SEC; is that

24  right?

25    A    I think it was '99, yeah.

Page 13

1      Q     How come you left the SEC?

2      A     My former boss, [Personal Privacy], was [Personal Privacy] of

3  Knight Securities and he asked me to join him in his firm.

4      Q     What was your position at Knight Securities?

5      A     Regulatory counsel.

6      Q     How long did you work at Knight Securities for?

7      A     A short period of time, maybe three, four months.

8      Q     What kind of things did you do there at Knight

9  Securities?

10     A     Drafted -- you know, again, in the short period of

11  time, drafted comment letters and worked on, you know,

12  regulatory issues for the firm.

13     Q     And then after three or four months with Knight

14  Securities you went back to the SEC?

15     A     Correct.

16     Q     How come you left Knight Securities after only a

17  few months?

18     A     Yes, my wife still worked here, still worked at the

19  SEC so we -- I was commuting by train up to New Jersey every

20  week and so there's personal -- that was not working out as

21  intended.  There was a lot of stress on, you know, on me.

22  And then -- so, that's one -- part of -- one part of the

23  reason, the other reason was I didn't like the job itself.

24        I thought Knight Securities, you know, was growing

25  very fast and so I then, you know, also talked to Lori about,

Page 14

1  you know, getting a promotion at the SEC.  So I thought that

2  was very desirable for me, vis-…-vis my job at Knight

3  Securities.

4      Q    That was Lori Richards?

5      A    Yes, ma'am -- yes, sir.

6      Q    Okay.

7      A    Ma'am for Lori.

8      Q    Now, do you recall that at some point in time there

9  was an action brought by the SEC against Knight Securities?

10     A    Yes.

11     Q    Okay.  What was that about?

12     A    It was a, you know, fundamentally at its core, best

13 execution issue.

14     Q    Were there allegations that Knight Security was

15 engaged in front-running?

16     A    Yes.

17     Q    Okay.  And was that going on while you were at

18 Knight Securities or --

19     A    I don't know.  It could have been when I was there

20 also.

21     Q    Okay.  But the allegations didn't surface until

22 after you left Knight Securities; is that right?

23     A    Correct.

24     Q    Okay.

25          MS. STEIBER:  Did your departure from Knight

1    Securities have anything to do with front-running or --

2    execution violations?

3         THE WITNESS:  No.

4         BY MR. KOTZ:

5    Q    All right, so you came back in about 2000 you think

6    to the SEC?

7    A    I -- this was probably -- I remember July '99 if my

8    memory serves me correct.

9    Q    Okay, July 1999.  And what was your position when

10   you returned to the SEC?

11   A    I think I was an assistant director.

12   Q    Okay.  Who was your supervisor at that point?

13   A    Maryann Gajella.  No, I'm sorry, I'm confused when

14   I was promoted to associate director and assistant director.

15   I'm not sure if that's correct.

16   Q    Okay.

17   A    I thought when I came back from Knight Securities I

18   was, at some point, promoted to associate director.

19   Q    Okay.  And then subsequently you were --

20   A    Before that I was assistant director.

21   Q    Okay.

22   A    I apologize.

23   Q    All right.  What about in the period of time 2003

24   to 2006, what was your position at that time?

25   A    Branch chief.  And then at some point I was a -- I

1    was promoted to assistant director and then I worked --

2           MR. COBB:  No, he said 2000.

3           BY MR. KOTZ:

4     Q    2003 through --

5     A    Oh, I'm sorry.  I'm in '93.  2003 to '06 I would

6    have been associate director.

7     Q    Okay.  So in that period of time, 2003 to 2006,

8    where you were associate director, who did you report to

9    then?

10    A    To Lori Richards.

11    Q    Okay.  And what were your duties as associate

12   director?

13    A    I was responsible for the -- running the SRO

14   Inspection Program.

15    Q    Okay.  How many people did you have under you at

16   that point?

17    A    It varied over time, but maybe as little as 10 to

18   15, to as many as 25 or so.

19    Q    Okay.  Who were your direct reports when you were

20   associate director?

21    A    I think assistant directors would have been Eric

22   Swanson and Mark Donohue.

23    Q    Okay.  So in that 2003 to 2006 period you

24   supervised both Eric Swanson and Mark Donohue?

25    A    Directly, yes.

MADOFF_EXHIBITS-00862

Page 17

1        Q       Okay.  And then how long did you serve as an

2   associate director?

3        A       Until I left the Commission two-and-a-half years

4   ago.

5        Q       Okay. So that was --

6        A       Back in --

7        Q       -- 2007?

8        A       7th November 2007.

9        Q       How come you left the Commission that time?

10       A       Mainly because there was a good opportunity

11  presented to me and it was about that point in my career that

12  I felt it was a good time to leave the Commission.

13       Q       And what's the position that you left to go to?

14       A       I went to the head of compliance at where I am now,

15  Getgo LLC.

16       Q       And you remain in that position today?

17       A       Correct.

18       Q       Okay.  When did you first hear of Bernard Madoff or

19  Madoff Securities?

20       A       Early on in my career.

21       Q       So that would be in the '90's you think?

22       A       Early, yeah.  Mid-90's, like --

23       Q       Okay.  What did you hear of Bernie Madoff or Madoff

24  Securities in the mid-90's?

25       A       I conducted an exam of the market-making unit.

MADOFF_EXHIBITS-00863

Page 18

1      Q    Okay.  In the mid-90's?

2      A    I think -- again, I don't recall the exact dates

3   but it was a limit order display exam.

4      Q    Okay, yeah.  We'll get to the specific exams in a

5   minutes, but was -- so that was the first time you heard of

6   Bernie Madoff, when you conducted the exam?  You weren't

7   aware of them before that?

8      A    Not that, I mean, the first time I now can

9   recollect learning about Madoff was when we -- when I was

10  asked to do an exam.

11     Q    And what was Bernie Madoff's reputation at that

12  time?

13     A    I -- the firm's -- I didn't know what his

14  reputation was --

15     Q    Okay.

16     A    -- I knew what the firm's reputation was.

17     Q    What was the firm's reputation?

18     A    That it was one of the, if not the largest third

19  market-maker in which they executed over the -- you know,

20  listed securities over-the-counter.  And they had a very good

21  reputation in terms of their execution quality of retail

22  customer orders.

23     Q    Okay.  And did you ever -- were you ever aware of

24  Bernie Madoff's involvement with SEC functions or SEC

25  matters?

1          MR. COBB:  Ever or about that time?

2          BY MR. KOTZ:

3      Q   In that time.

4      A   The time -- again, as a junior attorney I was not

5   familiar with that, no.

6      Q   You ever hear that Bernie Madoff had a friendship

7   with former Chairman Arthur Levitt?

8      A   Now or at that time?

9      Q   At that time.

10     A   I wasn't aware of that, no.

11     Q   Okay.  Are you aware of that now?

12     A   Yes.

13     Q   Meaning now within the last year?

14     A   Recently, yeah, now within the last -- just from

15   what I've read the --

16     Q   Okay, subsequent to December 2008 you mean?

17     A   Correct.

18     Q   Okay.  Have you ever met Bernie Madoff in person?

19     A   Yes.

20     Q   How many times?

21     A   Maybe three.

22     Q   Okay.  And that's --

23     A   I'm guessing, but that's approximately what I

24   think.

25     Q   What were those times?

1     A    During the exams and then at -- he was at Eric

2    Swanson's wedding, would be the last time.

3     Q    Okay.

4          MS. STEIBER:  Did you see him at SEC events?

5          THE WITNESS:  I don't recall.

6          BY MR. KOTZ:

7     Q    Okay, well we'll get into the exams, but did you

8    have a conversation with him at Eric Swanson's wedding?

9     A    I didn't -- no, I did not speak with him.

10    Q    Okay.  So other than through the exams, the only

11   time you met Bernie Madoff was at the wedding and you didn't

12   speak to him at the wedding?

13    A    Well, met, I guess I didn't meet him, but he was --

14   the only time I saw him would have been at the exams and at

15   the wedding.

16    Q    Okay.

17         MS. STEIBER:  Did you receive any personal phone

18   calls from him that were not exam-related?

19         THE WITNESS:  No, not that I recall.

20         BY MR. KOTZ:

21    Q    Okay.  Let's talk about policies in OC for a

22   minute.  Were there formal policies and procedures for

23   handling tips or complaints when you were in OC?

24    A    Formal policies?

25    Q    Yes.

Page 21

1      A    I would have -- I wouldn't be aware of formal

2   policies.

3      Q    Wouldn't be aware?

4      A    Right.

5      Q    Why wouldn't you be aware of them?

6      A    I mean there were -- I don't recall like a written

7   policy on how to handle them.

8      Q    Okay.  So you were not aware of any formal policies

9   about how to handle complaints --

10     A    Yeah, I'm -- how were you -- formal like written

11  policies in a manual or something like that, I'm not aware of

12  those.

13     Q    There were informal policies?

14     A    There would be -- if I got a tip or complaint I

15  would handle them then probably, depending on what the tip or

16  complaint was and -- certain way to make sure that they were

17  handled appropriately.

18     Q    So what was that way?

19     A    I would -- if it made sense to conduct an

20  examination given what the facts, I would have then

21  assigned -- I would assign -- I would ask someone to, you

22  know, basically -- up an exam or inspection.

23     Q    Okay.  But would you log somewhere, anywhere, that

24  you got a tip or complaint?

25     A    Not that I recall, no.

Page 22

1        Q      And how would you decide whether there was

2    information that would necessitate doing an examination?

3        A      Again, if the complaint seemed -- I guess, things

4    like the credibility of it, whether it was in my jurisdiction

5    as it were, those would be the main factors.

6        Q      Okay.  And were there times where you would refer

7    the information or complaint to the enforcement division?

8        A      I don't recall doing that.

9        Q      Okay.  Would there be situations that if you got a

10   complaint that you would feel that enforcement should be

11   provided a copy of the complaint or would your decision be

12   either to do an examination or not?

13       A      Yeah, I don't recall getting the complaint, the tip

14   or complaint that if I didn't follow up in my program that it

15   made sense to forward it on to someone else.

16       Q      So if the complaint was credible and had

17   allegations of potential violations of securities laws you

18   would decide to do an examination or inspection?

19       A      If it was within -- my jurisdiction, yes.

20       Q      Okay.  Did you receive tips or complaints yourself,

21   personally, while you were at OC?

22       A      I'm thinking I -- nothing comes to mind that I can

23   recall.

24       Q      Okay.  But you received them from others; is that

25   right?

1       A    I'm sorry, I'm --

2       Q    You would receive tips or complaints from other

3  people?

4       A    You mean within the building?

5       Q    Yeah, within OC.

6       A    Yeah, that was probably -- yes, I do recall several

7  instances of that.

8       Q    Okay.  And who would they come from?  Would they

9  come from Lori Richards?

10      A    I think it depends.

11      Q    Okay.  Do you remember any tips coming to you from

12  Lori Richards?

13      A    Yes.

14      Q    Okay.

15           BY MS. STEIBER:

16      Q    How many tips or complaints did you receive from

17  any source during your years at OC?

18      A    You know, I can only recall, right now, two.

19      Q    And as an associate director --

20      A    But again, you'd have to define what exactly a tip

21  or complaint is, but I only recall two that come to mind, but

22  my guess is there were probably more.

23      Q    And as an associate director, how many tips or

24  complaints did OC receive per month, approximately?

25      A    I don't know.  I mean, you know, there was a

Page 24

1   hotline that I'm aware of and things like that that other

2   people within OC managed.  So I assume that tips or

3   complaints within my jurisdiction would flow to me from that

4   source would be probably the main source of that I would have

5   been aware of.

6         Q    From this hotline?  And what would the hotline do

7   with the tips or complaints?

8         A    I assume that there was -- if it made sense for my

9   jurisdiction to follow up then they -- I assume they would

10  have alerted me.

11        Q    I'm just wondering if there's a database or

12  something that you're aware of that the hotline kept.

13        A    I would assume they tracked it but I'm not aware of

14  that.

15        Q    Okay.

16             BY MR. KOTZ:

17        Q    What is a cause examination?

18        A    It -- there -- it would be an out-of-cycle exam

19  that for some reason made sense, you know, they had some

20  cause to do it out of cycle or not within the routine

21  inspection process.

22        Q    So if you got a tip -- and you said depending on

23  the tip if it's credible and within your jurisdiction you

24  would have an exam or inspection be done, would you at that

25  point do that kind of an examination, a cause examination?

1      A    In our vernacular that would probably -- I would --

2   probably would refer to that as a cause exam, yes.

3      Q    Now you mentioned your jurisdiction.  What was your

4   jurisdiction?

5      A    Primary jurisdiction was inspection of

6   self-regulatory organizations.  And then as part of that

7   program we primary -- we were focused on surveillance

8   investigatory and enforcement programs at the SRMs and then

9   as part of the surveillance programs, a lot of times you'd

10  have to conduct trading exams because the records wouldn't

11  exist solely at the SRMs.  Then we also started, as we got

12  more staff to do trading examinations of broker-dealers or

13  for brokers or specialists, things like that.

14     Q    Okay.  So if a tip or complaint came in and it

15  there was determination that you would do a cause

16  examination, who would determine what the focus of the

17  examination would be?

18     A    Typically being -- if I was referred the tip I

19  would decide what the focus would be, maybe in consultation

20  with my assistant directors.

21     Q    Okay.  But in -- the final decision would be made

22  by you as associate director?

23     A    Yeah, but it's very -- I have a very collaborative

24  approach, it wasn't dictatorial.

25     Q    Okay.  How long would it typically take from the

Page 26

1    time OC receives a credible tip or complaint to begin a cause

2    examination?

3        A    Depending on staffing issues it -- the planning

4    memos should start, you know, more or less immediately,

5    within the next, you know, within a week or so or two at the

6    most.

7        Q    So if it took several months for the planning memo

8    to start, would you consider that too long of a period of

9    time?

10       A    No, I mean, again, it depends on what's starting

11   the -- when it was written or finished, but I would assume

12   that they would start thinking about how to do the exam and

13   staffing it and things like that.

14       Q    Right away?

15       A    Well, you know, within a matter of weeks, yes.

16       Q    Okay.  All right, let's talk -- you mentioned some

17   of the different matters you were involved in related to

18   Madoff Securities, so let me ask you about that.  We can show

19   you a document, this is marked as Exhibit 2 and this is a

20   chart of Madoff exams.  It says at the top, "Appendix A, List

21   of Examinations and Staff."  Yeah, this was created by OC.

22                              (SEC Exhibit No. 2 was marked

23                              for identification.)

24       A    Created by OC in response to --

25       Q    A request to identify the different exams that

Page 27

1    related to Madoff in connection with the investigation, but

2    not during his time there.

3              MR. COBB:  So reasonably created as a summary?

4              MS. STEIBER:  Right.

5              BY MR. KOTZ:

6         Q    Right.  Correct.  So if you see under 1998

7    inspection of eight third-market firms, HQ, 1997 to 1998, you

8    see your name appears there along with several others?

9         A    Yes.

10        Q    Do you recall that inspection, the 1998 inspection

11   of eight third-market firms?

12        A    Yes, I do, vaguely.

13        Q    What do you recall about it?

14        A    I'm sorry, am I on the right one?

15             MR. COBB:  I don't know.  I was just trying to read

16   both pages.

17             THE WITNESS:  Around 1998?

18             MR. COBB:  1998 on this one though, right?

19             MR. KOTZ:  Right.

20             MR. COBB:  Trifocals just killing me.

21             THE WITNESS:  I recall we were -- I recall the

22   issue of best execution was front and center in terms of

23   the -- either recent adoption or the process to adopt the

24   order-handling rules, so we followed up on the issues that

25   are -- the focus of the order-handling rules such as best

Page 28

1    execution and limit order display.  That's what I recall.

2              BY MR. KOTZ:

3        Q    Do you recall if there was any conclusion that the

4    inspection came to about Madoff?

5        A    I don't recall.

6        Q    At the next one on this, Exhibit 2, right above it

7    it says 1999 limit order display review, HQ.

8        A    Yes.

9        Q    And your name is listed on that one as well.

10   And -- so you were involved in that examination?

11       A    Yes.

12       Q    Okay.  So what do you recall about that one?

13       A    That I recall more clearly, we did a limit order

14   display exam of Madoff.

15       Q    What does that mean, "limit order display exam of

16   Madoff?"

17       A    In '97 the SEC passed a rule requiring

18   market-makers and specialists to display customer limit

19   orders that are better than the NBBO and so once the rule --

20   so we were basically making sure that people were complying

21   with the new rules -- or Madoff was complying with the new

22   rules.

23       Q    And what was your involvement with that

24   examination?

25       A    I think I was a branch chief on that exam.

MADOFF_EXHIBITS-00874

Page 29

1      Q    Okay.  I'm going to show you two documents -- three

2  documents in connection with the exam.  We're going to mark

3  these as Exhibits 3a, 3b and 3c.  3a is a memorandum from

4  Lori Richards and you to Richard Walker and Steven Cutler,

5  Division of Enforcement, dated August 3, 2000.  3b is a

6  letter from Lori Richards to Shana Madoff Skoller, December

7  20, 2000.  And Exhibit 3c is a memo from you to Arthur

8  Richardson, Division of Enforcement, dated March 8, 2001.  If

9  you could take a look at these documents and I'll ask you

10 some questions.

11                        (SEC Exhibit Nos. 3a, 3b, 3c were

12                         marked for identification.)

13            (The witness examined the documents.)

14     A    Okay.

15     Q    Okay.  Based on your own general recollection and

16 the documents, what do you recall about the findings in

17 connection with this limit order display review examination?

18     A    I recall pretty much what it says, that we found

19 violations at the firms we inspected.

20     Q    Including Bernard L. Madoff Investment Securities?

21     A    Yes.

22     Q    And do you recall that OC referred it to

23 enforcement for a deficiency letter?

24     A    I recall we referred the results of the exam to

25 enforcement, yes, I do.

Page 30

1      Q    Okay.  Do you recall that at that time OC

2  recommended a deficiency letter be sent out?

3      A    I recall that we sent out a deficiency letter.

4      Q    Okay.

5           BY MS. STEIBER:

6      Q    Do your recall that OC took the position that an

7  enforcement action should be brought in that case?

8      A    I recall that we felt that it -- the violations

9  were material enough to refer to enforcement, yes.

10     Q    And do you recall how enforcement reacted to your

11 recommendation that an action should be brought?

12     A    I don't recall.

13     Q    Do your recall who made the decision that a

14 deficiency letter would be the appropriate result to the

15 exam?

16     A    I don't recall.  What I recall is that we sent a

17 deficiency letter and also referred to enforcement.  I don't

18 recall that that was the final result.

19          BY MR. KOTZ:

20     Q    So did you know if an enforcement action was ever

21 brought against Madoff?

22     A    I do not know.  But obviously, I'm guessing that

23 nothing was ever brought, but I don't know.

24     Q    Now, on 3b, the letter is referenced to Shana

25 Madoff Skoller, do you know if you met Shana Madoff at that

Page 31

1   time?

2       A    During the exam, the onsite portion, I don't

3   recall, but it's possible.

4       Q    Do you recall who the contact person on that exam

5   was from Madoff?

6       A    It was always Peter Madoff.

7       Q    Did you have any contact with anyone else at Madoff

8   Securities during this 1999 limit order display exam?

9       A    I mean, I would say 99 percent of the

10  communications were with Peter Madoff.  I think other people

11  might have said hello or something to that regard, but he was

12  the point person.

13      Q    Okay.  Did you have any contact with Bernie Madoff

14  in connection with the 1999 limit order display exam?

15      A    I think he said hello to the team, if I recall

16  correctly.

17      Q    But that was it?

18      A    That's all I recall.

19      Q    Do you recall why you referred these reports to

20  enforcement for further action?

21      A    I don't recall.

22      Q    Okay.  Going back to the chart, the next matter

23  listed was the 2003 QQQ trading review and your name is

24  associated with that as well.  Do you remember that exam?

25      A    Just a very vague recollection.

MADOFF_EXHIBITS-00877

Page 32

1      Q    Okay.  Let me show you a document, perhaps that

2  will help.  This is a memorandum from you, Eric Swanson, Matt

3  Daugherty to Lori Richards, dated March 3, 2003, and we're

4  going to mark this as Exhibit 4.  Thank you.  And if you can

5  see attached to Exhibit 4 is an April 8, 2003 document

6  request from Eric Swanson to Peter Madoff.

7                          (SEC Exhibit No. 4 was marked for

8                          identification.)

9            (The witness examined the documents.)

10           MR. COBB:  And the record will reflect the act of

11  describing documents.  Is there a question about --

12           MR. KOTZ:  Well, I just wanted --

13           MR. COBB:  Does he recall it?

14           MR. KOTZ:  Well, I just wanted him to read it

15  first.

16           MR. COBB:  Sure.

17           MR. KOTZ:  And then I'm going to show him another

18  document.

19           THE WITNESS:  How much you -- I can read it

20  carefully, I mean, do you want me to spend a lot of time?  I

21  mean, I'm not --

22           MR. KOTZ:  Right.  Well, just -- you don't have to

23  read it and analyze it, just kind of read it over and then

24  I'm going to show you another document and ask you a question

25  about it.

Page 33

1          THE WITNESS:  Okay, sure.

2          MR. KOTZ:  Okay?  This document you can mark --

3          MR. COBB:  Read it over.

4          MR. KOTZ:  -- as Exhibit 5.  This is an e-mail from

5    ▮▮▮▮▮▮▮▮▮ to Eric Swanson with an attached memorandum from

6    ▮▮▮▮▮▮▮▮ to Tom Eidt dated September 12, 2003, Re: Madoff

7    Activity on QQQ.

8                          (SEC Exhibit No. 5 was marked for

9                          identification.)

10         (Witness examined the documents.)

11         THE WITNESS:  You said this is an e-mail or --

12         MR. KOTZ:  No, it's a --  yeah, there's an e-mail

13   dated Monday, October 20, 2002 --

14         THE WITNESS:  Oh, with the attachment?

15         MR. KOTZ:  -- attachment.

16         MR. COBB:  And the attachment is the memo?

17         MS. STEIBER:  Yes, the attachment is the memo.

18         MR. KOTZ:  And I'll just point you out to

19   something, you can continue to read it afterward if you want.

20         THE WITNESS:  Okay.

21         BY MR. KOTZ:

22     Q    In the memo from ▮▮▮▮▮▮▮ to Tom Eidt it says, "We

23   decided to investigate trading in the security based on the

24   fact that the market for QQQ is often locked or crossed.  We

25   have suspected that when one of these types of markets -- for

1    security, that market-makers and specialists were violating

2    their duty at best execution on customer trades."  My

3    question is is that your recollection of what led to this

4    examination?

5         A     Yes, that's a fair sentence.

6         Q     And what was your role in this triple Q

7    examination?

8         A     I was apprised that, if I recall, that -- I often

9    encouraged my staff to come up with ideas, I think Brad came

10   up with this, I'm not sure.  And so my role would have simply

11   said, "Sure, go ahead and do that."

12        Q     Okay.  And then while the examination was ongoing

13   did you have any role?

14        A     Not that I recall, no.

15        Q     Did you have any contacts with anyone at Madoff

16   Securities during this triple Q examination?

17        A     Not that I recall.

18        Q     Okay.

19              BY MS. STEIBER:

20        Q     As the associate director with examinations going

21   on under you, would you monitor the exams to make sure that

22   they were completed?  Would you follow up on the

23   examinations?

24        A     Rely on Eric and Mark to basically manage the

25   day-to-day part of the exams.

MADOFF_EXHIBITS-00880

Page 35

1      Q    And then at some point did -- like monthly, would

2    they come and report to you the exam findings or did you

3    track it on a spreadsheet?

4      A    I think we tracked all of our exams and inspections

5    in a, you know, I think -- I don't know what -- in an Excel

6    type database or something like that.

7      Q    Did you put all of those exams in the Starz

8    database?  Is that what you're referring to?

9      A    I think we had, in-office -- the office had a

10   track -- you know, a summary of all the open inspections and

11   exams and I would get copies of that.

12     Q    And would you follow up to make sure that they were

13   being worked on or --

14     A    I mean, where I felt -- I would ask questions and

15   see how things were going, sure.

16          MR. KOTZ:  Okay, show him the e-mail.

17          MR. COBB:  Are you done with five or --

18          MS. STEIBER:  Yes.

19          BY MR. KOTZ:

20     Q    Yeah.  Okay, we're going to mark the next document

21   as Exhibit 6.  And this is an e-mail from ███████████ to Matt

22   Daugherty 8/27/2003, 5:26 p.m.  And here it references Matt,

23   "We had a second call with Madoff and I think we understand

24   these trades a lot better."  Do you know if you were on the

25   phone with any of the calls with Madoff in connection with

1    this exam?

2                              (SEC Exhibit No. 6 was marked for

3                              identification.)

4        A    I don't recall that I was, no.

5        Q    Okay.  Do you know when he says, "We had a second

6    call with Madoff," who he's referring to?  Is that Peter

7    Madoff?

8        A    I don't know.

9        Q    Okay, let me show you another document.  This is an

10   e-mail from you to Eric Swanson dated 10/29/2003, 3:52 p.m.

11   We're going to mark this as Exhibit 7.  And this document

12   you -- it's entitled, "Call Madoff Re: Fleet ASAP."  Do you

13   remember why you were suggesting to Eric Swanson that he call

14   Madoff?

15                             (SEC Exhibit No. 7 was marked for

16                             identification.)

17       A    '03, I don't recollect why.

18       Q    Do you know what Fleet is?  Re: Fleet ASAP?

19       A    Fleet is a broker-dealer in -- I'm pretty sure.

20       Q    So is it a different broker-dealer?  Is it related

21   to Madoff?

22       A    Right, it's a separate broker-dealer.

23       Q    Okay.  So do you have any idea why you would be

24   suggesting call Madoff Re: Fleet?

25       A    I could guess, but maybe Fleet was sending Madoff

MADOFF_EXHIBITS-00882

Page 37

```
 1    orders, their retail order -- something to do with that.

 2         Q    Okay.

 3         A    But that's a guess.

 4         Q    Okay.  I understand that.  Mark the next document

 5    as Exhibit 8.  And this is a memorandum from           to

 6    Eric Swanson dated November 10, 2003, Re: Examination of

 7    Madoff, Execution --

 8                         (SEC Exhibit No. 8 was marked for

 9                          identification.)

10              MR. COBB:  You want this back?  I'm trying to --

11              BY MR. KOTZ:

12         Q    Okay.  If you look in the second paragraph it says,

13    "The staff has found numerous inconsistent instances of bad

14    executions by MADF, Bernard L. Madoff Investment Securities

15    LLC."

16         A    I'm sorry, I don't see where you're reading.

17         Q    I'm sorry, second paragraph.

18         A    Yeah.

19         Q    See where it says --

20         A    "The staff has found --"  Okay.

21         Q    "-- resulting in some loss to the customers

22    involved."  So "Staff has found numerous inconsistent

23    instances of bad executions by Madoff resulting in some loss

24    to the customers involved."  So you recall that that was the

25    conclusion of the triple Q exam?  And then if you can -- if
```

Page 38

1  you also look at the --

2      A    I don't recall that.

3      Q    Okay.

4          MR. COBB:  Go through it and look at the

5  appendices.

6          THE WITNESS:  Okay.

7          BY MR. KOTZ:

8      Q    If you could take a look at the third page in the

9  document which has conclusion.  You see where it says, "The

10 staff believes that there's a best execution problem with

11 Madoff.  The staff further believes that Madoff and its

12 broker customers have thus far failed to adequately monitor

13 this behavior.  Based on these conclusions, the staff

14 recommend that a deficiency letter be sent out outlining the

15 problem areas, as well as recommending that Madoff execute

16 customer orders at ECNs when it is able to do so rather than

17 proprietorialy taking that price, all that is getting the

18 customer a worse IT price."

19          Do you recall that in the triple Q exam, staff

20 concluded that there was a best execution problem with Madoff

21 in general?

22     A    I mean, obviously I see it now, but I don't recall,

23 you know, obviously this is refreshing -- this I agree with,

24 it says what it says.

25     Q    Okay.  And do you recall that the staff recommended

MADOFF_EXHIBITS-00884

Page 39

1    that a deficiency letter be sent out?

2        A    I mean, without seeing this I wouldn't have

3    recalled it, but yes, I can see that they -- that's what they

4    recommended.

5        Q    Okay.  And the first page of this document, Exhibit

6    8, it says at the top, BE-Final.  Do you see that?

7        A    Yes.

8        Q    Do you know what that would refer to?

9        A    Probably best ex-final, would be my guess.  I'm

10   guessing.

11       Q    Is that your handwriting?

12       A    It's no my handwriting, no.

13       Q    Do you know it a deficiency letter was ever sent

14   out in connection with the triple Q exam?

15       A    I don't recall.

16       Q    Who would have made the decision to -- whether or

17   not to send out a deficiency letter?

18       A    Deficiency letter would typically be done by --

19   recommended by the branch chief and the assistant director.

20       Q    So the --

21       A    And then they would probably cc me or alert me

22   depending on how serious it was.

23       Q    Okay.  But who would actually make the decision as

24   to whether to send it, not recommend that it be sent but

25   decide that they would send it?

Page 40

1      A    I mean, it's -- depending on how serious it is,

2  it's something that a branch chief could do, but they would

3  certainly alert their assistant -- the assistant director --

4      Q    Okay.

5      A    -- or cc them.

6      Q    Now, if a deficiency letter was sent out, would it

7  be in the work papers?

8      A    It should be in the work papers, yes.

9      Q    Okay.  Now, we had testimony from [OCIE Staff Attorney] and I

10 wanted to tell you what he said and give -- ask you to

11 comment about this.  He indicated to us that he didn't

12 believe a deficiency letter was ever sent out and when asked

13 why he said, "I remember seeing this memo -- sending this

14 memo, and frankly, there were a lot of projects at the time

15 that would kind of die off.  I mean, you know, you do some

16 initial review and then you go up the chain and I think the

17 superiors had determined, "Well, I got other things to worry

18 about."  Those old projects just kind of languished and I had

19 a lot of projects like that."

20         And then when asked specifically about this project

21 he said, "There was never any further direction.  It was a

22 pretty common occurrence."  Is that an accurate reflection of

23 what happened in OC at that time?

24     A    I would disagree with that characterization.

25     Q    Okay, in what way?

Page 41

1    A    Well, I mean, he's -- that's his perception of what

2  was going on at the time, but -- above him, but I would

3  disagree with that description.

4    Q    So what was your perception of what went on and

5  that you would disagree?

6    A    Well, if he felt things died there might have been

7  reasons why they died and maybe he wasn't aware of.

8    Q    Okay.

9         MS. STEIBER:  Is that normal practice, not telling

10  the staff that performs an examination of the reasons why

11  their recommendation wasn't accepted?

12        THE WITNESS:  I would tell people who worked for me

13  exactly what was going on.

14        MR. KOTZ:  And you don't remember why there's at

15  least no record, and according to ▮▮▮▮▮ there was no

16  deficiency letter sent out in the triple Q exam?

17        THE WITNESS:  I don't remember why, no.

18        MR. COBB:  Only for clarification, he doesn't know

19  that there's no record.

20        MR. KOTZ:  Right.

21        MR. COBB:  Okay.

22        MS. STEIBER:  But wouldn't you, as the associate

23  director, keep track of what open projects there were and

24  what conclusions each project had?

25        THE WITNESS:  Yes.

Page 42

1              MS. STEIBER:  Where would you keep track of that?

2              THE WITNESS:  Like I said, we had a -- Tina Berry

3    was for the -- most of the years, responsible for keeping

4    track of our open inspections.

5              MS. STEIBER:  Okay, so --

6              THE WITNESS:  And so --

7              MS. STEIBER:  And so if I go to Tina Berry she

8    should have a record of the inspections that were under you

9    as associate director and their resolutions?

10             THE WITNESS:  I think that's fair, yes.

11             BY MR. KOTZ:

12        Q    So if we went to Tina Berry and/or reviewed the

13   work files and found no evidence of deficiency letters, isn't

14   it likely that a deficiency letter was never sent out?

15        A    I mean, if you can't find one, I think that's a

16   reasonable conclusion, yes.

17        Q    Okay, next document.  Okay, this next document is

18   an article called "Don't Ask, Don't Tell, Bernie Madoff is so

19   Secretive He Even Asks his Investors to Keep Mum," by Erin

20   Arvedlund, 5/7/2001.  A two-page document we're going to mark

21   as Exhibit 9.

22                        (SEC Exhibit No. 9 was marked for

23                         identification.)

24             MR. COBB:  Read it --

25             (The witness examined the document.)

1          BY MR. KOTZ:

2          Q    Okay, do you recall ever seeing this document

3    before?

4          A    I mean, I see it now but I don't recall, no.

5          Q    Okay.  Do you see where it says at the top, "John,

6    she is very good.  This is a great exam for us.  Lori."

7          A    Yes.

8          Q    Do you think that refers to Lori talking to you?

9          A    Yes.

10         Q    And you see that this is dated 5/7/2001, and if you

11   look in the bottom right-hand corner it has a date 5/15/2001.

12   Do you know whether Lori Richards sent you this article in --

13   sometime in May of 2001?

14         A    I don't know.

15         Q    Do you regularly read Barron's?

16         A    No.

17         Q    Okay.  Do you consider it a reputable publication?

18         A    Yes.

19         Q    Other than recalling specifically this article

20   right now, do you recall that Lori Richards sent you a copy

21   of an article about Bernie Madoff and suggested that this

22   would be a great exam?

23         A    I mean, it looks like she did but I don't recall

24   it.

25         Q    Okay.

Page 44

1    A    And it's eight years ago, right?

2    Q    I'm sorry?

3    A    It's eight years ago, so it's a long time ago.

4    Q    Let me ask you just about a couple of things in the

5    article.  The third paragraph down, you see it says, "But

6    what few on the street know is that Bernie Madoff also

7    manages more than 6 billion for wealthy individuals.  That's

8    enough to rank Madoff's operation among the world's five

9    largest hedge funds according to a 2001 report in MarHedge, a

10   trade publication."

11        Were you aware of the magnitude of Bernie Madoff's

12   managing of money and the fact that he was a very, very,

13   large hedge fund, enough to rank him among the world's five

14   largest hedge funds in the early 2000's?

15   A    Was I aware?

16   Q    Yeah.

17   A    Not -- no, and if I read this it would have been

18   probably my first awareness of that business.

19        BY MS. STEIBER:

20   Q    So if Lori sent you an article, do you think that

21   you would have read it?

22   A    I mean --

23   Q    She sent you an article in 2001.

24   A    Sure.

25   Q    Do you think you would have read it?

MADOFF_EXHIBITS-00890

Page 45

1    A    Typically I would have, but it's possible I didn't.

2    Q    And if you read it in 2001 and you saw that Bernie

3    Madoff manages more than $6 billion for wealthy individuals,

4    would that have seemed like a large amount of money at that

5    time -- in that time period from 2001 to 2003?

6    A    I would have -- yeah, I wasn't familiar with the

7    hedge fund business, I wouldn't have known.  I mean, I would

8    have saw -- I would have saw they said the five biggest of

9    the -- I would assume that that's what it would have been.

10    Q    Well, you said in the mid-90's that you were

11    familiar with Bernie Madoff as a market-maker.  If you had

12    read this in 2001 would it have surprised you that he's also

13    supposedly managing money in the 6 billion range?

14    A    That he also had a hedge fund business wouldn't

15    have surprised me, no.  I mean, I didn't -- I simply didn't

16    know.

17    Q    You had never heard of it before but it wouldn't

18    have surprised you?  .

19    A    I mean, firms have run different businesses.

20    Obviously, I was focused on the trading business; if they had

21    other ones I wasn't aware of that.  And then, obviously, if I

22    read this I would have been aware.

23    Q    But you were just saying that you're not familiar

24    with the hedge fund business, so at that point, when you have

25    an article and -- that's been brought to your attention for a

MADOFF_EXHIBITS-00891

Page 46

1   great exam and some of the information you might not be

2   familiar with, was there someone you would have gone to in OC

3   so that they could explain it to you?

4       A    If I felt a need that I needed to have it explained

5   to me, yes, I would.

6       Q    Okay, so if you read something and you didn't

7   understand it, would you have felt a need to understand it?

8       A    Well, this seems self -- I -- this seems self --

9   you know, this seems -- it says what it says so I don't see

10  why I would have asked someone to explain anything to me.

11      Q    Okay.  So you're unfamiliar with hedge funds, this

12  is -- and that's not familiar to you and you might have a

13  great exam but you would not have sought out any more

14  information about the hedge funds mentioned in the article.

15  Is that your testimony?

16      A    I don't recall either one way or the other seeking

17  out any other information.

18      Q    Okay.

19           BY MR. KOTZ:

20      Q    There's a reference in the sixth paragraph to

21  Fairfield Greenwich.  Do you see that?  And Fairfield Century

22  Limited?

23      A    Yes.

24      Q    And then, "Managed by Bernie Madoff, Fairfield

25  Century has assets of 3.3 billion."  Do you know if OC ever

1    examined any of the Madoff feeder funds like Fairfield?

2        A     I do not know.

3        Q     Okay.

4              BY MS. STEIBER:

5        Q     Did you get a status on what other associate

6    directors in OC -- what matters they were managing?

7        A     I don't recall ever getting any --

8        Q     You didn't have like --

9        A     -- documents as to what they were doing.

10       Q     Not documents, but would you get e-mail, like

11   updates, showing you what everyone was working on?

12       A     No, I don't recall that.

13       Q     Did you have OC meetings --

14       A     We had a staff meeting in which -- yes, in which

15   the other associates would talk about, you know, their most

16   significant projects.  So yeah, is -- it was oral but, yeah.

17       Q     So -- and you don't remember a hedge fund sweep

18   that was -- of fund-to-funds that was performed in 2003?

19       A     I don't recall, no.

20             BY MR. KOTZ:

21       Q     Okay.  So if you got an article from Lori Richards

22   that said, "She's very good.  This is a great exam for us,"

23   what would you have done?

24       A     I don't know what I did in this instance.

25       Q     Okay, but in --

MADOFF_EXHIBITS-00893

Page 48

1    A    I don't recall opening an exam as a result of this

2 article.

3    Q    Okay.  Do you recall any further conversations with

4 Lori Richards about her suggestion that you do an exam?

5    A    I don't recall.

6    Q    Okay.  Do you know if you ever contacted Erin

7 Arvedlund to get more information about what she wrote in the

8 article?

9    A    I don't recall.  I mean, I would recall, I

10 didn't -- I never called or spoke to her.

11   Q    Was there a prohibition in OC or some kind of rule

12 against calling an author of an article like this to get more

13 information?

14   A    Not that I'm aware of.

15   Q    Okay.  Let me show you another document, we'll mark

16 this as Exhibit 10.  This is an e-mail from you to Eric

17 Swanson dated December 11, 2003, 1:53 p.m.  To see if this

18 further refreshes your recollection, this is a copy of the

19 same article, it seems as though you're forwarding to Eric

20 Swanson in 2003.

21                        (SEC Exhibit No. 10 was marked for

22                             identification.)

23   A    The same article that I just saw?

24   Q    Yes.

25   A    Okay.

Page 49

1       Q       Okay.  Do you have any recollection of why you

2   might have forwarded this article to Eric Swanson two years

3   later?

4       A       Typically, I forward articles as an FYI or possibly

5   for something for us to follow up on.

6       Q       Okay.  But you don't remember specifically

7   forwarding this article or seeing this article?

8       A       I don't recall, no.

9               BY MR. WILSON:

10      Q       Do you recall why Tina Berry sent you these

11  articles?

12      A       I'm only guessing, I mean, because she knows that

13  we've done exams on Madoff and we might find it interesting.

14      Q       But you don't recall any type of conversation about

15  that?

16      A       With Tina?

17      Q       Yes.

18      A       I don't recall.

19              BY MR. KOTZ:

20      Q       Okay, let's show you another document, we'll mark

21  this Exhibit 11.  This is an e-mail from ███████████████ to

22  Mavis Kelly dated Wednesday, May 21, 2003, 5:47 p.m.  This is

23  a two-page e-mail with several attachments.

24                              (SEC Exhibit No. 11 was marked for

25                                  identification.)

Page 50

1          (The witness examined the document.)

2          MR. COBB:  I'm sorry, Exhibit 11?  Did we skip one

3    or did I miss one?

4          MR. KOTZ:  This is 10.

5          MR. COBB:  Okay, I'm sorry.  Thanks.

6          BY MR. KOTZ:

7     Q    Have you ever seen this document before?

8     A    I don't recall ever seeing this, no.

9     Q    No?  Do you know whether this document triggered a

10   cause examination of Bernie Madoff?

11    A    I don't know.

12    Q    Do you know what did trigger the cause examination

13   of Bernie Madoff in 2004?

14    A    Which cause exam are you referring to?

15    Q    The cause exam that Washington Headquarters worked

16   on.

17    A    The one that was within my group?

18    Q    Yeah.

19    A    I mean -- thought about it, I think it was the --

20   an article that I was made aware of and I assume it's that

21   article.

22    Q    Okay.  Let me show you another document.  This is

23   an e-mail from you to Lori Richards dated December 18, 2003,

24   6:13 p.m.  We're going to mark this as Exhibit 12.  And in

25   this article you say, "Lori, regarding tip IA/IC received

Page 51

1    about Madoff, a compliance officer and an investment advisor

2    notified Mavis that he was concerned about the returns

3    Fairfield was posting."  Then you say, "We would like to

4    contact this compliance officer and get a better

5    understanding of how the strategy is supposed to work."

6                          (SEC Exhibit No. 12a was marked for

7                          identification.)

8         MS. STEIBER:  So do you now recall that you were

9    familiar with this tip from ████████████ to Mavis?  And

10   remembering that you're under oath.

11        THE WITNESS:  I remember I'm under oath all the

12   time.  Again, I'm -- I can see what's said in this e-mail

13   and -- so, I'm a little confused by the e-mail because it

14   seems to be from me but it seems to be written from Eric.

15        MS. STEIBER:  Like you had forward -- maybe had

16   forwarded an e-mail that you were writing with Eric to Lori?

17        THE WITNESS:  Yeah, but this doesn't look like a

18   forward, I -- in terms of the e-mail traffic.

19        MS. STEIBER:  Did you and Eric work closely

20   together?

21        THE WITNESS:  Yes.

22        MS. STEIBER:  So it was possible that you could

23   work on an e-mail together and send it to Lori?

24        THE WITNESS:  Yes.

25        MR. COBB:  Yes, it's possible?

Page 52

1          THE WITNESS:  It's possible, yes.

2          BY MR. KOTZ:

3     Q    Okay, I'm going to show you another document.

4     We'll mark this as Exhibit 12.  This is an e-mail from you,

5     Eric Swanson, Mark Donohue, Genevievette Walker, Jackie Wood,

6     to Lori Richards, dated December 2003.

7               If you see in this document, which is a planning

8     memorandum, in the background section it says, "The staff

9     received -- recently received information from an outside

10    source alleging that Bernard L. Madoff, the principal of

11    Bernard L. Madoff Investment Securities LLC, Madoff

12    Securities, a leading market-maker in -- securities has been

13    front-running violations."

14               Do you see that?

15                         (SEC Exhibit No. 12b was marked for

16                              identification.)

17    A     Yes.

18    Q     Okay.  Were you aware that there was an examination

19    in your group of Bernard Madoff of alleged front-running

20    violations?

21    A     Yes.

22    Q     Okay.  Do you know what the outside source referred

23    to in this memorandum was?

24    A     I don't -- I can only guess that the article but

25    I'm not sure.

Page 53

1       Q       You think the article was an outside source and not

2       the ████████████ complaint that was sent in May of 2003

3       and that is referred to in the December 2003 e-mail?

4       A       I don't know, but it makes sense, yes.

5       Q       So -- but you do remember that a cause exam was

6       initiated of Bernard L. Madoff and Madoff Securities; is that

7       right?

8       A       Yes.

9       Q       Okay.  And --

10      A       By my group.

11      Q       By your group.  And what was your involvement in

12      that cause exam?

13      A       I instructed my staff to do the cause exam.

14      Q       Why did you instruct your staff to do the cause

15      exam?

16      A       My recollection is that Lori -- Lori and I had a

17      discussion, it could be e-mails, I'm not -- I can't remember

18      exactly, that there's allegations that Madoff may be taking

19      advantage of his retail order flow.

20      Q       Where did those allegations come from?

21      A       My recollection is they were from the media, the --

22      a newspaper article, or Barron's would be my guess.

23      Q       Okay.  And in that conversation did you talk about

24      the fact that you had received a complaint from an entity

25      like Mr. ████████ and then actually followed up with him on

Page 54

1   several occasions to get information about his allegations

2   about Bernie Madoff?

3        A     I don't recall.  I don't recall his allegations.

4        Q     And how is the decision made as to what the cause

5   examination of Madoff would focus on?

6        A     Well, my group was responsible for trading exams,

7   so we focused on, in essence, the trading aspect of the

8   allegation.

9        Q     What was the trading aspect of the allegation?

10       A     Well, whether the retail order flow could be, you

11  know, based on the best execution exam, could be harmed by if

12  information was passed to other entities.

13       Q     What about allegations that were raised by ███████

14  ███████████ that seemed to indicate Mr. Madoff was not actually

15  trading at all?

16       A     I don't recall those allegations.

17       Q     Okay.  So is it possible that you made this

18  decision with Lori as to how to focus the cause exam of

19  Madoff without being aware of allegations that came in at the

20  same time by ██████████████████?

21       A     I'm trying to understand your question.

22       Q     Well, is it possible that you made the decision to

23  focus the cause exam of Bernie Madoff on front-running

24  allegations without being aware that ████████████████ had

25  come in and brought allegations to OC that were somewhat

1    different in nature?

2        A    Is it possible that I -- I focused on the

3    front-running aspect of the exam, yes.

4        Q    Because you hadn't seen the fact that a complaint

5    had come in around the same time period that your staff was

6    working on -- your staff was aware of.

7            MR. COBB:  I think that misstates his testimony, he

8    said he --

9            MR. KOTZ:  I'm asking the question.

10           MR. COBB:  -- just didn't recall.

11           MR. KOTZ:  But I'm asking the question.

12           MR. COBB:  Well, you said he said, that was my

13   objection.

14           BY MR. KOTZ:

15       Q    All right, I'll re-ask the question.  You made the

16   decision to -- was it you who made the decision to focus on

17   front-running in this cause exam?

18       A    Look I -- as I recall I got a -- I had a discussion

19   with Lori saying there was allegations of front-running of

20   Madoff's retail -- so that's what I -- so therefore, I

21   focused on that.

22       Q    So it was you who made the decision to focus on

23   front-running?

24       A    Was it me?

25       Q    Yeah, you.

MADOFF_EXHIBITS-00901

Page 56

1    A    That's all I recall that I focused on because that
2    was -- it could be mainly because that was the area of
3    expertise for my crew.
4    Q    Okay, but I'm trying to establish who made the
5    decision to focus on front-running.  Was that a decision made
6    by you?
7    A    I don't recall focusing on front-running, I recall
8    talking to Lori that there's allegations of front-running so
9    I said that -- so I said that would be an area that we could
10   do an exam.
11   Q    Okay, so who made the decision in the Madoff exam
12   that the exam would look at front-running?
13   A    I made -- I decided the scope of the exam for Mark
14   Donohue.
15   Q    Okay.  And you're not aware that at the same time
16   period your staff had received a complaint from ███████
17   ███████ that made different allegations; is that right?
18   A    I don't recall ever seeing that, no.
19   Q    Let me ask you a couple questions about Exhibit 11,
20   which is ████████████ complaint.  I'll just ask you if
21   this -- the issues at all were ever raised at that time
22   period.  One of the things that ████████ says is -- and you
23   can look kind of middle way down the page it says, "According
24   to BMS," do you see that?
25   A    Yes.

1    Q    "The options are traded with a number of traders

2  and crossed on the CBOE."  Do you know what the CBOE is?

3    A    Yes.

4    Q    What is it?

5    A    It's an options exchange in Chicago.

6    Q    Okay.  And you knew what that was at the time?

7    A    Yes.

8    Q    Okay.  Then it says, "With an 8 to 10 billion size

9  you must see the volume, but unfortunately you don't.  We

10  actually checked with some of the largest brokers, UBS,

11  Merrill, et cetera, which told us they never traded with them

12  OEX options.  The question is do they really implement the

13  full strategy?"

14         Do you recall at any time in making a determination

15  about what the scope of the Madoff exam would be, this issue

16  about whether Madoff was actually implementing his trading

17  strategy for options --

18    A    I don't recall.

19    Q    You don't recall this issue being something that

20  was discussed or what don't you recall?

21    A    I don't recall it being discussed, I don't recall

22  being aware of it.

23    Q    I'm sorry?

24    A    I don't recall being aware of it at this time.

25    Q    Okay.  All right, another question from this

Page 58

1    document to ask whether you recall being aware of -- you see

2    where it says, "Accounts are typically in cash at month end?"

3        A    Yes.

4        Q    Do -- first of all, do you know what is -- is there

5    any relevance to that, why accounts would be typically in

6    cash at month end?

7        A    I don't know.

8        Q    Would there be any securities regulation

9    requirements that Madoff could avoid by going to cash at the

10   end of every month?

11       A    There could be, I'm not familiar at the top of my

12   head what those are.

13       Q    Okay.  And then further down on this Exhibit 11,

14   ████████ complaint, it says, "There are no third-party

15   brokers involved in the process.  The auditor of the firm is

16   a related party to the principal."  Is that -- would that be

17   a concern?

18       A    Now, obviously, it would be.

19       Q    But it wouldn't at that time.

20       A    I wasn't aware of this at the -- I can't recall

21   being aware of this at the time, so --

22       Q    Okay, but would it be a concern?  Before whatever

23   happened in December 2008, would that be a concern?

24       A    It would be, certainly noteworthy, something that

25   should be followed up, perhaps.

1    Q    And do you know if in connection with the cause

2    exam of Madoff if anyone did follow up about this issue of

3    whether there are no third-party brokers involved or anything

4    about the auditor of the firm?  Was that ever followed up?

5    A    Not that I recall.

6    Q    Okay.  And then earlier in that same document,

7    Exhibit 11, it says, "The firm does not charge any management

8    or performance fees to these accounts, but rather brokerage

9    commissions.  We estimate the amount of money management --

10   strategy by BMS, somewhere between USD 8 to 10 billion.  Is

11   that something that would be a concern?

12   A    A concern of me at the time, I don't know.

13   Q    But I mean, the fact that the firm does not charge

14   any management or performance fees, is that -- would that be

15   odd?

16   A    Obviously, now having read a lot of stuff in the

17   media, I understand that that is odd.  At the time I might

18   not have been -- I was not familiar with this part of the

19   business.

20   Q    Okay.  And then if you see in Exhibit 11 there are

21   several attachments.  One attachment is another article in

22   MarHedge entitled, "Madoff Tops Charts, Skeptics Ask How."

23   Do you see that article?

24   A    Yes.

25   Q    Do you recall that?  Have you ever seen this

Page 60

1  article before?

2       A    I don't recall seeing this article.

3       Q    At the time you -- at the time that you made the

4  determination to have the staff undertake the Madoff cause

5  exam, were you familiar with the basic characteristics of a

6  Ponzi scheme?

7       A    I would say I -- in the colloquial sense, yeah, I

8  would understand what Ponzi scheme is.

9       Q    Couple of things that were referenced in the

10  article I wanted to ask you about.  If you could see on page

11  2 of the article, the second page of the article --

12            MR. COBB:  Hedge article?

13            BY MR. KOTZ:

14       Q    Sorry, yes, MarHedge article, attached to the

15  ████████ complaint.  It says, "Skeptics who express a mixture

16  of amazement, fascination, and curiosity about the program

17  wonder first about the relative complete lack of volatility

18  in the reported monthly returns.  Among other things they

19  also marvel at the seemingly astounding ability to time the

20  market to move to cash in the underlying securities before

21  market conditions turn negative and the related ability to

22  buy and sell the underlying stocks without noticeably

23  affecting the market."

24            Do you remember that that was an issue that was

25  discussed or was thought about when you were going to

```
 1   undertake the cause examination of Madoff?

 2        A    I don't recall that being an issue, no.

 3        Q    Okay.  Do you recall anything about the lack of

 4   volatility in Madoff's returns being an issue?

 5        A    No.

 6        Q    Do you know if anybody ever contacted the

 7   individual who wrote this article, Michael Ocrant, in

 8   connection with the Madoff examination?

 9        A    I did not contact him, I don't know if anyone else

10   did.

11        Q    Okay.  You think if you had been aware of this

12   ████████████  complaint the examination's scope might

13   have been more than just front-running?

14        A    It's -- my area was on trading so it's -- it could

15   have very well been the same, same scope.

16        Q    But if you got a complaint that alleged other

17   areas, for example, that he may not have been trading at all,

18   you would have done the same type of exam?

19        A    It's a hypothetical, I don't know what I would have

20   done.  But certainly, reasonably would have followed up with

21   it whether it was my group or another -- another group did

22   it.

23        Q    Okay, so even if your group --

24        A    There's jurisdiction issues, so I was careful, you

25   know, we were careful not to do IASE exams -- not careful but
```

1    simply, you know, we would make sure that the appropriate

2    area of the OC did the exam.  So I probably would have worked

3    with other areas.

4           BY MS. STEIBER:

5      Q    Well, let me ask you about that.  You wouldn't have

6    worked with other areas, is that what you just said?  Sorry.

7      A    I didn't say that, no.

8      Q    Okay.  Well, what I don't understand is if you're

9    going in for an examination and you said your expertise is

10   trading, and you're the associate director and you're putting

11   together a team; could you have pulled from the Investment

12   Advisor part of OC to get an examiner on the team who is more

13   familiar with hedge fund trading?

14     A    I could have done that or could have separated the

15   issues and had -- you know, have the IC group do the -- do

16   that exam separately.

17     Q    But if you have a registered broker-dealer but not

18   registered hedge fund, so you would -- you could create the

19   team though that goes in, because of the BD registration, any

20   way you want, right?  You could have somebody with investor

21   advisor experience, someone with broker-dealer trading

22   experience, someone with other types of experience; you don't

23   have to just have people from the Market Oversight or SRO

24   group, correct?

25     A    There's no requirement or guideline that would --

MADOFF_EXHIBITS-00908

1  that, correct.

2        BY MR. KOTZ:

3    Q    Do you recall what time period it took from the

4  time that you instructed the staff to initiate the Madoff

5  exam as to when the planning memo began to be prepared and

6  the exam was initiated?

7    A    I saw the -- if that's a planning memo, but I don't

8  recall.

9    Q    You don't recall it being a particularly long

10  period of time, many months, before the planning memo was

11  ever started?

12    A    I don't recall that, no.

13    Q    Okay.  But if the office received a complaint from

14  ███████████████ in May of 2003 and the planning memo

15  didn't -- wasn't drafted until lat December 2003, do you

16  think that was too long a period of time to follow up on a

17  complaint?

18    A    It would depend on a variety of factors that --

19    Q    What would those factors be?

20    A    Well, resources, how, you know, how credible the

21  complaint was, et cetera, things like that.  But obviously,

22  the decision was made to do the exam, so typically I would

23  expect once a decisions been made for the planning memo to

24  be, you know, done in a relatively short period of time.

25    Q    Okay.  And that would be a lot shorter than seven

Page 64

1   months, would you say?

2        A    What I'm talking about -- from what -- you know,

3   when the decision was made to do the exam to start the

4   planning memo.

5        Q    Okay.  What about the time period from when the

6   complaint came in until the decision was made to do the exam,

7   could that take months?

8        A    It could, but I would expect it to, you know, to be

9   done, you know, in less than months.

10       Q    Okay.  Why don't we go to the planning memo.  Okay,

11  going back to Exhibit 12, the planning memo.  You see in this

12  memo, which is from you and several others to Lori Richards,

13  under "Course of Action," number 3 on the first page?  See,

14  it says, "The staff intends to send a letter to NASD

15  requesting execution data for Madoff Securities for the time

16  period of January 1, 2001 through December 31, 2002."

17            Why would staff send a letter to NASD requesting

18  execution data?

19       A    Because it's often easier to get trade data

20  directly from the NASD and it has a certain level of

21  reliability.

22       Q    And do you know who made the decision to -- that it

23  says that "The staff intends to send a letter to the NASD

24  requesting execution data?"

25       A    I'm pretty sure it was -- my understanding was Mark

1   Donohue was running the exam so I would expect it to be him.

2        Q    And do you know whether the staff ever did send a

3   letter to the NASD requesting execution data for Madoff

4   Securities?

5        A    I don't know if they actually did it but I would

6   assume they would have.

7             BY MS. STEIBER:

8        Q    Is it a standard step in a front-running exam to

9   get trade data from the NASD or from an exchange?

10        A    It makes a lot of sense, yes.  But I mean,

11   front-running exams are relatively -- you know, there's -- I

12   don't recall ever being involved in that many of them, so

13   whether there's a standard step probably is overstated.

14        Q    So it wouldn't be unusual --

15        A    No.

16        Q    -- to get the trade data and it would be --

17             MR. KOTZ:   And appropriate --

18             MS. STEIBER:   -- good practice.

19             THE WITNESS:   It makes sense to get it, yeah.

20             BY MR. KOTZ:

21        Q    Okay, I'm going to show you a document.  It's a

22   draft letter to the NASD from Eric Swanson, December 17,

23   2003.  And we're going to mark this as Exhibit 13.  Would

24   this letter be requesting the execution data from NASD?

25                       (SEC Exhibit No. 13 was marked for

Page 66

1                             identification.)

2       A    It looks like it, yes.

3       Q    And you don't know if this letter was ever sent

4   out?

5       A    This is obviously -- not the signed copy on

6   letterhead, so --

7       Q    Okay.  You mentioned earlier that you remembered

8   two tips that came in while you were in OC.  Any of them

9   relate to Madoff?

10      A    That would be this as a tip, yes.  I would view the

11  Madoff -- my recollection is Madoff was -- I would qualify as

12  a tip.

13      Q    Okay, so one of them is the one we're discussing

14  now and what is the other one?

15      A    Again, I use a tip, the Knight Securities case was

16  started based upon an allegation by an employee there.

17      Q    An allegation by --

18      A    By an employee at Knight.  So I would view that as

19  a tip as such.

20           MS. STEIBER:  Did that come in to you?

21           THE WITNESS:  I think -- now that I think about it

22  more, I think it was part of a arbitration that we became

23  aware of, so --

24           BY MR. KOTZ:

25      Q    Okay, I'll show you another document, mark this as

MADOFF_EXHIBITS-00912

1    Exhibit 14.  This is an e-mail from Lori Richards to you,

2    12/10/2003, 7:13 p.m. responding to an e-mail from you to

3    Lori.

4                          (SEC Exhibit No. 14 was marked for

5                          identification.)

6              MR. COBB:  What's the number?

7              THE WITNESS:  14.

8              BY MR. KOTZ:

9         Q    Do you recall anything about an informant on Canary

10   that also had information about Madoff?

11        A    I guess my recollection of why I started the Madoff

12   exam was based on that tip, so that makes sense.

13        Q    A tip from the outside, because previously you

14   talked about an article?

15        A    Right, but again, when I was -- in my recollection

16   of my discussions with Lori, you know, again, it's a long

17   time ago, my recollection was it was a tip or somehow she

18   became aware of the possibility of front-running.  So whether

19   she got it from the article or tip, you know, this seems more

20   consistent with my recollection.

21        Q    Okay.  What -- you say in this e-mail in response

22   to Lori, "How can I get trading records if they're hedge

23   fund?  Can we get a formal order?"  Why would you want to get

24   a formal order?  What kind of formal order would you want to

25   get?

MADOFF_EXHIBITS-00913

1      A    Again, my guess -- again, this is -- a guess, is

2   that I felt we couldn't get their -- I felt they probably

3   weren't registered or I knew that somehow and we couldn't

4   get -- we would -- couldn't get their records through the

5   exam process.

6           BY MS. STEIBER:

7      Q    So why didn't you seek a formal order?

8      A    My understanding is that Madoff agreed to give us

9   trading records voluntarily, so -- would have needed -- if

10  they agree to give you the records then it doesn't

11  necessitate to get a subpoena requiring them to do it.

12     Q    So if you have a registered broker, a

13  broker-dealer, you can have any of their trading records,

14  correct --

15     A    Right.

16     Q    -- without needing a formal order?  You didn't need

17  him to agree, he would have to provide all of his trading

18  records to you.

19     A    Right, but my understanding at the time, obviously

20  I understand more now, but was that Madoff had a hedge fund,

21  so that's probably why I said that.  But yes, you're right,

22  all of the records -- broker-dealer records -- would not have

23  been why I would have said that.

24     Q    Okay.

25           BY MR. KOTZ:

1    Q    And then you say in this, "I will draft a letter to

2  get that info tomorrow a.m.  Okay with you?"  Lori says yes.

3  Do you know if a letter was ever drafted?

4    A    Usually when I tell Lori I would do something I

5  would have instructed people to do it, so -- but I can't

6  recall whether a letter was actually drafted.

7         BY MS. STEIBER:

8    Q    And could you walk us through what the purpose of

9  drafting a letter would be based on your e-mail?  You know,

10  describe what types of data you were going to request.

11    A    Well, I'd say if I can -- again, my -- I don't

12  recall this but do you want me to run through the e-mail what

13  I think?  "If not, I can fairly easily figure out where their

14  executing their hedge fund trades and get the trading info

15  from their executing brokers."  So what I meant there was I

16  would have, hopefully, somehow figured out where the hedge

17  fund was executing its orders and then send broker-dealer

18  requests to those entities.

19    Q    And then you make --

20    A    Also, they were probably executing orders.  And

21  then I say, "But they may be executing their orders

22  in-house," meaning that I could probably just get -- if

23  that's the case then I could ask their broker-dealer for the

24  trading records.

25    Q    So if they're executing them in-house you would

1   have just gone directly to them to get the trading records?

2        A    To --

3        Q    You wouldn't go anywhere else?  If they're

4   executing in-house where would you go to get the trading

5   records?

6        A    To the -- to Madoff broker-dealer.

7        Q    Is it -- I want to be clear because I'm confused as

8   to your going to be investigating potential fraud of a

9   registrant and you would go to that registrant to request the

10  trading records?

11       A    I was investigating potential front-running so you

12  would go to the -- you would get trading records from that

13  entity, yes.

14       Q    Is there anywhere else that you could have gone?

15  If you know that they're executing them in-house and you

16  don't want to go to the registrant because you want to have

17  objective third-party records, is there anywhere you could go

18  to get those trading records?

19       A    Like I said previously, you could go to the NASD to

20  get audit trail data.  Whether there's enough information in

21  that audit trail for these purposes, it depends.  Audit trail

22  would simply say -- would simply have the executing

23  broker-dealer and the time and the price and the date, so

24  whether it was enough specificity to -- for the purpose of

25  the exam you'd have to -- typically you would have to then

1   get more specificity at the broker-dealer level.

2        Q    At the broker-dealer level.  Is there -- okay, you

3   go to the NASD, you look at their audit trail and you say you

4   don't think it's sufficient.  Can you go back to the NASD and

5   ask for additional information?

6        A    Well, for instance, if you get -- NASD would say,

7   we -- you know, Madoff bought 1000 shares of Microsoft, so if

8   you want to know that.  You would not be able to determine

9   whether it was 1000 shares from the hedge fund or from a

10  retail client.  So that information you -- that degree of

11  specificity would have, in my understanding, would only be at

12  the broker-dealer level.

13       Q    The broker-dealer.  There'd be no -- so you would

14  have absolutely nowhere you could go objective third-party to

15  find out if -- who -- for whom the -- or for whom the trades

16  were executed?

17       A    Right, so to know which customer to -- which

18  customer the trade was for you would have to go to the

19  broker-dealer level.  And again, typically these are omnibus

20  accounts and the like, so all -- the only information you

21  would have would be Merrill Lynch or Madoff by 1000 of a

22  Microsoft and that's what would occur -- and the time and

23  sales, of course.  That's the information that would be at

24  the SRO level.  If you wanted for -- depending on what you

25  were doing for the exam, if you wanted -- if you needed more

Page 72

1   specificity you would have to go to the broker-dealer.

2        Q    Well, so do you think that a good practice would be

3   to get the records from the NASD and then also get them from

4   the broker-dealer so that you could compare what you're

5   provided?

6        A    I mean, often we would just -- often I would just

7   get the information directly from the broker-dealer.  I,

8   obviously, know what you're asking, you're -- if I thought

9   there could be -- if I thought the records were -- any reason

10  think the records were not accurate, yes, I would then want

11  to verify with the NASD.

12             BY MR. KOTZ:

13       Q    Okay, I'm going to show you another document.  I'll

14  mark it as Exhibit 15.  This is the e-mail from Lori to you,

15  it's a reply to the e-mail from you to Lori.  The e-mail from

16  Lori to you is dated 12/18/2003, 4:25 p.m.

17             And then I'm going to show you another document.

18  It is Lori Richards e-mail 12/18/2003, it's marked 16.  And

19  then the next document we're going to mark -- okay.  The

20  e-mail from Lori Richards to you dated 12/18/2003, 4:25 p.m.

21  is Exhibit 15.  And then the second document is from Mark

22  Donohue to Matt Daugherty, 12/19/2003, 2:13 p.m. and that's

23  going to be Exhibit 16.

24             See, it references in both these e-mails are two

25  calls put in to Madoff by you and Lori Richards.  Do you

Page 73

1    recall having a conversation with Madoff at that time?

2                         (SEC Exhibit Nos. 15 and 16 were

3                         marked for identification.)

4         A    Yes.

5         Q    Okay.  And who was on that call, which Madoff was

6    it?

7         A    Bernie and possibly Peter, but I don't recall.

8         Q    Okay.  And what did -- what happened in that phone

9    call?  What was said?

10        A    The purpose of the call, as I recollect, I'm not

11   looking at the e-mail so it's just as I recollect now, were

12   basically to verify that he had a hedge fund, to make sure we

13   understood generally what the -- yeah, I wasn't aware of

14   hedge funds so I asked questions about what that looked like,

15   where the trades were executed, things like that.  And to

16   basically make sure that we could -- understood enough so

17   that we could then start conducting the exam.

18        Q    So you had substantive questions you asked Bernie

19   Madoff in that call about his operations?

20        A    Subsequent to the call?

21        Q    Substantive questions in that phone call about

22   Bernie Madoff's operations that were asked?

23        A    These were just general questions.

24             MS. STEIBER:  But they were general substantive

25   questions, right?  They're not just "I'm going to start an

1   exam next week," they're -- you were asking probing questions

2   about his operations?

3          THE WITNESS:  I think it was just to get an -- I

4   think my main objective was to make sure that we could send a

5   document request letter that made sense.  It's common

6   practice to call a firm to make sure, "Hey, you're a market

7   maker, you know, you execute over-the-counter we're going to

8   send you over-the-counter document request letters."  So it's

9   very, for me, a common practice.

10         MR. KOTZ:  But it was an informational phone call?

11  You were trying to seek information about his operation?

12         THE WITNESS:  And to make sure -- and then --

13  right, in -- basically to make sure we could then construct a

14  rational document request letter.

15         MS. STEIBER:  Is it usual for you, as the associate

16  director, to call the registrant before starting an exam?

17         THE WITNESS:  Typically, for SRO inspections, yes

18  it would be me depending on -- yeah, specialists exams it

19  would be me.  It would be kind of how important I thought the

20  exam was.

21         MS. STEIBER:  Wasn't it unusual though, you had

22  Lori also on the phone call with you?  Did you think it was a

23  really important exam or --

24         THE WITNESS:  No, that's not -- I mean, it's

25  happened before but it's not, certainly not normal.

Page 75

1          BY MR. KOTZ:

2     Q    It's certainly not normal?

3     A    It's not normal for Lori to be on a call with me,

4  no.  But it's -- I'm sure it's happened many times in the

5  past.

6     Q    And so why would there be a particular case where

7  Lori would be on the call as well?

8     A    My recollection in this instance was that she got

9  the, you know, got the tip and I said, "Well, why don't we

10 call together," or something like that.

11    Q    You didn't take any notes of that phone call?

12    A    I don't recall taking notes.

13    Q    Did Lori Richards say anything to you in particular

14 about Bernie Madoff in connection with that phone call or

15 otherwise, in connection with the exam, that would affect

16 scope or focus of your exam?

17    A    I mean, she may have said something.  I mean --

18 said -- helped me -- you know, obviously we would have had a

19 discussion as to what the scope of the exam would be, but --

20    Q    Did she ever indicate to you to back off from any

21 aspect of examining Madoff's operations?

22    A    That's definitely -- I feel strongly that that

23 would be highly unlikely that she would ever do that and she

24 did not do that here.  I don't recall her ever saying back

25 off anything in my whole career, so --

MADOFF_EXHIBITS-00921

1        Q    Okay.  All right, the next document we're going to

2   mark as Exhibit 17.  This is an e-mail dated 1/29 --

3            MR. COBB:  Are you done with these?

4            MR. KOTZ:  Yeah.

5            MR. COBB:  I'm sorry, it goes so fast.  I'm

6   notorious here for screwing up the exhibits.

7            MS. STEIBER:  Hold on.  Could we go off the record

8   for a second?

9            MR. KOTZ:  Yeah, why don't we go off the record.

10           (A brief recess was taken.)

11           MR. KOTZ:  Okay, now we're going to -- we're going

12   to mark the document as Exhibit 17, different document than I

13   previously indicated.  This is a -- yeah, this is a

14   compilation of the OC Headquarters' first Madoff document

15   request, draft 1 through 7, and a final document request.

16   And then in addition we're going to put into evidence as

17   Exhibit 18 a letter from Eric Swanson to Peter Madoff dated

18   January 6, 2004.

19                          (SEC Exhibit Nos. 17 and 18 were

20                           marked for identification.)

21           MR. COBB:  Just on -- so the 17 is a series of

22   drafts that ultimately culminates in 18, is that --

23           MS. STEIBER:  Yes.

24           MR. COBB:  Okay, thanks.

25           BY MR. KOTZ:

1    Q    So do you remember sending out a document request

2    to Bernie Madoff?

3    A    I don't recall specifically, but --

4    Q    Do you recall generally sending a document request

5    as part of the cause exam?

6    A    Yes.

7    Q    Okay.  And do you recall what kind of documents you

8    were seeking to obtain in that document request?

9    A    I don't recall specifically, but it would have been

10   records to -- consistent with doing the front-running exam.

11        MS. STEIBER:  And what were those records

12   consistent with doing the front-running exam?

13        THE WITNESS:  The records that they're laid out in

14   the letter.

15        MR. KOTZ:  Okay.

16        MS. STEIBER:  If you were doing a front-running

17   exam and you were going to make a letter, without looking at

18   what you have, what would be the documents that you would

19   want requested?  You talked before about audit trail data,

20   would that be one of the things that you would want?

21        THE WITNESS:  I would certainly want sample trades

22   from the retailers and sample trades from wherever we thought

23   the proprietary trades were being executed at.

24        MS. STEIBER:  Okay, would there be anything else

25   you would want?

1          THE WITNESS:  That would be the -- those trading

2     records would be the core of the examination.  I suppose

3     you'd want WSPs and things of that nature that are typical to

4     what --

5          MS. STEIBER:  What are WSPs?

6          THE WITNESS:  Written Supervisory Procedures.  And

7     the main issue here would be Chinese Walls, to ensure that

8     order information doesn't flow to a --

9          MS. STEIBER:  Anything else you would want?

10         THE WITNESS:  That's -- that would be the heart of

11    the exam from my perspective.  You can -- you need that

12    trading information to see in --

13         MR. KOTZ:  Okay.  Yeah, if you look at the third

14    draft, F3 in that document --

15         MS. STEIBER:  See the e-mail to you?

16         BY MR. KOTZ:

17    Q     In Exhibit 17, the third draft, there's an e-mail

18    from Mark Donohue to you and Eric Swanson dated 12/24/2003,

19    4:03 p.m.  "Attached is the latest version of the Madoff

20    document request letter."  Do you see that?

21    A     Mm-hmm.

22    Q     And the next page, do you see the number 1 on the

23    draft document request letter?

24    A     Mm-hmm.

25    Q     What type of information was being sought in this

1    draft under number 1?

2        A    So what type of information?  It looks like --

3        Q    Yeah, why would you request the daily profit and

4    loss statements and daily commission revenues?

5        A    I'm a strong believer that we should make sure we

6    see where the -- on any exam -- where the firm's making money

7    because that's often a -- of where there's possible

8    irregularities.  If they're losing money then it would

9    probably be something that would be less interesting than if

10   they're making.

11       Q    Why would you request specifically daily profit and

12   loss statements or daily commission revenues?

13       A    I figure that's -- I don't know.

14            MS. STEIBER:  Well that's not audit trail data, is

15   it?

16            THE WITNESS:  No.

17            BY MR. KOTZ:

18       Q    Okay.  And then if you look on the second page of

19   this document it says, "Describe in detail the hedging model

20   or investment strategy identified as the split-strike forward

21   conversion in a telephone conversation between Lori Richards,

22   John McCarthy and Bernie Madoff on December 19, 2003."  Do

23   you see that?

24       A    Yes.

25       Q    Okay.  And then the next one, it says, "Identify

Page 80

1    the four hedge funds discussed in the telephone conversation

2    between Lori Richards, John McCarthy and Bernard Madoff on

3    December 19, 2003."  Do you see that?

4        A    Yes.

5        Q    Okay.  Then if you look at Exhibit 18, the final

6    version of the document request, you see that it asks for

7    monthly profit and loss statements by security and monthly

8    commission revenues, not daily.  Do you have any idea why you

9    would have asked for monthly when the draft said daily?

10       A    Why the change?  I don't know.

11       Q    Okay.  And if you look at paragraph two on Exhibit

12   18, the final draft, the next page there, it leaves out any

13   reference to a telephone conversation between Lori Richards,

14   John McCarthy and Bernie Madoff on December 19, 2003, both in

15   two and in three.  Do you see -- do you have any idea why

16   it -- that reference to a telephone conversation would be in

17   the draft but not in the final?

18       A    Why they took it out, I don't know.  I don't recall

19   being part of the drafting process.

20       Q    Okay, you don't recall being part of the drafting

21   process?  Okay, if you look at the fifth tab in Exhibit 17

22   you see there's an e-mail, "John and Eric attached to a

23   document request with the revisions we just discussed."  See?

24   I mean, doesn't it seem as though you were part of the review

25   process for this document request?

MADOFF_EXHIBITS-00926

1      A    That would suggest that I discussed something with

2  Mark, yes.

3      Q    But a minute ago you said you weren't.

4           MR. COBB:  No, he didn't.  He said he didn't

5  recall.

6           MS. STEIBER:  No, he said he wasn't involved.

7           MR. COBB:  No, he said --

8           THE WITNESS:  I said I don't recall being a part of

9  the draft.

10          MR. COBB:  You want to read it back or play it

11 back?  He said he didn't recall being part of the drafting

12 process.

13          MS. STEIBER:  Does this refresh your recollection

14 then that you were involved in the drafting process?

15          THE WITNESS:  I mean, no, it doesn't but yes, I

16 certainly think I -- this looks like a valid and true

17 document.  This is -- it's starting to be a long time ago so

18 I don't recall what -- you know, whether or not I was --

19          MS. STEIBER:  And in that final draft, Exhibit 18,

20 is there a request for audit trail data in that final draft?

21 That final letter that was sent out?

22          MR. COBB:  You want him to read the whole letter or

23 you just want him --

24          MS. STEIBER:  He could read it an let me know if

25 there's any request for audit trail data.

MADOFF_EXHIBITS-00927

Page 82

1           MR. COBB:  Doesn't that speak for itself?  We'll

2      accept a representation, I mean --

3           MR. KOTZ:  But we'd like him to answer the question

4      if he wants to cooperate with us.

5           THE WITNESS:  Looks like in this --

6           MR. COBB:  Well, he has been totally cooperating,

7      he's here voluntarily.  You're asking him to read a letter

8      and tell you whether there's something in there, the letter

9      speaks for itself.

10          MR. KOTZ:  Well, I'd like him to answer the

11     question.

12          THE WITNESS:  So in this letter it looks like

13     there's not a request for audit trail data.

14          BY MR. KOTZ:

15     Q    Okay, thank you for the response.  We're going to

16     show you the next document.  Okay, we're going to mark as

17     Exhibit 19 a letter from Bernard L. Madoff to SEC, Attention:

18     Eric Swanson, dated January 16, 2004.  Do you recall, as part

19     of the cause exam, receiving a response from Bernie Madoff?

20                         (SEC Exhibit No. 19 was marked for

21                          identification.)

22     A    I don't recall, no.

23     Q    You don't recall that you ever got a response from

24     Bernie Madoff?

25     A    I didn't -- I would have expected a response but I

1    don't recall seeing it or reading it.

2         Q    Okay.  Do you think you would have seen it or read

3    it or that would have been something that Eric Swanson would

4    have done?

5         A    -- this is a prosecution of the exam that would

6    be -- something that I typically wouldn't be involved with.

7         Q    Would or would not?

8         A    Would not be typically involved with.

9         Q    Okay.  So do you recall though, in general, that

10   there were requests made for documents to Madoff and do you

11   recall whether he provided documents or what happened?  What

12   exactly do you recall about this exam?

13        A    I don't recall being part of the day-to-day running

14   of the exam.

15        Q    But do you recall knowing -- learning anything

16   about the exam, whether Madoff complied with the document

17   requests or gave information that gave the staff concerns?

18        A    I don't recall there ever being -- I don't recall

19   Mark or Eric or anyone highlighting concerns about whether

20   documents were being produced or not.

21        Q    Do you recall Mark or Eric or anyone else

22   highlighting any concerns about Madoff's responses or the

23   exam?

24        A    I don't recall, no.

25        Q    So it was pretty -- kind of routine thing you had

Page 84

1    allegations of front-running and what did you find in these?

2         A    My recollection is when I asked Mark whether he was

3    finding indicia of front-running that he said, no, he has not

4    yet come up with any indicia of front running.  But I don't

5    recall when exactly I asked him and that would have been at

6    some point during the examination --

7         Q    And do you recall --

8         A    -- several times.

9         Q    I'm sorry, several times?

10        A    Possibly, I might have asked Mark several times,

11   "Hey, how's it going," or something like that.  That's just

12   my general recollection.

13        Q    And do you recall whether there was a final

14   determination of whether Bernie Madoff was front-running?

15        A    My recollection is Mark said they did not find any

16   indicia of front-running.

17        Q    Okay.  Did they do a closing report in connection

18   with the exam?

19        A    Not that I recall.

20        Q    Why wouldn't they do a closing report?  Was that

21   normal to do a closing report?  You would just end an exam

22   with Mark saying he didn't think there was front-running and

23   that would be the end of it?

24        A    Typically, staff is supposed to -- when they finish

25   an exam they're supposed to close it out and I think there

MADOFF_EXHIBITS-00930

Page 85

1   should have been a close-out memo is my understanding.

2          MS. STEIBER:  Is there anything else you do at the

3   end of an exam to show the -- for the registrant?

4          THE WITNESS:  If there was -- typically there would

5   be deficiencies of some nature so we would typically send a

6   deficiency letter.

7          MS. STEIBER:  What about a meeting with the

8   registrant at the end?

9          THE WITNESS:  I don't view that as a -- it could

10  have happened on exams but I don't remember that being a

11  typical thing to do.

12         MS. STEIBER:  So it would be the closing report and

13  the deficiency letter, it wouldn't be the two main indicia of

14  the exam being closed?

15         THE WITNESS:  That's fair, I guess.

16         BY MR. KOTZ:

17     Q    Okay.  And you don't remember anyone raising to you

18  any concerns about Madoff's responses to the document

19  requests?  We've had significant testimony that the folks on

20  the exam had very grave concerns about some of the things

21  Madoff was saying.  You don't remember anybody bringing that

22  to your attention?

23     A    I do not, no.

24     Q    Were you hands-on as an associate director or -- it

25  just -- I'm just trying to understand.  Folks that worked on

1   the exam, through e-mails and testimony, have relayed that

2   there were very significant concerns about what Madoff was

3   providing them, what information he was giving them. And it

4   seems as though they never, at least according to you, they

5   never brought it to your attention. Do you think that was

6   because you were hands-off with these exams or with this

7   particular exam or is there any --

8          MR. COBB: I think his testimony was not that they

9   never brought it to his attention, it was that he didn't

10  recall anybody bringing it to his attention.

11         BY MR. KOTZ:

12    Q    Okay. So it may have been that you had -- were

13  actively involved in these discussions about concerns about

14  Madoff's operations you just don't remember?

15    A    It's very possible if they were serious that I was,

16  you know, Mark or Eric came to me, but I don't recall those

17  conversations.

18    Q    Okay. I'm going to show you another document, I'm

19  going to mark this as Exhibit 20. This is a -- notes of a

20  telephone call with ████████████████ dated 1/29/2004. If

21  you see, there's references here to returns are too

22  consistently high for this strategy, not doing that strategy

23  because ops and training is not in high. He doesn't

24  understand how he consistently makes money off this strategy,

25  perhaps he doesn't really use the strategy. The volume of

Page 87

1   options trading doesn't seem to be enough to protect the size

2   of the equity trading."  Do you remember a phone call back

3   with the complainant ████████████?

4                        (SEC Exhibit No. 20 was marked for

5                        identification.)

6        A    I don't recall -- I've never -- I don't recall ever

7   recognizing the name or talking to him or her.

8        Q    And you don't recall at any point anybody who

9   worked on the exam come to you and say, "We talked to some

10  individual and this is what he said?"

11       A    I don't recall that.

12       Q    And you don't recall any issues that were raised

13  about how Madoff really doesn't use the strategy after the

14  exam was initiated, when they did follow up to get

15  information from the person who submitted the complaint?

16       A    I mean, no, I don't -- my focus was on the issue of

17  front-running.  I don't recall that issue.

18       Q    Right, if you look back at Exhibit 12b there's an

19  e-mail from you to Lori Richards where it says, "We would

20  like to contact this compliance officer and get a better

21  understanding of how this strategy is supposed to work."  So

22  does that seem as though that you, or you and Eric, actually

23  requested that they call ████████████ back?

24       A    This certainly asks Lori.  Yes, according to this

25  e-mail that makes -- that seems a reasonable conclusion.

1     Q    So looking at the -- we showed you ███████

2   complaint and this information about the conversation with

3   █████.  In retrospect, do you think it was a mistake to

4   focus the scope of the exam on front-running when these other

5   allegations were brought to the SEC's attention?

6     A    For me?

7     Q    Yes.

8     A    It was not a mistake for me to focus on that, on

9   front-running, because that's where my area, my team's area

10  of expertise led.

11    Q    So even if you get allegations of other matters

12  that could be indicia of potentially, a Ponzi scheme, you

13  would have focused only on front-running?

14    A    Well, the other allegations, at least the way I

15  read them, were more appropriate handled by the Investment

16  Advisor Investment Company Group.

17    Q    So do you think it was a mistake not to bring to

18  anyone else's attention that there were allegations other

19  than what you were looking at relating to Bernie Madoff?

20    A    Was it a mistake not to bring it to other people's

21  attention?

22    Q    Right.

23    A    It -- the other allegations should have been

24  brought to other people's attention, yes.

25    Q    And in fact, if those allegations had been brought

1    by you or your office to the other people's attention,

2    perhaps Bernie Madoff's Ponzi scheme would have been

3    uncovered.  Okay?

4        A    I don't know.

5        Q    But if a complaint comes in and folks working for

6    you are looking at the complaint and reacting to the

7    complaint and you're referencing the complaint in an e-mail,

8    wouldn't that be your responsibility, as the associate

9    director, to make sure that all the allegations in the

10   complaint are looked at, not just the front-running ones?

11       A    I think my responsibility is to take information

12   that's consistent with my program and to follow up on those

13   complaints.

14       Q    So you wouldn't have any responsibility if other

15   issues were brought to your attention that were not within

16   your program to relay that to anyone else?

17       A    I think from the documents you provided me it -- I

18   probably was comfortable that the IAIC group had the

19   information that you're speaking of.  So I think I -- so

20   my -- if you're asking me what's reasonable and what's not, I

21   think it's reasonable that I would have expected them to, if

22   they were aware of the complaints, I would have expected them

23   to follow up on those complaints that were consistent with

24   their program.

25            BY MS. STEIBER:

Page 90

1      Q    So you're -- you'd be surprised we have testimony

2   from the Investment Advisor Group that says when you were

3   given this complaint, because it's a registered

4   broker-dealer, that they -- you were expected to look at all

5   of the allegations and they thought that you were conducting

6   an exam that looked at all of the allegations?

7      A    Would I be surprised if they said that?

8      Q    Would you be surprised, do you think?

9      A    I mean, if that's what they said, yeah, again, I'm

10  just explaining to you what I would -- what my expectations

11  would be.  The broker-dealer issue that -- from this

12  information is obviously -- front-running, so that's what I

13  followed up on.

14             BY MR. KOTZ:

15      Q    And you don't -- do you feel you have any

16  responsibility to ensure that someone else, somewhere,

17  follows up on other allegations that are brought to your

18  staff's attention?

19      A    Again, I took the information that I -- I took the

20  information and started a front-running exam.  If there are

21  IASE issues embedded in the complaint then, you know, I would

22  have expected them to follow up on those as appropriate.

23      Q    Okay.  I'll show you the next document.  Mark it as

24  Exhibit 21.  This is a conference call with Madoff dated --

25  or notes of a conference call with Madoff dated 2/4/04.  Do

Page 91

1   you recall if you participated in the conference call with

2   Madoff in February 2004?

3                              (SEC Exhibit No. 21 was marked for

4                              identification.)

5       A    February '04, I don't recall being part of a call,

6   no.

7       Q    I'm sorry?

8       A    I don't recall being part of a conference call with

9   Madoff.

10      Q    At any point in time?

11      A    No, I February of '04.

12      Q    Okay.

13      A    I said previously, yes, I was in a call with Lori

14  with Madoff.

15      Q    Okay, but that's the only call you remember being

16  on with Madoff was the one with Lori?

17      A    On the -- for this front-running exam that's the

18  only one I recall, yes.

19      Q    But with respect to another exam?  The previous one

20  we talked about?

21      A    I said previous exams I could have been on calls

22  with -- it probably would have been Peter on the other exams,

23  yes.

24      Q    But the point person on the cause exam in 2004,

25  that was Bernie Madoff?

1       A    The call that Lori and I did was with Bernie

2    Madoff, yes.

3       Q    Did -- did you think it was odd or did anyone say

4    to you that it was odd that Bernie Madoff, himself, was the

5    point person on an exam?  He was the one that the OC folks

6    dealt with directly, the exam folks dealt with rather than

7    compliance officer or a lawyer?

8       A    I think it's -- I was used to that form the Madoff

9    firm, it appears that Peter Madoff was the point person.

10   Would it be normal for Merrill Lynch?  Certainly not.  So

11   yes, it's odd as in atypical, but I viewed it as much smaller

12   firm that it didn't strike me as noteworthy at the time.

13      Q    Okay, I'll show you the next document we marked as

14   Exhibit 22.  These are additional notes.  You recognize these

15   notes?

16                          (SEC Exhibit No. 22 was marked for

17                          identification.)

18      A    I mean, it's not my handwriting so I guess, no, I

19   don't recognize it.

20      Q    Okay, second page of the notes, can you turn to

21   that for a second, has reference to "Get OAT from NASD and

22   act all Madoff orders."

23           MS. STEIBER:  It has Mavis -- at the top.

24           MR. KOTZ:  And then it has -- yeah, Mavis Kelly,

25   that was the woman who forwarded the ███████ complaint.  Do

Page 93

1    you know what that reference is "To get OATS from NASD?"

2         A    OAT stands for order audit trail that NASD keeps.

3         Q    And what would be the purpose of getting OATS from

4    NASD?

5         A    As I stated before, it would be a way to get trade

6    data.

7         Q    What about ACT?  What does ACT refer to?

8         A    OATS and ACT are basically audit trails.  ACT is a

9    subset of OATS.  ACT would be -- is typically easier to get

10   and quicker, historically.  But ACT is time and sales and

11   firm.  So it would have the name of the firm, the time of the

12   trade and the date and the price, things like that.

13        Q    And do you know if the staff ever got OATS from

14   NASD, or ACT?

15        A    I don't know.

16        Q    Okay.  Do you recall any issues that arose about

17   whether Madoff needed to register as an investment advisor in

18   the course of the cause exam of Madoff?

19        A    I don't recall that being an issue for my exam.

20        Q    Okay.  Now let me show you a document that may be

21   able to refresh your recollection.  I'm going to mark this as

22   Exhibit 23, this is an e-mail from Genevievette Walker to

23   Mark Donohue, Jacqueline Wood, February 4, 2004, 2:03 p.m.

24             I'm going to show you that document and then the

25   second document we're going to mark as Exhibit 24, this is a

MADOFF_EXHIBITS-00939

Page 94

1    memorandum from Lori Richards, you, Eric Swanson, Mark

2    Donohue and Matt Daugherty to Dan Gray dated March 11, 2004.

3             Does this refresh your recollection that the

4    investment advisor issue actually was an issue in your exam?

5                              (SEC Exhibit Nos. 23 and 24 were

6                                marked for identification.)

7    A    Yes.

8    Q    Okay.  A minute ago you didn't think it was?

9         MR. COBB:  He said he didn't recall.

10        THE WITNESS:  I didn't recall it being an issue,

11   no.

12        BY MR. KOTZ:

13   Q    Okay.  So now that you see the document, do you

14   recall anything about this issue?

15   A    I still don't recall, no.  But obviously, yes,

16   there's a draft document to Dan Gray.

17   Q    And why would they -- why would you and Lori, Eric

18   and Mark, Matt, send a memo to Dan Gray about this issue?

19   Who is Dan Gray?

20   A    I think he -- I think it's referring to Dan Gray in

21   Market Regulation.

22   Q    Why would the memo go to him about this issue?

23   A    I haven't read the memo in detail but it --

24   typically we'd send memos if we had questions of securities

25   laws or interpretation or guidance, things like that.

1      Q    And you don't remember whether this issue was

2  resolved as to whether Bernie Madoff should register as an

3  investment advisor at that time?

4      A    Right, I don't recall.

5           MS. STEIBER:  Could you review the last paragraph

6  to see if it --

7           THE WITNESS:  The "additionally" paragraph?  Okay.

8           BY MR. KOTZ:

9      Q    Does that refresh your recollection as to what

10 happened with that issue regarding the investment advisor and

11 your exam?

12     A    I'm still -- don't recall this issue, but it says

13 what it says.

14     Q    Okay.  I'll show you the next document marked as

15 Exhibit 25.  This is the second set of document requests to

16 Bernie Madoff, drafts 1 through 10 and a final request.  Do

17 you remember an additional document request that went out to

18 Bernie Madoff?

19                      (SEC Exhibit No. 25 was marked for

20                           identification.)

21     A    I don't recall.

22     Q    I'm going to show you another document marked as

23 Exhibit 26.  This is a draft letter from Eric Swanson to

24 Peter Madoff.  Do you recognize, personally, any of the

25 handwriting on this letter?

Page 96

1              (SEC Exhibit No. 26 was marked for

2              identification.)

3     A     It's not mine and I don't recognize whose it is.

4     Q     You see that there's -- on the face of Exhibit 26

5     there's question one, which is crossed out.  Do you see that?

6     A     Yes.

7     Q     What kind of information was being requested here

8     that was crossed out?

9     A     We call it trading data.

10          MS. STEIBER:  Would this be audit trail trading

11    data that's requested?

12          THE WITNESS:  Right, audit trail I also refer to

13    SRO, but it would be trading data from the firm, it looks

14    like.

15          MR. KOTZ:  And if you look at Exhibit 11 in the

16    previous document, which is the final letter that was sent to

17    Madoff dated February 18, 2004 --

18          THE WITNESS:  February 18, 2004?  Yes.

19          MR. KOTZ:  Do you see that the information

20    contained in the draft that was crossed out in 26 was not put

21    in the final?

22          MS. STEIBER:  Of those notes -- next letter.

23          MR. COBB:  So the next letter is on 26 and then

24    your question is is that request in the February 18th letter,

25    which you represent is the final letter?

Page 97

1          MS. STEIBER:  Correct.

2          MR. COBB:  Okay.

3          THE WITNESS:  Right, so this is not in here,

4     correct.

5          BY MR. KOTZ:

6      Q    And do you have any idea why it wasn't in there or

7     what "save for next letter" refers to?

8      A    I don't.

9      Q    Huh?

10     A    I do not.

11     Q    All right, next document we're going to show you,

12     Exhibit 27.  This is a letter from Bernie Madoff date March

13     11, 2004 to Eric Swanson in response to the second document

14     request.  I'll ask you if you ever saw this letter.

15                    (SEC Exhibit No. 27 was marked for

16                     identification.)

17          (The witness examined the document.)

18     A    I don't recall seeing this letter.

19     Q    Okay.  And do you recall anything about any

20     responses from Bernie Madoff, any representations made by

21     Bernie Madoff in his responses to the document requests?

22     A    I do not recall, no.

23     Q    Okay, the next document is a series of documents

24     we're going to mark as Exhibit 28.  It says, "Bernard L.

25     Madoff Investment Securities LLC, New York, London, Period

Page 98

1    Ending 12/31/01."  Do you know what this document is?

2                        (SEC Exhibit No. 28 was marked for

3                        identification.)

4         MS. STEIBER:  If you refer back to that March 1st

5    letter, the first line says, "In response to your letter of

6    February 18, 2004, we are providing copies of client account

7    statements reflecting all the transaction data related to the

8    accounts of those clients utilizing the split-strike forward

9    conversion strategy."  Okay.  And this is a sample of -- I'm

10   making representation, this is a sample of one of those

11   customer statements that was provided in response to the

12   second document request.

13        MR. COBB:  "This" being Exhibit 28?

14        BY MS. STEIBER:

15   Q     Exhibit 28.  Looking at that client customer

16   statement, would you describe that it contains trading, audit

17   trail data information?

18   A     Well, it's an account statement that has trading

19   information in it.

20   Q     Would that be audit trail information?

21   A     I would call this an account statement not a audit

22   trail.

23   Q     If you were conducting a front-running examination,

24   would the data provided in that customer statement be

25   sufficient to perform an adequate or good front-running

1    examination?

2         A    It's possible, yes.

3         Q    Why do you say it's possible?

4         A    We're talking about front-running a retail order

5    flow --

6         Q    Okay, how --

7         A    -- so if you -- so typically, front-running

8    means -- it's almost always in the context of large blocks of

9    orders.  So if I'm Fidelity and I'm going to sell 10 million

10   shares of Microsoft, then if I have that information before

11   they prosecute their execution strategy then I can trade

12   ahead of that order because that order typically will move

13   the market.  So if I buy before they start selling, that

14   price is -- then I will get better prices because of that

15   market information.

16              In a retail -- in this exam we're talking about

17   retail order flow of 100 shares and none of the orders by

18   themselves would move the market, so the information is not

19   valuable to front-run.  So I think the theory of this

20   front-running inspection was whether -- or my theory of it at

21   the time was whether or not you could, in almost a real-time

22   sense -- you would need, you know, strong technology -- you

23   could see trends from the retail flow and act upon the trends

24   before, you know, the next group of retail orders got

25   executed.

Page 100

1          So the premise on this whole exam was how do you

2     front-run retail orders.  And I think, you know, I think at

3     the time and probably today, I think it's -- I think -- I'm

4     still not -- I still do not think it's very easy if not --

5     if -- and almost -- whether it's possible to front-run retail

6     orders except in the context of pre-opening orders.

7          So that's -- yeah, I do remember asking mark to

8     concentrate on the pre-open where you most likely would have

9     market-moving information, the intraday trading.  The

10    intraday trading I think was much more difficult to -- much

11    more difficult for that information to be front-ran.

12         So back to your question if you're looking at -- if

13    you have account statements which show you bought 10,000

14    shares on a certain day, I think that's, to me, enough

15    information to know that that's unlikely to have front-ran

16    retail customer orders because it's simply -- there's no

17    information in retail order flow to determine -- to take

18    advantage of that to get a better price for Exxon or Home

19    Depot.

20         Q    So you think -- you could have been the one that

21    told Mark Donohue not to seek any other trade data other than

22    what's in this customer statement?

23         A    I mean, I definitely -- like I said, the

24    front-running -- should have included trading data from

25    retail side and from the proprietary side.  I don't recall

1    and would certainly be surprised if I ever said, "Don't get

2    the proprietary trading data."

3         Q    Now, if -- do you think if your exam team had gone

4    to the NASD and gotten the trade data they would have

5    discovered that Madoff wasn't trading?  Discovered it was,

6    potentially, a Ponzi scheme?

7         A    The -- well, actually, the trade data from the

8    market-making unit would have been at ACT and from what I've

9    seen those are real trades.  What I understand -- what I

10   recall from the phone call with Madoff was that most or all

11   of his trading was done out of London so those trades would

12   not have been included in the SRO audit trail.

13        Q    So if he was trading in London he wouldn't have

14   trading records?

15        A    He would have trading records, yes.

16        Q    Oh, he would have trading records but --

17        A    Or should have had trading records.

18        Q    So there's nowhere you could go to get trading

19   records if he's trading in London?  I want to understand, if

20   he's trading in London it seems that, to me, you would still

21   have places you could go -- .

22        A    Well, I would have expected Mark and the team to

23   get the trading records from his trading in London.  He

24   should have a trade blotter in London.

25        Q    And do you know if that was ever requested?  Did

1   you talk to Mark about requesting a trade blotter?

2        A    I do recall that -- I do recall talking to him

3   about getting the retail -- samples of the retail flow and

4   samples of the proprietary trades, which should have been the

5   trade record from London, from his broker-dealer in London.

6        Q    Now, what -- could you give a little bit more

7   detail about what Madoff said about trading in London and why

8   you recall that?

9        A    On the phone -- yeah, again, I knew nothing about

10  his hedge fund and he explained in general terms about his

11  hedge fund and that most -- it might have been most or all

12  his trading was done out of London.  I recall that because

13  that means my theory of the front-running case getting trade

14  data from the broker-dealer on the retail side or proprietary

15  side means we would have had to have gotten trade data from

16  London, so I just viewed that as noteworthy.

17        BY MR. KOTZ:

18        Q    Okay, I'm going to show you another document, we'll

19  mark that as Exhibit 29.  This is an e-mail from you to ▓▓▓▓

20  ▓▓▓▓▓▓▓ dated March 9, 2004, 12:31 p.m.

21        See you're providing information to ▓▓▓▓▓▓▓

22  about Madoff Securities.  You see part of what you tell

23  ▓▓▓▓ is, "Madoff has consistently generated revenues --"

24  I'm sorry, "Madoff has consistently generated returns for the

25  hedge funds of around 10 percent per year, which we have been

1   told is high given the conservative nature of the strategy

2   and market conditions over the last several years.  We're in

3   the process of analyzing one year of transactions in all the

4   hedge funds for which Madoff executes this strategy."

5          So do you recall having any -- first of all, who is

6   [Personal Privacy] ?  Where did he work?

7                     (SEC Exhibit No. 29 was marked for

8                     identification.)

9      A    Division of Enforcement.

10     Q    Okay.  Why would you provide information to the

11  Division of Enforcement?

12          MR. COBB:  You mean why did he in this instance or

13  why would he generally?

14          BY MR. KOTZ:

15     Q    Well, both I guess.  Let's start with why did you

16  in this instance.

17     A    I mean, they might be having -- they might -- often

18  I would -- they would come to me for when they didn't

19  understand trading or market issues, so that's -- that would

20  be a typical interaction I would have with the Division of

21  Enforcement in general.

22     Q    Okay.  But why would you provide them information

23  about a particular registrant that you were examining?

24     A    Do you mind if I -- should I read the whole e-mail

25  or --

Page 104

1      Q     Please, sure.

2      A     Okay.

3            (The witness examined the documents.)

4            THE WITNESS:  I'm sorry, are these e-mails part of

5      the chain?  It's on page -- their not page numbered but it

6      starts with subject?

7            MS. STEIBER:  I'm actually not sure.  I have a call

8      in to OC because they recently produced these e-mails and I'm

9      waiting for a call back to say, you know, exactly -- if they

10     are just from a search that mail came out this way.  We just

11     want to ask you a question about that first e-mail.

12           THE WITNESS:  First one, okay.  I'm sorry, I was

13     reading --

14           MS. STEIBER:  Yeah.

15           THE WITNESS:  These look like they're not related.

16           MS. STEIBER:  Right.

17           THE WITNESS:  Okay.  So I mean, this e-mail looks

18     like -- I think vaguely recall kind of apprising ███████ of kind

19     of interesting issues that are -- that could possibly --

20     exams that could possibly be referred to enforcement at some

21     time.  That's what --

22           BY MR. KOTZ:

23     Q     Do you think you were referring the facts that

24     Madoff had consistently generated returns of about 10 percent

25     per year, which is high given the conservative nature and the

Page 105

1    market conditions, to enforcement for their possible

2    investigation of Madoff?

3        A    Yeah, I would -- I mean, again, I don't recall

4    this, but that's, you know, looking at the -- maybe a

5    heads-up as opposed to this is -- usually referral -- an

6    actual referral is more formal with a memo, but it certainly

7    is a heads-up to ████ about issues we see at Citadel with

8    Madoff.

9        Q    Okay.  And so one of the issues you saw at Madoff

10   had to do with his consistently high returns?

11       A    Yeah, I mean it's part of the story that I'm giving

12   him a heads-up about.

13       Q    And you say, "We are in the process of analyzing

14   one year of transactions in which all of the hedge funds for

15   which Madoff executes his strategy," do you know how that

16   analysis was done?

17       A    I'm sorry, where's that sentence?  "We're in the

18   process of analyzing one year of transactions in all the

19   hedge funds for which Madoff executes his strategy."  How

20   it's done?

21       Q    How would you have gone about analyzing that one

22   year of transactions?

23       A    I don't know.

24       Q    Do you remember analyzing one year of transactions

25   in all of Madoff's hedge funds?

Page 106

1      A     I do not, no.

2      Q     Do you know if anybody with investment advisor

3   experience was brought in to analyze those returns?

4      A     I don't recall anyone being brought in.

5      Q     Do you know if falsification of returns would have

6   been something that you looked into in your analysis of one

7   year of transactions?

8      A     I'm sorry?

9      Q     Do you know if falsification of the returns would

10   have been part of the analysis that you were in the process

11   of conducting?

12      A     To determine whether they were false?

13      Q     Yeah.

14      A     I don't know.

15      Q     But I mean, would that be -- it talks about an

16   analysis of one year of transactions in all the hedge funds

17   for which Madoff executes the strategy.  As part of that

18   analysis would you look at whether the returns were

19   falsified?

20      A     I don't know.  I don't recall my team doing this

21   exam or part of the front-running exam.

22      Q     Right, but I mean if you said to ███████████████

23   that you're in the process of doing this, I assume you did --

24   your team actually did it.

25      A     I would assume so too, yes.

1      Q      Okay.

2             MS. STEIBER:  I just wanted to go back real quickly

3      to Exhibits 12a and 13, which one of them is the planning

4      memo that's addressed to you in which in section 3a it talks

5      about requesting trading data from the NASD and then that

6      draft letter to the NASD.  If -- you had testified earlier

7      that Madoff told you he was trading in Europe?

8             MR. KOTZ:  London.

9             MS. STEIBER:  Oh, sorry, in London.  Why would you

10     be drafting a letter to the NASD or why would that be part of

11     your process if you really believed that he was trading in

12     London?

13            THE WITNESS:  Well, front-running is kind of two

14     sets of data.  Of one -- we would certainly need the data

15     about the retail flow and that would be easy to get from the

16     NASD.

17            MS. STEIBER:  Okay.

18            MR. KOTZ:  Okay, we're going to mark two exhibits

19     now, Exhibits 30 and 31.  The first one, Exhibit 30, is an

20     e-mail from Genevievette Walker to Alex Sadowski, 4/6/2004,

21     6:49 p.m.

22            And then the next one, Exhibit 32 is an e-mail from

23     Mark Donohue to Genevievette Walker --

24                          (SEC Exhibit Nos. 30 and 31 were

25                           marked for identification.)

Page 108

1          MR. COBB:  I'm sorry, you went 30 and then 32.

2          MR. KOTZ:  -- dated 4/7/2004.  I'm sorry, 9:29 a.m.

3          MS. STEIBER:  So this is Exhibit 30 and 31.

4          BY MR. KOTZ:

5     Q    Yeah.  So Exhibit 30 is 4/6/2004, 6:49 p.m. e-mail

6     and 31 is the 4/7/2004, 9:29 a.m. e-mail from Donohue from

7     Genevievette Walker.

8          You can see in these e-mails, the first e-mail

9     Genevievette Walker says to Alex Sadowski asking which are

10    the priority of her projects.  And she said, "I'm not sure

11    where the hedge fund project falls on our list of priorities

12    as of right now, please advise."  And then Alex Sadowski

13    responds, "Get the mutual fund work completed first."

14         And then the 4/7/2004 e-mail, we have Genevievette

15    Walker working on -- asking -- sending an e-mail to Mark

16    Donohue saying, "Should we just focus on mutual funds and

17    return to Madoff when we're done?"  And Mark Donohue saying

18    to Genevievette Walker, "Concentrate on mutual funds for the

19    time being."

20         First, was that the team that was working on your

21    Madoff exam, Genevievette Walker, Jacqueline Wood and Mark

22    Donohue?  Is this the same exam that you have been talking

23    about?

24    A    That's my recollection, yes.

25    Q    Okay.  So were you aware that Mark Donohue

1    instructed Genevievette Walker to stop working on the Madoff

2    exam in favor of mutual funds work?

3        A    I don't read it that he told her to stop, but I

4    wasn't aware of either of these e-mails.

5        Q    Okay.  Were you aware at any point in time that

6    there was a shift in priorities from the Madoff exam to

7    mutual funds work?

8            MR. COBB:  Well --

9            THE WITNESS:  I mean, Mark says concentrate on the

10   mutual fund, that doesn't mean, you know, there's eight hours

11   in a day, you can obviously -- I assume what he meant was,

12   you know, focus on that and get it done first but it doesn't

13   mean stop working on Madoff or --

14           MR. KOTZ:  So --

15           THE WITNESS:  And Mark certainly didn't tell me,

16   "I'm having people stop working on Madoff," or anything like

17   that.

18           MR. KOTZ:  Okay.  So were you aware that there was

19   a almost one-year period where no work was done on the Madoff

20   examination?

21           THE WITNESS:  I was not aware of that, no.

22           MR. KOTZ:  Would it surprise you to hear that?  I

23   mean based on your recollection do you think that that could

24   have happened that there was this year-long period where

25   nothing was done on the Madoff exam from the moment that Mark

Page 110

1  Donohue told Genevievette Walker to concentrate on mutual

2  funds until a year later?

3        THE WITNESS:  April '04 to April '05, that would

4  surprise me, yes.

5        MR. KOTZ:  Okay.  I'm going to show you the next

6  document, we're going to mark this as Exhibit 32.  This is an

7  e-mail from Mark Donohue to Eric Swanson, 3/16/2004.  See,

8  Eric Swanson says to --

9                            (SEC Exhibit No. 32 was marked for

10                           identification.)

11       MS. STEIBER:  2005.

12       MR. KOTZ:  2005, I'm sorry.

13       MS. STEIBER:  This is almost a year later.

14       MR. KOTZ:  3/16/2005, that's right.  You see Eric

15  Swanson sends an e-mail to Mark Donohue on March 16, 2005,

16  "What is the status of the Madoff hedge fund thingee?"  And

17  Mark Donohue says, "Dead, we never found any real problems."

18       Were you aware that in or around the period of

19  March 2005 when the NYRO folks began asking questions about a

20  Madoff exam they were working on that they went to your staff

21  to ask what happened with your exam?  Are you -- do you

22  remember that?

23       MR. COBB:  I'm sorry, just let me -- that's two

24  questions.  First you asked him whether he was aware of this

25  exchange and then you added that other communication to his

MADOFF_EXHIBITS-00956

Page 111

1  staff.  So is that two questions, right?

2          BY MR. KOTZ:

3      Q    Yeah, I don't think I did but we'll -- are you

4  aware of the Mark Donohue -- Eric Swanson trying to find out

5  what happened with the Madoff hedge fund thingee?

6      A    No, I mean I was aware that Mark told me, I can't

7  remember the date, that they weren't find anything so it's

8  consistent with this.

9      Q    But --

10     A    But I don't know the -- I don't recall the dates

11  when I asked Mark.

12     Q    But where you aware that Eric Swanson was trying to

13  find out whatever happened with the Madoff examination in

14  2005?

15     A    No, I don't recall this.  I don't recall this

16  e-mail.

17     Q    Do you recall at some point in time that the folks

18  in New York asked for information or documentation from your

19  office about Madoff -- about your Madoff exam?

20     A    I recall that John Nee -- was doing a similar exam.

21  I mean, I got the sense it was after in time to our exam, but

22  I do recall that, yes.

23     Q    Okay.  And you recall that John Nee asked you to

24  provide documents relating to your exam to provide to them?

25     A    I mean, I recall us sending our files, as it were,

MADOFF_EXHIBITS-00957

1    to John Nee to incorporate it in his exam.

2         Q    At that point in time that you sent your files to

3    John Nee, did you have an understanding that your Madoff exam

4    had been completed?

5         A    My understanding is that we did not find any

6    indicia of front-running, yes.

7         Q    Okay.  Would it surprise you that that's not what

8    Mark Donohue testified?  And in fact, Mark Donohue testified

9    that there were significant questions that were pending but

10   that the exam hadn't been worked on for almost a year.

11        A    That would surprise me, yes.

12        Q    Do you think that that could have happened and you

13   weren't aware of it?

14        A    I'm not aware of it, so yes, it could have

15   happened.  I'm sorry, what do you -- what could have

16   happened?

17        Q    Do you think that Mark is not providing truthful

18   information or is it that you just weren't aware that this

19   was happening?

20        A    I certainly believe Mark is providing truthful

21   information, no question about that.  Was I aware of those

22   details at the time or now, I don't recall being aware of

23   them.

24        Q    Would that be concern that an exam that was

25   operating under you would be left dormant for almost a year?

Page 113

1      A      It's concerning, yes.

2      Q      Do you remember -- what was your reaction when you

3   found out that the New York office was also conducting an

4   exam of Madoff?

5      A      I remember being mildly upset about that.

6      Q      Why was that?

7      A      Because it meant that we probably didn't put our

8   information into the tracking system like we're supposed to

9   do.

10     Q      So you weren't aware that New York was doing an

11  examination of Madoff at the same time and New York wasn't

12  aware that you were; is that right?

13     A      I was not aware that they were, I don't know what

14  they were aware of.

15     Q      Did you discuss your examination with the New York

16  office?

17     A      I remember John Nee contacting us or me, but I

18  don't recall me discussing it clearly.  I'm sure it was

19  discussed with them.

20     Q      What do you say clearly was discussed with them?

21     A      Well, I think I told -- I asked Mark and maybe Eric

22  to, you know, deal with the fact that we have two ongoing

23  exams of the same firm at the same time or in near terms.  So

24  you know, I would have instructed them to coordinate and make

25  sure you're as helpful -- if theirs was ongoing, as helpful

MADOFF_EXHIBITS-00959

1   to them as possible, something like that.

2       Q    Do you recall that at that time Mark and Eric

3   really hadn't really gotten very far in their exam and so

4   there really wasn't much information for them to provide to

5   New York?

6       A    I mean, I do recall that Mark told me that he was

7   not finding anything, but I would have assumed there would

8   have been documents to provide from the exam.

9       Q    Do you think that the exam that was conducted under

10  you, the Madoff cause exam, was conducted in a adequate way?

11      A    I mean, now you're telling me that there was

12  nothing done for a long period of time, I think that shows a

13  certain level of inadequacy, yes.

14          MR. COBB:  If in fact it's true, you have no

15  knowledge of that.

16          THE WITNESS:  Right.

17          MR. KOTZ:  Do you recall it being difficult to find

18  the Madoff documents when they were being sent up to the New

19  York regional office because people didn't know where they

20  were because the matter hadn't been worked on for so long?

21          THE WITNESS:  I do recall Genevievette, issues with

22  Genevievette, that -- and, you know, of putting one and one

23  together that maybe the documents -- if the documents were

24  kept by here and then we had trouble with documents that she

25  was responsible for keeping.

1        MR. KOTZ:  What kind of trouble did you have with

2   the documents that Genevievette was responsible for keeping?

3        THE WITNESS:  Like sloppiness, things like that.  I

4   think there's doors were locked and it was hard to get to

5   them sometimes, just vague recollections.

6        MR. KOTZ:  What about in terms of Genevievette's

7   work?  Was her work sloppy?

8        THE WITNESS:  I would say she was one of the weaker

9   employees I've had in my career.

10       MR. KOTZ:  What about Jacqueline Wood?

11       THE WITNESS:  I would say on the contrary, she's

12  probably one of the best I've ever had.

13       MS. STEIBER:  Were you aware of problems between

14  Mark Donohue and Gen Walker?

15       THE WITNESS:  Yes.

16       MS. STEIBER:  What were you aware of?

17       THE WITNESS:  I think she made an allegation

18  against him.

19       MR. KOTZ:  Did you -- were you aware of any

20  allegations that Ms. Walker made against Mr. Donohue relating

21  to the Madoff exam?

22       THE WITNESS:  No.

23       MR. KOTZ:  Okay, you weren't aware of Ms. Walker

24  stating that she wanted to continue to work on the Madoff

25  exam but wasn't allowed to?

MADOFF_EXHIBITS-00961

Page 116

1        THE WITNESS:  I wasn't aware of that, no.

2        MR. KOTZ:  Do you think that the difficulties

3   between Mark Donohue and Ms. Walker might have had an impact

4   on how the Madoff exam was run?

5        THE WITNESS:  I don't think it should have.  I

6   mean, it's unfortunate she was a weak member, but the data

7   analysis could have done -- been done by Jackie at a high

8   level, so -- but it's certainly, you know, probably didn't

9   help, obviously.

10        MR. KOTZ:  Okay.  Do you remember ever following up

11   to find out what happened with NYRO's exam?

12        THE WITNESS:  Following up, I don't recall.

13        MR. KOTZ:  Do you remember at any point -- do you

14   remember at any point in time learning that the enforcement

15   division was looking into Madoff?

16        THE WITNESS:  I, obviously, became aware of it in

17   the media but I don't recall at the time ever being made

18   aware of it, no.  The Enforcement Division in New York or

19   generally?

20        MR. KOTZ:  Anywhere.

21        THE WITNESS:  Anywhere, yeah.

22        MR. KOTZ:  All right, next document I'm going to

23   show you is Exhibit 33.  This is an e-mail from you to Eric

24   Swanson dated 2/28/2006.  We're going to mark this as Exhibit

25   33.  And the next document we're going to mark as Exhibit 34,

Page 117

1    which is an e-mail from John Nee to Eric Swanson, cc Peter

2    Lamore dated 2/28/2006 at 3:03 p.m.

3            And you see you're asking Eric Swanson, "Any news

4    on that NYRO exam of Madoff," in the 2/28/2006 e-mail.  And

5    then in the 2/28/2006 e-mail, 3:03 p.m. there is a response

6    from John Nee saying, "We closed out the examination after

7    looking for and not finding any evidence of front-running,

8    see attached report.  However, shortly thereafter our

9    enforcement people got an anonymous complaint alleging Madoff

10   is either front-running or is the biggest Ponzi scheme ever."

11           Does that refresh your recollection as to whether

12   you became aware at any point that enforcement was looking

13   into Madoff?

14                        (SEC Exhibit Nos. 33 and 34 were

15                        marked for identification.)

16       A    If these are accurate, yes.

17       Q    Do you remember if you reviewed the examination

18   closing report that the NYRO office provided you?

19       A    I don't recall looking at it in detail, no.

20       Q    Did you have any particular reaction that

21   enforcement was looking into Madoff for an allegation of the

22   biggest Ponzi scheme ever?

23       A    I don't recall having a reaction, but --

24       Q    Okay.

25       A    -- but probably was.

MADOFF_EXHIBITS-00963

Page 118

1    Q   Okay.  Let me show you the next document we're

2  going to mark as 35.  This document is the day after you

3  received this e-mail on February 28, 2006 that gave

4  information about Madoff possibly having the biggest Ponzi

5  scheme ever.

6      And this is an e-mail dated 3/1/2006, 9:15 p.m.  An

7  e-mail exchange between you and John McCarthy, where you

8  say -- I'm sorry, between you and Eric Swanson where you say

9  in the e-mail, Wednesday, March 1st at 8:00 to Eric Swanson,

10  "Two things, one put the squeeze on Shana.  Two, Cutler gave

11  Lori a tip we should follow up on."

12      So this is the day after you find out that Madoff

13  may have been running the biggest Ponzi scheme ever.  Do you

14  recall why you're asking Eric Swanson to put the squeeze on

15  Shana?

16                (SEC Exhibit No. 35 was marked for

17                      identification.)

18    A   Yeah, I mean it's -- I think it has to do with the

19  conference that was coming up, if I recall correctly.

20    Q   Okay.  But the Shana in this e-mail, 3/1/2006

21  e-mail, that refers to Shana Madoff; is that right?

22    A   Yes.

23    Q   Okay.

24    A   And these are what -- at night or on weekends I

25  would, things that I would kind of to remember I would shoot

1  off an e-mail. One, you know, put the squeeze on Shana,

2  two --

3       Q    Do you remember what the tip was?  "Cutler gave

4  Lori a tip we should follow up on," was that the tip related

5  to Madoff?

6       A    No, I -- again, pretty much well remember it was --

7  Cutler gave very few tips to me, obviously, most of it went

8  the other way.  I do remember he wanted us to look into

9  possible -- possibility of insider trading in CDSs and that's

10  about the right period of time.

11      Q    And why were you asking Eric Swanson to put the

12  squeeze on Shana?

13      A    Because I wanted to -- originally, I did not

14  decline to go to a conference, a big annual conference, I

15  think I was getting pressure at that time.  You know, Lori

16  was really encouraging senior staff to participate in

17  conferences and she was -- if I recall correctly, like, you

18  know, the emcee of the conference in Florida so I wanted --

19  you know, I asked her previously, and this is a follow up to

20  that, whether she could get me on a panel.

21      Q    And why would Eric be putting the squeeze on her?

22      A    Probably just asking Eric to because he

23  communicated with her more than I did so I just, you know,

24  when you're talking to her, you know, remind her if she's had

25  any luck with getting me on a panel.

MADOFF_EXHIBITS-00965

Page 120

1    Q    So that has nothing to do with you finding out that

2    Madoff was potentially running the biggest Ponzi scheme ever?

3    A    To me it's -- it has nothing to do with it, it's

4    something completely separate.

5    Q    Okay.  Did you ever -- strike that.  When did you

6    first meet Shana Madoff?

7    A    It's possible during those exams and the late -- in

8    late 90's, but when I recall interacting with her would have

9    been when we started the SIA breakfast.

10    Q    So would you say your interactions with her were

11    all professional or were there any social in nature?

12    A    They were primarily professional until this period

13    of time.

14    Q    Okay.  Next document we're going to -- an e-mail

15    we're going to mark it as Exhibit 36.  This is an e-mail from

16    you to ███████████████████████ dated 12/19/2005, 10:57 a.m.  Do

17    you know who███████████████████████is?  Is that how I

18    pronounce her name, do you know?

19                            (SEC Exhibit No. 36 was marked for

20                            identification.)

21    A    I don't know but it sounds right to me.

22    Q    She has a reference in there -- ██████████████is

23    sending an e-mail to you saying, "Shana would like to send

24    you something but, unfortunately, we don't have your mailing

25    address.  Would you be so kind as to send it to me?"  Do you

Page 121

1    know what Shana was trying to send you?

2         A    I do not know.

3         Q    Did Shana ever send you a gift?

4         A    I don't recall ever getting a gift, no.

5         Q    Okay.  Do you remember an SAA conference took place

6    around March 19th or March 20, 2006 in Florida?

7         A    Yes.

8         Q    Okay.  I'm going to show you an e-mail, we're going

9    to mark this as Exhibit 37.  This is an e-mail between you

10   and Shana Madoff, 3/19/2006, 5:42 p.m.  You said before that

11   you had a professional relationship with Shana up to a

12   certain point and then it might have been more social.

13              What do you recall about the social relationship?

14   Here is a reference to grabbing a cocktail and lots of other

15   e-mails, but, you know, if you want to just tell me first

16   based on your recollection, what was the nature of the

17   relationship?

18                             (SEC Exhibit No. 37 was marked for

19                              identification.)

20        A    Until the -- yeah, I probably don't recall ever

21   doing anything social at all, maybe a dinner the night before

22   one of the breakfasts before that.  And then this -- at this

23   conference she, you know, we -- you know, I met her for beers

24   and we had beers.  So that was the first time I kind of ever

25   talked to her about anything personal, you know, non-work

MADOFF_EXHIBITS-00967

1   related.



16        Q    Okay.  We're going to mark the next document as

17   Exhibit 38.  This is an e-mail from Shana Madoff to you dated

18   Monday, April 17, 2006, 5:10 p.m.

19             Do you see in this e-mail Shana says to you, "Thank

20   you for your kindness, I really want to get some alone time

21   with you because I want to talk to you about the other night.

22   Hope all is well."  Do you know what she was referring to in

23   wanting to get some alone time with you to talk about the

24   other night?

25                              (SEC Exhibit No. 38 was marked for

Page 123

1                                identification.)

2          A    I think so, yes.

3          Q    What was that?

4          A    I think -- again, I can't remember the exact night,

5    but it, you know, within a matter of days I was in New York

6    with Eric and she and Eric -- or Eric asked me to go to a

7    karaoke bar with -- and meet up with Shana.  She was with

8    Eric at the time.  And then the karaoke bar turned out to be

9    a -- I call it a strip club, but a high-end strip club, and I

10   was extremely upset.  But they kind of where having -- looked

11   like they were having fun at my expense, so I think it became

12   a big deal between Eric and myself.

13         Q    And how are they having fun at your expense?

14         A    Well, because the told me we were going to a

15   karaoke bar but it was not a karaoke bar.

16         Q    And so you were uncomfortable being at a strip

17   club?

18         A    I was then and generally don't like going to places

19   like that.

20         Q    Okay.  I'm going to show you another document, this

21   is marked as Exhibit 39.  This is an e-mail 4/21/2006 from

22   Alex Sadowski to you.

23                            (SEC Exhibit No. 39 was marked for

24                            identification.)

25              MR. COBB:  I'm sorry, 4/21 did you say?

MADOFF_EXHIBITS-00969

Page 124

1           MS. STEIBER:   Yes.

2           BY MR. KOTZ:

3      Q    This e-mail and some subsequent e-mail reference

4  there being secrets from you and issues with full disclosure

5  about Eric Swanson and Shana Madoff.  Do you recall that

6  there was a time period where there was an issue about

7  information being kept from you about their relationship?

8      A    Yes, I do.

9      Q    Okay.  So what do you recall about that?

10     A    Well, I mean, Eric and I -- I was very much against

11  him having a relationship with her and I made it clear

12  Personal Privacy

13

14

15

16

17

18

19

20

21     Q    Did the fact that she worked for a registrant have

22  any impact on your feelings about whether Eric Swanson should

23  maintain a relationship with her?

24     A    The driving motivation -- that was not even -- the

25  driving motivations were much more personal than that.  That

Page 125

1    issue wouldn't have really come into play.

2        Q    I'm sorry, would not have come into play?

3        A    That would have not -- that would not have -- in my

4    mind then and now, that would be kind of -- there's -- what

5    drawed me to the conclusions would not have been that fact.

6    That would have been, I guess, irrelevant in this --

7        Q    So you didn't think there was anything

8    inappropriate about the fact that Shana was a registrant,

9    Eric worked for the SEC, potentially he would be regulating

10   the entity that Madoff -- that Shana worked for?  This was a

11   company that had been examined three, four times and

12   investigated by the SEC.

13       A    I -- you know, it might have played a minor role in

14   my thinking, but I think, you know, if she was -- again, it

15   was a very personal -- why I didn't want him dating her was

16   more personal than kind of the fact that she worked at a

17   broker-dealer.

18       Q    Did you have any concerns about the Madoff

19   operations in terms of the fact that you had done an

20   examination of front-running or that perhaps that part of

21   what you were concerned about Eric being involved with was a

22   person who may have been in a company or the compliance

23   officer of a company that was involved in illegal things?

24       A    I mean, at that time I didn't view Madoff a company

25   that was doing illegal things.

MADOFF_EXHIBITS-00971

1       Q.   So that's no.

2       A    Ask the question again.

3       Q    So the fact that you had done an exam, you hadn't

4   found front-running but yet there was still questions about

5   Madoff's returns --

6            MS. STEIBER:  You had that complaint from Nee

7   saying that maybe their running the largest Ponzi scheme

8   ever.

9            THE WITNESS:  Oh, I see.  Again, my -- the reason

10  why I was against him dating Shana were, I would say more

11  profound than that -- those sorts of issues didn't come into

12  play.

13           BY MR. KOTZ:

14      Q    You just didn't like Shana for whatever reason?

15      A    That's fair, I guess.

16      Q    And there was a time period when you and Alex

17  Sadowski were kind of sharing information about what happened

18  with Eric and Shana; is that right?

19      A    Is it right that I would have shared information

20  with Alex?

21      Q    Yeah.

22      A    Yes.

23      Q    Okay.  And then there was an incident where you saw

24  them, you saw Eric and Shana together, I think at his

25  apartment, his roommate was there.  What was the roommate's

1   name?

2            MS. STEIBER:  ██████████████████████

3            BY MR. KOTZ:

4       Q    ██████████████, and you got very upset.  Do you

5   recall that?

6       A    Yeah, vaguely, but yes I do recall that.

7       Q    Okay.

8       A    I guess I was surprised.

9       Q    And did you indicate to Eric Swanson that if he

10  didn't cut of his relationship with Shana Madoff he would

11  lose you as a friend?

12      A    I mean, that's consistent with how I felt, yes.

13      Q    Okay.  But in the end Eric Swanson didn't cut off

14  his relationship with Shana, in fact, he married her.  Is

15  that right?

16      A    That's right.

17      Q    So how did that resolve itself given that you were

18  so upset and I guess you're still friends with him today

19  aren't you?

20      A    Yes.

21      Q    Okay.  So how did that resolve itself?

22      A    Slowly.  I mean, something that still, to this day,

23  I'm somewhat upset in.

24      Q    And how did you feel when you found out that in

25  December 2008, that Bernie Madoff had admitted to a Ponzi

Page 128

1    scheme?  Did you feel like if, perhaps, Eric had listed to

2    you he might not be involved with somebody who, at least now,

3    has an uncle who's, you know, one of the most famous

4    fraudsters ever?

5        A    That thought came to my mind, yes.

6        Q    I'm going to show you another document.  This is

7    Exhibit 40.  This is an e-mail from you and Alex Sadowski,

8    Thursday, April 6, 2006 at 2:01 p.m.  Do you recall what you

9    were referring to when you said, "I guess we won't be

10   inspecting Madoff any time soon?"

11                            (SEC Exhibit No. 40 was marked for

12                             identification.)

13           MR. COBB:  Do you recall the context of the e-mail?

14           THE WITNESS:  Yeah.

15           MR. COBB:  This is 40, I'm sorry?  Yeah, 40.  God,

16   I wish I could see.

17           THE WITNESS:  I mean, I recall this general

18   situation, yes.

19           MR. KOTZ:  What do you recall about the general

20   situation?

21           THE WITNESS:  That I was upset about it and, you

22   know, probably more accurate description would be saying Eric

23   won't be inspecting Madoff anytime soon.  But it's -- the

24   real point is to -- for me to tell Eric -- or I'm sorry,

25   Alex, that, "Hey, I'm aware of what's going on."  The point

Page 129

1    of it was not about our inspection program.

2            MR. KOTZ:  Did you think at any point in time that

3    Eric's relationship with Shana Madoff had an impact on the

4    operations of the SEC such that, you know, decisions would be

5    made about whether Madoff would be inspected?

6            THE WITNESS:  Certainly, if an inspection of Madoff

7    was in the offing he would not be part of it, certainly.

8            MR. KOTZ:  But would that factor into decisions of

9    your group whether you would be involved in a Madoff

10   inspection?

11           THE WITNESS:  It -- mainly, I mean, again, it would

12   mainly be whether he would be involved but not the group in

13   general, no.

14           MR. KOTZ:  So the group could do a Madoff

15   inspection without Eric?

16           THE WITNESS:  Yes.

17           MR. KOTZ:  Did you feel at any point in time that

18   Eric should formally recuse himself from all Madoff matters

19   after he developed a relationship with Shana Madoff?

20           MR. COBB:  Well, were there any Madoff matters

21   after that?

22           MR. KOTZ:  I mean, was there any responsibility on

23   Eric Swanson's part to take any action after he started

24   developing a relationship with the compliance officer or

25   registrant?

1           THE WITNESS:  I would view that -- I mean, I would

2      view that as peculiar.  I mean, if it -- if a matter came up,

3      certainly he would -- should be recused.  But as people that

4      are into romantic relationships, they may or may not -- they

5      don't proactively recuse themselves is my typical experience.

6           MR. KOTZ:  What about if somebody was say,

7      interviewing for a job with a particular company?  Somebody,

8      Eric Swanson was interviewing for a job with Madoff, would he

9      send out some kind of recusal saying, "From now on I'm not to

10     be involved in any Madoff matters?"

11          THE WITNESS:  Yeah, I think there's a -- again, I'm

12     not that familiar with the process, but I think you're

13     supposed to alert -- if I understand it -- I mean, I told

14     Lori when I was interviewing at Getgo.  I don't know if

15     that's a policy or simply a process that I did.

16          MR. KOTZ:  Do you think that that same type of

17     policy should apply when somebody is involved in a romantic

18     relationship?

19          THE WITNESS:  I don't view that as unreasonable,

20     but again, I think the main thing is to ensure that if

21     there's an -- if there's a regulatory matter before someone

22     that should recuse themselves that they handle it

23     appropriately.

24          MR. KOTZ:  I'll show you the next document.  I'll

25     mark it as Exhibit 41.  This is an e-mail from Eric Swanson

MADOFF_EXHIBITS-00976

1   to you dated 4/23/2006 at 5:33 p.m.  You see at the bottom of

2   the page an e-mail from you to Steve Luparello, where you

3   say, "Shana, Steve, Mike and John, I'm sorry for such short

4   notice but it looks like the SEC contingent is going to have

5   to back out of the Greenwich breakfast.  Obviously, we can

6   proceed -- we all can proceed without us but given the usual

7   aspects of this breakfast I understand that it creates

8   difficulties without SEC involvement."  Do you recall why the

9   decision was made for the SEC contingent to back out of the

10  breakfast?

11                          (SEC Exhibit No. 41 was marked for

12                          identification.)

13          THE WITNESS:  I'm not sure on the dates but I think

14  after the karaoke thing I made the decision I don't -- you

15  know, want to basically limit my interactions with Shana, so

16  I was asking her to -- I told Eric to cancel the breakfast.

17          MS. STEIBER:  Why, because she was playing a joke

18  on you?

19          THE WITNESS:  I just felt that Eric was comporting

20  himself in a way that he never did in the past, I just

21  wanted -- I just felt it was better for me not to be, you

22  know, involved in that situation.

23  Personal Privacy

24

25

Page 132



Personal Privacy

```
22        BY MR. KOTZ:

23        Q    Do you think there's, generally, any concerns about

24   having too much fraternization between SEC examiners and

25   registrants or representative of registrants?  Is there a
```

1  point at which there's too much interaction and

2  fraternization?

3      A    There's -- yeah.  When, obviously, people are

4  married to people at broker-dealers, et cetera, so I mean,

5  you know, I think it's just simply a matter of judgment

6  what -- where that line is.

7      Q    Okay.  You don't think that it creates sort of an

8  appearance problem when there's too much fraternization or

9  interaction between examiners and registrants at these kind

10 of social functions?

11     A    It certainly could, yes.

12     Q    Okay, I'll show you the next document, we'll mark

13 it as Exhibit 42.  And this is an e-mail from Eric Swanson to

14 John McCarthy dated 4/27/2006, 9:46 a.m.

15          Here in an e-mail below in the exchange on April

16 27, 2006, 10:46 a.m., you emailed to Eric Swanson "red flag."

17 You can look at the whole thing and see if you can figure out

18 what the red flag refers to.

19                         (SEC Exhibit No. 42 was marked for

20                          identification.)

21          (The witness examined the document.)

22     A    Yeah, I remember this.

23     Q    What was it referring to?

24     A    Replacing -- I think if I was to do a full

25 sentence -- right now, you're doing things that I -- now

1   you're doing things that I ask you to do.  Meaning, I'm being

2   sarcastic, you know, actually being cooperative again like

3   you used to be is maybe is how -- would have been better.

4        Q    Does it seem that Eric doesn't get that.  He says,

5   "You're asking me to do this, what am I supposed to do?"

6   He's -- it seems --

7        A    Yeah, I recall -- I think what I -- I'm sorry.

8        Q    Go ahead, I'm sorry.

9        A    What I recall is that I canceled the breakfast then

10  basically said, "Okay, we'll do the one more."  The hedge

11  fund one I felt was actually relatively important, the one up

12  in Greenwich, so I think we -- Eric was kind -- I put him in

13  probably an awkward situation of canceling it then kind of

14  rescheduling it is my recollection.

15       Q    Okay.

16       A    And then that was the last one.

17       Q    And do you remember when -- around the time that

18  Eric left the SEC there was a going-away party for him?

19       A    Yeah, it was at my house, yes.

20       Q    Okay.  And Shana attended this party?

21       A    Yes.

22       Q    Okay, was that a problem given your concerns about

23  their relationship or was that -- as the process sort of took

24  place you were more relaxed or mellow about the relationship?

25       A    I think it was a point I was getting mellower, but

Page 135

1   I still did -- again, I still did not view her in a positive

2   vein and probably didn't want her coming to my house would be

3   my guess.

4       Q    And then how long --

5       A    But things were -- things were mellowed out, if I

6   recall correctly, by that time significantly more than --

7       Q    And how long after Eric left the SEC did you leave

8   the SEC?

9       A    I left in November '07.

10      Q    So about a year afterward?

11      A    Makes sense.

12      Q    Okay.  Did your departure have anything to do with

13  Eric or Shana?

14      A    I left the SEC for completely unrelated reasons,

15  yes.

16      Q    Okay.  What was your reaction when you first heard

17  that Bernie Madoff had admitted to conducting a Ponzi scheme

18  given the fact that there was an examination that you were

19  involved in?

20      A    One of surprise.

21      Q    We discussed here several exams that the OC

22  division did of Madoff, are you aware of other registrants

23  where there were so many exams done over a short period of

24  time?

25      A    I mean, it -- probably -- you could probably find

Page 136

1    many examples of similar.

2         Q     Where there were three or four exams conducted at

3    the same entity?

4         A     I mean, I -- I'm guessing but I don't -- I think

5    you could find many examples of that.  I mean, obviously, if

6    you look at a Merrill Lynch, but that's not really an apples

7    to apples example.  But a relatively small firm is -- a

8    relatively small firm that just has, as it turns out, two

9    lines of business, and it's probably -- it would probably be

10   fewer examples of that.

11        Q     And do you think there are other examples of

12   situations where not only were there several exams of a small

13   firm but also an enforcement investigation opened up of a

14   small firm?

15        A     Are there examples -- I assume that would be

16   relatively unusual, but again, I don't know.

17        Q     Okay.  Were you surprised overall that OC, in

18   either your exam or the NYRO exam or other exams, didn't

19   discover the Ponzi scheme?

20        A     I mean, I was not surprised, I my judgment, given

21   the scope of the exam under me that we didn't find it, no.

22        Q     What about the New York regional office exam that

23   they did?

24        A     Certainly, with the Markopolos memo, information

25   like that, I think the odds should go up significantly they

1   would find it.

2       Q      Did you have occasion to read Harry Markopolos'

3   memo?

4       A      I did.  I read most of -- not every word.

5       Q      When?

6       A      When it came out in the Wall Street Journal.

7       Q      After December 2008?

8       A      Yes.

9       Q      Okay.  And what was your impression of that letter

10  written by Mr. Markopolos?

11      A      It's -- kind of speaks for itself.  It's

12  exhaustive, obviously he was obsessed with the issue and --

13      Q      Do you think it was a credible document?

14      A      Again, reading in the Wall Street Journal with

15  20/20 hindsight it made a lot of accurate points.

16      Q      Do you think if you had access to that document

17  when you did your exam you would have been able to uncover

18  Madoff's Ponzi scheme?

19      A      The answer is I don't know.

20      Q      Okay.  Do you think OC examiners have the necessary

21  qualifications to be effective?

22      A      Some do, some don't.

23      Q      What about the folks on your team?

24      A      Again, getting up the learning curve and

25  understanding the markets and trading takes a long time.  So

MADOFF_EXHIBITS-00983

Page 138

1    you know -- but, you know, most of the highly-motivated staff

2    end up getting pretty far up the learning curve, but not all.

3         Q    Do you think at the time that your team conducted

4    the Madoff cause exam they were experienced enough, had

5    enough qualifications to be able to do an adequate job?

6         A    Certainly, I think Mark did and Eric did, yes.

7         Q    What about the rest of the team?

8         A    Like I say, Genevievette was one of the weaker

9    employees I've had, so I would probably say no to her.  But

10   Jackie, with proper direction, could do a decent job.

11        Q    Okay.  Did Eric Swanson's relationship with Shana

12   Madoff have any impact at all on the cause exam that you

13   headed?

14        A    None that I'm aware of, no.

15        Q    Since Bernie Madoff confessed to the Ponzi scheme

16   in December of 2008, have you had any conversations with any

17   current or former employees about the examination, the cause

18   exam that you worked on?

19        A    I spoke, only socially, with Lori.  Spoke very

20   briefly with Eric, but not about the exam.  I speak a lot to

21   Alex because he works for me now, presently, but, you know,

22   not about the exam.

23        Q    Okay.  Were you aware that Alex had come and spoke

24   to us?

25        A    He had to ask me for time off, yes.

MADOFF_EXHIBITS-00984

1    Q    Okay.  And did you and Alex talk about the

2  substance of the conversations in the interview he gave us?

3    A    He talked, he told me generally what he talked

4  about and said he couldn't, you know, wasn't allowed to speak

5  about the testimony.  So --

6    Q    So what did he tell you generally about what he

7  talked about?

8    A    He said there were a lot of personal stuff, I think

9  he said something to that effect.

10   Q    Did he say anything about substantive matters

11 relating to the exam?

12   A    He didn't -- he did not talk to me about that at

13 all, no, or reference it.

14         MS. STEIBER:  When did you speak to Lori about the

15 exam?

16         THE WITNESS:  I never spoke to Lori about the exam.

17         MS. STEIBER:  When was the last time --

18         THE WITNESS:  I spoke to her socially, yes, saw her

19 at a restaurant recently and we've had coffee a couple times,

20 but not about issues -- it's very clear we can't talk about

21 anything Madoff.

22         MR. KOTZ:  What about with Eric Swanson?  Have you

23 ever had a conversation with him about the Madoff matter?

24         THE WITNESS:  No.  Again, I think, except in the

25 context of, "How are you doing?  How are you holding up?"

MADOFF_EXHIBITS-00985

1   Things like that.

2          MR. KOTZ:  And you went to Eric Swanson's wedding

3   with Shana Madoff?

4          THE WITNESS:  Correct.

5          MR. KOTZ:  Who else from either current or former

6   SEC employees were there?

7          THE WITNESS:  Well, the people I knew, there

8   where -- I mean, Steve Luparello was I guess a former, Lori,

9   my wife, I think Alex was there, and perhaps others I can't

10   recall off the top of my head.

11          MR. KOTZ:  Just to kind of be clear, was there any

12   effort at all by anyone to limit your scope of your Madoff

13   investigation or back off from the Madoff investigation?

14          THE WITNESS:  None whatsoever.

15          MR. KOTZ:  Okay.  And in your time at the SEC did

16   you ever see situations where powerful influential people got

17   preferential treatment because of their position?

18          THE WITNESS:  Got preferential treatment?  No, I've

19   never seen that.

20          MR. KOTZ:  When you were conducting the Madoff

21   cause exam, was it a factor that Madoff had been an

22   influential person who was previously head of the NASDAQ,

23   otherwise well-known figure in the industry?

24          THE WITNESS:  If it was a factor it would have been

25   probably an opposite factor.  I think a lot of people are

Page 141

1   excited to work, you know, like specialists case because

2   they're high profile.  Madoff might have had -- fallen into

3   that category.

4           MR. KOTZ:  Okay.  So anything else about the Madoff

5   cause exam or Madoff investigations or otherwise relating to

6   Bernie Madoff that we haven't asked you today that is

7   relevant?

8           THE WITNESS:  You seem pretty comprehensive, so

9   that's all I can think of.

10          MS. STEIBER:  Can we just go back to -- I think you

11  covered this earlier -- but looking back there's nothing

12  different that you would do in your exam if you had to do it

13  all over again?

14          MR. COBB:  Based on the same information he had at

15  the time?

16          MS. STEIBER:  Based on the same information you had

17  at the time, is there anything different that you would wish

18  that you had done?

19          THE WITNESS:  Well, you referred to an 11-month

20  period that -- where nothing was done, so I would like to

21  have done something differently in regard to that, yes.

22          MS. STEIBER:  What about have a closing report for

23  the exam, would that be something that should have been in

24  place?

25          THE WITNESS:  Again, I mean, is that a do or -- is

Page 142

1   that incredibly important to me at this stage whether

2   there -- or not there's a closing report?  No, it's whether

3   or not they did a good job investigating the exam and looked

4   for front-running aggressively.  Yes, would I have liked them

5   having a closing report?  Sure, but I don't think that's

6   demonstrative of, you know, why, you know, the results of the

7   exam, per se.  But yes, I would like that.

8           MS. STEIBER:  What about make sure that they went

9   to a third party to retrieve trading data?

10          THE WITNESS:  Again, vis-...-vis the -- as I

11  understood the exam, you know, that you'd have records in

12  London and records in the U.S., vis-...-vis the retail shops.

13  So getting -- I think in retrospect, getting third-party

14  records of the London trades would have probably -- l assume

15  they were done over-the-counter, I think there would have to

16  have been indicia of that the records he provided us were

17  false.

18          MS. STEIBER:  But you still wish that they had

19  requested any such records?

20          THE WITNESS:  Well, again, for the retail records,

21  getting them from the broker-deal directly makes sense to me

22  because you need -- we would have probably needed the level

23  of detail they provided.  Yes, obviously, if there's indicia

24  that these records could be false or falsified, yes, I would

25  have liked to verify them with a third party.

MADOFF_EXHIBITS-00988

1       But I don't think there, at the time, there was any

2   indicia that, you know, the retail flow was false data and,

3   in fact, it probably wasn't false data.  Obviously, the

4   London trades would have been false, from my understanding.

5       MR. KOTZ:  Okay, I think that's all we have.  I

6   caution you as we've cautioned others, not to discuss your

7   testimony with anyone else.  And you signed that

8   confidentiality agreement.  And that you will get back to us

9   on --

10      MR. COBB:  I promise.

11      MR. KOTZ:  -- signing your agreement, having your

12  firm look at it.  Okay?  All right, we are off the record.

13      (Whereupon, at 1:10 p.m. the examination was

14  concluded.)

15                  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

**EXHIBIT O**

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of                    )

                                    )File No. OIG-509

OIG-509                             )


WITNESS:   Number 67


PAGES:    1 through 136              COPY


PLACE:    Securities and Exchange Commission


          100 F Street, N.E.


          Room 2740


          Washington, DC


DATE:     Monday, March 9, 2009




          The above-entitled matter came on for hearing,


pursuant to notice, at 9:40 a.m.

MADOFF_EXHIBITS-00160

APPEARANCES:


On behalf of the Securities and Exchange Commission:

    H. DAVID KOTZ, ESQ., Investigator General

    HEIDI STEIBER, ESQ., Assistant Investigator

    CHRISTOPHER WILSON, ESQ., Assistant Investigator

    DAVID WITHERSPOON, ESQ.

    DAVID FIELDER, ESQ.

    Office of the Inspector General

    U.S. Securities and Exchange Commission

    100 F Street, N.E.


    Washington, D.C. 20549




On behalf of the witness:


    JACQUELINE WOOD PERRELL, ESQ., PRO SE


    Proskauer Rose, LLP


    1001 Pennsylvania Avenue, N.W.


    Washington, D.C. 20004

MADOFF_EXHIBITS-00161

Page 3

CONTENTS

| WITNESS | EXAMINATION |
|---|---|
| Jacqueline Wood Perrell | 8 |

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 - Lancer Funds by▇▇▇▇▇▇▇ | | 19 |
| 2 - E-mail from▇▇▇▇▇▇▇▇to M. Kelly,5/21/03 | | 21 |
| 3 - E-mail from J. McCarthy to J. Perrell, | | |
| Barron's article, 12/11/03 | | 40 |
| 4 - Planning memorandum from J. Perrell to | | |
| G. Walker, 12/16/03 | | 43 |
| 5 - NASD document request letter to Madoff | | |
| Securities, 12/7/03 | | 46 |
| 6 - E-mail from J. Perrell to E. Swanson with | | |
| draft letters, 12/19/03 | | 48 |
| 7 - E-mail from J. McCarthy to L. Richards, | | |
| 12/18/03, and M. Donahue to M. Daugherty, | | |
| 12/19/03 | | 53 |
| 8 - Document request letter from M. Donahue to | | |
| J. McCarthy, cc: J. Perrell, 12/24/03 | | 55 |
| 9 - Letter from B.L. Madoff to SEC, 1/16/04 | | 58 |
| 10 - E-mail from G. Walker to M. Donahue and | | |
| J. Perrell, 1/29/04 | | 59 |
| 11 - E-mail from G. Walker to M. Donahue, J. | | |
| Wood, 1/29/04 | | 66 |

Page 4

C O N T E N T S

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 12 - | E-mail from G. Walker to M. Donahue, 1/29/04 | 66 |
| 13 - | E-mail from J. Perrell to M. Donahue, 2/3/04 | 69 |
| 14 - | Handwritten notes by J. Perrell, 2/4/04 | 71 |
| 15 - | E-mail from G. Walker to J. Perrell and | |
| | M. Donahue, | 78 |
| 16 - | E-mail from G. Walker to J. Perrell, 2/4/04 | 80 |
| 17 - | E-mail from G. Walker to J. Perrell, | |
| | supplemental information request, 2/6/04 | 82 |
| 18 - | E-mails between G. Walker and J. Perrell, | |
| | 2/11/04 | 87 |
| 19 - | E-mail from J. Perrell to M. Donahue, 2/11/04 | 87 |
| 20 - | Letter from B. Madoff to M. Donahue, 3/23/04 | 88 |
| 21 - | E-mail from M. Donahue to J. Perrell and G. Walker, | |
| | 2/18/04 | 94 |
| 22 - | Mark-up draft letter to P. Madoff from E. Swanson, | |
| | February 2004 | 95 |
| 23 - | Letter from B. Madoff to E. Swanson, 3/1/04 | 97 |
| 24 - | Letter from E. Swanson to P. Madoff, 2/18/04 | 99 |
| 25 - | E-mail from J. Perrell to E. Swanson, 3/9/04 | 101 |
| 26 - | E-mail from J. Perrell to M. Donahue, 3/18/04 | 104 |
| 27 - | Handwritten notes re Madoff, 3/18/04 | 106 |
| 28 - | E-mail from G. Walker to M. Donahue, | |
| | copy J. Perrell, 3/23/04 | 107 |

MADOFF_EXHIBITS-00163

C O N T E N T S

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 29 | E-mail from G. Walker to M. Donahue, copy J. Perrell, Madoff supplements, 3/23/2004 | 110 |
| 30 | E-mail from G. Walker to M. Donahue, copy J. Perrell, 3/24/2004 | 111 |
| 31 | E-mail from G. Walker to M. Donahue, copy J. Perrell, 3/25/2004 | 112 |
| 32 | E-mail from M. Donahue to G. Walker, copy to J. Perrell, 4/7/2004 | 114 |
| 33 | E-mail from M. Kelly to L. Ward, B. Snively, K. Stevens and J. Reese, 4/16/04 | 116 |
| 34 | E-mail from E. Swanson to M. Donahue, 3/16/05 | 118 |
| 35 | E-mail from M. Donahue to G. Walker, M. Daugherty and Former OCIE Attorney Advisor, 5/31/05 | 119 |
| 36 | E-mail from G. Walker to M. Donahue, 6/2/2005 | 120 |

MADOFF_EXHIBITS-00164

Page 6

1                    P R O C E E D I N G S

2          MR. KOTZ:  We are on the record at 9:40 a.m. on

3    March 9, 2009, at the United States Securities and Exchange

4    Commission, Office of Inspector General.

5          I am going to swear you in.  Okay.  Would you

6    please raise your right hand?

7    Whereupon,

8                    JACQUELINE WOOD PERRELL

9    was called as a witness, and having first been duly sworn,

10   was examined and testified as follows:

11         MR. KOTZ:  Would you please state and spell your

12   full name for the record?

13         THE WITNESS:  Jacqueline, J-a-c-q-u-e-l-i-n-e, Wood

14   Perrell, P-e-r-r-e-l-l.

15         MR. KOTZ:  Okay.  And for the time you were at the

16   SEC you were known as Jacqueline Wood?

17         THE WITNESS:  Jacqueline Wood; Jacqueline Murray

18   Wood.

19         MR. KOTZ:  Okay.  My name is David Kotz.  I am the

20   Inspector General of the United States Securities and

21   Exchange Commission.  This is an investigation by the Office

22   of Inspector General, Case Number 509.  I am going to ask you

23   certain questions.  You are going to provide answers under

24   oath.

25         The court reporter will record and later transcribe

Page 10

1          THE WITNESS:  All right.  Thank you.

2          BY MR. KOTZ:

3     Q    Okay.  So you were saying you graduated law school

4     in?

5     A    December of 1998.

6     Q    Okay.  And then what did you do after graduating

7     law school?

8     A    I continued employment as a lawyer with Miles &

9     Stockbridge.

10    Q    Okay.  As an associate?

11    A    Yes.

12    Q    Okay.  How long did you do that for?

13    A    Until I came to the SEC in 2003.

14    Q    What kind of law did you practice at Miles &

15    Stockbridge?

16    A    Business and commercial litigation, some white

17    collar, criminal defense work, and a little bit of the

18    securities.

19    Q    Okay.  What made you decide to come to the SEC?

20    A    I did a little bit of securities at Miles &

21    Stockbridge, and the partner that I actually worked for

22    became the federal judge, so that type of work, elaborating.

23    So I decided to try to get more experience and come to the

24    SEC.

25    Q    And then you started working with the SEC in

Page 13

1   that a yes?

2       A    Yes, yeah, sorry.  I tell my clients not to do

3   that, but I do it.

4       Q    Right, okay.  And what is the office of market

5   oversight?  Are you familiar with that office?

6       A    Well, my understanding is that office is that we

7   were a group, that our group was a part of that office

8   oversight.  I'm not really sure of the delineation.  I know

9   that we dealt with mostly self-regulatory organizations, but

10  market oversight would be oversight of the exchanges,

11  probably.

12      Q    So the SRO groups were in market oversight.  Was

13  that your understanding?

14      A    Yes, that's my understanding, and there are groups,

15  like there is SRO-1 and SRO-3 that does the same type of

16  work, and then there's SRO-2, which does a different type of

17  work, but I was never fully aware of because I was not in

18  that group.

19      Q    And when in 2003 did you start with the SEC?

20      A    September.

21      Q    And you were staff attorney when you started.  Did

22  you change positions at all?

23      A    No.

24      Q    When did you leave the SEC?

25      A    January 16, 2006; no, January 13, 2006.

1            MR. KOTZ:  This is from outside the SEC.  I think

2    this may have been the tip that led to that initial exam.  So

3    could you take a look at this document, Exhibit 2?

4            (The witness examined the document.)

5            BY MR. KOTZ:

6       Q    Okay.  Do you recognize this document?  Have you

7    ever seen this document before?

8       A    No.

9       Q    Do you remember any communications with Mavis Kelly

10   about matters related to Bernard Madoff?

11      A    No, I don't believe I had any discussions with me.

12   I don't recall any.

13      Q    Okay.  You don't remember Mavis being the one who

14   was providing information to you as kind of leading up to the

15   exam we did?

16      A    Yeah, I believe she did provide information

17   documents, but I don't recall any conversations with her

18   about what she provided us.  So she either provided them

19   directly to me or maybe she provided them to Mark and Mark

20   provided them to the team.  But I don't recall having any

21   specific conversations with Mavis.

22      Q    Okay, who was on the team?

23      A    Mark Donahue, myself, maybe--

24      Q    Is that Genevievette Walker?

25      A    Yes, Gen Walker.

Page 24

1        A    I do not.  I know that I was never told it was from

2    a tip, and I never picked up on that through any of my

3    interactions on this project.

4        Q    Okay.  What were you told?  I mean, what were you

5    guys looking at?

6        A    We were looking at his trading strategy and trying

7    to, based on what I can recall.  We were looking at the way

8    that he trades.  And I remember mostly about the black box

9    and how his automated trading, how that automated trading is

10   done, the strategies behind that.  Whoever does those

11   algorithms or those mathematicians, how they're done, the

12   timing on the trading.  I do recall, although I fully don't

13   understand the split strike conversion, we were just looking

14   at his trading.

15       Q    Why were you looking at his trading?  In other

16   words, what was the concern about his trading?  Do you

17   remember?

18       A    As a staff person I was not fully told that.

19            BY MS. STEIBER:

20       Q    What's the difference between a routine exam and a

21   cause exam?

22       A    Well, for a routine exam we may go in on like a

23   cyclical time, so we may go into the New York Stock Exchange

24   once every three years.  For a cause exam we may get, I

25   guess, a tip or something may come into the office to the

Page 25

1   higher ups, and asking to look into something, and then we

2   would do with an exam based on that, which is something more

3   specific as opposed to we're going in to just do a routine,

4   you know, we want to look at the last three to five years of

5   what you've been doing.

6        Q    And did you have an understanding if this was a

7   routine or a cause exam?

8        A    I did not.  I did not have an understanding.  Well,

9   I don't think it was a routine exam.  I don't think I was

10  told that, but I wasn't as a staff person really told

11  specifically that it was a for cause exam either.  The

12  project came in.  I was staffed on it, and then I just hit

13  the ground running on that.

14          BY MR. KOTZ:

15       Q    So is it difficult though sometimes to figure out

16  what questions to ask or what work to do if you don't know

17  what precipitated the exam?

18       A    Well, I think, you know, I was taking a lot of

19  direction also from my branch chief, and what we were

20  supposed to look at.  And, you know, I don't really recall it

21  being so many years ago.  There were specific conversations

22  with Mark or anybody else about why we were doing this.

23          The in-depth is not what I was told.  All I was

24  told is that we were looking at this trading to see if the

25  trading, if there were any concerns with the trading.  But

Page 26

1    what those concerns were from, a higher level perspective, I

2    don't know.

3         Q    Okay.  But it was clear there might have been some

4    concern that Madoff was engaging in some improper activity,

5    or you wouldn't have been looking at it.

6         A    Well, I think you can assume that, because

7    certainly we wouldn't be looking at Madoff unless it was a

8    routine exam, which I don't.  You know, the broker-dealer

9    group, which is a different group in there, specifically,

10   probably would have been the people that went in just on the

11   routine exams.  So, yes.  I think that there was maybe a

12   concern or something, but as far as to the specifics of those

13   concerns, I wasn't fully briefed on those.

14        Q    Okay.  Did you have an understanding at that point

15   there was a concern about front-running?

16        A    For?

17        Q    On the part of Madoff?

18        A    I don't recall.  It's possible.  I mean we always

19   try to look for that type of activity.

20        Q    But you don't recall specifically being told

21   you're going to be looking for front running?

22        A    I don't recall as I sit here today.  I mean unless

23   you have documents, I could refresh my recollection.

24        Q    Okay.  What about, do you recall any conversations

25   at any point in time while you were working on this exam

Page 34

1   can't get?

2      A    No.  I don't think that's my understanding.  I mean

3   the SEC, if it's books and records, that is required to be

4   capped by the broker-dealer.  You know, that's why the have

5   FOIA.  You know, the broker-dealers can ask for FOIA

6   protection to make sure that that information does not go

7   outside the Commission.

8      Q    So notwithstanding that the information is

9   proprietary, but the SEC wanted to see it, they would be able

10  to see it?

11     A    We always ask for proprietary information whenever

12  we did any exam and while we received it.

13     Q    Okay.  What about this idea the accounts were

14  typically in cash at month's end, every month.  The accounts

15  were in cash.  Do you remember that as an issue?

16     A    I don't recall that.

17     Q    Do you remember any discussion about the fact that

18  he could have been churning; Bernie Madoff?

19     A    I think that played into the commissions issue that

20  we were looking into, but, beyond I have no recollection of

21  specifics.

22     Q    What was the commissions issue?

23     A    The churning, I mean, is he churning and creating

24  commissions.

25     Q    Oh, okay.  When I think of commission, I think of

MADOFF_EXHIBITS-00172

Page 39

1   engagement letter or reports, or any type of work papers?

2       A    I know that I don't recall that I did, but that

3   doesn't mean that Gen Walker didn't or Mark.  I don't know.

4   Sometimes, when the boxes come in from the broker-dealer they

5   get divided, so I may not always know what the others in the

6   group are looking at.

7            BY MR. KOTZ:

8       Q    The time you were there, was there an investment

9   advisor group in OC as well?

10      A    Yes.

11      Q    What did they do?

12      A    Well, they did the routine examinations for the

13  investment advisors, and then I assumed they also do similar

14  to what we would do.  The four calls, theirs an investment

15  advisor tip that came through, a concern that they would do a

16  --

17      Q    Okay.  Was there any discussion in the Madoff exam

18  you participated in seeking some assistance from the

19  investment advisor group of OC?

20      A    Not that I can recall.

21      Q    Okay.  Were you aware it talked about that the

22  original tip that came in involved issues related to hedge

23  funds?

24      A    Not that I can recall.

25      Q    And you don't know why market oversight was the

Page 42

1   documents, and sometimes trading data can be very, you know,

2   you're looking at data, so it's not as if you're looking at

3   e-mails, which are prose and tell you more of a story and you

4   have more of an understanding.  When you're looking at data

5   and you're trying to piece things together, it's a little

6   different.

7        Q    So how many other matters you were working on

8   around when you were working on this one?

9        A    I can't recall.  The group keeps these

10  spreadsheets.  All of the opening matters were all matters

11  and a list of each staff member, and they keep track of how

12  many projects you have.  I recall many.

13       Q    Many like more than five?

14       A    Yes.

15       Q    More than 10?

16       A    Probably between five and 10.

17       Q    Were you working on any market timing cases at that

18  time?

19       A    Well, at the time, if my recollection of Madoff was

20  2004, then yes.

21            MR. KOTZ:  Okay, why don't I show you some of the

22  more particular documents?  We're going to mark this as

23  Exhibit 4.  It's a planning memorandum from you to

24  Genevievette Walker, 12/16/2003, 3:25 p.m.

25                                                          //

Page 45

1       A     No.  She left sometime after I left.

2       Q     What was your impression of her skills and

3   abilities?

4       A     You know, Gen is a good lawyer.  Sometimes, things

5   may not have been prepared as quickly as you'd like to speed

6   things along, but I mean when you're on a team sometimes you

7   pick up more work than others.

8       Q     If you look in these documents that we just handed

9   you, the different drafts of the planning memos, if you look

10  on the last document under "Course of action."

11      A     Okay.

12      Q     "The staff intends to send a letter to NASD

13  requesting execution data from Madoff Securities for the time

14  period of January 1, 2001, through December 31, 2002.  The

15  staff will review and analyze the execution data produced by

16  NASD to identify which trades or series of trades may have

17  been utilized to commit the alleged front-running

18  violations."  Do you recall why that was put in?

19      A     Because we wanted to see the data from a third-

20  party, an outside source.

21      Q     Why would you do that?

22      A     Just to make sure, compare it with what we received

23  from the actual firm.

24      Q     Okay.  Do you know if a letter was ever sent to

25  NASD requesting execution data?

Page 53

1    to look at your data.  So we may have bifurcated it and said,

2    you know, for now we want to look at your commissions.

3         We want to look at the identity of the hedge fund.

4    But these conversions are strategies; and, then, at that

5    point we'll look at that and then we will come back and ask

6    for trading data.  So unless you can tell me that maybe a

7    follow-up letter hadn't been sent out, we're asking for

8    trading data, then you know my answer may be different.

9         Q    **But even if you were requesting the trade data from**

10   **Madoff directly, then you would also go to a third party like**

11   **the NASD and request that data, in the normal course of**

12   **events.**

13        A    Right.  I don't know, you know.  I don't know if

14   generally speaking we would get it from one or the other, or

15   sometimes we would get it from both.  So I don't know.  It

16   just depends on the project.  I mean it's quite possible we

17   would get it from both, but I know there were times when we

18   just asked for trading data from the entity itself.

19        MR. KOTZ:  All right, let me show you another

20   document.  There are two documents that are e-mails from John

21   McCarthy to Lori Richards, 12/18/2003, and from Mark Donahue

22   to Matthew Daugherty, 12/19/2003.  We're going to mark these

23   as Exhibit 7.

24                      (SEC Exhibit 7 was marked for

25                       identification.)

Page 59

1    nor any other person or entity affiliated with Madoff

2    Securities manages or buys as hedge funds."  Do you remember

3    if that statement raised any concerns?

4        A    Not that I can recall.

5        Q    So, do you think, I mean, the team generally

6    thought he was telling the truth, but he was saying Madoff

7    Securities was the manager that buys hedge funds?

8        A    I don't know at the time.  This was just one of

9    many statements in this letter.  I mean we were really

10   focused on the data and looking at the data.

11       Q    Okay.  What about the statement, "Please know we

12   have no communications or disclosures from customers using

13   this strategy to investors, owners, or perspective investors

14   or owners."  Do you know if that statement was ever vetted?

15   I mean, was there any effort made to determine whether the

16   statement was true?

17       A    Not that I can recall.

18                         (SEC Exhibit 10 was marked for

19                          identification.)

20       MR. KOTZ:  Okay, I'm going to show you some

21   handwritten notes dated 1/29/2004, marked as Exhibit 10.

22   It's a series of notes in different handwriting.  So, Chris

23   wanted to get a sense of do you know whose handwriting they

24   were, if any of them were yours, etcetera.

25                    (The witness examined the document.)

Page 61

1   anybody who had provided information to get further

2   information as part of the work on this exam?

3        A    Say that again?

4        Q    You don't remember any point in time that folks on

5   your team went back to somebody to get more information after

6   you received documents from Madoff?

7        A    I believe we went and did a second request to

8   Madoff, but in terms of other outside sources, besides

9   possibly NASD, I don't recall us going to any other sources

10  or any other information.

11       Q    Okay.  If you see in here there are references on

12  the first page: "Returns are too consistently high for this

13  strategy; not doing that strategy, because option trading is

14  not high.  How does he trade the options?  He doesn't

15  understand how he consistently makes money off this strategy.

16  Perhaps he doesn't really use the strategy.

17            The volume of options trading doesn't seem to be

18  enough to protect the size of the equity trading.  Perhaps he

19  traded options differently."  And does any of this ring any

20  bells in terms of some of the issues you were looking at

21  about the options, about the fact that perhaps he doesn't do

22  what he's saying he's doing?

23       A    Well, I think that's the whole reason why we were

24  looking into his strategies, his trading strategies in

25  particular with this black box, which is the strategy that he

Page 62

1   was using to trade with.  And so I think what I recall in

2   addition to, you know, the front running issues that were

3   pointed out, is trying to figure out the trading strategy

4   that he uses and how he gets these returns from these

5   strategies.

6        Q     And what did you figure out about that?

7        A     All I recall is at some point we box things up and

8   we sent everything up to NYRO.  And I don't recall any

9   specifics as to what we may or may not have found at that

10  point unless you can show me something.  Because from my view

11  we were working on this and then I don't want to say

12  suddenly, but at some point in time it was sent to New York.

13  So we didn't finish our exam in D.C.

14              BY MS. STEIBER:

15       Q     How long does it usually take you to finish an exam

16  from tip to concluding memo, if there is a concluding memo?

17       A     It's so varied on the complexity of the exam.  Are

18  you saying for cause?

19       Q     For cause, in your experience, how long does it

20  take for a cause exam to be completed?

21       A     I would just be guessing.  I mean, months.

22       Q     Months?

23       A     Months, maybe; you know, several months.

24       Q     So several months, so anything over six months

25  would seem like a long time?

Page 69

1       A    I don't recall.  No.  As I sit here today, I don't

2    recall that.

3            MR. KOTZ:  Okay.  Why don't we show you the next

4    document.  This is an e-mail from you to Mark Donahue,

5    February 3, 2004, 2:20 p.m.  We're going to mark it as

6    Exhibit 13, and it is an attachment of three pages, as well.

7    Will you take a look at this document?

8                         (SEC Exhibit 13 was marked for

9                          identification.)

10           MS. STEIBER:  You might have to show her that.

11           MR. WILSON:  Yeah, it got cut off.

12           BY MR. KOTZ:

13      Q    Yeah.  Okay. It does appear as if you drafted this,

14   or at least had a hand in drafting this?

15      A    Yes, it appears so.

16      Q    Okay.  And you can see that you say in here on the

17   second page, "Commission revenues generated from these four

18   institutional clients account for the overwhelming majority

19   of commission revenues generated for the firm since 2001.

20   Obviously, this trading strategy has yielded made

21   unbelievable profits, which would explain why this strategy

22   is well-guarded by Madoff."  What did you mean by that?

23      A    Looking at the profit numbers they make up a

24   majority of his revenues.

25      Q    What did you mean that it was "unbelievable

1   profits?"

2      A   I don't recall what I mean by unbelievable.

3      Q   But do you recall that there was a concern that

4   these profits were not believable?  It seems as though you

5   say that here.

6      A   I don't believe that the unbelievable, when I say

7   unbelievable, I mean imaginary, if that.

8      Q   Okay.  So what would you mean by unbelievable?

9      A   Large profits.

10      Q   Okay.

11      A   High profits.

12      Q   Okay, but I mean the mere fact of these large, high

13   profits, unbelievable profits, whichever words you want to

14   use, was that something that would be the matter the OC exam

15   would look into, how that could be?

16      A   I believe that's probably what we were doing.

17      Q   Okay.  And then it says in there that the strategy

18   was "well-guarded" by Madoff.  Do you know what you did to

19   look into this issue of Madoff's unbelievable profits?

20      A   Well, I believe we did follow-up, according to the

21   February 3, 2004.  We were doing follow-up questions which

22   are many, so that was our response.  This was taken from the

23   first document production.  This information was gathered

24   from the first document production, which yielded follow-up

25   questions.

Page 71

1          BY MS. STEIBER:

2      Q    At the time did it strike you as strange that he

3   was making a majority of his profits from this hidden,

4   unknown, hedge fund side, rather than from his well-known

5   market maker?

6      A    I don't believe at that moment at that time that I

7   could make a decision at that time, which I think is why we

8   did follow-up questions.

9      Q    But do you remember at the time, Swanson or Donahue

10  or anyone saying, wow, here is this unknown trading entity.

11  I shouldn't say trading entity.  It's not an entity, but this

12  unknown side of Madoff's business that's making more profit

13  than his well-known market maker?

14     A    No.  I wasn't.  No one -- the three of them -- had

15  not said anything to me to that affect.

16          MR. KOTZ:  Okay.

17          MS. STEIBER:  Is that 13 or is that part of 12?

18          MR. KOTZ:  Okay, yeah.  So the next document I'm

19  going to show you is a series of notes dated 2/4/04.  We're

20  going to mark it as Exhibit 14.

21                         (SEC Exhibit 14 was marked for

22                              identification.)

23          (The witness examined the document.)

24          BY MR. KOTZ:

25     Q    Okay.  Are these your notes?

Page 72

1      A    Yes.

2      Q    Okay.  They are your notes. Great.  And so there

3  was a conference call with Madoff on 2/4/2004?

4      A    Apparently, yes.

5      Q    Do you remember that at all?

6      A    I remember a couple of calls with Madoff.

7      Q    Which Madoff would that be?  Bernie?

8      A    Peter, I believe.

9      Q    Could you kind of go through these notes?  Start

10  from like "Because market conditions required . . ."

11      A    "Because market conditions for model did not

12  present itself, therefore no trading activity."

13      Q    What does that mean?  Do you know?

14      A    I can guess that may be there were periods where

15  there was no trading activity, and maybe we asked why.  And

16  he said because there were no market conditions for the

17  model, so that the model did not generate any trading because

18  of the algorithms.  There was no trading activity for that

19  time, because the opportunity didn't present itself.

20      Q    Okay.

21      A    Strategy doesn't operate all the time.

22      Q    Okay.

23      A    The same, number 2, "The same as a commission."

24  Oh, we must have been asking what commission equivalent

25  means.  It means the same as a commission.  "When a dealer

Page 73

1    trades, charge a commission equivalent; compensation for

2    execution on dealer trades, no compensation charged on a

3    principal trade."

4          Number 3, "All identified."  Six, "Black box model

5    that executes the strategy.  The black box determines when

6    the strategy gets executed."

7      Q    Do you remember if you asked him any questions

8    about what this black box model was?

9      A    Specifically, I don't recall, but I'm pretty sure

10   we had discussions with him about the black box model.

11         MS. STEIBER:  When you say with him, you mean

12   Bernie or Peter?

13         THE WITNESS:  With Peter.  I believe we dealt with

14   Peter on this matter.

15         MR. KOTZ:  Okay, go on, 15.

16         THE WITNESS:  "Madoff has" -- something -- "15

17   different black box systems."  Oh, "Madoff has built 15

18   different black box systems over the years.  On variable

19   percentage of correlate to the S&P 100, determined by the

20   client's risk parameters.  95% correlation has to be using

21   smallest list of securities.  Took an index fund doing S&P

22   500, 100% correlation.  Strategy using S&P 100.

23         If you want to achieve 95% correlation, must

24   determine which securities can be used to achieve the

25   strategy.  Client tells you the percentage of correlation the

Page 74

1   client wants.  Specific conditions:  All securities must be

2   resident in S&P 100 index must be greater.  Will dictate

3   which stocks you have to" -- something -- "each security is

4   eligible.  Has to be dollar wages.

5            Takes the security and runs it through a back test,

6   time test model, a historical database.  Correlation is

7   continually monitored.  If derivative is greater than five

8   percent, then the model triggers the cell order.  No

9   discretion on the part of Madoff.  Everything is determined

10  by the black box."  So this was the discussion on the black

11  box.

12            BY MR. KOTZ:

13       Q    So what does he mean, that no discretion on the

14  part of Madoff?  Everything is determined by the black box?

15       A    The black box has algorithms set that based on

16  certain criteria it will go ahead and trigger a cell order.

17       Q.   But the black box determines when to buy and sell.

18       A    That's my understanding.

19       Q    And was this an effort to try to ask him about

20  these unbelievable returns, do you think?

21       A    I don't know, specifically, about the high returns.

22  But I know that this discussion seems to stem on how the

23  black box works.  But we did ask them about the commission

24  equivalent also.

25       Q    Did he seem to give you any real information about

MADOFF_EXHIBITS-00185

Page 75

1    how the black box works?  It just kind of says it makes all

2    the decisions.  We don't have anything to do with it.

3    There's this black box out there that is incredible?

4         A    Well, he talks about the correlation and what

5    stocks are being used.  I mean these notes here, although

6    they're just three pages, I don't think I was the only one

7    taking notes.  But they talk about how each uses

8    correlations, these conditions.  I mean, perhaps this was

9    just the first telephone call where we were getting a flavor

10   of the black box, and then at that point.  I mean, it's not

11   unusual for us to have one call, which would then trigger

12   numerous other calls.

13        Q    Do you remember there being numerous other calls?

14        A    I remember we did have a couple, a few more, one or

15   two perhaps, around that time period.

16        Q    Do you remember if Peter Madoff or Bernie Madoff

17   ever did explain how this black box was able to get these

18   returns?

19        A    Based on this, unless you can show me something, I

20   don't recall anything  beyond our notes, and possibly the

21   follow-up questions that we had that may relate to that.

22        Q    Did you generally feel satisfied after you talked

23   to Peter Madoff that he had kind of answered your questions?

24   Or, how did that go?

25        A    Well, I think what we normally do is once we get

MADOFF_EXHIBITS-00186

Page 81

1          BY MR. KOTZ:

2      Q    Okay.  Does this refresh any more of your

3   recollection about this particular issue about Madoff

4   disclaiming himself to be an investment advisor?

5      A    It doesn't bring up any specific thoughts or

6   memories.  I would think that at this point we may have

7   followed up with another document request asking for, and I

8   can't remember based on our first document request if  we

9   asked for the names of all clients, which we must have,

10  because he's identified clients by years.  But if she says

11  here we don't know their classifications and the exemption,

12  the 15-client exemption, I don't know.  This doesn't refresh

13  anything.

14     Q    But, looking at this, would you agree that this

15  would be something that should be followed-up on?

16     A    I'm not aware that it wasn't followed-up on.

17     Q    Well, I'm just asking you.

18     A    It seemed like this was something that Gen was

19  running with.

20     Q    But you would agree that it's something that should

21  have been followed up on, whether it was or was not?

22     A    I believe that, sure, absolutely.

23     Q    And in order to get really the expertise in this

24  area, wouldn't it make sense to go to the IA side if an issue

25  like this arose?

1          THE WITNESS:  I don't know.  I mean, it's with the

2     SEC internal.  So that information it's my understanding is

3     something that you could get from, because she had an issue

4     with Mark and another branch chief, so.

5          MS. STEIBER:  But you felt like she was comfortable

6     working with Donahue at this time, that she wasn't

7     frustrated?  Like when she says, "beat a dead horse," it

8     sounds like she's a little frustrated.

9          THE WITNESS:  Right.  No.  I didn't have that sense

10    as I said at this time while we were working on Madoff

11    together.  I am aware that she had issues with Mark

12    subsequently thereafter.  And so, you know, that's why I say

13    at this time I wasn't aware it was Madoff, because Madoff

14    came earlier when this complaint was lodged.

15          BY MR. KOTZ:

16     Q     Do you have any sense of the general nature of her

17    issues?

18     A     I don't.  I just don't think she was very happy

19    working with Mark, but I mean specifically I can't recall.

20     Q     Did you share any concerns about working for Mark?

21     A     No.  Not at all.  Actually, Mark and I came from

22    Miles & Stockbridge.  He was at the Rockville office.  He had

23    a stellar reputation at the firm, and we just so happened to

24    meet up here again in OC.  I love working with mark.  He is

25    very personable and knowledgeable, and I would work with him

1   again today.  But some people just don't get along, and I

2   think that was just one instance.

3          BY MS. STEIBER:

4      Q    **And are you still friends with Mark today?**

5      A    Yes.

6      Q    **Did you talk to him about your testimony?**

7      A    I actually saw him at the metro.  I think it was

8   Thursday and he was going up and I was coming down.  And I

9   hugged him and said hello.  And I said I just wanted to let

10  you know I'm coming in on Monday to talk about Madoff.  And

11  we had no substantive discussions besides me telling him that

12  I was coming in.

13         MR. KOTZ:  All right.  Why don't we take a few

14  minutes, okay?

15         THE WITNESS:  Do you by any chance know how much

16  longer you'll need me?  Because I have another production to

17  the SEC that I have to take care of today.

18         MR. KOTZ:  Okay.  Let's go off the record.

19         THE WITNESS:  Can I actually just say one other

20  thing on the record?

21         MR. KOTZ:  Sure.  Sure.

22         THE WITNESS:  When this complaint was lodged

23  against Mark Donahue and [former OCIE Branch Chief] who is the branch

24  chief.  There was some internal, I think.  It was whatever

25  group outside group handles those types of complaints.  Gen

Page 90

1   what were the level of priorities of different projects.

2   Would you have viewed this Bernard Madoff one as a

3   particularly high priority or lesser priority than some of

4   the market timing or other projects?

5       A    I don't think that I would set a level of priority

6   on that, because you're working on a matter depending on

7   documents that you received from the entity.  Because if you

8   don't have documents from your document request, you aren't

9   doing as much as you would be once you received that.  So

10  it's quite possible that Madoff exam was fit in whenever

11  there was down-time on some of the other projects, because

12  those projects also entailed very large volume document

13  productions.  So I don't think that I prioritized any of my

14  projects at that time.  It was basically what I had and what

15  was coming in.  But, of course, if someone came to me and

16  said that this needs to be done first over this, then I

17  readjust the schedule.

18      Q    Did anybody come to you and say do Madoff over

19  something else?

20      A    Not that I can recall.

21      Q    Were there other times where other projects were

22  given priority like that?

23      A    Perhaps the market timing at that time, since it

24  was very quick.  It came on very quickly.  We had to get

25  documents very quickly.

Page 91

```
 1      Q    Okay.  When you first joined OC, did you have any

 2   training?  You know, about how to do an exam?

 3      A    It's really on-the-job training.  I mean, that was

 4   something that myself along with other individuals in the

 5   group wanted to have more formalized training.  We thought it

 6   was very important to bring people on and do some type of

 7   formal training, but it just didn't happen for some reason.

 8   And your training was really on-the-job as well as talking to

 9   those people who were already on the job and getting help

10   from them.

11      Q    So you didn't have any training in, you know, how

12   to spot fraud or something like that?

13      A    No.  I don't.  And I don't know if they have that

14   type of training at OC now.  But no, I mean, it's a team.

15   It's very much a team environment where you are put on a team

16   with other more experienced people, so you learn from them

17   and you get direction from that as well.

18      Q    Is it fair to say that Madoff's trading strategies

19   and operations are pretty complex?

20      A    I would agree; it's complex.

21      Q    So, I mean, you know, obviously, information has

22   been brought to light subsequent to this exam, different

23   situation involving Bernie Madoff.  But is it fair to say

24   that at least in your situation, given the lack of

25   particularized training, that it would have been difficult
```

Page 100

1    question that we would ask of any broker-dealer firm.

2         BY MS. STEIBER:

3         Q    And did you find that Madoff was cooperative?

4         A    I found that throughout this process, whenever we

5    requested documents, he seemed to always provide us with

6    those documents.  And, again, this is a voluntary production,

7    so he's going to produce documents on a voluntary basis

8    pursuant to these questions.

9         Q    And did you find it odd at all that he is the one

10   that responds to your document request rather than his

11   compliance officer or someone else at the firm?

12        A    No, because, you know, I don't know the extent of

13   his involvement in the broker-dealer, but it appears that he

14   had as much information as their chief compliance officer,

15   which was Peter at this time.  But it wouldn't strike me.  It

16   didn't.

17        Q    Did you recall ever receiving a response from a

18   document request from the CEO of a company?

19        A    Not that I can think of off the top of my head.

20        BY MR. KOTZ:

21        Q    The document we showed you before, it talked about

22   that book is of the examination was front-running.  Right?

23   Do you remember that?

24        A    Yes.

25        Q    Now, were the questions that you asked in the

Page 103

1      that Madoff was using?

2          A    Not that I can recall.

3          Q    Do you do any follow-up with these 16 institutions

4      you've got the names for?

5          A    Not that I recall.  I know I did not.

6          Q    Would that have been normal to do the follow-up

7      with those institutions?

8          A    I think it depends.  You have to be really careful

9      when you contact other people you don't want to scare

10     clients.  So I think that's an internal decision that's made

11     by the staff.  So once you go outside to the clients of the

12     entity that you're examining, that could scare their clients,

13     and that could cause business issues.  So I was not privy to

14     any -- not that I can recall -- discussions of whether we

15     were going to just call these clients, but I know that I did

16     not.

17              BY MS. STEIBER:

18         Q    Okay.  Can I ask you a question?  You made a point

19     of saying that Madoff was voluntarily complying, but as a

20     broker-dealer doesn't he have to make his books and records

21     available to you?

22         A    Right.  What he was sending us our documents

23     pursuant to, if he were to say I'm not going to send you

24     something, we could go to enforcement and get the subpoena

25     for those documents.  So that's what I mean in that sense.  I

Page 106

1                    (SEC Exhibit 27 was marked for

2                    identification.)

3           MR. KOTZ:  Okay.  Show you another document.  These

4    are some notes.  It says on the top "Madoff," and it says

5    3/18/04, two pages of notes, marked as Exhibit 27.

6           (The witness examined the document.)

7           THE WITNESS:  These are my notes.

8           BY MR. KOTZ:

9        Q   So can we go on we these then?

10       A   Sure.  These first couple are the same questions

11   that you saw on the previous e-mail that you just typed out.

12   Apparently, there was the conference call with Bernie on

13   March 18, 2004.  The question, I guess, "Communications with

14   clients, funds allocate certain amount of money to trade.

15   Money amount goes into program.   Investment manager/advisor

16   is the authorized agent of the client.

17           Calls Madoff regarding amount of money to invest.

18   Account statement sent to the fund itself.  Only

19   communication because based on strategy directive Madoff

20   follows the criteria and enters into the box.  No profit/loss

21   calculated by Madoff; settlement date on account statements,

22   prices, average price stock trades, average price at the end

23   of the day.  DVP: commissions A/P equals 50."  Oh, that must

24   be like a trade at 50, the commission billed to the client

25   would be 50.04, because the four cents would be the

MADOFF_EXHIBITS-00194

Page 107

1   commission equivalent.  When he's in/out, and then something

2   S&P index.

3       Q    Okay.  So looking over the notes, does that refresh

4   your recollection anything further than the words on the page

5   in terms of what was discussed in these meetings?

6       A    No.  Not as to this conversation, no.  It just

7   appeared that he was answering some questions, follow-up

8   questions.

9       Q    When you would have a conversation with Madoff you

10  would get off the phone with him.  Was it a sense that the

11  questions seem to have been answered, or was it the sense

12  that the more answers he gives the more questions there are.

13      A    A combination of both; I mean he answered some

14  questions and then some questions he answered which could

15  spawn at the end of the call with a discussion with everyone

16  further questions and need for clarification.  So it's really

17  a combination of both.

18      Q    Did you get the impression he was being forthright

19  with you?

20      A    I did.  I mean I don't recall ever getting off of a

21  phone call and feeling like there was feeling uneasy.

22      Q    Did anybody else express ever getting off the phone

23  call and feeling uneasy?

24      A    Not to me.  No.  Not to me.

25                        (SEC Exhibit 28 was marked for

Page 112

1    Q    Do you remember in general the conclusion of any of

2    the members of the team that in fact he was front-running?

3    A    No.  I don't.  It's five years ago.  I really don't

4    recall.  This is just one of many exams that I was working

5    on, and I wasn't lead on this, so it's another thing where I

6    was leading other exams, so I recall more of that since I was

7    the lead examiner attorney.

8    Q    Okay.  I'll show you another document from

9    Genevievette to Mark with a copy to Mark and to you dated

10   March 25, 2004, 3:10 p.m.  Mark this Exhibit 31.

11                            (SEC Exhibit 31 was marked for

12                            identification.)

13        (The witness examined the document.)

14        BY MR. KOTZ:

15   Q    Do you remember anything about this for a

16   conclusion they do appear to be in sync?

17   A    No.

18   Q    But I mean it is fair to say a substantial amount

19   of work was done.  It looks like there was quite a bit of

20   analysis by Genevievette and probably others in the Madoff

21   exam.

22   A    She appears to and it's quite possible that she was

23   lead of this because all this analysis.  She did a portion

24   and there seems to be a portion that she was running with,

25   but this was not something that I recall analyzing.

MADOFF_EXHIBITS-00196

Page 121

1      Q    So it's also about a year and a half after your

2    group started working on it?

3      A    Yeah.

4      Q    So I mean, you know, we were talking before about

5    how long these things take.  There was a year and a half exam

6    that was conducted by your group about Madoff.  Is that

7    right?

8      A    Hm-hmm.

9      Q    Yes?

10     A    Yes.

11     Q    Okay.  From looking at our records, we noted, we

12   have been able to look at documents that seem to indicate

13   that from about December 2003, to April 2004, it was a

14   significant amount of work.  And then we have a couple of e-

15   mails that refer to the fact that there should be a focus on

16   mutual fund cases.  Between that time period and a year later

17   we don't have a lot of records of a lot of work done on

18   Madoff.  Do you know why that would be?

19     A    I don't.

20     Q    Do you remember a big lull in the Madoff case where

21   it was being worked on for several months?  Eric Swanson

22   says, "We're fairly suspicious," and then it seems like very

23   little happens for a year.  And then NYRO works on it as

24   well?

25     A    Yes, that's what happened.

Page 122

1    Q    So there was a long time period where the Madoff

2    case was like in limbo?

3    A    That there was no activity on Madoff.  For some

4    reason, no work was being done on this exam.

5         MS. STEIBER:  Would you call it like a decision

6    from someone to put it on the back burner?

7         THE WITNESS:  I don't know.  I mean it could be

8    that with everything else that was going on in the office

9    that there was more activity on other types of projects.  In

10   that case, there was not an affirmative pull it off the back

11   burner.  It just happened that way because there were other

12   issues that were going on in that time.

13        I don't know.  I don't recall hearing from Mark or

14   anyone else that this was purposely taken off and put on the

15   back burner.  In my looking back now, it's exactly as you had

16   described it.  There was a lot of activity, and then other

17   projects in the office may have taken precedent and then

18   Madoff there was just not a lot of activity at that time

19   then.

20        BY MR. KOTZ:

21   Q    And so the amount of work you would do on the

22   Madoff case would be affected by your higher ups.  Right?

23   How would you know that there wasn't supposed to be too much

24   activity?

25   A    Sure, the branch chief; I would know that from my

Page 127

1       Q     Did you hear about the allegation regarding Eric

2    Swanson and Shana Madoff?

3       A     Yeah.

4       Q     What do you think about that?

5       A     I don't think he was dating.  I don't believe he

6    was dating Shana back then at that time.  He was actually

7    engaged to another woman, I think.  So that's why, you know,

8    I read this and I know what it looks like.  But I think he

9    was dating and engaged to another woman at that time.  So I

10   don't know.

11      Q     But we've had some e-mails, Bernie Madoff seemed to

12   be a well known figure.

13      A     Absolutely.

14      Q     So do you think that that could have played a role

15   into the decision?  Not necessarily to stop looking at it,

16   but to put it on the back burner, this guy's a well-known

17   guy, there's probably nothing there.  Let's look at some

18   other matters?

19      A     Perhaps.  I don't have any recollection of anything

20   being told to me; nothing like, but it's Bernie Madoff, I

21   mean.  Yeah, nothing like that, so I think that that is the

22   likelihood theory that, you know, I probably would conclude

23   as well that maybe that's what happened.  But nothing has

24   been said to me to that affect.

25      Q     So, I mean, you are aware I guess that NYRO did an

MADOFF_EXHIBITS-00199

Page 128

1   exam, then there was an enforcement exam?

2      A    I was not aware of the enforcement exam.

3      Q    Did you ever find out what happened with the NYRO

4   exam?

5      A    No, I was leading a New York Stock Exchange Exam

6   and I was one of a few people in the office who had a lot of

7   the projects, so it wasn't something I followed up on myself.

8      Q    And, you know, given you guys started looking at it

9   and it was kind of a lull, but then NYRO picked it up and

10  looked at it for quite a period of time, do you have any

11  explanation of how the SEC could have missed this?

12     A    I don't.  I have no theory.

13     Q    In connection with how OC does things, some have

14  stated that there's sort of an approach when you do an exam

15  of, you know, a check list.  You check off all the boxes and

16  you may not see kind of a forest for the threes, do you think

17  that that could possibly be what was going on?  I mean how

18  could it be explained that there was substantial examination

19  of Madoff, yet, it seems everybody didn't.

20     A    Well, I think one of the issues, and this is

21  something that I along with some colleague thought, you need

22  to provide meaningful training.  And you also need to make

23  sure you have people in the office who have industry

24  experience who have been in the industry and can spot these

25  issues based on experience.  And, certainly, I'm not saying

MADOFF_EXHIBITS-00200

Page 129

1    you have to fill the entire staff with experienced people,

2    because that's not just practical.  They should be able to

3    teach people who are just coming in who don't have that kind

4    of experience.

5            But I think back in 2003 when I came, it was a very

6    young group and a group of people who wanted to be trained

7    more and probably there should have been better training.

8    And I think that for me, that was one of the issues that I

9    had with the group.  I think that could be part of the

10   problem.

11       Q    So you felt like you weren't adequately trained to

12   deal with all these complex matters?

13       A    Well, I think that there could have been more

14   training.  You know, when we went on site, when we were

15   trained by other attorney-examiners who had been there, so

16   certainly that is just as important.  But when you s tart to

17   get really busy, those people are harder to go to because

18   their own plates full of their own work.  So having more

19   formalized training would help that group.

20       Q    So you felt in certain ways you had to kind of

21   research things by yourself to figure them out?

22       A    Sure.

23       Q    So, you know, it might have been better if you

24   either had some training on it or been able to go to somebody

25   and get that information, rather than trying to figure it out

**EXHIBIT P**

**RE: Madoff Request**                                                  4/28/2005 2:48:26 PM
From: Ostrow, William D.
To: Nee, John ▮Personal Privacy▮
Cc: Lamore, Peter▮Personal Privacy▮

Thanks for the data feed idea.  We just had the meeting with the Compliance Department (Bernie, Peter Madoff and ▮▮▮▮▮ ▮Personal Privacy▮  We talked about various compliance issues that we came across in the written supervisory procedures and trading data we have examined.  Most importantly, we discussed how ▮Personal Privacy▮ algorithm and black box system works. Bernie stated that the system incorporates live market data, but does not use order flow.  Based upon ▮Personal Privacy▮ algorithm and capacity to manage money, this led us to ask if ▮Privacy▮(or anyone at the firm) has ever managed money for an outsider.  Bernie said, □Never.□ ▮Privacy▮s algorithm is on auto pilot.  All trades in ▮Privacy▮s account are entered through the MISS system directly from the algorithm.  After the market closes, the firm will be showing us some current screen shots from today□s trading and the firm alerts generated.

William Ostrow

Staff Accountant

U.S. Securities and Exchange Commission

Northeast Regional Office


▮Personal Privacy▮

—————

From: Nee, John
Sent: Thursday, April 28, 2005 2:12 PM
To: Ostrow, William D.; Lamore, Peter
Subject: Madoff Request

William and Pete,

Have we asked the firm for a listing of all data/information feeds that eminates from its premises.  And, if anyone outside that firm has access into any of the firm□s systems (aside from customers placing orders.)

Perhaps talking to IT about business continuity might shed some light as well.

John

MADOFF_EXHIBITS-04116