# EXHIBIT T

# The World's Largest Hedge Fund is a Fraud

### November 7, 2005 Submission to the SEC
### Madoff Investment Securities, LLC
### www.madoff.com

**Opening Remarks:**

I am the original source for the information presented herein having first presented my rationale, both verbally and in writing, to the SEC's Boston office in May, 1999 before any public information doubting Madoff Investment Securities, LLC appeared in the press. There was no whistleblower or insider involved in compiling this report. I used the Mosaic Theory to assemble my set of observations. My observations were collected first-hand by listening to fund of fund investors talk about their investments in a hedge fund run by Madoff Investment Securities, LLC, a SEC registered firm. I have also spoken to the heads of various Wall Street equity derivative trading desks and every single one of the senior managers I spoke with told me that Bernie Madoff was a fraud. Of course, no one wants to take undue career risk by sticking their head up and saying the emperor isn't wearing any clothes but....

I am a derivatives expert and have traded or assisted in the trading of several billion $US in options strategies for hedge funds and institutional clients. I have experience managing split-strike conversion products both using index options and using individual stock options, both with and without index puts. Very few people in the world have the mathematical background needed to manage these types of products but I am one of them. I have outlined a detailed set of Red Flags that make me very suspicious that Bernie Madoff's returns aren't real and, if they are real, then they would almost certainly have to be generated by front-running customer order flow from the broker-dealer arm of Madoff Investment Securities. LLC.

Due to the sensitive nature of the case I detail below, its dissemination within the SEC must be limited to those with a need to know. The firm involved is located in the New York Region.

As a result of this case, several careers on Wall Street and in Europe will be ruined. Therefore, I have not signed nor put my name on this report. I request that my name not be released to anyone other than the Branch Chief and Team Leader in the New York Region who are assigned to the case, without my express written permission. The fewer people who know who wrote this report the better. I am worried about the personal safety of myself and my family. Under no circumstances is this report or its contents to be shared with any other regulatory body without my express permission. This report has been written solely for the SEC's internal use.

As far as I know, none of the hedge fund, fund of funds (FOF's) mentioned in my report are engaged in a conspiracy to commit fraud. I believe they are naïve men and women with a notable lack of derivatives expertise and possessing little or no quantitative finance ability.

**There are 2 possible scenarios that involve fraud by Madoff Securities:**

1. Scenario # 1 **(Unlikely):** I am submitting this case under Section 21A(e) of the 1934 Act in the event that the broker-dealer and ECN depicted is actually providing the stated

returns to investors but is earning those returns by front-running customer order flow. Front-running qualifies as insider-trading since it relies upon material, non-public information that is acted upon for the benefit of one party to the detriment of another party. Section 21A(e) of the 1934 Act allows the SEC to pay up to 10% of the total fines levied for insider-trading. We have obtained approval from the SEC's Office of General Counsel, the Chairman's Office, and the bounty program administrator that the SEC is able and willing to pay Section 21A(e) rewards. This case should qualify if insider-trading is involved.

2. Scenario # 2 **(Highly likely)** Madoff Securities is the world's largest Ponzi Scheme. In this case there is no SEC reward payment due the whistle-blower so basically I'm turning this case in because it's the right thing to do. Far better that the SEC is proactive in shutting down a Ponzi Scheme of this size rather than reactive.

**Who:** The politically powerful Madoff family owns and operates a New York City based broker-dealer, ECN, and what is effectively the world's largest hedge fund. Bernard "Bernie" Madoff, the family patriarch started the firm.

According to the www.madoff.com website, *"Bernard L. Madoff was one of the five broker-dealers most closely involved in developing the NASDAQ Stock Market. He has been chairman of the board of directors of the NASDAQ Stock Market as well as a member of the board of governors of the NASD and a member of numerous NASD committees. Bernard Madoff was also a founding member of the International Securities Clearing Corporation in London.* His brother, Peter B. Madoff *has served as vice chairman of the NASD, a member of its board of governors, and chairman of its New York region. He also has been actively involved in the NASDAQ Stock Market as a member of its board of governors and its executive committee and as chairman of its trading committee. He also has been a member of the board of directors of the Security Traders Association of New York. He is a member of the board of directors of the Depository Trust Corporation.*

**What:**

1. The family runs what is effectively the world's largest hedge fund with estimated assets under management of at least $20 billion to perhaps $50 billion, but no one knows exactly how much money BM is managing. That we have what is effectively the world's largest hedge fund operating underground is plainly put shocking. But then again, we don't even know the size of the hedge fund industry so none of this should be surprising. A super-sized fraud of this magnitude was bound to happen given the lack of regulation of these off-shore entities. My best guess is that approximately $30 billion is involved.

2. However the hedge fund isn't organized as a hedge fund by Bernard Madoff (BM) yet it acts and trades exactly like one. BM allows third party Fund of Funds (FOF's) to private label hedge funds that provide his firm, Madoff Securities, with equity tranch funding. In return for equity tranch funding, BM runs a trading strategy, **as agent**, whose returns flow to the third party FOF hedge funds and their investors who put up equity capital to

fund BM's broker-dealer and ECN operations. *BM tells investors it earns its fees by charging commissions on all of the trades done in their accounts.*
**Red Flag # 1:** *Why would a US broker-dealer organize and fund itself in such an unusual manner? Doesn't this seem to be an unseemly way of operating under the regulator's radar screens? Why aren't the commissions charged fully disclosed to investors? Can a SEC Registered Investment Advisor charge **both** commissions and charge a principle fee for trades?* **MOST IMPORTANTLY**, *why would BM settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits? Doing some simple math on BM's 12% average annual return stream to investors, the hedge fund, before fees, would have to be earning average annual returns of 16%. Subtract out the 1% management fee and investors are down to 15%. 20% of the profits would amount to 3% (.20 x 15% = 3% profit participation) so investors would be left with the stated 12% annual returns listed in Attachment 1 (Fairfield Sentry Ltd. Performance Data). Total fees to the third party FOF's would amount to 4% annually. Now why would BM leave 4% in average annual fee revenue on the table unless he were a Ponzi Scheme? Or, is he charging a whole lot more than 4% in undisclosed commissions?*

3. The third parties organize the hedge funds and obtain investors but 100% of the money raised is actually managed by Madoff Investment Securities, LLC in a purported hedge fund strategy. The investors that pony up the money don't know that BM is managing their money. That Madoff is managing the money is purposely kept secret from the investors. Some prominent US based hedge fund, fund of funds, that "invest" in BM in this manner include:

   A. Fairfield Sentry Limited (Arden Asset Management) which had $5.2 billion invested in BM as of May 2005; 11th Floor, 919 Third Avenue; New York, NY 10022; Telephone 212.319.606; The Fairfield Greenwich Group is a global family of companies with offices in New York, London and Bermuda, and representative offices in the U.S., Europe and Latin America. Local operating entities are authorized or regulated by a variety of government agencies, including Fairfield Greenwich Advisors LLC, a U.S. SEC registered investment adviser, Fairfield Heathcliff Capital LLC, a U.S. NASD member broker-dealer, and Fairfield Greenwich (UK) Limited, authorized and regulated by the Financial Services Authority in the United Kingdom.

   B. Access International Advisors; www.aiagroup.com; a SEC registered investment advisor, telephone # 212.223.7167; Suite 2206; 509 Madison Avenue, New York, NY 10022 which had over $450 million invested with BM as of mid-2002. The majority of this FOF's investors are European, even though the firm is US registered.

   C. Broyhill All-Weather Fund, L.P. had $350 million invested with BM as of March 2000.

   D. Tremont Capital Management, Inc. Corporate Headquarters is located at 555 Theodore Fremd Avenue; Rye, New York 10580; T: (914) 925-1140 F: (914) 921-3499. Tremont oversees on an advisory and fully discretionary basis over $10.5 billion in assets. Clients include institutional investors, public and private pension plans, ERISA plans, university endowments, foundations, and financial institutions, as well as high net worth individuals. Tremont is owned by Oppenheimer Funds Inc. which is owned by Mass Mutual Insurance Company so they should have sufficient reserves to make investors whole. Mass Mutual is currently under investigation by the Massachusetts Attorney General, the Department of Justice, and the SEC.

E. During a 2002 marketing trip to Europe every hedge fund FOF I met with in Paris and Geneva had investments with BM. They all said he was their best manager! A partial list of money managers and Private Banks that invest in BM is included at the end of this report in Attachment 3.

4. Here's what smells bad about the idea of providing equity tranch funding to a US registered broker-dealer:

A. The investment returns passed along to the third party hedge funds are equivalent to BM borrowing money. These 12 month returns from 1990 – May 2005 ranged from a low of 6.23% to a high of 19.98%, with an average 12 month return during that time period of 12.00%. Add in the 4% in average annual management & participation fees and BM would have to be delivering average annual returns of 16% in order for the investors to receive 12%. No Broker-Dealer that I've ever heard of finances its operations at that high of an implied borrowing rate (source: Attachment 1; Fairfield Sentry Limited return data from December 1990 – May 2005). Ask around and I'm sure you'll find that BM is the only firm on Wall Street that pays an average of 16% to fund its operations.

B. BD's typically fund in the short-term credit markets and benchmark a significant part of their overnight funding to LIBOR plus or minus some spread. LIBOR + 40 basis points would seem a more realistic borrowing rate for a broker-dealer of BM's size.

C. **Red Flag # 2**: *why would a BD choose to fund at such a high implied interest rate when cheaper money is available in the short-term credit markets? One reason that comes to mind is that BM couldn't stand the due diligence scrutiny of the short-term credit markets. If Charles Ponzi had issued bank notes promising 50% interest on 3 month time deposits instead of issuing unregulated Ponzi Notes to his investors, the State Banking Commission would have quickly shut him down. The key to a successful Ponzi Scheme is to promise lucrative returns but to do so in an unregulated area of the capital markets. Hedge funds are not due to fall under the SEC's umbrella until February 2006.*

5. The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. Look closely at Attachment 1, Fairfield Sentry Ltd.'s performance summary and you won't see BM's name anywhere on the document, yet BM is the actual hedge fund manager with discretionary trading authority over all funds, as agent.

**Red Flag # 3:** *Why the need for such secrecy? If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings. Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know he was managing their money? Or is it that BM doesn't want the SEC and FSA to know that he exists?*

6. The third party FOF's never tell investors who is actually managing their money and describe the investment strategy as: This hedge fund's objective is long term growth on

a consistent basis with low volatility. The investment advisor invests exclusively in the U.S. and utilizes a strategy often referred to as a "split-strike conversion." Generally this style involves purchasing a basket of 30 – 35 large-capitalization stocks with a high degree of correlation to the general market (e.g. American Express, Boeing, Citigroup, Coca-Cola, Dupont, Exxon, General Motors, IBM, Merck, McDonalds). To provide the desired hedge, the manager then sells out-of-the-money OEX index call options and buys out-of-the-money OEX index put options. The amount of calls that are sold and puts that are bought represent a dollar amount equal to the basket of shares purchases.

7. I personally have run split-strike conversion strategies and know that BM's approach is far riskier than stated in 6 above. His strategy is wholly inferior to an all index approach and is wholly incapable of generating returns in the range of 6.23% to 19.98%. <u>BM's strategy should not be able beat the return on US Treasury Bills</u> Due to the glaring weakness of the strategy:

   A. <u>Income Part of the strategy</u> is to buy 30 – 35 large-cap stocks, sell out-of-the-money index call options against the value of the stock basket. There are three possible sources of income in this strategy.

      1) We earn income from the stock's dividends. Let's attribute a 2% average return to this source of funds for the 14 ½ year time period. This explains 2% of the 16% average gross annual returns before fees and leaves 14% of the returns unexplained.

      2) We earn income from the sale of OTC OEX index call options. Let's also assume that we can generate an additional 2% annual return via the sale of OTC out-of-the-money OEX index call options which leaves 12% of the 16% gross returns unexplained. On Friday, October 14, 2005 the OEX (S&P 100) index closed at 550.49 and there were only 163,809 OEX index call option contracts outstanding (termed the "open interest"). 163,809 call option calls outstanding x $100 contact multiplier x 550.49 index closing price = $9,017, 521,641 in stock equivalents hedged.

      3) We can earn income from capital gains by selling the stocks that go up in price. This portion of the return stream would have to earn the lion's share of the hedge fund strategy's returns. We have 12% of the return stream unexplained so far. However, the OTC OEX index puts that we buy will cost AT LEAST <8%> per year (a lot more in most years but I'm giving BM the benefit of every doubt here). Therefore, BM's stock selection would have to be earning an average of 20% per year. That would mean that he's been the world's best stock-picker since 1990 beating out such luminaries as Warren Buffet and Bill Miller. Yet no one's ever heard of BM as being a stock-picker, much less the world's best stock-picker. Why isn't he famous if he was able to earn 20% average annual returns?

    **Red Flag # 4:** *$9.017 billion in total OEX listed call options outstanding is not nearly enough to generate income on BM's total amount of assets under management which I estimate to range between $20 - $50 billion. Fairfield Sentry Ltd. alone has $5.1 billion with BM. And, while BM may say he only uses Over-the-Counter(OTC) index options, there is no way that this is*

*possible. The OTC market should never be several times larger than the exchange listed market for this type of plain vanilla derivative.*

B. Protection Part of the strategy is to buy out-of-the-money OEX index put options. This costs you money each and every month. This hurts your returns and is the main reason why BM's strategy would have trouble earning 0% average annual returns much less the 12% net returns stated in Fairfield Sentry Ltd.'s performance summary. Even if BM earns a 4% return from the combination of 2% stock dividends and 2% from the sale of call options, the cost of the puts would put this strategy in the red year in and year out. No way he can possibly be delivering 12% net to investors. The math just doesn't support this strategy if he's really buying index put options.

**Red Flag # 5:** *BM would need to be purchasing at-the-money put options because he has only 7 small monthly losses in the past 14 ½ years. His largest monthly loss is only <0.55%>, so his puts would have to be at-the-money. At-the-money put options are very, very expensive. A one-year at-the-money put option would cost you <8%> or more, depending upon the market's volatility. And <8%> would be a cheap price to pay in many of the past 14 ½ years for put protection!! Assuming BM only paid< 8%> per year in put protection, and assuming he can earn +2% from stock dividends plus another +2% from call option sales, he's still under-water <4%> performance wise. <8%> put cost + 2% stock dividends + 2% income from call sales = <4%>. And, I've proven that BM would need to be earning at least 16% annually to deliver 12% after fees to investors. That means the rest of his returns would have to be coming from stock selection where he picked and sold winning stocks to include in his 35-stock basket of large-cap names. Lots of luck doing that during the past stock market crises like 1997's Asian Currency Crises, the 1998 Russian Debt / LTCM crises, and the 2000-2002 killer bear market. And index put option protection was a lot more expensive during these crises periods than 8%. Mathematically none of BM's returns listed in Attachment 1 make much sense. They are just too unbelievably good to be true.*

C. The OEX index (S&P 100) closed at 550.49 on Friday, October 14, 2005 meaning that each put option hedged $55,049 dollars worth of stock ($100 contract multiplier x 550.49 OEX closing index price = $55,049 in stock hedged). As of that same date, the total open interest for OEX index put options was 307,176 contracts meaning that a total of $16,909,731,624 in stock was being hedged by the use of OEX index puts (307,176 total put contracts in existence as of Oct 14th x $55,049 hedge value of 1 OEX index put = $16,909,731,624 in stock hedged). Note: I excluded a few thousand OEX LEAP index put options from my calculations because these are long-term options and not relevant for a split-strike conversion strategy such as BM's.

**Red Flag # 6:** *At my best guess level of BM's assets under management of $30 billion, or even at my low end estimate of $20 billion in assets under management, BM would have to be over 100% of the total OEX put option contract open interest in order to hedge his stock holdings as depicted in the third party hedge funds marketing literature. In other words, there are not enough index option put contracts in existence to hedge the way BM says he is hedging! And there is no*

6

*way the OTC market is bigger than the exchange listed market for plain vanilla S&P 100 index put options.*

D.  Mathematically I have proven that BM cannot be hedging using listed index put and call options.  One hedge fund FOF has told me that BM uses only Over-the-Counter options and trades exclusively thru UBS and Merrill Lynch.  I have not called those two firms to check on this because it seems implausible that a BD would trade $20 - $50 billion worth of index put options per month over-the-counter thru only 2 firms.  That plus the fact that if BM was really buying OTC index put options, then there is no way his average annual returns could be positive!!  At a minimum, using the cheapest way to buy puts would cost a fund <8%> per year.  To get the put cost down to <8%>, BM would have to buy a one-year at-the-money put option and hold it for one-year.  No way his call sales could ever hope to come even fractionally close to covering the cost of the puts.

**Red Flag # 7:** *The counter-party credit exposures for UBS and Merrill would be too large for these firms credit departments to approve.* *The SEC should ask BM for trade tickets showing he has traded OTC options thru these two firms.  Then the SEC should visit the firms' OTC derivatives desks, talk the to heads of trading and ask to see BM's trade tickets.  Then ask the director of operations to verify the tickets and ask to see the inventory of all of the stock and listed options hedging the OTC puts and calls.  If these firms can't show you the off-setting hedged positions then they are assisting BM as part of a conspiracy to commit fraud.  If any other brokerage firms equity derivatives desk is engaged in a conspiracy to cover for BM, then this scandal will be a doozy when it hits the financial press but at least investors would have firms with deep pockets to sue.*

**Red Flag # 8:** *OTC options are more expensive to trade than listed options.  You have to pay extra for the customization features and secrecy offered by OTC options.  Trading in the size of $20 - $50 billion per month would be impossible and the bid-ask spreads would be so wide as to preclude earning any profit whatsoever.  These Broker/Dealers would need to offset their short OTC index put option exposure to a falling stock market by hedging out their short put option risk by either buying listed put options or selling short index futures and the derivatives markets are not deep and liquid enough to accomplish this without paying a penalty in prohibitively expensive transaction costs.*

**Red Flag # 9:** *Extensive and voluminous paperwork would be required to keep track of and clear each OTC trade.  Plus, why aren't Goldman, Sachs and Citigroup involved in handling BM's order flow?  Both Goldman and Citigroup are a lot larger in the OTC derivatives markets than UBS or Merrill Lynch.*

E.  My experience with split-strike conversion trades is that the best a good manager is likely to obtain using the strategy marketed by the third-party FOF's is T-bills less management fees.  And, if the stock market is down by more than 2%, the return from this strategy will range from a high of zero return to a low of a few percent depending upon your put's cost and how far out-of-the-money it is.

F.  In 2000 I ran a regression of BM's hedge fund returns using the performance data from Fairfield Sentry Limited.  BM had a .06 correlation to the equity market's return which confirms the .06 Beta that Fairfield Sentry Limited lists in its return numbers.

**Red Flag # 10**: *It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! The strategy depicted retains 100% of the single-stock downside risk since they own only index put options and not single stock put options. Therefore if one or more stocks in their portfolio were to tank on bad news, BM's index put would offer little protection and their portfolio should feel the pain. However, BM's performance numbers show only 7 extremely small losses during 14 ½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak! Either BM is the world's best stock and options manager that the SEC and the investing public has **never** heard of or he's a fraud. You would have to figure that at some point BM owned a WorldCom, Enron, GM or HealthSouth in their portfolio when bad or really bad news came out and caused these stocks to drop like a rock.*

8. **Red Flag # 11** *Two press articles, which came to print well after my initial May 1999 presentation to the SEC, do doubt Bernie Madoff's returns and these are:*
   A. The May 7, 2001 edition of Barron's, in an article entitled, ***"Don't Ask, Don't Tell; Bernie Madoff is so secretive, he even asks his investors to keep mum,"*** written by Erin Arvedlund, published an expose about Bernie Madoff a few years ago with no resulting investigation by any regulators. Ms. Arvedlund has since left Barron's. I have attached a copy of the Barrons' article which lists numerous red flags.
   B. Michael Ocrant, formerly a reporter for MAR Hedge visited Bernie Madoff's offices and wrote a very negative article that doubted the source of BM's returns. He reported to a colleague that he saw some very unusual things while at Madoff's offices. The SEC should contact him. Michael Ocrant is currently serving as the Director of Alternative Investments; Institutional Investor; New York, NY 10001; Telephone # 212-224-3821 or 212-213-6202; Email: mocrant@iiconferences.com

9. Fund of funds with whom I have spoken to that have BM in their stable of funds continually brag about their returns and how they are generated thanks to BM's access to his broker-dealer's access to order flow. They believe that BM has perfect knowledge of the market's direction due to his access to customer order flow into his broker-dealer.
   **Red Flag # 12**: *Yes, BM has access to his customer's order flow thru his broker-dealer but he is only one broker out of many, so it is impossible for him to know the market's direction to such a degree as to only post monthly losses once every couple of years. All of Wall Street's big wire houses experience trading losses on a more regular frequency that BM. Ask yourself how BM's trading experience could be so much better than all of the other firms on Wall Street. Either he's the best trading firm on the street and rarely ever has large losing months unlike other firms or he's a fraud.*
10. **Red Flag # 13:** *I believe that BM's returns can be real ONLY if they are generated from front-running his customer's order flow. In other words, yes, if he's buying at a penny above his customer's buy orders, he can only lose one penny if the stock drops but can*

*make several pennies if the stock goes up. For example, if a customer has an order to buy 100,000 shares of IBM at $100, BM can put in his own order to buy 100,000 share of IBM at $100.01. This is what's known as a right-tail distribution and is very similar to the payoff distribution of a call option. Doing this could easily generate returns of 30% - 60% or more per anum. He could be doing the same thing by front-running customer sell orders. However, if BM's returns are real but he's generating them from front-running there are two problems with this:*

    *A. Problem # 1: front-running is one form of insider-trading and is illegal*

    *B. Problem # 2: generating real returns from front-running but telling hedge fund investors that you are generating the returns via a complex (but unworkable) stock and options strategy is securities fraud.*

Some time ago, during different market conditions, I ran a study using the Black-Scholes Option Pricing Model to analyze the value of front-running with the goal of putting a monetary value on front-running where the insider knew the customer's order and traded ahead of it. When I ran the study the model inputs were valued at: OEX component stocks annualized volatility on a cap-weighted basis was 50% (during a bear market period), the T-bill rate was 5.80%, and the average stock price was $46. I then calculated the value of an at-the-money call options over time intervals of 1 minute, 5 minutes, 10 minutes, and 15 minutes. I used a 253 trading day year. The SEC should be able to duplicate these results:

1 minute option = 3 cents worth of trade information value
5 minute option = 7 cents worth of trade information value
10 minute option = 10 cents worth of trade information value
15 minute option = 12 cents worth of trade information value

**Conclusion:** Bernie Madoff used to advertise in industry trade publications that he would pay 1 cent per share for other broker's order flow. If he was paying 1 cent per share for order flow and front-running these broker's customers, then he could easily be earning returns in the 30% - 60% or higher annually. In all time intervals ranging from 1 minute to 15 minutes, having access to order flow is the monetary equivalent of owning a valuable call option on that order. The value of these implicit call options ranges between 3 – 12 times the one penny per share paid for access to order flow. If this is what he's doing, then the returns are real but the stated investment strategy is illegal and based solely on insider-trading.

**NOTE:** I am pretty confident that BM is a Ponzi Scheme, but in the off chance he is front-running customer orders and his returns are real, then this case qualifies as insider-trading under the SEC's bounty program as outlined in Section 21A(e) of the 1934 Act. However, if BM was front-running, a highly profitable activity, then he wouldn't need to borrow funds from investors at 16% implied interest. Therefore it is far more likely that BM is a Ponzi Scheme. Front-running is a very simple fraud to commit and requires only access to inside information. The elaborateness of BM's fund-raising, his need for secrecy, his high 16% average cost of funds, and reliance on a derivatives investment scheme that few investors (or regulators) would be capable of comprehending lead to a weight of the evidence conclusion that this is a Ponzi Scheme.

9

11. **Red Flag # 14:** *Madoff subsidizes down months!  Hard to believe (and I don't believe this) but I've heard two FOF's tell me that they don't believe Madoff can make money in big down months either.  They tell me that Madoff "subsidizes" their investors in down months, so that they will be able to show a low volatility of returns.  These types of stories are commonly found around Ponzi Schemes.  These investors tell me that Madoff only books winning tickets in their accounts and "eats the losses" during months when the market sells off hard.  The problem with this is that it's securities fraud to misstate either returns or the volatility of those returns.  These FOF professionals who heard BM tell them that he subsidizes losses were professionally negligent in not turning BM into the SEC, FSA and other regulators for securities fraud.*
   **Red Flag # 15:** *Why would a fund of funds investor believe any broker-dealer that commits fraud in a few important areas – such as misstating returns and misstating volatility of returns – yet believe him in other areas?  I'd really like to believe in the tooth fairy, but I don't after catching my mother putting a quarter underneath my pillow one night.*

12. **Red Flag # 16:** *Madoff has perfect market-timing ability.  One investor told me, with a straight face, that Madoff went to 100% cash in July 1998 and December 1999, ahead of market declines.  He said he knows this because Madoff faxes his trade tickets to his firm and the custodial bank.  However, since Madoff owns a broker-dealer, he can generate whatever trade tickets he wants.  And, I'll bet very few FOF's ask BM to fax them trade tickets.  And if these trade tickets are faxed, have the FOF's then matched them to the time and sales of the exchanges?  For example, if BM says he bot 1 million shares of GM, sold $1 million worth of OTC OEX calls and bot $1 million worth of OTC OEX puts, we should see prints somewhere.  The GM share prints would show on either the NYSE or some other exchange while the broker-dealers he traded OTC options thru would show prints of the hedges they traded to be able to provide BM with the OTC options at the prices listed on BM's trade tickets.*

13. **Red Flag # 17:** *Madoff does not allow outside performance audits.  One London based hedge fund, fund of funds, representing Arab money, asked to send in a team of Big 4 accountants to conduct a performance audit during their planned due diligence.  They were told "No, only Madoff's brother-in-law who owns his own accounting firm is allowed to audit performance for reasons of secrecy in order to keep Madoff's proprietary trading strategy secret so that nobody can copy it.  Amazingly, this fund of funds then agreed to invest $200 million of their client's money anyway, because the low volatility of returns was so attractive!!  Let's see, how many hedge funds have faked an audited performance history??  Wood River is the latest that comes to mind as does the Manhattan Fund but the number of bogus hedge funds that have relied upon fake audits has got to number in the dozens.*

14. **Red Flag # 18:** *Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's.  In 2000, I analyzed the returns of Madoff and measured them against the returns of the Gateway Option Income Fund (Ticker GATEX).  During the 87 month span analyzed, Madoff was down only 3 months versus GATEX being down 26 months.  GATEX earned an annualized return of 10.27% during the period studied vs. 15.62% for Bernie Madoff and 19.58% for the S&P 500. GATEX has a more flexible investment strategy than BM, so GATEX's returns should be*

*superior to BM's but instead they are inferior. This makes no sense. How could BM be better using an inferior strategy?*

15. **Red Flag # 19:** *There have been several option income funds that went IPO since August 2004. None of them have the high returns that Bernie Madoff has. How can this be? They use similar strategies only they should be making more than BM in up months because most of these option income funds don't buy expensive index put options to protect their portfolios. Thus the publicly traded option income funds should make more money in up markets and lose more than Madoff in down markets. Hmm....that Madoff's returns are so high yet he buys expensive put options is just another reason to believe he is running the world's largest Ponzi Scheme. A good study for the SEC would be to compare 2005 performance of the new option income funds to Bernie Madoff while accounting for the cost of Bernie's index put option protection. There's no way Bernie can have positive returns in 2005 given what the market's done and where volatility is.*

16. **Red Flag # 20:** *Madoff is suspected of being a fraud by some of the world's largest and most sophisticated financial services firms. Without naming names, here's an abbreviated tally:*

   A. A managing director at Goldman, Sachs prime brokerage operation told me that his firm doubts Bernie Madoff is legitimate so they don't deal with him.

   B. From an Email I received this past June 2005 I now suspect that the end is near for BM. All Ponzi Schemes eventually topple of their own weight once they become too large and it now appears that BM is having trouble meeting redemptions and is attempting to borrow sizeable funds in Europe.

ABCDEFGH and I had dinner with a savvy European investor that studies the HFOF market. He stated that both RBC and Socgen have removed Madoff some time ago from approved lists of individual managers used by investors to build their own tailored HFOFs.

More importantly, Madoff was turned down, according to this source, for a borrowing line from a Euro bank, I believe he said Paribas. Now why would Madoff need to borrow more funds? This Euro Investor said that Madoff was in fact running "way over" our suggested $12-14 billion (Fairfield Sentry is running $5.3 BB by themselves!) . Madoff's 12 month returns is about 7% net of the feeder fund's fees. Looks like he is stepping down the pay out.

   C. An official from a Top 5 money center bank's FOF told me that his firm wouldn't touch Bernie Madoff with a ten foot pole and that there's no way he's for real.

17. **Red Flag # 21:** *ECN's didn't exist prior to 1998. Madoff makes verbal claims to his third party hedge FOF's that he has private access to ECN's internal order flow, which Madoff pays for, and that this is a substantial part of the return generating process. If this is true, then where did the returns come from in the years 1991 – 1997, prior to the ascendance of the ECN's? Presumably, prior to 1998, Madoff only had access to order flow on the NASDAQ for which he paid 1 cent per share for. He would have no such advantage pre-1998 on the large-cap, NYSE listed stocks the marketing literature says he buys (Exxon, McDonalds, American Express, IBM, Merck, etc...).*

18. **Red Flag # 22:** *The Fairfield Sentry Limited Performance Chart (Attachment 1) depicted for Bernie Madoff's investment strategy are misleading. The S&P 500 return line is accurate because it is moving up and down, reflecting positive and negative returns. Fairfield Sentry's performance chart is misleading, it is almost a straight line rising at a 45 degree angle. This chart cannot be cumulative in the common usage of the term for reporting purposes, which means "geometric returns." The chart must be some sort of arithmetic average sum, since a true*

11

*cumulative return line, given the listed monthly returns would be exponentially rising (i.e. curving upward at an increasing rate). My rule of thumb is that if the manager misstates his performance, you can't trust him. Yet somehow Madoff is now running the world's largest, most clandestine hedge fund so clearly investors aren't doing their due diligence. And why does he provide the S&P 500 as his benchmark when he is actually managing using a S&P 100 strategy? Shouldn't the performance line presented be the S&P 100's (OEX) performance?*

19. **Red Flag # 23:** *Why is Bernie Madoff borrowing money at an average rate of 16.00% per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's charge only 1% and 10%, yet BM allows them the extra 10%. Why? And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?*

20. **Red Flag # 24:** *Only Madoff family members are privy to the investment strategy. Name one other prominent multi-billion dollar hedge fund that doesn't have outside, non-family professionals involved in the investment process. You can't because there aren't any. Michael Ocrant, the former MAR Hedge Reporter listed above saw some highly suspicious red flags during his visit to Madoff's offices and should be interviewed by the SEC as soon as possible.*

21. **Red Flag # 25:** *The Madoff family has held important leadership positions with the NASD, NASDAQ, SIA, DTC, and other prominent industry bodies therefore these organizations would not be inclined to doubt or investigate Madoff Investment Securities, LLC. The NASD and NASDAQ do not exactly have a glorious reputation as vigorous regulators untainted by politics or money.*

22. **Red Flag # 26:** *BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for "cleaner financial statements" according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud. Recently, the BD REFCO Securities engaged in "fake borrowing" with Liberty, a hedge fund, that made it appear that Liberty owed REFCO over $400 million in receivables. This allowed REFCO to mask its true debt position and made all of their equity ratios look better than they actually were. And of course, Grant Thorton, REFCO's external auditor missed this $400 million entry. As did the two lead underwriters who were also tasked with due-diligence on the IPO - CSFB and Goldman Sachs. BM uses his brother-in-law as his external auditor, so in this case there isn't even the façade of having an independent and vigilant auditor verifying the accounting entries.*

23. **Red Flag # 27:** *Several equity derivatives professionals will all tell you that the split-strike conversion strategy that BM runs is an outright fraud and cannot possibly achieve 12% average annual returns with only 7 down months during a 14 ½ year time period. Some derivatives experts that the SEC should call to hear their opinions of how and why BM is a fraud and for some insights into the mathematical reasons behind their belief, the SEC should call:*

   a. Leon Gross, Managing Director of Citigroup's world-wide equity derivatives research unit; 3rd Floor, 390 Greenwich Street; New York, NY 10013; Tel# 800.492.9833 or 212.723.7873 or leon.j.gross@citigroup.com [ Leon can't believe that the SEC hasn't shut down Bernie Madoff yet. He's also amazed that FOF's actually believe this stupid options strategy is capable of earning a positive return much less a 12% net average annual return. He thinks the strategy would have trouble earning 1% net much less 12% net. Leon is a free spirit, so if you ask him he'll tell you but you'd understand it better if you met him at his

workplace in a private conference room and tell him he won't need to have Citigroup lawyers present, you're just there for some friendly opinions. He talks derivatives at a high level, so ask simple "yes or no" type questions to start off the interview then drill down.]

b. Walter "Bud"Haslett, CFA; Write Capital Management, LLC; Suite 455; 900 Briggs Road; Mount Laurel, NJ 08065; Tel#: 856.727.1700 or bud.haslett@writecapital.com   www.writecapital.com   [ Bud's firm runs $ hundreds of millions in options related strategies and he knows all of the math. ]

c. Joanne Hill, Ph.D.; Vice-President and global head of equity derivatives research, Goldman Sachs (NY), 46th Floor; One New York Plaza, New York, NY 10004; Tel# 212.902.2908  [ Again, make sure she doesn't lawyer up or this conversation will be useless to you.  Tell her you want her opinion and no one will hold her to it or ever tell she gave the SEC an opinion without legal counsel present. ]

24. **Red Flag # 28:**  *BM's Sharpe Ratio of 2.55 (Attachment 1: Fairfield Sentry Ltd. Performance Data) is UNBELIEVABLY HIGH compared to the Sharpe Ratios experienced by the rest of the hedge fund industry.  The SEC should obtain industry hedge fund rankings and see exactly how outstanding Fairfield Sentry Ltd.'s Sharpe Ratio is.  Look at the hedge fund rankings for Fairfield Sentry Ltd. and see how their performance numbers compare to the rest of the industry.  Then ask yourself how this is possible and why hasn't the world come to acknowledge BM as the world's best hedge fund manager?*

25. **Red Flag # 29:**  *BM tells the third party FOF's that he has so much money under management that he's going to close his strategy to new investments.  However, I have met several FOF's who brag about their "special access" to BM's capacity. This would be humorous except that too many European FOF's have told me this same seductive story about their being so close to BM that he'll waive the fact that he's closed his funds to other investors but let them in because they're special.  It seems like every single one of these third party FOF's has a "special relationship" with BM.*

**Conclusions:**

1. I have presented 174 months (14 ½ years) of Fairfield Sentry's return numbers dating back to December 1990. Only 7 months or 4% of the months saw negative returns. Classify this as "definitely too good to be true!" No major league baseball hitter bats .960, no NFL team has ever gone 96 wins and only 4 losses over a 100 game span, and you can bet everything you own that no money manager is up 96% of the months either. It is inconceivable that BM's largest monthly loss could only be -0.55% and that his longest losing streaks could consist of 1 slightly down month every couple of years. Nobody on earth is that good of a money manager unless they're front-running.

2. There are too many red flags to ignore. REFCO, Wood River, the Manhattan Fund, Princeton Economics, and other hedge fund blow ups all had a lot fewer red flags than Madoff and look what happened at those places.

3. Bernie Madoff is running the world's largest unregistered hedge fund. He's organized this business as "hedge fund of funds private labeling their own hedge funds which Bernie Madoff **secretly** runs for them using a split-strike conversion strategy getting paid only trading commissions which are not disclosed." If this isn't a regulatory dodge, I don't know what is. This is back-door marketing and financing scheme that is opaque and rife with hidden fees (he charges only commissions on the trades). If this product isn't marketed correctly, what is the chance that it is managed correctly? In my financial industry experience, I've found that wherever there's one cockroach in plain sight, many more are lurking behind the corner out of plain view.

4. Mathematically this type of split-strike conversion fund should never be able to beat US Treasury Bills much less provide 12.00% average annual returns to investors net of fees. I and other derivatives professionals on Wall Street will swear up and down that a split-strike conversion strategy cannot earn an average annual return anywhere near the 16% gross returns necessary to be able to deliver 12% net returns to investors.

5. BM would have to be trading more than 100% of the open interest of OEX index put options every month. And if BM is using only OTC OEX index options, it is guaranteed that the Wall Street firms on the other side of those trades would have to be laying off a significant portion of that risk in the exchange listed index options markets. Every large derivatives dealer on Wall Street will tell you that Bernie Madoff is a fraud. Go ask the heads of equity derivatives trading at Morgan Stanley, Goldman Sachs, JP Morgan and Citigroup their opinions about Bernie Madoff. They'll all tell the SEC that they can't believe that BM hasn't been caught yet.

6. The SEC is slated to start overseeing hedge funds in February 2006, yet since Bernie Madoff is not registered as a hedge fund but acting as one but via third party shields, the chances of Madoff escaping SEC scrutiny are very high. If I hadn't written this report, there's no way the SEC would have known to check the facts behind all of these third party hedge funds.

**Potential Fall Out if Bernie Madoff turns out to be a Ponzi Scheme:**

1. If the average hedge fund is assumed to be levered 4:1, it doesn't take a rocket scientist to realize that there might be anywhere from a few hundred billion on up in selling pressure in the wake of a $20 - $50 billion hedge fund fraud. With the hedge fund market estimated to be $1 trillion, having one hedge fund with 2% - 5% of the industry's assets under management suddenly blow up, it is hard to predict the severity of the resulting shock wave. You just know it'll be unpleasant for anywhere from a few days to a few weeks but the fall out shouldn't be anywhere near as great as that from the Long Term Capital Management Crises. Using the hurricane scale with which we've all become quite familiar with this year, I'd rate BM turning out to be a Ponzi Scheme as a Category 2 or 3 hurricane where the 1998 LTCM Crises was a Category 5.

2. Hedge fund, fund of funds with greater than a 10% exposure to Bernie Madoff will likely be faced with forced redemptions. This will lead to a cascade of panic selling in all of the various hedge fund sectors whether equity related or not. Long –short and market neutral managers will take losses as their shorts rise and their longs fall. Convertible arbitrage managers will lose as the long positions in underlying bonds are sold and the short equity call options are bought to close. Fixed income arbitrage managers will also face losses as credit spreads widen. Basically, most hedge funds categories with two exceptions will have at least one big down month thanks to the unwinding caused by forced redemptions. Dedicated Short Funds and Long Volatility Funds are the two hedge fund categories that will do well.

3. The French and Swiss Private Banks are the largest investors in Bernie Madoff. This will have a huge negative impact on the European capital markets as several large fund of funds implode. I figure one-half to three-quarters of Bernie Madoff's funds come from overseas. The unwinding trade will hurt all markets across the globe but it is the Private European Banks that will fare the worst.

4. European regulators will be seen as not being up to the task of dealing with hedge fund fraud. Hopefully this scandal will serve as a long overdue wake-up call for them and result in increased funding and staffing levels for European Financial Regulators.

5. In the US Fairfield Sentry, Broyhill, Access International Advisors, Tremont and several other hedge fund, fund of funds will all implode. There will be a call for increased hedge fund regulation by scared and battered high net worth investors.

6. The Wall Street wire house FOF's are not invested in Madoff's strategy. As far as I know the wire house's internal FOF's all think he's a fraud and have avoided him like the plague. But these very same wire houses often own highly profitable hedge fund prime brokerage operations and these operations will suffer contained, but painful nonetheless, losses from loans to some hedge funds that go bust during the panic selling. As a result, I predict that some investment banks will pull out of the prime brokerage business deeming it too volatile from an earnings standpoint. Damage to Wall Street will be unpleasant in that hedge funds and FOF's are a big source of trading revenues. If the

hedge fund industry fades, Wall Street will need to find another revenue source to replace them.

7. US Mutual fund investors and other long-term investors in main stream investment products will only feel a month or two's worth of pain from the selling cascade in the hedge fund arena but their markets should recover afterwards.

8. Congress will be up in arms and there will be Senate and House hearings just like there were for Long Term Capital Management.

9. The SEC's critics who say the SEC shouldn't be regulating private partnerships will be forever silenced. Hopefully this leads to expanded powers and increased funding for the SEC. Parties that opposed SEC entry into hedge fund regulation will fall silent. The SEC will gain political strength in Washington from this episode but only if the SEC is proactive and launches an immediate, full scale investigation into all of the Red Flags surrounding Madoff Investment Securities, LLC. Otherwise, it is almost certain that NYAG Elliot Spitzer will launch his investigation first and once again beat the SEC to the punch causing the SEC further public embarrassment.

10. Hedge funds will face increased due diligence from regulators, investors, prime brokers and counter-parties which is a good thing and long overdue.

**Potential Fall Out if Bernie Madoff is found out to be front-running customer order flow:**

1. This would be just one more black eye among many for the brokerage industry and the NYSE and NASDAQ. At this point the reputations of both the NYSE and NASDAQ are already at rock bottom, so there's likely little downside left for these two troubled organizations.

2. The industry wouldn't miss a beat other than for the liquidation of Madoff Investment Securities, LLC. Figure it will be similar to REFCO's demise only there won't be a buyer of the firm given that they cheated customers who would all be embarrassed to remain customers once the news they've been ripped off is on the front-pages. These former customers are more likely to sue for damages than remain customers. Unsecured lenders would face losses but other than that the industry would be better off.

3. At least the returns are real, in which case determining restitution could keep the courts busy for years. The Class Action Bar would be thrilled. A lot of the FOF's are registered offshore in places where the long arm of the law might not reach. My guess is that the fight for the money off-shore would keep dozens of lawyers happily employed for many years.

4. The FOF's would suffer little in the way of damage. All could be counted on to say *"We didn't know the manager was generating returns illegally. We relied upon the NYSE and NASDAQ to regulate their markets and prevent front-running therefore we see no reason to return any funds."*

## Attachments:

1. 2 page Summary of Fairfield Sentry Ltd with performance data from December 1990 – May 2005

2. Copy of the May 7, 2001 Barrons' article, ***"Don't Ask, Don't Tell; Bernie Madoff is so secretetive, he even asks his investors to keep mum,"*** written by Erin E. Arvedlund.

3. Partial list of French and Swiss money-managers and private banks with investments in Bernie Madoff's hedge fund. Undoubtedly there are dozens more European FOF's and Private Banks that are invested with BM.

4. 2 page offering memorandum, faxed March 29, 2001, for an investment in what I believe is Fairfield Sentry Ltd., one of several investment programs run by Madoff Investment Securities, LLC for third party hedge fund, fund of funds. I do not know who the source was who faxed this document since the fax heading is blank. The document number listed at the bottom of the page appears to read   I:\Data\WPDOCS\AG_\94021597

# ATTACHMENT 1:  Fairfield Sentry Performance Data

**Fairfield Sentry Ltd**

**Fund Category(s):**
Long/Short Equity

**Strategy Description:**
The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments"). The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index , (ii) the sale of out-of-the-money S&P 100 index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 index put options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 45 stocks in the S&P 100. The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk. A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

| Contact Info | | Fees & Structure | |
|---|---|---|---|
| Fund: | Fairfield Sentry Ltd | Fund Assets: | $5100.00million |
| General Partner: | Arden Asset Management | Strategy Assets: | $5300.00million |
| Address: | 919 Third Avenue | Firm Assets: | $8300million |
| | 11th th Floor | Min. Investment: | $ 0.10million |
| | New York NY 10022 | Management Fee: | 1.00% |
| | USA | Incentive Fee: | 20.00% |
| Tel: | 212-319-6060 | Hurdle Rate: | |
| Fax: | | High Water Mark: | Yes |
| Email: | fairfieldfunds@fggus.com | Additions: | Monthly |
| Contact Person: | Fairfield Funds | Redemptions: | Monthly |
| Portfolio Manager: | | Lockup: | |
| | | Inception Date: | Dec-1990 |
| | | Money Invested In: | United States |
| | | Open to New Investments: | Yes |

| Annual Returns | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| 2.83% | 18.58% | 14.67% | 11.68% | 11.49% | 12.95% | 12.99% | 14.00% | 13.40% | 14.18% | 11.55% | 10.68% | 9.33% | 8.21% | 7.07% | 2.52% |



Fairfield Sentry Ltd

■ Fairfield Sentry Ltd
■ S&P 500

| | |
|---|---|
| Year To Date: | 2.52% |
| Highest 12 Month Return: | 19.98% |
| Lowest 12 Month Return: | 6.23% |
| Average Annual Return: | 12.00% |
| Average Monthly Return: | 0.96% |
| Highest Monthly Return: | 3.36% |
| Lowest Monthly Return: | -0.55% |
| Average Gain: | 1.01% |
| Average Loss: | -0.24% |
| Profitable Percentage: | 95.98% |
| Compounded Monthly Return: | 0.96% |
| Longest Losing Streak: | 1 mo. |
| Maximum Drawdown: | -0.55% |

| | |
|---|---|
| Sharpe Ratio (Rolling 12): | 2.56 |
| Sharpe Ratio (Annualized): | 2.55 |
| Std. Dev. (Monthly): | 0.75% |
| Std. Dev. (Rolling 12): | 2.74% |
| Beta: | 0.06 |
| Alpha: | 0.91 |
| R: | 0.30 |
| R Squared: | 0.09 |

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1990 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 2.83% E |
| 1991 | 3.06% E | 1.46% E | 0.59% E | 1.39% E | 1.88% E | 0.37% E | 2.04% E | 1.07% E | 0.80% E | 2.82% E | 0.08% E | 1.63% E |
| 1992 | 0.49% E | 2.79% E | 1.01% E | 2.86% E | -0.18% | 1.29% E | 0.00% E | 0.92% E | 0.40% E | 1.40% E | 1.42% E | 1.43% E |
| 1993 | 0.00% E | 1.93% E | 1.86% E | 0.06% E | 1.72% E | 0.86% E | 0.09% E | 1.78% E | 0.35% E | 1.77% E | 0.26% E | 0.45% E |
| 1994 | 2.18% E | -0.36% E | 1.52% E | 1.82% E | 0.51% E | 0.29% E | 1.78% E | 0.42% E | 0.82% E | 1.88% E | -0.55% E | 0.66% E |
| 1995 | 0.92% E | 0.76% E | 0.84% E | 1.69% E | 1.72% E | 0.50% E | 1.08% E | -0.16% E | 1.70% E | 1.60% E | 0.51% E | 1.10% E |
| 1996 | 1.49% E | 0.73% E | 1.23% E | 0.64% E | 1.41% E | 0.22% E | 1.92% E | 0.27% E | 1.22% E | 1.10% E | 1.58% E | 0.48% E |
| 1997 | 2.45% E | 0.73% E | 0.86% E | 1.17% E | 0.63% E | 1.34% E | 0.75% E | 0.35% E | 2.39% E | 0.55% E | 1.56% E | 0.42% E |
| 1998 | 0.91% E | 1.29% E | 1.75% E | 0.42% E | 1.76% E | 1.28% E | 0.83% E | 1.04% E | 1.93% E | 0.84% E | 0.33% E |
| 1999 | 2.08% E | 0.17% E | 2.29% E | 0.36% E | 1.51% E | 1.76% E | 0.43% E | 0.94% E | 0.73% E | 1.11% E | 1.61% E | 0.39% E |
| 2000 | 2.20% E | 0.20% E | 1.84% E | 0.34% E | 1.37% E | 0.80% E | 0.65% E | 1.32% E | 0.25% E | 0.92% E | 0.68% E | 0.43% E |
| 2001 | 2.21% E | 0.14% E | 1.13% E | 1.32% E | 0.32% E | 0.23% E | 0.44% E | 1.01% E | 0.73% E | 1.28% E | 1.21% E | 0.19% E |
| 2002 | 0.03% E | 0.60% E | 0.46% E | 1.16% E | 2.12% E | 0.26% E | 3.36% E | -0.06% E | 0.13% E | 0.73% E | 0.16% E | 0.06% E |
| 2003 | -0.27% | 0.04% E | 1.97% E | 0.10% E | 0.95% E | 1.00% E | 1.44% E | 0.22% E | 0.93% E | 1.32% E | -0.08% E | 0.32% E |
| 2004 | 0.94% E | 0.50% E | 0.05% C | 0.43% C | 0.66% C | 1.28% C | 0.08% C | 1.33% E | 0.53% E | 0.03% E | 0.79% E | 0.24% E |
| 2005 | 0.51% E | 0.37% E | 0.85% E | 0.14% C | 0.63% C | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**END ATTACHMENT # 1 FAIRFIELD SENTRY LTD. PERFORMANCE DATA**

**EXHIBIT U**

**Bernard_L_Madoff_Investments.doc**                    12/22/2004 3:17:43 PM

**From:** Nee, John   Personal Privacy
**To:** Ostrow, William D.                Lamore, Peter    Personal Privacy
**Attachments:** Bernard_L_Madoff_Investments.doc.zip

FYI Most recent NASD Exam Report.



MADOFF_EXHIBITS-03970

Bernard L. Madoff Investment                            Exam #      E10030067
Securities LLC
Firm CRD # 2625                                         Content version #      35
1 of 26 pages

# Exam Report

## Regulatory Summary

| Apparent Violation Rationale | Recommended Action |
|---|---|
| No Apparent Violations | Filed Without Action |

## Background

### Business and Operational Section:

Bernard L. Madoff Investment Securities LLC ("the Firm") has been a member of NASD
since March 25, 1960.  The Firm is also a member of CSE, MSRB, DTC, OCC, NSCC
and SIPC.  The Firm is currently organized as a limited liability company and is wholly
owned by Mr. Bernard L. Madoff (CRD# 316687).  The Firm is a Level 2 firm, and the
current net capital category is 15c3-3 Ai Nasd $250k.  The Firm operates pursuant to
15c3-1(a)(2)(i) and is required to maintain a miminmum net capital requirement of
$250,000.  Due to the number of stocks that the firm makes markets in, the firm's
requirement is increased to $1,000,000.   The Firm is self clearing.  The Firm engages
in market making and also trades securities for its own account.

Service Bureau:          None

| Types of Business | Percentage of Revenue | Method of Processing |
|---|---|---|
| Broker or dealer making inter-dealer markets in corporate securities OTC | 30% | Bernard L. Madoff |
| Trading Securities for own account | 70% | Bernard L. Madoff |

The Firm's internet home page is: www.Madoff.com

The Firm processes approximately 2,400,000 transactions per month.  Greater than
99% of the firm's orders are from broker dealers, orders will be accepted electronically
by other firms hitting the firm's bid or ask.  Bernard L. Madoff Securities, LLC, has
developed a computer program, Madoff Integrated Support System (MISS) that
automatically executes orders with broker dealers.  The firm also has approximately
thirty (30) institutional customers that transmit orders through Bloomberg for execution.
These orders will be handled the same way in which broker dealer orders are handled.

This document contains proprietary and confidential information and shall not be reproduced or
disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03971

Bernard L. Madoff Investment
Securities LLC
Firm CRD #  2625
2 of 26 pages

Exam #    E10030067

Content version #    35

The following material changes occurred at the Firm within the last six months: None

## Offices, Ownership and Personnel:

The Firm employs approximately 80 registered persons that operate from its main office. The firm does not maintain any branch office locations.

Ownership:

| Name | Title | CRD Number | Percentage Ownership |
|------|-------|-----------|---------------------|
| Peter Barnett Madoff | Chief Compliance Officer | 316688 | Less Than 5% |
| Bernard Lawrence Madoff | Sole Member | 316687 | 75% Or More |

Supervisory Personnel:

| Business Activities | Name | Date Assumed |
|--------------------|------|--------------|
| General Compliance | Peter Madoff | June 1969 |
| Anti-Money Laundering Compliance | Peter Madoff | April 2002 |
| Financial Reporting | Bernard L. Madoff | March 1960 |
| Operations | Bernard L. Madoff | March 1960 |
| Options | Peter Madoff | April 1976 |
| Trading /Market Making | Andrew Madoff & Mark Madoff | December 1999 November 1999 |
| Customer Complaints | Bernard L. Madoff | March 1960 |
| Written Supervisory Procedures | Peter Madoff | June 1969 |
| Review of Supervisory System | Bernard L. Madoff | March 1960 |
| Customer Inquiries | Bernard L. Madoff | March 1960 |

## Exam History

The table below summarizes the recent examination history including the last two routine exams and other exams during the same time period (excluding TCs and CCs):

| Exam # | Exam Type | Field Work Start Date | Action | Violations |
|--------|-----------|----------------------|--------|------------|
| | | | | |

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03972

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD #  2625*
*3 of 26 pages*

*Exam #      E10030067*

*Content version #      35*

| Exam # | Exam Type | Field Work Start Date | Action | Violations |
|---|---|---|---|---|
| **E10010480** | *RE* | 04/23/2001 | Filed Without Action | |
| **E10990060** | *RE* | 05/17/1999 | Letter Of Caution | 1020 Registration Of Principals |

Narrative as Reported on Form U-6 Regarding Disciplinary History:

None

## Rationale

The following is the rationale for the exam focus:

### Exam Element Group: Administration

- Rationale for Exam Element Group: Other regulatory requirements - Staff will review form filings - to ensure that Form U-4, U-5 and BD are accurately filled out and filed timely.

### Exam Element Group: Registration and Education

- Rationale for Exam Element Group: Other regulatory requirements - Staff will review regulatory element of continuing education to ensure the firm did not have any inactive registered persons during the review period.

### Exam Element Group: Firm Supervision

- Rationale for Exam Element Group: Other (WSP review for underlying business areas) - The staff will review the supervisory procedures for all business lines on which the 2003 exam staff focused.

### Exam Element Group: Internal Controls

- Rationale for Exam Element Group: Mandatory area of review - Pursuant to DSM 02-06, Staff will review internal controls related to internal audit, new products, trading risk controls and independent review.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03973

*Bernard L. Madoff Investment Securities LLC*
*Firm CRD # 2625*
*4 of 26 pages*

Exam #      E10030067

Content version #      35

### Exam Element Group: Capital and Credit Regulation

- Rationale for Exam Element Group: Mandatory area of review - Staff will conduct a net capital computation for the period ending July 31, 2003, choosing the most recent net capital computation because the FOCUS report and core examiner did not reveal concerns for any specific time period.

### Exam Element Group: Customer Protection

- Rationale for Exam Element Group: Mandatory area of review – The staff will ensure the firm complies with its claimed exemption to SEC Rule 15c3-3.

### Exam Element Group: Financial Controls

- Rationale for Exam Element Group: Mandatory area of review - Pursuant to exam supplement H, the staff will ensure independence of the firm's contracted auditor.  The staff will review the firm's AML policies.

### Exam Element Group: Broker-Dealer Conduct

- Rationale for Exam Element Group: Mandatory area of review - Staff will review customer grievances to determine if there are any patterns of complaints or arbitrations received.  If patterns exist, staff will consider expanding the focus to include other areas.

### Exam Element Group: Customer Information and Disclosures

- Rationale for Exam Element Group: Mandatory area of review - Staff will conduct a review of Reg. SP requirements noted as a mandatory area of review.

### Exam Element Group: Trade Reporting

- Rationale for Exam Element Group: Other regulatory requirements - The staff will review to ensure compliance with the trade reporting requirements as set forth in MSRB Rule G-14.

### Exam Element Group: Offerings

Rationale for Exam Element Group: Other regulatory requirements - The staff will substantiate the firm's claim that it has not participated in municipal securities offerings.

### Exam Element Group: Broker-Dealer Conduct

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03974

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
5 of 26 pages

Exam #    E10030067

Content version #    35

- Rationale for Exam Element Group: Other regulatory requirements - The staff will substantiate the firm's claim that it has not participated in municipal securities offerings and ensure the firm has procedures in place in the event it conduct a business requiring compliance with MSRB Rule G-37/38.

# Findings

## Apparent Violations

None

## Other Matters

### Form Filings

Question: For applicable new hires, did the firm obtain a copy of Form U-5 or CFTC Form 8-T from the previous employer?

Response: Yes

Records Reviewed:

- Employee records
- Recently Hired Employees (List of)

Exhibits:

- Recently Hired Employees (List of) [3]

Description of Finding and Root Cause Analysis: Staff reviewed employee records of five recently hired registered person as of May 1, 2001. Staff reviewed the files of Personal Privacy Personal Privacy and determined that the firm obtained form U-5 filed by each of the representatives previous employers within (60)days.

### Form Filings

Question: Did the firm file (and, as necessary, amend) the Form U-5 with NASD and provide a copy to the registered person within the required time frame?

Response: Yes

Records Reviewed:

- Late Charge Report (05/25/2001 - 08/26/2003)
- Recently Terminated Employees (List of)

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03975

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*6 of 26 pages*

*Exam #     E10030067*

*Content version #     35*

- Form U-5

Exhibits:

- Late Charge Report [1]

- Recently Terminated Employees (List of) [2]

Description of Finding and Root Cause Analysis: Staff review of the late charge report did not reveal any late U-5 filings for the period May 25, 2001 through August 26, 2003.  In addition the staff conducted a walk through of five recently terminated representatives as of May 25, 2001. Staff reviewed Form U-5 filings for the following representatives and found that in each instance the firm filed the U-5 within 30 days of termination Personal Privacy

Personal Privacy

### Form Filings

Question:  Does the firm keep its Form BD current and accurate?

Response:  Yes

Records Reviewed:

- Form BD

Exhibits:

- Form BD [4]

Description of Finding and Root Cause Analysis: Staff review of the firm's Form BD revealed that it appears to be accurate in regards to names, address, ownership percentages, business types, affiliates, memberships,...etc. No problems were noted.

### Qualification and Registration

Question:  Are associated persons properly qualified and registered, as required, including those registered in a limited capacity?

Response:  Yes

Records Reviewed:

- Registered Persons (List from CRD or IRIS)

Sample Name:  Qualification and Registration Sample 1

   Recommended Selection Method: Random

   Selection Method: Random

   Sample Type:  Detection

   Sample Size: 33

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03976

*Bernard L. Madoff Investment Securities LLC*
*Firm CRD # 2625*
*7 of 26 pages*

*Exam #   E10030067*

*Content version #   35*

Sample Population: 73

Sample Review Period: 08/01/2003 - 08/31/2003

Sample Description/Rationale: All equity traders.

Description of Finding and Root Cause Analysis: Staff sampled thirty-three equity traders of the seventy-three employed at the firm for the period August 1, 2003 through August 31, 2003, as suggested by the sampling guidelines. The review revealed all had proper licenses and registrations. None of the registered representatives receive commissions, as they all receive a salary and a bonus.

## Qualification and Registration

Question: Does the firm have two registered principals pursuant to NASD Rule 1021(e) or an exemption from the two-principal requirement?

Response: Yes

Records Reviewed:

- CRD

- IRIS

Description of Finding and Root Cause Analysis: The firm only has one (1) municipal securities principal (Bernard Madoff), however the firm is engaged in a general securities business and pursuant to the MSRB Rule G-3, only needs one qualified Municipal Securities Principal, since there are several other General Securities Principals employed by the firm. In addition, the firm has not conducted a municipal securities business for the previous two (2)exams.

## Regulatory Element of Continuing Education

Question: Did the firm permit, directly or indirectly, any inactive registered representatives to either perform or to be compensated for activities, conducted while inactive, that require an active securities registration?

Response: No

Records Reviewed:

- CE Inactive Reports (05/25/2001 - 08/26/2003)

Exhibits:

- CE Inactive Reports [5]

Description of Finding and Root Cause Analysis: Staff review of the CRD CE Inactive reports for the period of 05/25/2001 through 08/26/2003 did not reveal any inactive registered persons.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*8 of 26 pages*

*Exam #     E10030067*

*Content version #     35*

## Correspondence

Question:  Does a registered principal review all incoming and outgoing (written and electronic) correspondence with the public relating to the investment banking or securities business, or does the firm provide appropriate training to associated persons?

Response:  Yes

Records Reviewed:

- Correspondence (Written and Electronic)
- Written Supervisory Procedures

Sample Name:  Correspondence Sample 1

Recommended Selection Method: Systematic

Selection Method: Systematic

Sample Type:  Detection

Sample Size:  54

Sample Population: 500

Sample Review Period: 05/25/2001 - 09/12/2003

Sample Description/Rationale: Electronic correspondence

Description of Finding and Root Cause Analysis: Staff review of fifty-four pieces of correspondence as suggested by the sampling guidelines, revealed all correspondence were reviewed by the appropriate personnel. Staff only reviewed electronic correspondence because the firm did not have any written correspondence.  Shana Madoff reviews electronic correspondence on a daily basis.  Once she reviews the emails she archives them into three different categories spam, business and personal.  Ms. Madoff walked the staff through her process of reviewing the correspondence.

## Supervision

Question:  Has the firm implemented an adequate supervisory system designed to detect and prevent potential rule violations?

Response:  Yes

Records Reviewed:

- Written Supervisory Procedures
- Annual Compliance Meeting Attendance List
- Annual Compliance Meeting Outline or Agenda

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03978

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
9 of 26 pages

Exam #    E10030067

Content version #    35

Sample Name:  Supervision Sample 1

Recommended Selection Method: Random

Selection Method: Random

Sample Type:  Detection

Sample Size: 35

Sample Population: 80

Sample Review Period: 05/25/2001 - 09/12/2003

Sample Description/Rationale: All Registered Representatives

Description of Finding and Root Cause Analysis: Staff sampled thirty-five registered employees of the firm as recommended by the sampling guidelines.  Staff found that all thirty-five registered representatives sampled participated in the compliance meetings.  The firm conducts weekly compliance meetings.  The meetings are in the form of lectures or mass e-mailings with information described in the firm's yearly written training plan. All information that is sent to the registered representatives is kept in a compliance binder.  Additional information is provided to registered personnel during continuing education seminars.  Information may be sent out by any of the firm's officers.  Shana Madoff, Compliance Counsel, maintains the information along with proof of participation and email receipts.

## Internal Communications

Question:  Does the firm maintain records of internal communications?

Response:  Yes

Records Reviewed:

- Internal Communications

Description of Finding and Root Cause Analysis: Shana Madoff maintains all emails on the firms server.  The emails are archived for each registered person and categorized by spam, business and personal.

## Internal Communications

Question:  Does the firm have written procedures for reviewing, approving, distributing, and maintaining internal communications?

Response:  Yes

Records Reviewed:

- Written Supervisory Procedures

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
10 of 26 pages

Exam #      E10030067

Content version #      35

Description of Finding and Root Cause Analysis: Staff review of the firm's written supervisory procedures revealed that the firm has procedures for reviewing, approving, distributing and maintaining internal controls.  Staff sat with Shana Madoff as she demonstrated to the staff how she conducts her review of emails on a daily basis.  Ms. Madoff spends about three hours of her day reviewing all emails.  All emails are automatically sent to Ms. Madoff for her review.

### Board of Directors - Senior Management

Question:  Does the Board/senior management advise key employees of acceptable business activities and acceptable levels of risk?

Response:  N/A

Description of Finding and Root Cause Analysis: Senior management is involved in day to day operations.

### Internal Communications

Question:  If the firm has written procedures for reviewing, approving, and distributing internal communications, are the procedures followed?

Response:  Yes

Records Reviewed:

- Internal Communications
- Written Supervisory Procedures

Description of Finding and Root Cause Analysis: Staff sampled five traders at the firm.  Staff reviewed internal communications for the five traders and determined that the procedures for internal communications were being followed.

### Board of Directors - Senior Management

Question:  Does the Board/senior management advise key employees of acceptable business activities and acceptable levels of risk?

Response:  Yes

Description of Finding and Root Cause Analysis: Senior management is involved in day to day operations.  Bernard Madoff and Peter Madoff are involved in every aspect of the firm's business.  Mr. Madoff verbally informs the firm's employees regarding any issues. Since Mr. Madoff is involved in every aspect of the firm's business, he is aware of all activity/risks, he also ensures that all guidelines are adhered to.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03980

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*11 of 26 pages*

*Exam #    E10030067*

*Content version #    35*

### Board of Directors - Senior Management

Question:  Are these business activity/risk level guidelines reviewed and updated with appropriate frequency?

Response:  Yes

Description of Finding and Root Cause Analysis: Please see the response to the above question, "Does the Board/senior management advise key employees of acceptable business activities and acceptable levels of risk?"

### Board of Directors - Senior Management

Question:  Does the Board/senior management communicate these guidelines to key employees in a clear and timely manner?

Response:  Yes

Description of Finding and Root Cause Analysis: Please see the response to the above question, "Does the Board/senior management advise key employees of acceptable business activities and acceptable levels of risk?"

### Board of Directors - Senior Management

Question:  Does the Board/senior management monitor to ensure these guidelines are adhered to?

Response:  Yes

Description of Finding and Root Cause Analysis: Please see the response to the above question, "Does the Board/senior management advise key employees of acceptable business activities and acceptable levels of risk?"

### Credit Risk

Question:  Does the firm have adequate written internal control and risk management procedures relating to credit risk, including margin?

Response:  N/A

Firm's Response to Finding: The firm does not engage in any sort of credit risk.  All transactions are done on an RVP/DVP basis.

### Financial Analysis

Question:  Does the firm have adequate written internal control and risk management procedures for monitoring trends in the firm's financial status?

Response:  Yes

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*12 of 26 pages*

*Exam #   E10030067*

*Content version #   35*

Description of Finding and Root Cause Analysis: The firm's FINOP, on a daily basis reviews and computes the firm's positions, general ledger and net capital computations. The FINOP reports all trends to Bernard Madoff.

## Financial Analysis

Question: Is there evidence that the firm implements these procedures?

Response: Yes

Description of Finding and Root Cause Analysis: Staff review of the firm's financials for the previous twelve months did not reveal and financial risk as the firm is extremely well capitalized. The firm's excess net capital has been over $300 million dollars for each month over the past year. Staff review of the Instite Surveillance and Focus reports did not reveal any exceptions that would put the firm at risk.

## Funding and Liquidity

Question: Does the firm have adequate written internal control and risk management procedures relating to funding and liquidity activities, including contingency plans?

Response: Yes

Description of Finding and Root Cause Analysis: The firm does not have any bank loans or lines of credit. The firm is well capitalized, for the period ending July 31, 2003, the firm had an excess net capital of $365,496,618. The firm is family run and operated, with members of the Madoff family comprising senior management. They are in constant contact with all individuals and departments at the firm.

## Funding and Liquidity

Question: Is there evidence that the firm implements these procedures?

Response: Yes

Description of Finding and Root Cause Analysis: It has been determined by the staff that the firm's business has been constant for several years. Staff reviewed Insite Surveillance for the past year and revealed the firm has been consistent.

## Internal Audit

Question: Does the staff responsible for conducting internal audits have an appropriate degree of independence from the departments and people they audit?

Response: N/A

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03982

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*13 of 26 pages*

Exam #    E10030067

Content version #    35

Description of Finding and Root Cause Analysis: The firm does not have an Internal Audit Department.  The firm has approximately 80 employees. Trading, financials, compliance etc. are reviewed on a daily basis by the appointed supervisory personnel.  The firm's business has not changed since its inception, the firm primarily deals with Broker/Dealers and trading for its own account.

## Systems and Operations Risk

Question:  Does the firm have adequate written internal control and risk management procedures relating to operations, clearance and settlement, and management information systems?

Response:  Yes

Description of Finding and Root Cause Analysis: Madoff Securities has a disaster recovery facility, located in Queens, NY. It is fully equipped and staffed.  The duplicate office has all of the features of the primary Madoff Securities offices. The facility is tested continuously to ensure that it is prepared to take over the firm's operations if any kind of disaster were to affect the Manhattan office. Members of the firm's staff are rotated through the facility and regularly perform their work from it. Thus, there is always staff on hand in case disaster strikes at the firm's main office.

The disaster recovery facility is on a different electric power grid than the main office, and it is served by a different telephone central office. The facility also has its own electrical generator.

The firm's proprietary trading system ("MISS") provides the four supervisors Andrew Madoff, Mark Madoff, [Personal Privacy] with all types of alerts if certain trading parameters are exceeded. The MISS system shows traders positions at any given time; position limits; reports trades the instant they are executed; and indicates type of order flow execution traffic.  The four supervisors review trade parameters on a real time basis of all the traders and systems.

## Trading Risk Controls

Question:  Does the firm have adequate written internal control and risk management procedures relating to trading activities?

Response:  Yes

Description of Finding and Root Cause Analysis: The firm's proprietary trading system ("MISS") provides the four supervisors Andrew Madoff, Mark Madoff [Personal Privacy] with all types of alerts if certain trading parameters are exceeded.  The MISS system shows traders positions at any given time; position limits; reports trades the

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
14 of 26 pages

Exam #      E10030067

Content version #      35

instant they are executed; and indicates type of order flow execution traffic. The four supervisors review trade parameters on a real time basis of all the traders and systems.

The firm walked the staff through the process of reviewing the trading systems and traders.

### Independent Review

Question: Does senior management's assessment of the firm's major credit risks appear accurate?

Response: Yes

Description of Finding and Root Cause Analysis: Staff review of the firm's financial statements appear to be accurate. Since the firm is family run and Bernard Madoff is involved in every aspect of the business he is aware of any risks if any may be present. Staff review was unable to address any credit risk items. The firm is well capitalized.

### Independent Review

Question: Are credit risk items consistent with the authorizing guidelines, and are they adequately managed?

Response: Yes

Description of Finding and Root Cause Analysis: Please see response to above question, (Does senior management's assessment of the firm's major credit risks appear accurate?)

### Net Capital Verification

Question: Is the firm's net capital computation correct?

Response: Yes

Records Reviewed:

- Net Capital Computation Workbook (07/01/2003 - 07/31/2003)
- Net Capital Computation Work papers (07/01/2003 - 07/31/2003)

Exhibits:

- Net Capital Computation Workbook [16]

Description of Finding and Root Cause Analysis: Staff computed a net capital computation for the period ending July 31, 2003. As of July 31, 2003, the firm computed a net capital of $366,496,617.61, with a minimum net capital requirement of $1,000,000, resulting in excess net capital of $365,496,617.61.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03984

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*15 of 26 pages*

Exam #     E10030067

Content version #     35

During the staff's review of the firm's inventory, it was noted that the firm values it's inventory using Bloomberg. The firm however uses code UQ which is the official PX NASDAQ close price if available for the securities, If not the primary code of US is used which is a code that reflects a composite closing price. The staff also used Bloomberg however the staff's Bloomberg is defaulted to the US code which gave different values for six of the forty positions sampled. The staff manually changed the code for the position that generated different values and obtained the same value as the firm. Per Bernard Madoff, using the UQ code is the most conservative and appropriate way to mark the positions to market.

As a result of the staff's review, the staff computed a net capital of $366,507,406.84, with a minimum net capital requirement $1,000,000, resulting in excess net capital of $365,507,262.21.

The difference is attributed to the difference of the marking of the positions to market which resulted in a difference of $10,644.60. Staff tested twenty short positions and twenty long positions all in excess of $750,000. The total long market value verified by the staff was $19,840,696 and the total short market value verified by the staff was $19,214,562.

Staff also reviewed ten options positions which reveled that the firm was taking haircuts consistent with the Rule of Interpretations guide book. In addition, the staff reviewed all the firm's options positions that have not expired. The staff reviewed four call positions which the firm valued at $6,735 and the staff value at $7,465. This resulted in a difference of ($730). In addition the staff reviewed five put positions which the firm valued at $31,650 and the staff valued at $31,900, a difference of ($250). As stated earlier, the firm uses a different code in Bloomberg to obtain its values. The firm take a more conservative approach to the pricing of the options. The difference is immaterial to the firm's net capital.

### Net Capital Verification

Question: Did the firm conduct a securities business while deficient?

Response: N/A

### Customer Protection - PAIB

Question: Is the firm's PAIB Reserve Formula computation accurate?

Response: N/A

Exhibits:

- PAIB Reserve Formula Worksheet Schedule [57]

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03985

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*16 of 26 pages*

*Exam #   E10030067*

*Content version #   35*

Description of Finding and Root Cause Analysis: The firm does not accept customer funds,  all the firm's transactions are done on an RVP/DVP basis.

## Customer Protection - PAIB

Question:  Are the computations, deposits into and withdrawals from the PAIB Reserve Bank Account made on a timely basis?

Response:  N/A

Exhibits:

- Review of Firm's PAIB Reserve Computations [56]

Description of Finding and Root Cause Analysis: Staff reviewed reserve formulas for the period July 1, 2003 through July 31, 2003 and noted that the firm did not have a reserve requirement.  The firm maintains $20,000 on deposit in the reserve bank account.  A review of the reserve account revealed that the firm did not have any additions or withdrawals during the above time period.  99% of the firm's customers are broker/dealers.

## Protection of Customer Cash

Question:  Has a Special Reserve Bank Account been established?

Response:  Yes

Description of Finding and Root Cause Analysis: Please see previous question - Customer protection - PAIB.  The firm does not receive customer funds.

## Monitoring for Anti-Money Laundering Requirements

Question:  Does the firm properly report cash transactions exceeding $10,000, and properly maintain records?

Response:  N/A

Exhibits:

- Currency Transactions - Exceptions Schedule [50]

Description of Finding and Root Cause Analysis: The firm does not receive cash of currency.

## Monitoring for Anti-Money Laundering Requirements

Question:  Does the firm include proper information and keep proper records for transmittal of funds exceeding $3,000.00?

Response:  N/A

Description of Finding and Root Cause Analysis: The firm does not wire funds to customers, as all accounts are RVP/DVP and accounts are flat.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03986

*Bernard L. Madoff Investment Securities LLC*
*Firm CRD # 2625*
*17 of 26 pages*

Exam #      E10030067

Content version #      35

### Customer Grievances

Question: Does the firm create and maintain a record of all customer complaints and other related records pursuant to SEC Rule 17a-3, SEC Rule 17a-4, MSRB Rule G-9, and MSRB Rule G-8?

Response: Yes

Records Reviewed:

- Customer complaint file
- 3070 Reports

Exhibits:

- Customer Grievances [36]

Description of Finding and Root Cause Analysis: The firm maintains a customer complaint file, however, it has not received any customer complaints. The staff ran the firm's 3070 filings off the 3070 disclosure site on the NASD's intranet and noted no complaints.

### Customer Grievances

Question: Does the firm maintain a record of all arbitration and litigation files pursuant to SEC Rule 17a-3 and SEC Rule 17a-4?

Response: Yes

Records Reviewed:

- Arbitration and litigation files

Exhibits:

- Customer Grievances [36]

Sample Name: Arbitrations and Litigations Sample 1

Recommended Selection Method: Systematic

Selection Method: Systematic

Sample Type: Detection

Sample Size: 2

Sample Population: 2

Sample Review Period: 05/21/2001 - 09/12/2003

Sample Description/Rationale: All arbitrations since last exam.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03987

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
18 of 26 pages

Exam #    E10030067

Content version #    35

Description of Finding and Root Cause Analysis: The firm maintains a arbitration/litigation file, which includes two arbitrations against the firm. The one arbitration is an action against the firm by Next-trade to recover payment for order matching services performed by Nexttrades electronic communications network ("ECN"). The arbitration seeks an amount of $838.76. The second arbitration against the firm seeks payment in the amount of $3,058.24 for failure to make payment to Domestic Securities for use of its ECN. Both of these arbitrations are de minimis in nature and do not appear to pose a significant adverse impact on the firm's net capital position.

## Regulation S-P

Question: Does the firm provide initial, annual, and revised privacy notices as required by Regulation S-P, including the opportunity to "opt out" of certain information sharing arrangements?

Response: N/A

Description of Finding and Root Cause Analysis: The firm does not maintain any retail customers.

## Transaction Reporting

Question: Did the firm report trade information in equity securities accurately to the appropriate entity?

Response: N/A

Exhibits:

- Transaction Reporting - Block Exception Report [23]
- Transaction Reporting - Bunched Exception Report [24]
- Transaction Reporting - Equities Exception Schedule [40]
- Transaction Reporting - Equities Fail to Report [41]
- Transaction Reporting - Equities [42]

Description of Finding and Root Cause Analysis: Staff will not review transaction reporting for the firm as market regulation conducted a trading and market making review under examination number MRD200339223 in March 2003. In addition, staff ran a query through the MSRB for any trades during the period May 25, 2001 through September 12, 2003. Jon Nachtsheim of MSRB contacted the staff and stated that Madoff does not have a symbol and has not conducted any transactions for the time period requested.

## Filing Requirements

Question: Have all applicable filing requirements been met?

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment Securities LLC*
*Firm CRD # 2625*
*19 of 26 pages*

Exam #    E10030067

Content version #    35

Response: N/A

Exhibits:

- Firm List of Offerings [37]
- Municipal Filing Requirements Exceptions [38]

Description of Finding and Root Cause Analysis: The firm indicated that it did not conduct any underwritings. The staff did not notice any evidence to the contrary.

## Municipal Material Events

Question: Does the underwriter ensure that the issuer discloses material events pursuant to SEC Rule 15c2-12?

Response: N/A

Description of Finding and Root Cause Analysis: The firm did not conduct any underwritings, or make any recommendations in municipal securities during the review period.

## Political Contributions and Consultants

Question: Is the firm in compliance with the requirements of MSRB Rule G-37?

Response: Yes

Records Reviewed:

- Form G-37/G-38
- General ledger

Description of Finding and Root Cause Analysis: Staff review of the firm's general ledger did not reveal any political contributions. The firm filed a Form G-37x on February 21, 1999.

## Political Contributions and Consultants

Question: Is the firm's use of consultants in compliance with the requirements of MSRB Rule G-38?

Response: N/A

Exhibits:

- Disclosure and Reporting Verification for Consultants [59]

Firm's Response to Finding: The firm does not use Municipal Finance Professionals.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
20 of 26 pages

Exam #    E10030067

Content version #    35

**Exit Conference**

**Firm Name:**                    Bernard L. Madoff Investment Securities LLC

**Examination Number:**    E10030067

**Date:**                            10/23/2003

**Attendees:**                   Bernard Madoff [Personal Privacy]

**Exit Conference Location:** 885 Third Avenue, 18th Floor

New York, NY 10022

**Items Noted:**

- No Apparent Violations

# Appendix A

### Exhibit List

| Exhibit Number | Exhibit Description |
| --- | --- |
| 1 | Late Charge Report |
| 2 | Recently Terminated Employees (List of) |
| 3 | Recently Hired Employees (List of) |
| 4 | Form BD |
| 5 | CE Inactive Reports |
| 6 | Anti-Money Laundering Compliance Program |
| 7 | Written Supervisory Procedures |
| 8 | AML independent testing results and findings |
| 9 | Net capital computation |
| 10 | Balance sheet and income statement |
| 11 | Bank statements |
| 12 | FOCUS Report |
| 13 | General ledger |
| 14 | Reserve Bank Account Letter |

This document contains proprietary and confidential information and shall not be reproduced or
disclosed without prior written authorization from NASD.

Bernard L. Madoff Investment
Securities LLC
Firm CRD # 2625
21 of 26 pages

Exam #   E10030067

Content version #   35

| Exhibit Number | Exhibit Description |
|---|---|
| 15 | Reserve Bank Account statements |
| 16 | Net Capital Computation Workbook |
| 17 | NASD Assessment Report |
| 18 | Annual audit report |
| 19 | Auditor engagement letter or description of the nature and scope of the non-audit services provided by the accountant |
| 20 | Operations Internal Control Procedures |
| 21 | Independence of Accountant Checklist |
| 22 | Supervisory System - Written Supervisory Procedures Checklist |
| 23 | Transaction Reporting - Block Exception Report |
| 24 | Transaction Reporting - Bunched Exception Report |
| 25 | Transaction Reporting - Municipal |
| 26 | Transaction Reporting - Municipal Fail to Report |
| 27 | Transaction Reporting - Municipal Exception Schedule |
| 28 | Transaction Reporting - Corporate Bonds |
| 29 | Transaction Reporting - Corporate Bonds Fail to Report |
| 30 | Transaction Reporting - Corporate Bonds Exception Schedule |
| 31 | Commissions - Equities |
| 32 | Commissions - Corporate Debt |
| 33 | Commissions - Government |
| 34 | Commissions - Municipal |
| 35 | Operations Order Ticket Exception |
| 36 | Customer Grievances |
| 37 | Firm List of Offerings |
| 38 | Municipal Filing Requirements Exceptions |
| 39 | Unsuitable Recommendations |
| 40 | Transaction Reporting - Equities Exception Schedule |
| 41 | Transaction Reporting - Equities Fail to Report |
| 42 | Transaction Reporting - Equities |
| 43 | Markup Markdown - Government |
| 44 | Markup Markdown - Corporate Debt |
| 45 | Markup Markdown - Municipal |
| 46 | Markup Markdown - Equities |
| 47 | Sales Practice Potential Exception |
| 48 | Foreign Financial Accounts - Exceptions Schedule |
| 49 | Transportation of Currency or Monetary Instruments - Exceptions Schedule |
| 50 | Currency Transactions - Exceptions Schedule |
| 51 | Completion of Customer Sell Orders Exception Schedule |
| 52 | Excess and Deficiency Schedule |
| 53 | Loans Collateralized By Securities Schedule |
| 54 | Review of Firm's Reserve Computation |
| 55 | Reserve Formula Worksheet Schedule |
| 56 | Review of Firm's PAIB Reserve Computations |
| 57 | PAIB Reserve Formula Worksheet Schedule |

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03991

Bernard L. Madoff Investment
Securities LLC
Firm CRD #  2625
22 of 26 pages

Exam #    E10030067

Content version #    35

| Exhibit Number | Exhibit Description |
|---|---|
| 58 | Summary Of Subordinated Loan Agreements |
| 59 | Disclosure and Reporting Verification for Consultants |
| 60 | Net Capital Computation Workpapers |

# Appendix B

## Review Records

| Record Title | Time Period From: | Time Period To: |
|---|---|---|
| 3070 Reports | 05/250/2001 | 09/12/2003 |
| AML independent testing results and findings | | |
| Annual Compliance Meeting Attendance List | 2001 | 2002 |
| Annual Compliance Meeting Outline or Agenda | 2001 | 2002 |
| Annual audit report | 2002 | 2002 |
| Anti-Money Laundering Compliance Program | 2002 | 2003 |
| Arbitration and litigation files | 05/25/2001 | 09/12/2003 |
| Auditor engagement letter or description of the nature and scope of the non-audit services provided by the accountant | | |
| Balance sheet and income statement | 07/01/2001 | 07/31/2003 |
| Bank statements | 07/01/2003 | 07/31/2003 |
| CE Inactive Reports | 05/25/2001 | 08/26/2003 |
| CRD | | |
| Correspondence (Written and Electronic) | 05/25/2001 | 09/12/2003 |
| Customer complaint file | 05/25/2001 | 09/12/2003 |
| Employee records | | |
| FOCUS Report | 07/01/2003 | 07/31/2003 |
| FOCUS Report | 12/01/2001 | 12/31/2001 |
| Form BD | | |
| Form G-37/G-38 | 2001 | 2003 |
| Form U-5 | 2001 | 2003 |
| General ledger | 07/01/2003 | 07/31/2003 |
| IRIS | | |
| Information Request | | |
| Internal Communications | 01/2003 | 09/30/2003 |

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD #  2625*
*23 of 26 pages*

*Exam #      E10030067*

*Content version #       35*

| | | |
|---|---|---|
| Late Charge Report | 05/25/2001 | 08/26/2003 |
| NASD Assessment Report | 2002 | 2002 |
| Net Capital Computation Workbook | 07/01/2003 | 07/31/2003 |
| Net Capital Computation Workpapers | 07/01/2003 | 07/31/2003 |
| Net capital computation | 07/01/2003 | 07/31/2003 |
| Operations Internal Control Procedures | | |
| Recently Hired Employees (List of) | 05/25/2001 | 09/12/2003 |
| Recently Terminated Employees (List of) | 05/25/2001 | 09/12/2003 |
| Registered Persons (List from CRD or IRIS) | 05/25/2001 | 09/12/2003 |
| Reserve Bank Account Letter | | |
| Reserve Bank Account statements | 07/01/2003 | 07/31/2003 |
| Written Supervisory Procedures | | |

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03993

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*24 of 26 pages*

*Exam #     E10030067*

*Content version #     35*

# Appendix C

## Sampling Guidelines

### Qualification and Registration

#### Qualification and Registration Sample 1   (Detection)

Recommended Selection Method:     Random

Sample Selection Method:     Random

Sample Size:     33

Sample Population:     73

Sample Review Period:     08/01/2003 - 08/31/2003

Sample Description/Rationale:     All equity traders.

Sample Deviations:     0

Sample Projections:     95% confident that violations occur in at least 0% of the population.

### Qualification and Registration

#### Qualification and Registration Sample 2   (Detection)

Recommended Selection Method:     Random

Sample Selection Method:     Random

Sample Size:     33

Sample Population:     73

Sample Review Period:     08/01/2003 - 08/31/2003

Sample Description/Rationale:     All equity traders.

Sample Deviations:     0

Sample Projections:     95% confident that violations occur in at least 0% of the population.

### Correspondence

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD #  2625*
*25 of 26 pages*

*Exam #      E10030067*

*Content version #      35*

**Correspondence Sample 1   (Detection)**

| | |
|---|---|
| Recommended Selection Method: | Systematic |
| Sample Selection Method: | Systematic |
| Sample Size: | 54 |
| Sample Population: | 500 |
| Sample Review Period: | 05/25/2001 - 09/12/2003 |
| Sample Description/Rationale: | Electronic correspondence |
| Sample Deviations: | 0 |
| Sample Projections: | 95% confident that violations occur in at least 0% of the population. |

## Supervision

**Supervision Sample 1   (Detection)**

| | |
|---|---|
| Recommended Selection Method: | Random |
| Sample Selection Method: | Random |
| Sample Size: | 35 |
| Sample Population: | 80 |
| Sample Review Period: | 05/25/2001 - 09/12/2003 |
| Sample Description/Rationale: | All Registered Representatives |
| Sample Deviations: | 0 |
| Sample Projections: | 95% confident that violations occur in at least 0% of the population. |

## Customer Grievances

**Arbitrations and Litigations Sample 1   (Detection)**

| | |
|---|---|
| Recommended Selection Method: | Systematic |
| Sample Selection Method: | Systematic |
| Sample Size: | 2 |
| Sample Population: | 2 |
| Sample Review Period: | 05/21/2001 - 09/12/2003 |
| Sample Description/Rationale: | All arbitrations since last exam. |

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

*Bernard L. Madoff Investment*
*Securities LLC*
*Firm CRD # 2625*
*26 of 26 pages*

Exam #    E10030067

Content version #      35

Sample Deviations:                    0

Sample Projections:   95% confident that violations occur in at least 0% of the population.

This document contains proprietary and confidential information and shall not be reproduced or disclosed without prior written authorization from NASD.

MADOFF_EXHIBITS-03996

**EXHIBIT V**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Esq., Trustee for*
*the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. _____ (BRL) |
| Plaintiff, | |
| v. | |
| PETER B. MADOFF, MARK D. MADOFF, ANDREW H. MADOFF, and SHANA D. MADOFF, | |
| Defendants. | |

300026787

customers' funds and using them in a wide array of outside business ventures, ranging from real estate partnerships to hair salons, for their own personal benefit.

63.     The Family Defendants used their IA Accounts to funnel BLMIS customers' money to themselves and their family members, as described in greater detail below. They each withdrew millions more than they invested into those accounts.

64.     The Family Defendants failed to sufficiently perform any of the regulatory, supervisory, or compliance roles required of senior managers in a securities firm. They each received huge sums of money from BLMIS without any legitimate business purpose. None of them could have had a good-faith basis to believe either that they were entitled to the money or that it was the result of benefit or value they conferred to the Firm. They each failed to note or report any of the blatant irregularities and improbable gains reflected in their own personal IA accounts and in the Firm's business practices and operations.

**Peter Madoff**

65.     The Trustee has thus far identified at least $60,631,292 that Peter Madoff received from BLMIS which is recoverable through this action. Between 2001 and 2008, Peter was paid a total of $20,067,920 in salary and bonus. In addition, he received over $3.5 million paid either directly to him or to vendors on his behalf as a "draw" during that same period. These purported "draws" all came directly from BLMIS's bank accounts.

66.     Peter maintained two customer accounts with BLMIS. The Trustee has learned so far that Peter invested $32,146 into his accounts—including a grand total of only *fourteen dollars* after December 1995—yet he redeemed $16,252,004. It was—or at the very least,

300026787

should have been—obvious to Peter that the gains reflected in his IA account statements did not reflect actual securities transactions or market conditions during that time.

67.     In fact, the Trustee has been unable to verify that any money was ever invested into one of Peter Madoff's investment accounts—account number 1M0174.  Notwithstanding the lack of actual investment, the March 2002 account statement reflects transactions in Microsoft stock generating a purported gain of $8,752,620.  These trades were a complete fabrication. Despite having no money or securities invested in the account, Peter's investment account suddenly shows that approximately $15.4 million worth of Microsoft stock had been "purchased" in or about December 2000 and "sold" in or about January  2002.  The first evidence of this "purchase" of Microsoft stock does not appear until March 2002.  Less than two months later, on or about May 17, 2002, Peter Madoff redeemed nearly $6 million from this account, which included the gains from the fabricated Microsoft transactions.  The purchase and sale of Microsoft shares reflected on Peter Madoff's account statements were a complete fiction. They never occurred.  They were simply typed out on his account statements to justify his withdrawal of nearly $6 million of other people's money.

68.     Defendant Peter Madoff continued to withdraw sums of money far exceeding the invented gains of the fabricated Microsoft transaction.  Between April 2003 and May 2005, he withdrew an *additional* $6.9 million from the same account.

69.     Peter's investment account was again manipulated in September 2005 to falsely reflect the purchase of 125,000 shares of Apple Computer ("Apple") stock in or about January 2004, more than a year and a half earlier.  The first evidence of this purported "purchase" does not appear until September 2005.

300026787

# EXHIBIT W

1

1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2        CIVIL ACTION NO. 09-00816 (SRC)(MAS)

3

4

5  THE LAUTENBERG FOUNDATION,      DEPOSITION UPON
    JOSHUA S. LAUTENBERG AND      ORAL EXAMINATION
6  ELLEN LAUTENBERG,           OF
                         PETER MADOFF
7

        Plaintiffs
8

9        vs

10

11  PETER MADOFF,

12        Defendant
    -------------------------
13

14

15                     COPY

16     T R A N S C R I P T  of the stenographic

17  notes of SUSAN GIOFFRE, a Notary Public and

18  Certified Court Reporter of the State of New Jersey,

19  License No. XI001220, taken at the offices of

20  LANKLER, SIFFERT & WOHL, LLP, 500 Madison Avenue

21  New York, New York, on Thursday, November 12, 2009,

22  commencing at approximately 10:45 a.m.

23

24

25



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com



```
 1  APPEARANCES:
 2
 3  McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
    1300 Mount Kemble Avenue
 4  P.O. Box 2075
    Morristown, New Jersey 07962-2075
 5  (973) 993-8100
    gtrif@mdmc-law.com
 6  rriccio@mdmc-law.com
    BY:  RONALD J. RICCIO, ESQ.
 7      GREG TRIF, ESQ.
        STEPHEN M. GREENBERG, ESQ.
 8  Counsel for Plaintiffs
 9
10  LANKLER, SIFFERT & WOHL, LLP
    500 Madison Avenue - 33rd Floor
11  New York, New York 10110-3398
    (212) 921-8399
12  cpada@lswlaw.com
    rrubin@lswlaw.com
13  BY:  CHARLES T. SPADA, ESQ.
        JEANNIE R. RUBIN, ESQ.
14  Counsel for Defendant
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              I N D E X
 2
 3  WITNESS NAME              PAGE NO.
 4
 5
 6  PETER MADOFF
 7  DIRECT EXAMINATION BY MR. RICCIO      9
 8
 9
10
11
12          E X H I B I T S
13
    EXHIBIT NO.  DESCRIPTION         PAGE NO.
14
15  P-1      Complaint            12
16  P-2      Answer of Defendant
             Peter Madoff         14
17
    P-3      Opinion
18
    P-4      Order Amending Opinion   38
19
    P-5      (Documents Re: Lautenberg
20           Family Foundation/Joshua
             Lautenberg           38
21
    P-6      Article by Michael Ocrant,
22           May 2001             81
23
    P-7      Article by Erin Arvedlund,
24           5/7/01               81
25
```

```
 1          MR. SPADA:  Ron, as I mentioned before
 2  we began, I'd like to read a statement into the
 3  record.
 4          My name is Charles Spada.  I'm counsel
 5  for Mr. Madoff, with me is Rosie Rubin.
 6          The Plaintiffs' Complaint alleges that
 7  in December 2008, Defendant, Peter Madoff, was told
 8  that his brother had committed a massive, decades
 9  long, now notorious fraud in the investment advisory
10  at Bernard L. Madoff Investment Securities, LLC.
11          Upon Bernard Madoff's arrest in
12  December 2008, the FBI and the trustee appointed by
13  the court to liquidate BLMIS under the Securities
14  Investor Protection Act, took over Madoff Securities'
15  premises and seized all Madoff Securities' documents.
16          Those documents include 40 years' worth
17  of e-mail, correspondence, account statements,
18  financial documents and other documents.
19          At the time the U.S. Attorney's office
20  for the Southern District of New York launched a
21  wide-ranging investigation of Bernard Madoff's Ponzi
22  fraud, which is still ongoing eleven months later.
23          This investigation has resulted in the
24  prosecution of Bernard Madoff and two other
25  individuals.
```

```
 1          Peter Madoff remains a subject of this
 2  investigation.
 3          The U.S. Attorney's office has stated
 4  in a recent publicly available court filing that it
 5  has secured, "The contents of one-half floor of an
 6  office building containing the equivalent of
 7  thousands of boxes of documents", concerning the
 8  Ponzi scheme, and that's in the Motion for
 9  Reconsideration of Bail Conditions in United States
10  vs Frank DePascale.
11          Peter Madoff has no access to the
12  documents secured by the U.S. Attorney's office.
13          The complaint here alleges that the
14  Plaintiffs, with whom Peter Madoff had no direct
15  relationship, are among the victims of Bernard
16  Madoff's fraud in the investment advisory business
17          The heart of the Complaint is that in
18  hindsight, Peter Madoff did not satisfactorily
19  address a complex series of red flags that arose over
20  a period of years concerning Bernard Madoff's
21  investment advisory business and that Peter Madoff
22  was a culpable participant in the fraud in that he,
23  directly or indirectly, endorsed, induced or
24  concealed the securities law violations of Madoff
25  Securities.
```

2  (Pages 2 to 5)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

6

1  The Complaint's allegations and
2  Defendant's various defenses are thus extremely fact
3  intensive, potentially depending on the precise
4  circumstances in which each alleged event occurred
5  over a 20-plus year period and Peter Madoff's duties
6  and knowledge at various times during this 20-plus
7  year period.
8  Even the sharpest of memories could not
9  accurately address these issues without the benefit
10  of reviewing and being refreshed by extensive
11  relevant documents which we will seek to obtain
12  pursuant to the normal discovery process.
13  Accordingly, we have asserted that in
14  the interest of fairness, accuracy and efficiency,
15  document discovery should proceed before depositions.
16  Document discovery would enable Peter
17  to refresh his recollection of relevant facts and
18  events in this matter.
19  Plaintiffs, however, have been
20  unwilling to adjourn Peter's testimony, and the Court
21  has granted Plaintiffs' application to take the
22  Defendant's deposition over our objection and request
23  to stay the deposition until the parties have had an
24  opportunity for document discovery.
25  In light of all the circumstances

8

1  MR. RICCIO:  Yes.  Additionally, we do
2  not agree with the characterization of the
3  allegations in this Complaint against Mr. Madoff.
4  They are significantly different than
5  Plaintiffs' view of things.
6  We would refer to our Complaint and to
7  Judge Chesler's Opinion denying the Defendant's
8  Motion to Dismiss in substantial parts.
9  Whether the Fifth Amendment is properly
10  invoked will depend on a question-by-question
11  analysis of the question and the answer.
12  As we understand it now, you're going to
13  be invoking the Fifth Amendment on a blanket basis,
14  is that correct?
15  MR. SPADA:  Until we have access to the
16  documents, he'll be allowed to give you his name and
17  no other information concerning this matter.
18  MR. GREENBERG:  Could we have two
19  seconds?
20  MR. SPADA:  Sure.  We're going off the
21  record?
22  MR. GREENBERG:  Yes.
23  (Discussion off the record.)
24
25

7

1  detailed above, our only responsible alternative is
2  to advise Peter Madoff to exercise his constitutional
3  right to decline to answer the Plaintiffs' questions
4  at this time.
5  In 2001, the U.S. Supreme Court, in a
6  decision in Ohio vs. Reiner, noted that the Fifth
7  Amendment's basic function is to protect innocent men
8  who otherwise might be ensnared by ambiguous
9  circumstances.
10  An innocent man could find no more
11  ambiguous and treacherous circumstances than these.
12  MR. RICCIO:  Just in response briefly,
13  a few points.
14  First, the argument that counsel has
15  just advanced, in what amounts to a self-serving
16  statement, was presented to Judge Arleo.
17  The argument was rejected, an Order has
18  been entered, and Mr. Madoff is here today pursuant
19  to a court order.
20  Additionally, the --
21  MR. SPADA:  Ron, just to clarify that.
22  We do not have the court order yet, but
23  both sides, it's understood we're not disputing,
24  we're operating under that the Court has ordered that
25  this deposition take place.

9

1  P E T E R   M A D O F F,
2  called as a witness, having been first
3  duly sworn according to law,
4  testifies as follows:
5
6  DIRECT EXAMINATION BY MR. RICCIO:
7
8  Q  Mr. Madoff, my name is Ronald Riccio.
9  We today at this deposition to my
10  left is Greg Trif, to his left is Stephen Greenberg.
11  We are counsel for Plaintiffs in a
12  lawsuit, The Lautenberg Foundation vs Peter Madoff.
13  You are Peter Madoff, are you not?
14  A  Yes.
15  Q  And you are the Defendant in this
16  action, are you not?
17  A  Yes.
18  Q  Now, you've been administered an oath to
19  tell the truth.  The oath that you have been
20  administered is the same oath as you would take if
21  you were called to testify at a trial in this matter.
22  All of your answers and all of my
23  questions are being stenographically transcribed by a
24  court reporter.
25  The reason we're doing that is so that

3  (Pages 6 to 9)



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

10

1 there is a record of what happens here today.
2        If at any point in time you don't
3 understand a question that I ask, then please ask me
4 to repeat it or rephrase it, and I will, otherwise
5 I'm going to assume that you understood the question
6 and gave an answer knowingly understanding the
7 question that I asked.
8        Do you understand that?
9    A    Yes.
10   Q    You also need to verbalize all of your
11 answers so that, you know, a nod, for example, cannot
12 be transcribed because it's not audible.
13       Do you understand that?
14   A    Yes.
15   Q    From time to time during the course of
16 this deposition, your lawyer may make an objection to
17 a question that I ask.
18       You should allow him to make his
19 objection, and then unless he directs you not to
20 answer, you are required to do so.
21       Do you understand that?
22   A    Yes.
23   Q    Is there any reason why, because of your
24 health, you are unable to testify today?
25   A    No.

11

1    Q    Where do you live, Mr. Madoff?
2    A    Upon the advice of my counsel, I
3 respectfully decline to answer based on my right
4 under the Fifth Amendment to the United States
5 Constitution not to be compelled to be a witness
6 against myself.
7    Q    What's the basis for your assertion of
8 that?
9        MR. SPADA:  The basis is on advice of
10 counsel.
11   Q    Are you in fear of a criminal
12 prosecution?
13       MR. SPADA:  I refuse to allow the
14 witness to answer that because it may result in the
15 disclosure of attorney/client privilege.
16   Q    Are you the target of a grand jury
17 investigation?
18       MR. SPADA:  Same objection, and I refuse
19 -- as we stated in our statement, we've been informed
20 he is the subject of the investigation.
21   Q    Have you ever been deposed before?
22   A    Upon the advice of my counsel, I
23 respectfully decline to answer based on my right
24 under the Fifth Amendment to the United States
25 Constitution not to be compelled to be a witness

12

1 against myself.
2    Q    Have you ever been a defendant in a
3 civil case?
4    A    Upon the advice of my counsel, I
5 respectfully decline to answer based on my right
6 under the Fifth Amendment to the United States
7 Constitution not to be compelled to be a witness
8 against myself.
9    Q    Are you currently a defendant in any
10 case other than this action?
11   A    Upon the advice of my counsel, I
12 respectfully decline to answer based on my right
13 under the Fifth Amendment to the United States
14 Constitution not to be compelled to be a witness
15 against myself.
16   Q    Have you read the Complaint in this
17 action?
18   A    Upon the advice of my counsel, I
19 respectfully decline to answer based on my right
20 under the Fifth Amendment to the United States
21 Constitution not to be compelled to be a witness
22 against myself.
23       MR. RICCIO:  Would you mark that as P-1?
24       (Complaint is received and marked as
25 Plaintiffs' Exhibit 1 for Identification.)

13

1    Q    Mr. Madoff, P-1 for Identification is a
2 copy of the Complaint in this matter, Lautenberg vs
3 Peter Madoff.
4        I'm going to show you P-1 and ask you to
5 take a look at it and tell me when you've examined
6 it.
7        (Witness reviewing exhibit.)
8    Q    Have you had an opportunity to look at
9 the Complaint?
10   A    Upon the advice of my counsel, I
11 respectfully decline to answer based on my right
12 under the Fifth Amendment to the United States
13 Constitution not to be compelled to be a witness
14 against myself.
15   Q    Do you feel that you are risking
16 self-incrimination because thirty-seconds ago you
17 leafed through P-1?
18   A    Upon the advice of my counsel, I
19 respectfully decline to answer based on my right
20 under the Fifth Amendment to the United States
21 Constitution not to be compelled to be a witness
22 against myself.
23       MR. SPADA:  Are you asking that he sit
24 here and review the whole Complaint?
25       MR. RICCIO:  No. I asked him to examine

4  (Pages 10 to 13)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

14

1  it, and he did.
2      Q     Have you ever seen P-1 before today?
3      A     Upon the advice of my counsel, I
4  respectfully decline to answer based on my right
5  under the Fifth Amendment to the United States
6  Constitution not to be compelled to be a witness
7  against myself.
8      Q     Have you discussed the Complaint in this
9  action with anyone other than your lawyers?
10     A     Upon the advice of my counsel, I
11 respectfully decline to answer based on my right
12 under the Fifth Amendment to the United States
13 Constitution not to be compelled to be a witness
14 against myself.
15     Q     Is Shana Madoff your wife?
16     A     Upon the advice of my counsel, I
17 respectfully decline to answer based on my right
18 under the Fifth Amendment to the United States
19 Constitution not to be compelled to be a witness
20 against myself.
21         MR. RICCIO:  Can we mark this as P-2 for
22 Identification?
23         (Answer of Defendant Peter Madoff is
24 received and marked as Plaintiffs' Exhibit 2 for
25 Identification.)

15

1      Q     By the way, Shana Madoff is your
2  daughter, correct?
3      A     Upon the advice of my counsel, I
4  respectfully decline to answer based on my right
5  under the Fifth Amendment to the United States
6  Constitution not to be compelled to be a witness
7  against myself.
8      Q     Take a look at P-2 for Identification
9  which is the Answer filed by your lawyers to the
10 Complaint in this action, and please take your time
11 and go through it, okay?
12         (Witness reviewing exhibit.)
13     Q     And am I correct that this answer was
14 filed on your behalf by your attorney, Mr. Spada?
15     A     Upon the advice of my counsel, I
16 respectfully decline to answer based on my right
17 under the Fifth Amendment to the United States
18 Constitution not to be compelled to be a witness
19 against myself.
20     Q     Is Mr. Spada your attorney?
21     A     Upon the advice of my counsel, I
22 respectfully decline to answer based on my right
23 under the Fifth Amendment to the United States
24 Constitution not to be compelled to be a witness
25 against myself.

16

1      Q     Did you authorize Mr. Spada to file this
2  Complaint?
3         MR. SPADA:  Objection, calls for
4  attorney/client privilege, and I instruct the witness
5  not to answer.
6         MR. RICCIO:  Let me correct my question
7  to which you objected.
8         I meant to say "Answer."
9      Q     Did you authorize Mr. Spada to file this
10 Answer on your behalf?
11         MR. SPADA:  Same objection, and I
12 instruct the witness not to answer.
13     Q     Did you review the Answer before it was
14 filed?
15     A     Upon the advice of my counsel, I
16 respectfully decline to answer based on my right
17 under the Fifth Amendment to the United States
18 Constitution not to be compelled to be a witness
19 against myself.
20     Q     Have you ever read the Answer?
21     A     Upon the advice of my counsel, I
22 respectfully decline to answer based on my right
23 under the Fifth Amendment to the United States
24 Constitution not to be compelled to be a witness
25 against myself.

17

1      Q     Did Mr. Spada file this Answer without
2  showing it to you?
3      A     Upon the advice of my counsel, I
4  respectfully decline to answer based on my right
5  under the Fifth Amendment to the United States
6  Constitution not to be compelled to be a witness
7  against myself.
8      Q     Take a look at paragraph 11 of the
9  Answer, please.
10         MR. SPADA:  I don't think we have it.
11         (Handing.)
12     Q     Do you have paragraph 11 in front of
13 you?
14         (Witness reviewing exhibit.)
15     Q     Do you want me to repeat my question?
16         Do you have paragraph 11 in front of
17 you?
18     A     Yes.
19     Q     Have you read it?
20     A     Yes.
21     Q     Is it accurate?
22     A     Upon the advice of my counsel, I
23 respectfully decline to answer based on my right
24 under the Fifth Amendment to the United States
25 Constitution not to be compelled to be a witness

5  (Pages 14 to 17)


Rizman
Rappaport
Dillon & Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

18

1  against myself.
2      Q    Paragraph 11 states that you're an
3  attorney.  Are you an attorney?
4      A    Upon the advice of my counsel, I
5  respectfully decline to answer based on my right
6  under the Fifth Amendment to the United States
7  Constitution not to be compelled to be a witness
8  against myself.
9      Q    Are you 63 years old?
10      A    Upon the advice of my counsel, I
11  respectfully decline to answer based on my right
12  under the Fifth Amendment to the United States
13  Constitution not to be compelled to be a witness
14  against myself.
15      Q    Are you Bernard Madoff's brother?
16      A    Upon the advice of my counsel, I
17  respectfully decline to answer based on my right
18  under the Fifth Amendment to the United States
19  Constitution not to be compelled to be a witness
20  against myself.
21      Q    Did you work at BLMIS from June of 1969
22  until December 2008?
23      A    Upon the advice of my counsel, I
24  respectfully decline to answer based on my right
25  under the Fifth Amendment to the United States

19

1  Constitution not to be compelled to be a witness
2  against myself.
3      Q    Are there any documents in the
4  possession of the SIPC Trustee or United States
5  Attorney that you would need to look at in order to
6  determine how old you are?
7      A    Upon the advice of my counsel, I
8  respectfully decline to answer based on my right
9  under the Fifth Amendment to the United States
10  Constitution not to be compelled to be a witness
11  against myself.
12      Q    Are there any documents in the
13  possession of the United States Attorney or the SIPC
14  Trustee that you would need to look at to determine
15  whether you are Bernard Madoff's brother?
16      A    Upon the advice of my counsel, I
17  respectfully decline to answer based on my right
18  under the Fifth Amendment to the United States
19  Constitution not to be compelled to be a witness
20  against myself.
21      Q    Do you deny that between June of 1969
22  until December 2008 that you worked at BLMIS?
23      A    Upon the advice of my counsel, I
24  respectfully decline to answer based on my right
25  under the Fifth Amendment to the United States

20

1  Constitution not to be compelled to be a witness
2  against myself.
3      Q    Did you allow a knowingly false answer
4  to be filed with the Court in this matter?
5      MR. SPADA:  Objection.
6      A    Upon the advice of my counsel, I
7  respectfully decline to answer based on my right
8  under the Fifth Amendment to the United States
9  Constitution not to be compelled to be a witness
10  against myself.
11      Q    Take a look at paragraph 13.
12      Would you read that, please?
13      (Witness reviewing exhibit.)
14      Q    Have you read it?
15      A    Yes.
16      Q    Would you read it into the record?
17      MR. SPADA:  I'm going to object to
18  having the witness read the document into the record.
19      MR. RICCIO:  Why?
20      MR. SPADA:  I don't understand.  You've
21  marked the exhibit.
22      I'm not going to allow the witness to
23  sit here and read documents when he's asserting his
24  right until he has access to documents.
25      MR. RICCIO:  It's one sentence.

21

1      MR. SPADA:  Okay, I'm objecting.
2      Q    You can read it into the record.
3      MR. SPADA:  I object and instruct the
4  witness not to read the document into the record.
5  The document is already in the record.
6      MR. RICCIO:  So what's the basis for the
7  direction?
8      MR. SPADA:  The basis is upon advice of
9  counsel he is asserting his rights not to respond to
10  your questions -- not to answer your questions.
11      We're not going to go through an
12  exercise where you pull out excerpts from documents
13  and ask the witness to read them into the record to
14  try to create the appearance that he's giving some
15  sort of testimony on it.
16      The document is already in the record.
17  Whatever document you want to enter into the record,
18  you're free to do that, but this is not going to be
19  an exercise in having him read documents into the
20  record.
21      MR. RICCIO:  What I want to understand
22  is, is he not reading it into the record because he's
23  taking the Fifth or because you're directing him not
24  to answer?
25      MR. SPADA:  I'm directing him not to

6  (Pages 18 to 21)

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

22

1  answer.
2       MR. RICCIO:  And you're directing him
3  not to answer on what basis?
4       MR. SPADA:  The document is already in
5  the record and I don't want you to be able to create
6  the false appearance that you're getting some form of
7  testimony about him when it's clear he's asserting
8  his rights until we get access to the documents.
9       MR. RICCIO:  Our position is that that
10  is not a basis for instructing the witness not to
11  answer.
12       MR. SPADA:  Understood.
13
14  BY MR. RICCIO:
15    Q    Well, Mr. Madoff, since you haven't read
16  paragraph 13 into the record, I will.
17       It says, Defendant admits the
18  allegations in paragraph 13 of the Complaint.
19       I'm sorry.
20       "Defendant denies the allegations in
21  paragraph 13 of the Complaint, except admits that
22  during certain years Defendant was responsible for
23  the day-to-day management of the market-making
24  trading desk at BLMIS."
25       Did I correctly read that statement in

23

1  the record?
2    A    Upon the advice of my counsel, I
3  respectfully decline to answer based on my right
4  under the Fifth Amendment to the United States
5  Constitution not to be compelled to be a witness
6  against myself.
7       MR. SPADA:  And I'm going to give a
8  belated objection to asking the witness whether
9  you've read something correctly into the record.
10    Q    Were you responsible, during your years
11  of work at BLMIS, for the day-to-day management of
12  the market-making trading desk at BLMIS?
13    A    Upon the advice of my counsel, I
14  respectfully decline to answer based on my right
15  under the Fifth Amendment to the United States
16  Constitution not to be compelled to be a witness
17  against myself.
18    Q    Take a look at paragraph 14 and read
19  that to yourself.
20       (Witness reviewing exhibit.)
21    Q    Have you read it?
22    A    Yes.
23    Q    Do you understand it?
24    A    Upon the advice of my counsel, I
25  respectfully decline to answer based on my right

24

1  under the Fifth Amendment to the United States
2  Constitution not to be compelled to be a witness
3  against myself.
4    Q    Is there anything in Paragraph 14 that
5  is not true?
6    A    Upon the advice of my counsel, I
7  respectfully decline to answer based on my right
8  under the Fifth Amendment to the United States
9  Constitution not to be compelled to be a witness
10  against myself.
11    Q    And am I correct that, according to
12  paragraph 14, at various times you were a senior
13  managing director and chief compliance officer of
14  BLMIS?
15    A    Upon the advice of my counsel, I
16  respectfully decline to answer based on my right
17  under the Fifth Amendment to the United States
18  Constitution not to be compelled to be a witness
19  against myself.
20    Q    And am I correct that at various times
21  your daughter Shana also worked at BLMIS?
22    A    Upon the advice of my counsel, I
23  respectfully decline to answer based on my right
24  under the Fifth Amendment to the United States
25  Constitution not to be compelled to be a witness

25

1  against myself.
2    Q    And am I correct that Shana, at various
3  times, was a compliance attorney at BLMIS?
4    A    Upon the advice of my counsel, I
5  respectfully decline to answer based on my right
6  under the Fifth Amendment to the United States
7  Constitution not to be compelled to be a witness
8  against myself.
9       MR. RICCIO:  Just so that the record is
10  clear, by listening to these invocations of the Fifth
11  Amendment, it's not to be construed as an agreement
12  that the Fifth Amendment has been properly invoked by
13  the witness.
14       We have a standing objection to his
15  invocation of the Fifth Amendment rather than to
16  object every time he does it.
17       MR. SPADA:  Sure.
18       MR. RICCIO:  Is that understood?
19       MR. SPADA:  Sure.  We agree that you're
20  not agreeing to his invocation by necessarily not
21  objecting each time.
22       MR. RICCIO:  Yes.  And that we reserve
23  the right to object to his invocation for every
24  invocation that he invokes during the course of this
25  deposition.

7 (Pages 22 to 25)



**Rizman
Rappaport
Dillon&Rose,**LLC
**Certified Court Reporters**

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

26

1        MR. SPADA:  Understood.
2
3    BY MR. RICCIO:
4        Q        Would you take a look at P-1, which is
5    the Complaint?
6            (Witness reviewing exhibit.)
7        Q    Do you have it in front of you?
8            Look at paragraph 15 of the Complaint
9    and just read it to yourself silently so that you're
10   familiar with it.
11           (Witness reviewing exhibit.)
12       Q    Have you read it?
13       A    Yes.
14       Q    Okay.  Did you understand it?
15       A    Upon the advice of my counsel, I
16   respectfully decline to answer based on my right
17   under the Fifth Amendment to the United States
18   Constitution not to be compelled to be a witness
19   against myself.
20       Q    Now, take a look at P-2, which is your
21   Answer to the Complaint in this matter, and look at
22   paragraph 15 of P-2.
23           Do you have that in front of you?
24       A    Yes.
25       Q    Have you read it?

28

1    Constitution not to be compelled to be a witness
2    against myself.
3        Q    Am I correct that you are or have been a
4    member of the NASD Board of Governors?
5        A    Upon the advice of my counsel, I
6    respectfully decline to answer based on my right
7    under the Fifth Amendment to the United States
8    Constitution not to be compelled to be a witness
9    against myself.
10       Q    What do the letters "NASD" stand for?
11       A    Upon the advice of my counsel, I
12   respectfully decline to answer based on my right
13   under the Fifth Amendment to the United States
14   Constitution not to be compelled to be a witness
15   against myself.
16       Q    Isn't it true that you were the chairman
17   of the New York Region of the NASD?
18       A    Upon the advice of my counsel, I
19   respectfully decline to answer based on my right
20   under the Fifth Amendment to the United States
21   Constitution not to be compelled to be a witness
22   against myself.
23       Q    Isn't it true that in paragraph 15 of
24   your Answer you admitted that you were the chairman
25   of the New York Region of the NASD?

27

1        A    Yes.
2        Q    Do you understand it?
3        A    Upon the advice of my counsel, I
4    respectfully decline to answer based on my right
5    under the Fifth Amendment to the United States
6    Constitution not to be compelled to be a witness
7    against myself.
8        Q    Now, paragraph 15 of your Answer admits
9    the allegations in the third, fourth, and fifth
10   sentences of paragraph 15 of the Complaint.
11           Do you see that?
12           MR. SPADA:  Does he see it in the
13   document?
14           MR. RICCIO:  Yes.
15       A    Yes.
16       Q    Okay.  And the third, fourth, and fifth
17   sentences of paragraph 15 of the Complaint begin with
18   the words "Not only was he an attorney..."
19           Do you see that in the Complaint?
20       A    Yes.
21       Q    And am I correct that you have served as
22   vice chairman of the NASD?
23       A    Upon the advice of my counsel, I
24   respectfully decline to answer based on my right
25   under the Fifth Amendment to the United States

29

1        A    Upon the advice of my counsel, I
2    respectfully decline to answer based on my right
3    under the Fifth Amendment to the United States
4    Constitution not to be compelled to be a witness
5    against myself.
6        Q    Is your answer in paragraph 15 a lie?
7        A    Upon the advice of my counsel, I
8    respectfully decline to answer based on my right
9    under the Fifth Amendment to the United States
10   Constitution not to be compelled to be a witness
11   against myself.
12       Q    Do you know why your lawyer, who filed
13   the Answer on your behalf, admitted the third,
14   fourth, and fifth sentences of paragraph 15?
15           MR. SPADA:  Objection, and I instruct
16   the witness not to answer to the extent it would
17   reveal attorney/client privilege.
18       Q    Without revealing any attorney/client
19   communication, do you have an understanding why your
20   attorney filed this Answer admitting the third,
21   fourth, and fifth sentences?
22       A    Upon the advice of my counsel, I
23   respectfully decline to answer based on my right
24   under the Fifth Amendment to the United States
25   Constitution not to be compelled to be a witness

8  (Pages 26 to 29)


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

30

1  against myself.
2     Q    Are there any documents that your
3  attorney referred to -- strike that.
4        You heard your attorney's opening
5  statement, didn't you?
6     A    Yes.
7     Q    And you heard him talk about the fact
8  that there are documents in the possession of the
9  United States Attorney's office and the SIPC Trustee,
10 correct?
11    A    Yes.
12    Q    And you're concerned that those
13 documents should be reviewed by you before you give
14 testimony today, correct?
15    A    Yes.
16    Q    And you had access to those documents
17 before you left the employ of BLMIS, did you not?
18    A    Upon the advice of my counsel, I
19 respectfully decline to answer based on my right
20 under the Fifth Amendment to the United States
21 Constitution not to be compelled to be a witness
22 against myself.
23    Q    At some point in time after your brother
24 confessed to the Ponzi scheme, you entered the
25 offices of BLMIS and sought to remove some belongings

31

1  from that office, isn't that true?
2        MR. SPADA:  Objection to form.
3        You can respond.
4     A    Upon the advice of my counsel, I
5  respectfully decline to answer based on my right
6  under the Fifth Amendment to the United States
7  Constitution not to be compelled to be a witness
8  against myself.
9     Q    And isn't it true that when you tried to
10 remove some belongings from the office, that you were
11 stopped by the FBI from doing so?
12       MR. SPADA:  Objection to form.
13    A    Upon the advice of my counsel, I
14 respectfully decline to answer based on my right
15 under the Fifth Amendment to the United States
16 Constitution not to be compelled to be a witness
17 against myself.
18    Q    Do you have in your possession any
19 documents that were prepared in the ordinary course
20 of the business of BMIS -- or BLMIS?
21    A    Upon the advice of my counsel, I
22 respectfully decline to answer based on my right
23 under the Fifth Amendment to the United States
24 Constitution not to be compelled to be a witness
25 against myself.

32

1        MR. SPADA:  And belated objection to the
2  form of the question.
3     Q    Take a look at paragraph 48 of your
4  Answer of P-2.
5        MR. SPADA:  Forty-eight?
6        MR. RICCIO:  Yes.
7     Q    Please read it to yourself.
8        (Witness reviewing exhibit.)
9     Q    Have you read it?
10    A    Yes.
11    Q    Do you understand it?
12    A    Upon the advice of my counsel, I
13 respectfully decline to answer based on my right
14 under the Fifth Amendment to the United States
15 Constitution not to be compelled to be a witness
16 against myself.
17    Q    Paragraph 48 states in relevant part,
18 and I'm quoting, "He had direct and supervisory
19 involvement in the day-to-day operations of the
20 market-making and proprietary trading operations of
21 BLMIS."
22       Mr. Madoff, did I correctly read those
23 words from paragraph 48 of your Answer?
24       MR. SPADA:  Can we have it read back?
25       And your question is, did you read what

33

1  the Answer says?
2        MR. RICCIO:  Correctly.
3        MR. SPADA:  Correctly. I'm going to
4  object and instruct the witness not to answer.
5        MR. RICCIO:  What's the basis for
6  your --
7        MR. SPADA:  Are you asking did you read
8  what words it says on the page correctly, that those
9  are the exact words --
10       MR. RICCIO:  Right.
11       MR. SPADA:  -- that it says on that
12 page?
13       MR. RICCIO:  Correct.
14       MR. SPADA:  Okay.  You can answer that.
15       Can we have it read -- read the question
16 back or the part being quoted?
17       (Question read back.)
18       MR. SPADA:  And we understand the
19 question to be, are those the exact words of that
20 portion on the page?
21       MR. RICCIO:  This is the third time,
22 yes.
23    A    Yes.
24    Q    Are those words an accurate description
25 of your involvement at BLMIS as an employee?



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

34

1    A    Upon the advice of my counsel, I
2  respectfully decline to answer based on my right
3  under the Fifth Amendment to the United States
4  Constitution not to be compelled to be a witness
5  against myself.
6    MR. RICCIO:  So the record is clear, the
7  paragraphs of the Answer that the witness was just
8  questioned about, in our view, opens the door for our
9  ability to question him more specifically about the
10  subject matter of those areas, mainly, his 40 years
11  of employment, as reflected in the Answer to
12  paragraph 11, at BLMIS, as well as his direct and
13  supervisory involvement at that firm.
14    So, therefore, it's our position
15  specifically that this is an improper invocation of
16  the Fifth Amendment.  It's a violation of the Court's
17  order, it's a waiver of the Fifth Amendment, and we
18  reserve our right to move for sanctions.
19    MR. SPADA:  And we would object to that
20  characterization and further state that in our
21  conversation -- first of all, it's clearly not a
22  waiver of the Fifth Amendment.
23    And secondly, you know that because in
24  all of our discussions you've wanted to take this
25  deposition to force him to assert the Fifth

36

1  BY MR. RICCIO:
2    Q    Mr. Madoff, do you understand your
3  obligations to obey court orders?
4    MR. SPADA:  I'm going to instruct the
5  witness not to answer.
6    We don't even have a court order in
7  front of us, so to vaguely ask him does he understand
8  legal obligations to obey court orders is not a
9  proper question and I'm not going to let him answer.
10    MR. RICCIO:  Just so the record is
11  clear, the Rules of Civil Procedure are pretty
12  specific about what you can direct the witness not to
13  answer, and you've had two or three directions not to
14  answer which are not anywhere, to my knowledge
15  supported by the rules.
16    You can certainly make your objection,
17  you can spell it out on the record, but it's not a
18  basis for directing him not to answer.
19    So when we move, and we're obviously
20  going to have to move before the Court for sanctions
21  for disobeying the Court's order, you know, among
22  other things, it's not just the frivolous invocation
23  of the Fifth Amendment, but it's, in addition, the
24  instructions not to answer which are not anywhere
25  supported by the rules.

35

1  Amendment.
2    So to now state that there's some sort
3  of waiver is not only inaccurate, but I think it's
4  disingenuous.
5    MR. RICCIO:  So the record is clear,
6  this deposition wasn't taken to force him to take the
7  Fifth Amendment.  It was taken to get him to provide
8  answer to the questions I'm asking.
9    You decided, as his attorney, that you
10  would recommend his invocation of the Fifth
11  Amendment, which is what he's doing, but you cannot
12  suggest that by us taking this deposition it was with
13  the agreement that he would invoke his Fifth
14  Amendment rights.
15    MR. SPADA:  The discussion in front of
16  the Magistrate in which we objected to having him sit
17  for a deposition without the documents was that if he
18  is forced to do so, he will assert his rights.
19    There was no assertion for you -- by you
20  in front of the Magistrate that he in any way already
21  waived those rights.
22    So to now be arguing that there was some
23  sort of waiver is belated and I think disingenuous
24  and it's not supported by the law.
25

37

1    MR. SPADA:  Well, since there's not a
2  question pending, now is a good time to take a break.
3    MR. RICCIO:  Okay, fine.
4    (Recess.)
5    MR. RICCIO:  We're resuming after a
6  ten-minute recess.
7    In order to expedite this process, it's
8  evident to me that the witness will be taking the
9  Fifth Amendment on essentially every question that I
10  ask.
11    So I would have no objection, and rather
12  than having him read from the preprinted form that he
13  has, that he simply say "Fifth."
14    Is that acceptable, Charlie?
15    MR. SPADA:  Either "Fifth Amendment" or
16  "same answer."
17    MR. RICCIO:  Or "same answer," whatever
18  what --
19    MR. SPADA:  Why don't we go with "same
20  answer" if he's invoking the Fifth?
21    And understood that you're not going to
22  say "same answer" if you've answered "Yes" or "No" to
23  a question.
24    "Same answer" will refer to the
25  statement "Upon the advice of my counsel, I

10  (Pages 34 to 37)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

38

1  respectfully decline to answer based on my right
2  under the Fifth Amendment to the United States
3  Constitution not to be compelled to a witness against
4  myself."
5          MR. GREENBERG:  Off the record.
6          (Discussion off the record.)
7          MR. RICCIO:  P-3 for Identification is a
8  copy of Judge Chesler's Opinion.
9          And then, if you can, mark that one as
10 P-4.
11         (Opinion is received and marked as
12 Plaintiffs' Exhibit 3 for Identification.)
13         (Order Amending Opinion is received and
14 marked as Plaintiffs' Exhibit 4 for Identification.)
15
16 BY MR. RICCIO:
17     Q     P-4 for Identification is Judge
18 Chesler's November 4, 2009 Order amending his
19 Opinion.
20         Mr. Madoff, take a look at Exhibits 3
21 and 4, and I represent to you that they are Judge
22 Chesler's Opinion and Order amending his Opinion.
23         My question to you is:  Have you seen
24 P-3 before today?
25         (Witness reviewing exhibit.)

40

1     A     Exhibit 3?
2     Q     Yes.
3          (Witness reviewing exhibit.)
4     Q     And look at the second paragraph of the
5  Court's Opinion at page 18.
6          I'm going to read into the record the
7  sentence from the Opinion that I'll have a question
8  about.
9          The sentence reads, "As discussed by the
10 Court above, the various indicia of wrongdoing and
11 fraud alleged in the Complaint paired with Peter
12 Madoff's responsibilities and role at BMIS constitute
13 strong circumstantial evidence of recklessness by
14 Defendant in his omissions regarding this
15 information."
16         My question is:  Do you dispute Judge
17 Chesler's finding that I just read to you?
18         MR. SPADA:  I'm going to object to the
19 question to the extent it calls for a legal
20 conclusion.  I will let the witness respond.
21     A     Same answer.
22     Q     If you turn to page 19 of the Court's
23 Opinion, eight lines from the top, I'm going to read
24 into the record a sentence and ask you whether or not
25 you dispute the accuracy of the Court's finding.

39

1          MR. SPADA:  I also just object to the
2  question to the extent it would reveal
3  attorney/client privilege.
4          I instruct you not to answer.
5          MR. RICCIO:  Charlie, you can't instruct
6  him not to answer.  He can answer by invoking the
7  Fifth Amendment.
8          MR. SPADA:  If it's on something other
9  than counsel showed him, is that your question?
10         MR. RICCIO:  Yes, other than something
11 counsel showed you, yes.
12         MR. SPADA:  You can answer.
13     A     Upon the advice of my counsel, I
14 respectfully decline to answer based on my right
15 under the Fifth Amendment to the United States
16 Constitution not to be compelled to be a witness
17 against myself.
18     Q     Now, we have stipulated that from this
19 point forward, if you intend to invoke your Fifth
20 Amendment privilege, to just say "same answer" to the
21 one you just gave.
22         Is that understood?
23     A     Yes.
24     Q     Okay.  Please turn to page 18 of the
25 Court's Opinion.

41

1          "These allegations give rise to the
2  strong inference that one charged with the
3  responsibility for directing company policies,
4  knowing its financial situation and ensuring legal
5  compliance was aware of the investment advisory
6  operations or would at the very least be reckless in
7  failing to find out."
8          Do you dispute that finding?
9          MR. SPADA:  I'm going to object to
10 asking the witness for a legal conclusion and also
11 object to any line of questioning based on the
12 Opinion that is trying to trick the witness into
13 somehow waiving his Fifth Amendment rights today,
14 which upon the advice of counsel he is clearly
15 invoking until we get access to the documents.
16         You can respond.
17     A     Same answer.
18     Q     Mr. Madoff, are you invoking your Fifth
19 Amendment rights provisionally?
20         MR. SPADA:  I'm going to object to form
21 and also object to the extent that he's invoking his
22 rights, as we've stated and he stated, upon the
23 advice of counsel, and I'm going to object to him
24 revealing the substance of that advice.
25     Q     Are you reserving the right to -- strike

11  (Pages 38 to 41)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

42

1   that.
2        Are you reserving the right to reverse
3   the position you're taking today?
4        MR. SPADA:  I am going to object to
5   that.
6        Again, it calls for the advice of
7   counsel, and I'm not going to allow the witness to
8   answer.
9    Q   Mr. Madoff, do you deny having actual
10  knowledge of the Ponzi scheme referred into the
11  Complaint in this matter?
12    A   Same answer.
13    Q   Do you deny that for a period of at
14  least 20 years, you had actual knowledge of the Ponzi
15  scheme referred into the Complaint in this matter?
16    A   Same answer.
17    Q   Do you deny knowingly defrauding the
18  plaintiffs in this matter, to their great loss and
19  detriment, for the entire time that they were BMIS
20  customers?
21    A   Same answer.
22    Q   Do you deny having made material
23  affirmative misrepresentations to the plaintiffs in
24  this matter for the entire time that they were BMIS
25  customers?

43

1    A   Same answer.
2    Q   Do you deny omitting to disclose
3  material facts to the plaintiffs in this matter, to
4  their great loss and detriment, for the entire time
5  that they were BMIS customers?
6    A   Same answer.
7    Q   Do you deny having a malicious intent to
8  harm the plaintiffs for the entire time that they
9  were BMIS customers?
10    A   Same answer.
11    Q   Do you deny substantially assisting your
12  brother Bernard in stealing money from the plaintiffs
13  during the entire time that they were BMIS customers?
14       MR. SPADA:  Objection to form.
15       You can respond.
16    A   Same answer.
17    Q   Do you deny being culpably involved and
18  participating in the Ponzi scheme to defraud the
19  plaintiffs?
20       MR. SPADA:  Objection to form.
21       You can respond.
22    A   Same answer.
23    Q   Do you deny personally stealing more
24  than $60 million from BMIS investors as a result of
25  the Ponzi scheme referred to in the Complaint?

44

1       MR. SPADA:  Objection to form.  You can
2  respond.
3    A   Same answer.
4    Q   Do you deny that Plaintiffs relied upon
5  your integrity, your trust, your knowledge, your
6  skill and training in make investments in BMIS?
7       MR. SPADA:  Objection to form.
8       You can respond.
9    A   Same answer.
10    Q   Do you deny that Plaintiffs relied upon
11  your ethics in making their investment in BMIS?
12       MR. SPADA:  Objection to form.
13       You can answer.
14    A   Same answer.
15    Q   What are your ethics as a businessman?
16       MR. SPADA:  Objection to form.
17       You can respond.
18    A   Same answer.
19    Q   Do you believe you have ethics?
20       MR. SPADA:  Objection to form.
21       You can respond.
22    A   Same answer.
23    Q   Do you -- strike that.
24       Do you deny that you had a fiduciary
25  relationship between yourself personally and

45

1   Plaintiffs?
2    A   Same answer.
3    Q   Did you deny that because you had a
4  fiduciary relationship directly with Plaintiffs, that
5  you owed them duties of care and loyalty?
6    A   Same answer.
7    Q   Do you deny that during the entire time
8  Plaintiffs were investors at BMIS, that you breached
9  your duty of loyalty to them?
10    A   Same answer.
11    Q   Do you deny that during the entire
12  period of time that Plaintiffs were customers at
13  BMIS, that you were grossly negligent in protecting
14  their investment?
15    A   Same answer.
16    Q   Do you deny that for the period of time
17  that Plaintiffs were customers in BMIS, that you were
18  negligent in protecting their investments?
19    A   Same answer.
20    Q   Do you deny attempting to secretly
21  remove documents from BMIS' offices after law
22  enforcement personnel ordered the offices locked
23  down?
24       MR. SPADA:  Objection to form.
25       You can respond.

12 (Pages 42 to 45)



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

46

1    A    Same answer.
2    Q    Did you have a conversation with your
3  brother in December 2008 about redemption of --
4  strike that.
5        Do you deny that in January of 2008,
6  that you traveled to Switzerland with your brother
7  Bernard -- strike that.
8        Do you deny that in 2004, you took a ski
9  trip with your brother Bernard to discuss
10  continuation of the Ponzi scheme?
11        MR. SPADA:  Objection to form.
12        You can respond.
13    A    Same answer.
14    Q    Did you take a ski trip with your
15  brother in 2004 to Switzerland?
16    A    Same answer.
17    Q    Do you deny that on January 1, 2008,
18  that you and other members of your family, at a
19  restaurant in Palm Beach, discussed and formulated a
20  plan for the continuation of the Ponzi scheme?
21    A    Same answer.
22    Q    Do you deny having -- strike that.
23        Have you ever been to a restaurant by
24  the name of "Bistro Chez Jean Pierre" in Palm Beach?
25    A    Same answer.

47

1    Q    Mr. Madoff, if I asked you questions
2  about your history of any prior depositions, is it
3  your intention to invoke the Fifth Amendment?
4    A    Same answer.
5        MR. RICCIO:  Can we have a stipulation
6  that if asked questions about his history of prior
7  depositions, that as to all of those questions he
8  will invoke the Fifth Amendment?
9        MR. SPADA:  That would certainly be our
10  advice, and I think he's already stated that earlier
11  on the record.
12        MR. RICCIO:  Do I need to go through the
13  questions?
14        MR. SPADA:  You do not.
15        MR. RICCIO:  So we are operating, then,
16  on the premise that any questions pertaining to his
17  history of prior depositions will be answered by him
18  invoking the Fifth Amendment?
19        MR. SPADA:  That would be my advice.
20        And would you follow my advice on that?
21        THE WITNESS:  Yes.
22
23  BY MR. RICCIO:
24    Q    If asked questions about your history of
25  having given testimony in court cases, am I correct

48

1  that you will be invoking your Fifth Amendment
2  privilege with respect to all of those questions?
3    A    Yes.
4    Q    With respect to your preparation for
5  depositions -- strike that.
6        With respect to your preparation for
7  this deposition, am I correct that you will be
8  invoking your Fifth Amendment privilege with respect
9  to every question asked about your preparation?
10        MR. SPADA:  I would object also to the
11  extent it calls for attorney/client privilege, which
12  he's not obligated to reveal.
13    A    Yes.
14    Q    With respect to any other cases in which
15  you are a party, whether they be civil, criminal,
16  quasi-criminal or regulatory, am I correct that your
17  answer to any questions regarding the subject matter
18  of cases in which you are a party, that you will
19  invoke your Fifth Amendment privilege with respect to
20  every such question?
21        MR. SPADA:  Objection to form.
22        You can respond.
23    A    Yes.
24    Q    Other than your lawyers, have you
25  discussed this lawsuit with any other person?

49

1    A    Same answer.
2    Q    Have you discussed this lawsuit with any
3  representatives of the United States Attorney's
4  office?
5    A    Same answer.
6    Q    Are you the subject of a grand jury
7  investigation?
8        MR. SPADA:  I'm going to object to the
9  extent it would call for attorney/client privilege.
10        And as I stated on the record, defense
11  counsel has been informed by the U.S. Attorney's
12  office for the Southern District of New York that he
13  is a subject of their investigation.
14        MR. RICCIO:  Is he a target of the
15  investigation, I'm asking the witness.
16        MR. SPADA:  To the extent it would call
17  for the disclosure of attorney/client privilege, I
18  would instruct you not to answer.
19    Q    Without divulging any communication that
20  your attorney may have given to you about your status
21  as a target of a criminal investigation, is it your
22  understanding that you are a target of a criminal
23  investigation?
24    A    Same answer.
25    Q    Are you in fear of criminal prosecution?

13  (Pages 46 to 49)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

50

1    A    Same answer.
2         MR. SPADA:  And objection to the extent
3  it would call for the disclosure of attorney/client
4  privilege.
5    Q    Are there any documents that are in the
6  possession of the United States Attorney's office or
7  the SIPC Trustee that you believe will assist you to
8  answer the questions that I'm asking of you without
9  invocation of the Fifth Amendment privilege?
10        MR. SPADA:  I'm going to object to the
11  question.
12        As we've clearly stated before the
13  Magistrate and today, it's our position we are
14  entitled to the BLMIS documents before the witness
15  has to respond to whether documents would -- whether
16  he would testify about such matters.
17        MR. RICCIO:  So am I correct in
18  understanding that that's the basis for the
19  invocation of the Fifth Amendment?
20        MR. SPADA:  Among other things, yes.
21        MR. RICCIO:  What are the other things?
22        MR. SPADA:  Can I have the question read
23  back?
24        (Question read back.)
25    A    Same answer.

51

1    Q    Have you had any conversations with
2  anyone from the SEC regarding this case?
3    A    Same answer.
4    Q    Is your son-in-law an employee of the
5  SEC?
6    A    Same answer.
7    Q    Is your son-in-law a former employee of
8  the SEC?
9    A    Same answer.
10   Q    Have you had any conversations with the
11  SIPC Trustee regarding the subject matter of this
12  action?
13   A    Same answer.
14   Q    Now, Mr. Madoff, I'm going to ask you
15  about your personal background.
16        First, how old are you?
17        MR. SPADA:  Asked and answered.
18        You can respond.
19   A    Same answer.
20   Q    Where did you go to high school?
21   A    Same answer.
22   Q    Did you go to high school?
23   A    Same answer.
24   Q    Did you go to grammar school?
25   A    Same answer.

52

1    Q    Did you go to college?
2    A    Same answer.
3    Q    Did you go to law school?
4    A    Same answer.
5    Q    Did you ever go to school?
6    A    Same answer.
7    Q    Did you ever have a job in your life?
8    A    Same answer.
9    Q    When you were a teenager, did you have a
10  job as a lifeguard?
11   A    Same answer.
12   Q    Did your brother have a job as a
13  lifeguard?
14   A    Same answer.
15   Q    When was the last time you talked to
16  Bernard Madoff?
17   A    Same answer.
18   Q    Did you ever talk to him in your entire
19  life?
20   A    Same answer.
21   Q    Do you need documents to assist you to
22  decide whether or not you can answer the question as
23  to whether you ever spoke to your brother in your
24  entire life?
25        MR. SPADA:  Objection.  You can respond.

53

1    A    Same answer.
2    Q    Is it fair to say that any questions I
3  ask about any past employment will result in an
4  invocation of your Fifth Amendment privilege?
5    A    Same answer, yes.
6    Q    Mr. Madoff, I have a series of questions
7  for you regarding your involvement with various
8  industry groups such as the NASD, the NASDAQ, the
9  FINRA, the Securities Traders Association of New
10  York, the Depository Trust & Clearing Corp., the
11  Securities Industry Financial Markets Association,
12  and am I correct that if I ask you any questions
13  about any of those groups that you will invoke your
14  Fifth Amendment privilege with respect to each and
15  every such question?
16   A    Yes.
17   Q    Why?
18        MR. SPADA:  Objection, calls for legal
19  advice and I instruct the witness not to answer.
20   Q    Do you remember -- is there something
21  wrong with your memory?
22        MR. SPADA:  Objection.
23   Q    Do you recall -- I'll strike the
24  question.
25        Do you recall at the outset of this

14  (Pages 50 to 53)



**Rizman
Rappaport
Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

54

1 deposition I asked you if you had a mental or health
2 problem that prevented you from giving testimony
3 today, and I think you said "No"?
4         MR. SPADA:  He responded to that.
5     Q    You responded to that.
6         So what I'm asking you is:  With respect
7 to the organizations such as NASDAQ, N-A-S-D-A-Q, is
8 there anything wrong with your memory for you to
9 determine whether or not you ever held a position
10 with that group?
11         MR. SPADA:  I'm going to object to that
12 question.  He's been advised not to answer.  He's
13 accepting that advice.
14         It's not appropriate to ask him other
15 than what you've asked him up front about his memory.
16         MR. RICCIO:  Well, is it a direction not
17 to answer or an invocation of the Fifth?
18         MR. SPADA:  Well, he's already answered
19 it, is there anything wrong with his memory today
20 that can keep him from testifying.
21         MR. RICCIO:  So the answer is --
22         MR. SPADA:  The answer is there's
23 nothing wrong with his memory.  He responded.
24
25

55

1 BY MR. RICCIO:
2     Q    So you don't have a memory lapse with
3 respect to your involvement with NASDAQ, do you?
4         MR. SPADA:  Objection to form.
5     A    Same answer.
6     Q    And am I correct that no -- strike that.
7         Am I correct that you do not need
8 documents to refresh your recollection as to whether
9 or not you were formally involved with NASDAQ?
10         MR. SPADA:  Objection to form.
11     A    Same answer.
12     Q    Am I correct that you don't need
13 documents to refresh your recollection as to whether
14 or not you have previously given depositions?
15         MR. SPADA:  Objection to form.
16     A    Same answer.
17     Q    Am I correct that you do not need
18 documents to refresh your recollection as to whether
19 or not you ever testified in another court
20 proceeding?
21         MR. SPADA:  Objection to form.
22     A    Same answer.
23     Q    Am I correct that you do not need
24 documents to refresh your recollection as to whether
25 or not you -- as to what you did to prepare for this

56

1 deposition?
2         MR. SPADA:  Objection to form, and it's
3 an inappropriate question and calls for legal advice.
4     A    Same answer.
5     Q    Am I correct that you do not need
6 documents to refresh your recollection as to whether
7 or not you were ever a party in a prior litigation?
8     A    Same answer.
9     Q    Am I correct that you do not need
10 documents to refresh your recollection as to whether
11 or not you had conversations with the following
12 persons or entities:  The United States Attorney's
13 office, the SEC, or the SIPC Trustee?
14         MR. SPADA:  Objection to form.
15     A    Same answer.
16     Q    Am I correct that you do not need
17 documents to refresh your recollection as to whether
18 you ever went to school in your entire life?
19         MR. SPADA:  Objection to form.
20     A    Same answer.
21     Q    Am I correct that you do not need
22 documents to refresh your recollection as to whether
23 or not you ever had a job in your entire life?
24         MR. SPADA:  Objection to form.
25     A    Same answer.

57

1     Q    Do you hold any professional licenses?
2     A    Same answer.
3     Q    Am I correct that you will invoke the
4 Fifth Amendment with respect to any questions I might
5 have regarding professional licenses you may hold,
6 such as a license as an attorney, a Series 1 License,
7 a Series 7 License, or a Series 55 License or other
8 professional licenses?
9         MR. SPADA:  Objection to form.
10     A    Same answer.
11     Q    Have you authored any publications?
12     A    Same answer.
13     Q    Do you need documents to refresh your
14 recollection as to whether or not you authored
15 anything?
16         MR. SPADA:  Objection to form.
17     A    Same answer.
18     Q    Have you ever written anything in your
19 entire life?
20         MR. SPADA:  Objection to form.
21     A    Same answer.
22     Q    Have you ever given a lecture in your
23 life?
24     A    Same answer.
25         MR. SPADA:  Objection to form.

15 (Pages 54 to 57)



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

58

1  Q    Have you ever gotten an award in your
2  life?
3        MR. SPADA:  Objection to form.
4    A   Same answer.
5  Q    Have you ever received an honor?
6        MR. SPADA:  Objection to form.
7    A   Same answer.
8  Q    Have you ever served as a member of any
9  board of directors?
10        MR. SPADA:  Objection to form.
11    A   Same answer.
12  Q    Now, according to your Answer, you
13  worked at BMIS for about 40 years, is that correct?
14    A   Same answer.
15  Q    So would it be fair to say that having
16  worked at a place for about 40 years, that you would
17  have an understanding of the basic structure of the
18  enterprise at which you were working?
19        MR. SPADA:  Objection to form.
20    A   Same answer.
21  Q    And is BMIS an LLC?
22        MR. SPADA:  Objection to form.
23    A   Same answer.
24  Q    Who owns BMIS?
25    A   Same answer.

59

1  Q    Are you a remember of BMIS?
2        MR. SPADA:  Objection to form.
3    A   Same answer.
4  Q    Is BMIS an LLC?
5    A   Same answer.
6  Q    Your Answer says that BMIS had offices
7  on the 17-19 floors of a building located at
8  885 Third Avenue in New York City, is that correct?
9    A   Same answer.
10  Q    Is it correct that that's what your
11  Answer says?  Look at paragraph 7.
12    A   Which document are you talking about?
13  Q    This will be P-2.
14        (Witness reviewing exhibit.)
15        MR. SPADA:  Which paragraph?
16        MR. RICCIO:  The seventh.
17        MR. SPADA:  You're asking him -- what's
18  the question?
19        MR. RICCIO:  Can we have it back?
20        (Record read.)
21    A   Same answer.
22        (Court reporter clarification.)
23        MR. SPADA:  Anywhere on the record where
24  you've heard "BLMIS," "BMIS" or "Madoff Securities",
25  I think both parties understand refers to Bernard L.

60

1  Madoff Securities.
2        MR. RICCIO:  Bernard L. Madoff
3  Investment Securities.
4        MR. SPADA:  Investment Securities,
5  right.
6        MR. RICCIO:  We're using the terms
7  interchangeably.
8
9  BY MR. RICCIO:
10    Q    So am I correct that if I were to ask
11  you questions about the structure of BLMIS, and by
12  "structure" I mean the form of the entity, the owners
13  of the entity, the various functions of the entity,
14  the employees of the entity, the business of the
15  entity, that you would invoke the Fifth Amendment
16  with respect to all of those areas?
17        MR. SPADA:  Objection to form.  You can
18  respond.
19    A   Same answer.
20  Q    "Same answer" meaning you will invoke
21  the Fifth Amendment as to all of those areas,
22  correct?
23    A   Yes.
24  Q    There was a Mr. DePascale who worked at
25  BLMIS.  Do you recognize that name?

61

1    A   Same answer.
2  Q    Have you ever seen that person in your
3  life?
4    A   Same answer.
5  Q    Did you ever speak to him?
6    A   Same answer.
7  Q    Do you know where he is now?
8    A   Same answer.
9  Q    Where is your brother now?
10    A   Same answer.
11        MR. SPADA:  I'll note for the record
12  that's a matter of public record where Bernard L.
13  Madoff is.
14        MR. RICCIO:  That's why I raise it
15  because how can he invoke the Fifth Amendment with
16  respect to something that's a matter of public
17  record?
18        MR. SPADA:  It's matter of public
19  record.  If the witness is invoking his rights,
20  that's his right to do so.
21        And to sit here and get into an
22  argument, then you're going to argue whether he
23  waived his rights or not.
24        MR. RICCIO:  No, I don't want to get
25  into an argument, but the Fifth Amendment, like all

16  (Pages 58 to 61)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

62

1  constitutional rights, is not absolute, is not
2  absolute.
3        And there's no such thing as a blanket
4  invocation of the Fifth Amendment, which is what
5  we're experiencing here today.
6        It's inappropriate.
7        MR. SPADA: He's responding to each of
8  your questions.
9        And if you're saying things wouldn't be
10  a waiver then, you know, you can tell me which
11  questions you want to ask and agree it wouldn't be a
12  waiver of his rights, and then he can make his
13  decision.
14    Q    Well, it's not waiving your right if you
15  tell me whether or not you know Mr. DePascale.
16        MR. SPADA: I'm going to object and
17  instruct the witness not to answer.
18        You know, you're trying to trick the
19  witness with a question like that.
20        MR. RICCIO: Charlie, you know what, I'm
21  not trying to trick the witness.
22        I'm trying to take a deposition that the
23  Court has allowed us to take.
24        The questions I'm asking are not
25  mystifying. They're very open questions. I'm

63

1  honestly asking them in good faith. This is not an
2  effort to trick the witness.
3        What the consequences are, the
4  consequences are.
5        MR. SPADA: That's correct.
6        MR. RICCIO: He will determine what
7  those consequences are, not me.
8        Can we take a five-minute break?
9        MR. SPADA: Sure.
10        (Recess.)
11        (Documents Re: Lautenberg Family
12  Foundation/Joshua Lautenberg are received and marked
13  as Plaintiffs' Exhibit 5 for Identification.)
14
15  BY MR. RICCIO:
16    Q    Mr. Madoff, take a look at Plaintiffs'
17  Exhibit P-5 which are --
18    A    I don't have it yet.
19    Q    I'm going to show it to you.
20        -- which are documents related to the
21  Lautenberg Family Foundation and Joshua Lautenberg.
22        Would you take a look at those, please?
23        MR. SPADA: For the record, this is
24  Plaintiffs' Exhibit 5.
25        (Witness reviewing exhibit.)

64

1    Q    Have you looked at the documents?
2    A    Yes.
3    Q    Do you recognize those documents as
4  being documents prepared by BLMIS?
5    A    Same answer.
6    Q    Can we agree that your brother has
7  admitted that for a period of time of 20 years,
8  during the operation of a Ponzi scheme by BLMIS, that
9  no trades were done for any customer?
10    A    Same answer.
11    Q    Can we agree that during a period of
12  20 years that BLMIS operated a Ponzi scheme and you
13  were a senior managing director and chief of
14  compliance for that firm?
15        MR. SPADA: Objection to form.
16        You can respond.
17    A    Same answer.
18    Q    Do you deny that all of the statements
19  issued to the Plaintiffs by BLMIS were mailed to the
20  Plaintiffs in Cliffside Park, New Jersey?
21    A    Same answer.
22    Q    Do you deny that you went to the State
23  of New Jersey in your capacity as an employee of
24  BLMIS?
25    A    Same answer.

65

1    Q    Do you deny that BLMIS advertised in New
2  Jersey?
3    A    Same answer.
4    Q    Do you deny that BLMIS had regular and
5  continuous contacts with the State of New Jersey?
6    A    Same answer.
7        MR. SPADA: I'm just going to note for
8  the record, going back to one of your earlier
9  questions about these being mailed, Plaintiffs'
10  Exhibit 5 being mailed to the Plaintiffs, two of the
11  pages, the last two pages of Plaintiffs' Exhibit 5,
12  indicate that they're being mailed to Frank R.
13  Lautenberg, who is not listed as a Plaintiff in the
14  case.
15    Q    Is what your lawyer just said correct?
16        MR. SPADA: Is it correct that that is
17  what Plaintiffs' Exhibit 5 says?
18        MR. RICCIO: No. I'm asking the witness
19  whether he agrees with what you just said because
20  you're not the witness, he's the witness.
21        MR. SPADA: I'm just correcting what was
22  a mischaracterization on the record about who it says
23  it was mailed to.
24        MR. RICCIO: Well, he can correct that.
25        MR. SPADA: You're asking is that what

17 (Pages 62 to 65)


**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

66

1 this document says?
2       MR. RICCIO:  I'm asking the witness a
3 question.
4       With all due respect, I'm not asking you
5 to give the answer.  I'm asking the witness to give
6 the answer.
7       MR. SPADA:  And your question is what?
8       MR. RICCIO:  Can you read it back?
9       (The following question is read back:
10       "Do you deny that all of the statements
11       issued to the Plaintiffs by BLMIS were
12       mailed to the Plaintiffs in Cliffside
13       Park, New Jersey?)"
14       MR. SPADA:  Objection, you can respond.
15   A   Same answer.
16   Q   Do you deny that BLMIS had a significant
17 number of investors who were domiciled in New Jersey?
18   A   Same answer.
19   Q   Do you deny that BLMIS had a significant
20 business interest in New Jersey?
21   A   Same answer.
22   Q   Do you deny that BLMIS submitted false
23 and fraudulent records to investors of BLMIS
24 domiciled in New Jersey?
25   A   Same answer.

67

1       MR. SPADA:  Can we go off the record a
2 second?
3       MR. RICCIO:  Yes.
4       (Discussion off the record.)
5       MR. RICCIO:  By stipulation, we're going
6 to redact from Exhibit P-5 confidential information
7 such as the taxpayer identification number that's
8 listed on these statements.
9       MR. SPADA:  I would propose, I guess,
10 rather than redact it, that, you know, it's
11 anticipated we'll get a Confidentiality Order and
12 that we request that that get confidential treatment.
13       We can agree, as is stipulated, after
14 the deposition for treatment of that material.
15       MR. RICCIO:  Well, we're still working
16 on a Confidentiality Order, but for the purposes of
17 today, P-5 is considered to be a confidential
18 document at least as it relates to the taxpayer
19 identification number.
20
21 BY MR. RICCIO:
22   Q   Am I correct that the investment
23 advisory arm of BLMIS was located on the 17th floor
24 of the firm's offices?
25   A   Same answer.

68

1   Q   If I ask you any questions about the
2 activities on the 17th floor of BLMIS, am I correct
3 that you will invoke your Fifth Amendment privilege?
4   A   Yes.
5   Q   Did you ever visit, at any time in your
6 entire life, the 17th floor of the office building
7 occupied by BLMIS during the course of your
8 employment there?
9   A   Same answer.
10   Q   Was BLMIS registered as an investment
11 advisor?
12   A   Same answer.
13       MR. RICCIO:  Can I see the Complaint,
14 please?  I guess it's P-1.
15       (Handing.)
16   Q   Take a look at Exhibit A to P-1.
17 Would you do that, please?
18       (Witness reviewing exhibit.)
19   Q   What is that document?
20   A   Same answer.
21   Q   Did you prepare Exhibit A to P-1?
22   A   Same answer.
23   Q   Does Exhibit A to P-1 contain any
24 statements by you?
25   A   Same answer.

69

1   Q   Did you intend Exhibit A to P-1 to be a
2 promotional piece utilized by BLMIS?
3       MR. SPADA:  Objection to form.
4   A   Same answer.
5   Q   Did you intend Exhibit A to P-1 to be a
6 materially false and misleading statement to be
7 relied upon by Plaintiffs?
8       MR. SPADA:  Objection to form.
9   A   Same answer.
10   Q   Did you intend for Exhibit A to P-1 to
11 contain material omissions of fact for the purpose of
12 deceiving Plaintiffs to invest in BLMIS?
13       MR. SPADA:  Objection to form.
14   A   Same answer.
15   Q   Take a look at Exhibit B to P-1.
16       (Witness reviewing exhibit.)
17   Q   Have you ever seen that document before?
18   A   Same answer.
19       MR. RICCIO:  For the record, Exhibit B
20 is a copy of the Complaint filed against Bernard
21 Madoff on December 11, 2008.
22   Q   Take a look at P-2, which is the Answer
23 to the Complaint, your Answer to this Complaint,
24 specifically paragraph 26.
25       Do you have that, paragraph 26?

18  (Pages 66 to 69)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

70

1    (Witness reviewing exhibit.)
2    Q    Okay.  Do you have that paragraph in
3 front of you?
4    A    Yes.
5    Q    And I'm going to read a portion of that
6 paragraph.
7    "On or about December 9, 2008, Bernard
8 L. Madoff informed Defendant that there had been
9 requests from clients for redemptions, and that
10 Bernard L. Madoff was unable to meet those
11 obligations."
12    Is that a correct statement of what your
13 brother said to you on or about December 9, 2008?
14    A    Same answer.
15    Q    Did you talk to your brother on
16 December 9, 2008 about redemptions?
17    A    Same answer.
18    Q    Am I correct that you were not surprised
19 when your brother confessed to operating a Ponzi
20 scheme?
21    A    Same answer.
22    Q    And am I correct that the reason you
23 were not surprised that your brother confessed to
24 operating a Ponzi scheme is because you knew all
25 about it?

71

1    A    Same answer.
2    Q    Take a look at Exhibit C to P-1 which,
3 for the record, is a Form ADV.
4    (Witness reviewing exhibit.)
5    Q    Have you had a chance to go through the
6 document?
7    A    Yes.
8    Q    Have you ever seen the document before?
9    A    Same answer.
10    Q    Am I correct that you prepared the
11 document?
12    A    Same answer.
13    MR. SPADA:  And just for clarification,
14 by "same answer" he's invoking his rights under the
15 Fifth Amendment on the advice of counsel.
16    MR. RICCIO:  He doesn't mean "Yes"?
17    MR. SPADA:  Correct.
18    Q    Am I correct that you prepared this
19 document?
20    A    Same answer.
21    Q    Am I correct that you do not deny that
22 you prepared this document?
23    A    Same answer.
24    Q    Am I correct that this document lists
25 you as a control person of BLMIS?

72

1    A    Same answer.
2    Q    Am I correct that you were, in fact, a
3 control person of BLMIS?
4    A    Same answer.
5    Q    Am I correct that this document lists
6 you as a director of trading/chief compliance
7 officer?
8    A    Same answer.
9    Q    And am I correct that that is an
10 accurate description of your job at BLMIS from June
11 of 1969 through December of 2008?
12    A    Same answer.
13    Q    And am I correct that you do not deny --
14 strike that.
15    Who was the accountant for BLMIS?
16    A    Same answer.
17    Q    Did you ever hear of a person by the
18 name of David Freighling, F-r-e-i-g-h-l-i-n-g?
19    A    Same answer.
20    Q    Am I correct that you knew that David
21 Freighling was the accountant for BLMIS?
22    A    Same answer.
23    Q    Am I correct that Mr. Freighling has
24 pleaded guilty to perpetrating a fraud?
25    A    Same answer.

73

1    Q    Am I correct that Mr. Freighling had his
2 offices in a strip mall?
3    A    Same answer.
4    Q    Am I correct that for the period of time
5 that Mr. Freighling was the accountant for BLMIS,
6 that you worked with him in providing him with
7 financial information about BLMIS?
8    A    Same answer.
9    Q    Am I correct that the audits performed
10 by David Freighling were fraudulent?
11    A    Same answer.
12    Q    Am I correct that when Mr. Freighling
13 prepared fraudulent audits, you knew those audits
14 were fraudulent?
15    A    Same answer.
16    Q    And is it fair to say that if I ask you
17 any further questions about Mr. Freighling or the
18 accounting functions performed by him, you will
19 invoke your Fifth Amendment privilege?
20    A    Yes.
21    Q    Do you understand that every time you
22 invoke your Fifth Amendment privilege here today that
23 it allows for the Court to make an adverse inference
24 against your interest in this litigation?
25    MR. SPADA:  I'm going to object to the



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

74

1  form of the question to the extent it calls for legal
2  advice or legal discussions between witness and
3  counsel and is not an appropriate question.
4          I direct you not to answer.
5      Q   Mr. Madoff, you do not deny -- strike
6  that.
7          Do you deny that you were solely
8  responsible for the management and policies of BLMIS
9  during the course of your employment there?
10         MR. SPADA: Objection to form.
11     A   Same answer.
12     Q   Am I correct that you do not deny that
13 you verified the financial condition of BLMIS on a
14 regular basis?
15     A   Same answer.
16     Q   Am I correct that BLMIS maintained two
17 sets of books?
18         MR. SPADA: Objection to form.
19     A   Same answer.
20     Q   Am I correct that you knew that BLMIS
21 maintained two sets of books?
22         MR. SPADA: Objection to form.
23     A   Same answer.
24     Q   Am I correct that the reason BLMIS
25 maintained two sets of books was to defraud the

75

1  investors and the regulators?
2          MR. SPADA: Objection to form.
3      A   Same answer.
4      Q   Am I correct that in your employment at
5  BLMIS that you did not establish a compliance program
6  of internal controls?
7          MR. SPADA: Objection to form.
8      A   Same answer.
9      Q   Am I correct that the reason you did not
10 establish a compliance program of internal controls
11 was so that the Ponzi scheme would go undetected?
12         MR. SPADA: Objection to form.
13     A   Same answer.
14     Q   Am I correct that you did not implement,
15 even if you established a compliance program of
16 internal controls?
17         MR. SPADA: Objection to form.
18     A   Same answer.
19     Q   Am I correct that you did not monitor a
20 compliance program of internal controls even if you
21 had established one?
22         MR. SPADA: Objection to form.
23     A   Same answer.
24     Q   Am I correct that you did not enforce a
25 compliance program of internal controls even if you

76

1  had established one?
2          MR. SPADA: Objection to form.
3      A   Same answer.
4      Q   Am I correct that you did absolutely
5  nothing to prevent -- strike that.
6          Am I correct that you did absolutely
7  nothing to detect any violations of the securities
8  laws at BLMIS during the course of your entire
9  employment at that firm?
10         MR. SPADA: Objection to form.
11     A   Same answer.
12     Q   Are you aware that the SEC promulgated a
13 report of an investigation into the failure of the
14 SEC to uncover the Ponzi scheme at BLMIS?
15     A   Same answer.
16         MR. SPADA: Could we go off the record
17 one second?
18         MR. RICCIO: Yes.
19         (Discussion off the record.)
20         (Recess.)
21
22 BY MR. RICCIO:
23     Q   Am I correct that in 1992, a complaint
24 was made regarding the business practices of BLMIS?
25         MR. SPADA: Objection to form.

77

1      A   Same answer.
2      Q   Am I correct that the SEC suspected that
3  BLMIS, in 1992, was operating a Ponzi scheme?
4          MR. SPADA: Objection to form.
5      A   Same answer.
6      Q   Am I correct that you and your brother
7  intentionally concealed from the SEC information that
8  would allow them to have uncovered the Ponzi scheme
9  in 1992?
10         MR. SPADA: Objection to form.
11     A   Same answer.
12     Q   Am I correct that in May of 2000, in
13 March of 2001, and in October of 2005, that a person
14 named Harry Markopolos, M-a-r-k-o-p-o-l-o-s,
15 complained to the SEC that BLMIS was the world's
16 largest hedge fund -- strike that.
17         Strike the whole question.
18         Do you know a person named Harry
19 Markopolos?
20     A   Same answer.
21     Q   Am I correct that in May 2000,
22 March 2001, and October 2005, Mr. Markopolos made a
23 complaint -- made complaints to the SEC about the
24 lawfulness of the business operations of BLMIS?
25     A   Same answer.

20 (Pages 74 to 77)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

78

1   Q    Am I correct that in his complaints he
2   detailed approximately 30 red flags indicating that
3   BLMIS was operating a Ponzi scheme?
4        MR. SPADA:  Objection to form.
5   A    Same answer.
6   Q    Am I correct that you were aware of
7   Mr. Markopolos' complaints?
8   A    Same answer.
9   Q    Am I correct that you, in conjunction
10  with your brother, intentionally hid from the SEC
11  evidence that would have uncovered the Ponzi scheme
12  at the time of Mr. Markopolos' complaints?
13       MR. SPADA:  Objection to form.
14  A    Same answer.
15  Q    Am I correct that you were aware of the
16  30 red flags identified by Mr. Markopolos?
17       MR. SPADA:  Objection to form.
18  A    Same answer.
19  Q    Am I correct that you consciously
20  avoided doing anything about those red flags?
21       MR. SPADA:  Objection to form.
22  A    Same answer.
23  Q    Am I correct that in May of 2003, a
24  hedge fund manager complained to the SEC about the
25  business practices of BLMIS?

79

1        MR. SPADA:  Objection to form.
2   A    Same answer.
3   Q    Am I correct that you were aware of that
4   complaint?
5   A    Same answer.
6   Q    Am I correct that you intentionally hid
7   from the SEC evidence that would have caused the SEC,
8   in May of 2003, to uncover the BLMIS Ponzi scheme?
9        MR. SPADA:  Objection to form.
10  A    Same answer.
11  Q    Am I correct that there were, according
12  to the SEC's investigation of itself, as many as six
13  separate complaints filed with the SEC about BLMIS
14  and its business practices?
15       MR. SPADA:  Objection to form.
16  A    Same answer.
17  Q    Am I correct that had you not knowingly
18  cooperated with your brother in concealing the
19  information from the SEC, that as early as 1992 the
20  SEC would have discovered that BLMIS was a massive
21  Ponzi scheme?
22       MR. SPADA:  Objection to form.
23  A    Same answer.
24  Q    Am I correct that you, by virtue of your
25  control of BLMIS, perpetuated the Ponzi scheme for at

80

1   least 20 years?
2        MR. SPADA:  Objection to form.
3   A    Same answer.
4   Q    Am I correct that you perpetuated the
5   scheme knowingly, willfully, and wantonly?
6        MR. SPADA:  Objection to form.
7   A    Same answer.
8   Q    Did you ever hear of a firm by the name
9   of Avellino, A-v-e-l-l-i-n-o, and Bienes,
10  B-i-e-n-e-s?
11  A    Same answer.
12  Q    Am I correct that BLMIS, through
13  yourself and your brother, used Avellino & Bienes to
14  defraud customers?
15       MR. SPADA:  Objection to form.
16  A    Same answer.
17  Q    Mr. Madoff, take a look at Exhibit D to
18  the Complaint.
19       MR. SPADA:  That's the document that's
20  entitled "The World's Largest Hedge Fund is a Fraud"
21  dated November 7, 2005?
22       MR. RICCIO:  That's it.
23       (Witness reviewing exhibit.)
24  Q    Am I correct, Mr. Madoff, that the
25  investors in BLMIS personally relied on you to

81

1   operate BLMIS in an honest and ethical, law-abiding
2   manner?
3        MR. SPADA:  Objection to form.
4   A    Same answer.
5   Q    And am I correct that you, in your
6   capacity as a control person of BLMIS, breached that
7   reliance on you by the investors because you did not
8   operate BLMIS in an honest, ethical, law-abiding
9   manner?
10       MR. SPADA:  Objection to form.
11  A    Same answer.
12       (Article by Michael Ocrant, May 2001, is
13  received and marked as Plaintiffs' Exhibit 6 for
14  Identification.)
15       (Article by Erin Arvedlund, 5/7/01,
16  is received and marked as Plaintiffs' Exhibit 7 for
17  Identification.)
18  Q    Take a look at Exhibit D to the
19  Complaint.
20       That's a document that was filed with
21  the SEC by Mr. Markopolos, to my understanding.
22       MR. SPADA:  I'll object to the
23  characterization.  It is what it is.
24       MR. RICCIO:  Can't we stipulate that
25  that's an accurate statement of what the document is?

21 (Pages 78 to 81)


Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

82

1    MR. SPADA:  I don't know that he filed
2  it with the SEC.
3    MR. RICCIO:  Sent it.
4    MR. SPADA:  Submit, maybe.
5    MR. RICCIO:  Sent to it to the SEC.
6    MR. SPADA:  I mean, I don't know that to
7  be a fact, but you can...
8    Q    Do you recognize the document,
9  Mr. Madoff?
10    A    Same answer.
11    Q    Am I correct that you were aware of
12  Mr. Markopolos' complaint to the SEC as reflected in
13  Exhibit D to the Complaint?
14    A    Same answer.
15    Q    Am I correct that you knowingly ignored
16  Mr. Markopolos' complaint?
17    A    Same answer.
18    Q    Am I correct that the reason you
19  knowingly ignored Mr. Markopolos' complaint is
20  because you knew that BLMIS was operating a Ponzi
21  scheme?
22    A    Same answer.
23    Q    And am I correct that you knew that
24  Mr. Markopolos was correct in the allegations he was
25  making to the SEC?

83

1    MR. SPADA:  Objection to form.
2    A    Same answer.
3    Q    Take a look at P-6 and P-7.
4    MR. SPADA:  Has the court reporter
5  marked these?
6    MR. RICCIO:  Yes, they've been marked.
7    (Witness reviewing exhibits.)
8    Q    All right.  You've taken a look at
9  Exhibits P-6 and P-7, correct?
10    A    Yes.
11    Q    And am I correct that P-6 is an article
12  written by Michael Ocrant, O-c-r-a-n-t?
13    MR. SPADA:  Objection to form.
14    A    Same answer.
15    Q    And this was published in May of 2001?
16    MR. SPADA:  Objection to form.
17    A    Same answer.
18    Q    And P-7 is an article written by Erin
19  Arvedlund, A-r-v-e-d-l-u-n-d?
20    MR. SPADA:  Objection to form.
21    A    Same answer.
22    Q    And this was written, am I correct, on
23  May 7, 2001?
24    MR. SPADA:  Objection to form.
25    A    Same answer.

84

1    Q    You saw both P-6 and P-7 at or about the
2  time they appeared in public print, did you not?
3    A    Same answer.
4    Q    And am I correct that the suggestions
5  and observations contained in P-6 and P-7 about the
6  integrity and the honestness and the law -- strike
7  that -- about the integrity, honesty and law-abiding
8  nature of BLMIS were accurate?
9    MR. SPADA:  Objection to form.
10    A    Same answer.
11    Q    And am I correct that you discussed both
12  of these articles with your brother Bernard?
13    MR. SPADA:  Objection to form.
14    A    Same answer.
15    Q    And am I correct that the reason you
16  discussed them with your brother Bernard was because
17  it concerned you that the Ponzi scheme was going to
18  be detected?
19    MR. SPADA:  Objection to form.
20    A    Same answer.
21    Q    And, in fact, both you and your brother
22  Bernard took steps to make sure that the information
23  contained in these articles, P-6 and P-7, did not
24  uncover the Ponzi scheme?
25    MR. SPADA:  Objection to form.

85

1    A    Same answer.
2    Q    Mr. Madoff, do you deny that it was your
3  responsibility to file reports with the SEC regarding
4  the business practices of BLMIS?
5    A    Same answer.
6    Q    And am I correct that you knowingly and
7  intentionally filed false documents with the SEC
8  regarding BLMIS' business practices?
9    A    Same answer.
10    Q    And am I correct that you knowingly and
11  intentionally filed false documents with the SEC in
12  order to materially mislead the SEC and the public
13  regarding the financial condition and business
14  operations of BLMIS?
15    A    Same answer.
16    Q    Am I correct that you knowingly and
17  intentionally cooperated with David Freighling,
18  BLMIS' accountant, in submitting materially false and
19  misleading information to the SEC?
20    MR. SPADA:  Objection to form.
21    A    Same answer.
22    Q    Based on your knowledge, training, and
23  experience, have you ever heard of the term "internal
24  controls"?
25    A    Same answer.

22 (Pages 82 to 85)

**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

86

1    Q     Am I correct that while you were
2    employed by BLMIS in your capacity as head of
3    compliance and as a control person, that you never
4    established any internal controls or internal
5    compliance programs at BLMIS?
6    A     Same answer.
7    Q     Have you ever heard of the term
8    "internal risk management controls"?
9    A     Same answer.
10   Q     Am I correct that during the course of
11   your employment at BLMIS and in your capacity as head
12   of the compliance and as a control person, that you
13   never instituted any internal risk management
14   controls at BLMIS?
15         MR. SPADA:  Objection to form.
16   A     Same answer.
17   Q     Am I correct that in your capacity as
18   head of compliance and as a control person at BLMIS,
19   that you did not communicate at any time with
20   department managers on a daily basis, on a monthly
21   basis, or on a yearly basis to ensure that proper
22   compliance procedures were being followed?
23         MR. SPADA:  Objection to form.
24   A     Same answer.
25   Q     Am I correct that BLMIS never had an

87

1    audit committee?
2          MR. SPADA:  Objection to form.
3    A     Same answer.
4    Q     Am I correct that the reason there was
5    no audit committee was to make sure that the Ponzi
6    scheme was not uncovered?
7          MR. SPADA:  Objection to form.
8    A     Same answer.
9    Q     Am I correct that BLMIS never had an
10   investment advisory manual?
11         MR. SPADA:  Objection to form.
12   A     Same answer.
13   Q     And am I correct that the reason BLMIS
14   never had an investment advisory manual was to
15   conceal the Ponzi scheme?
16         MR. SPADA:  Objection to form.
17   A     Same answer.
18   Q     Am I correct that BLMIS was reviewed in
19   2007 pursuant to the Investment Advisory Act?
20         MR. SPADA:  Objection to form.
21   A     Same answer.
22   Q     Am I correct that in connection with the
23   2007 annual review of BLMIS under the Investment
24   Advisory Act, that you provided materially false and
25   misleading statements to the reviewers?

88

1          MR. SPADA:  Objection to form.
2    A     Same answer.
3    Q     Am I correct that BLMIS did not have an
4    anti-money laundering compliance program?
5    A     Same answer.
6    Q     Am I correct that the reason that BLMIS
7    did not have an anti-money laundering compliance
8    program was in order to conceal the Ponzi scheme?
9          MR. SPADA:  Objection to form.
10   A     Same answer.
11   Q     Am I correct that BLMIS, with the
12   cooperation of yourself and your brother, engaged in
13   money laundering?
14         MR. SPADA:  Objection to form.
15   A     Same answer.
16   Q     Am I correct that the money laundering
17   involved BLMIS affiliates in Europe?
18         MR. SPADA:  Objection to form.
19   A     Same answer.
20   Q     Take a look at the Complaint again, P-1.
21         (Witness reviewing exhibit.)
22   Q     Would you take a look at paragraph 32 --
23   well, strike that -- paragraphs 31 through and
24   including 35 -- through and including 34 of P-1?
25         (Witness reviewing exhibit.)

89

1    A     Yes.
2    Q     Am I correct that every allegation
3    contained in paragraphs 31 through and including 34
4    of the Complaint, P-1, is true and correct in every
5    respect?
6    A     Same answer.
7    Q     Am I correct that every allegation
8    contained in P-1, from the beginning of the Complaint
9    to the end of the Complaint, is true and correct in
10   every material respect?
11         MR. SPADA:  Objection to form.
12   A     Same answer.
13   Q     Am I correct that you admit the
14   allegations contained in P-1?
15         MR. SPADA:  Objection to form.
16   A     Same answer.
17   Q     Am I correct that the denials in your
18   Answer, which is P-2, are not true and correct?
19         MR. SPADA:  Objection to form.
20   A     Same answer.
21   Q     Did you have an account at BLMIS in your
22   own name?
23   A     Same answer.
24   Q     Am I correct that during the period of
25   time that you had an account at BLMIS, that you

23  (Pages 86 to 89)



**Rizman
Rappaport
Dillon&Rose,**LLC
_Certified Court Reporters_

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Madoff-Direct

90

1 redeemed from your investment over $16 million?
2    A    Same answer.
3    Q    Am I correct that in May of 2002 you
4 redeemed nearly $6 million?
5    A    Same answer.
6    Q    Am I correct that you redeemed
7 approximately $6.9 million between April 2003 and May
8 of 2005?
9         MR. SPADA:  Objection to form.
10    A    Same answer.
11    Q    Am I correct that you redeemed over
12 $3 million between September 2005 and April 2006?
13         MR. SPADA:  Objection to form.
14    A    Same answer.
15    Q    Am I correct that the total amount of
16 your investments in these accounts, which produced
17 over $16 million in returns, was $32,000?
18         MR. SPADA:  Objection to form.
19    A    Same answer.
20    Q    Do you consider an investment of $32,000
21 which produces a $16 million return a good
22 investment?
23         MR. SPADA:  Objection to form.
24    A    Same answer.
25    Q    Did you know that the $16 million that

91

1 you received from your investment at BLMIS came from
2 other BLMIS investors?
3         MR. SPADA:  Objection to form.
4    A    Same answer.
5    Q    Did you know that some of the BLMIS
6 investors whose money you were taking as a redemption
7 were charities?
8         MR. SPADA:  Objection to form.
9    A    Same answer.
10    Q    And hospitals?
11         MR. SPADA:  Objection to form.
12    A    Same answer.
13    Q    And pensions?
14         MR. SPADA:  Objection to form.
15    A    Same answer.
16    Q    Do you regret having taken that money?
17         MR. SPADA:  Objection to form.
18    A    Same answer.
19    Q    Do you now know that the money that you
20 took was, in fact, money that belonged to charities,
21 pensions, hospitals, and the like?
22         MR. SPADA:  Objection to form.
23    A    Same answer.
24    Q    Do you know that your brother admitted
25 that fact?

92

1         MR. SPADA:  Objection.
2    A    Same answer.
3    Q    Have you offered to return any of that
4 money?
5         MR. SPADA:  Objection to form.
6    A    Same answer.
7         MR. RICCIO:  Do you want to just give us
8 five minutes?
9         MR. SPADA:  Sure.
10         (Recess.)
11         MR. RICCIO:  Okay, just a few more
12 questions.
13
14 BY MR. RICCIO:
15    Q    Mr. Madoff, do you admit that had you
16 not invoked your Fifth Amendment privilege today,
17 that you have sufficient personal knowledge to answer
18 all the questions that I've posed to you?
19         MR. SPADA:  Objection to form.
20    A    Same answer.
21    Q    And the "same answer" is the Fifth
22 Amendment, correct, the "same answer" as what you
23 read earlier?
24    A    Exactly, yes.
25    Q    And do you admit that you had sufficient

93

1 personal knowledge to answer all of the questions
2 I've posed to you today and did not need access to
3 any of the documents in the possession of the United
4 States Attorney's office, the SIPC Trustee, or any
5 other person?
6         MR. SPADA:  Objection to form.
7    A    Same answer.
8         MR. RICCIO:  I have no further questions
9 at this time.
10         MR. SPADA:  Thanks.
11         (Deposition concluded 1:40 p.m.)
12         (Exhibits retained by court reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25

24  (Pages 90 to 93)


**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

94

```
1        C E R T I F I C A T E
2
3
4        I CERTIFY that the foregoing is a true and
5   accurate transcript of the testimony as taken by and
6   before me stenographically at the time and place
7   aforementioned.
8
9
10
11
12        I FURTHER CERTIFY that I am neither attorney
13  for nor counsel to any of the parties; parties of any
14  of the attorneys in this action; and that I am not
15  financially interested in the outcome of this case.
16
17  _____
18  SUSAN GIOFFRE, CCR
    License No. XI001220
19  Notary Public of the State of New Jersey
20
    My Commission Expires:
21  March 30, 2010
22
23
24
25
```

95

```
1
2
3        I have read the foregoing transcript
4   and certify that it is a true and accurate
5   transcript of my testimony in the above-captioned
6   matter.
7
8
9
10       _____
            PETER MADOFF
11
12
13
14
15
16
17  Subscribed and sworn to before me
18  this _____ day of _____, 2009
19
20
21
22
23  _____
24  A Notary Public
25
```

                                    25 (Pages 94 to 95)



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

C E R T I F I C A T E

    I CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken by and before me stenographically at the time and place aforementioned.

    I FURTHER CERTIFY that I am neither attorney for nor counsel to any of the parties; parties of any of the attorneys in this action; and that I am not financially interested in the outcome of this case.

_____

SUSAN GIOFFRE, CCR
License No.. XI001220

My Commission Expires:
March 30, 2010

**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1
2
3          I have read the foregoing transcript
4    and certify that it is a true and accurate
5    transcript of my testimony in the above-captioned
6    matter.
7
8
9
10                    _____
                                PETER MADOFF
11
12
13
14
15
16
17   Subscribed and sworn to before me
18   this _____ day of _____, 2009
19
20
21
22
23   _____
24   A Notary Public
25



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**A**

ability 34:9
able 22:5
about 22:7 30:7
34:8,9 36:12
40:8 46:3 47:2,6
47:24 48:9 49:20
50:16 51:15 53:3
53:13 54:15
58:13,16 59:12
60:11 65:9,22
68:1 70:7,13,16
70:25 73:7,17
77:23 78:20,24
79:13 84:1,5,7
above 7:1 40:10
above-captioned
95:5
absolute 62:1,2
absolutely 76:4,6
acceptable 37:14
accepting 54:13
access 5:11 8:15
20:24 22:8 30:16
41:15 93:2
according 9:3
24:11 58:12
79:11
Accordingly 6:13
account 4:17 89:21
89:25
accountant 72:15
72:21 73:5 85:18
accounting 73:18
accounts 90:16
accuracy 6:14
40:25
accurate 17:21
33:24 72:10
81:25 84:8 94:5
95:4
accurately 6:9
Act 4:14 87:19,24
action 1:2 9:16
12:10,17 14:9
15:10 51:12
94:14
activities 68:2
actual 42:9,14
addition 36:23
Additionally 7:20
8:1
address 5:19 6:9
adjourn 6:20
administered 9:18
9:20
admit 89:13 92:15
92:25

admits 22:17,21
27:8
admitted 28:24
29:13 64:7 91:24
admitting 29:20
ADV 71:3
advanced 7:15
adverse 73:23
advertised 65:1
advice 11:2,9,22
12:4,11,18 13:10
13:18 14:3,10,16
15:3,15,21 16:15
16:21 17:3,22
18:4,10,16,23
19:7,16,23 20:6
21:8 23:2,13,24
24:6,15,22 25:4
26:15 27:3,23
28:5,11,18 29:1
29:7,22 30:18
31:4,13,21 32:12
34:1 37:25 39:13
41:14,23,24 42:6
47:10,19,20
53:19 54:13 56:3
71:15 74:2
advise 7:2
advised 54:12
advisor 68:11
advisory 4:9 5:16
5:21 41:5 67:23
87:10,14,19,24
affiliates 88:17
affirmative 42:23
aforementioned
94:7
after 30:23 37:5
45:21 67:13
again 42:6 88:20
against 8:3 11:6
12:1,8,15,22
13:14,22 14:7,14
14:20 15:7,19,25
16:19,25 17:7
18:1,8,14,20
19:2,11,20 20:2
20:10 23:6,17
24:3,10,19 25:1
25:8 26:19 27:7
28:2,9,15,22
29:5,11 30:1,22
31:8,17,25 32:16
34:5 38:3 39:17
69:20 73:24
ago 13:16
agree 8:2 25:19
62:11 64:6,11

67:13
agreeing 25:20
agreement 25:11
35:13
agrees 65:19
allegation 89:2,7
allegations 6:1 8:3
22:18,20 27:9
41:1 82:24 89:14
alleged 6:4 40:11
alleges 4:6 5:13
allow 10:18 11:13
20:3,22 42:7
77:8
allowed 8:16 62:23
allows 73:23
already 21:5,16
22:4 35:20 47:10
54:18
alternative 7:1
ambiguous 7:8,11
amending 3:18
38:13,18,22
Amendment 8:9
8:13 11:4,24
12:6,13,20 13:12
13:20 14:5,12,18
15:5,17,23 16:17
16:23 17:5,24
18:6,12,18,25
19:9,18,25 20:8
23:4,15 24:1,8
24:17,24 25:6,11
25:12,15 26:17
27:5,25 28:7,13
28:20 29:3,9,24
30:20 31:6,15,23
32:14 34:3,16,17
34:22 35:1,7,11
35:14 36:23 37:9
37:15 38:2 39:7
39:15,20 41:13
41:19 47:3,8,18
48:1,8,19 50:9
50:19 53:4,14
61:15,25 62:4
68:3 71:15 73:19
73:22 92:16,22
Amendment's 7:7
among 5:15 36:21
50:20
amount 90:15
amounts 7:15
analysis 8:11
annual 87:23
another 55:19
answer 3:16 7:3

8:11 10:6,20
11:3,14,23 12:5
12:12,19 13:11
13:19 14:4,11,17
14:23 15:4,9,13
15:16,22 16:5,8
16:10,12,13,16
16:20,22 17:1,4
17:9,23 18:5,11
18:17,24 19:8,17
19:24 20:3,7
21:10,24 22:1,3
22:11 23:3,14,25
24:7,16,23 25:5
26:16,21 27:4,8
27:24 28:6,12,19
28:24 29:2,6,8
29:13,16,20,23
30:19 31:5,14,22
32:4,13,23 33:1
33:4,14 34:2,7
34:11 35:8 36:5
36:9,13,14,18,24
37:16,17,20,22
37:24 38:1 39:4
39:6,6,12,14,20
40:21 41:17 42:8
42:12,16,21 43:1
43:6,10,16,22
44:3,9,13,14,18
44:22 45:2,6,10
45:15,19 46:1,13
46:16,21,25 47:4
48:17 49:1,5,18
49:24 50:1,8,25
51:3,6,9,13,19
51:21,23,25 52:2
52:4,6,8,11,14
52:17,20,22 53:1
53:5,19 54:12,17
54:21,22 55:5,11
55:16,22 56:4,8
56:15,20,25 57:2
57:10,12,17,21
57:24 58:4,7,11
58:12,14,20,23
58:25 59:3,5,6,9
59:11,21 60:19
60:20 61:1,4,6,8
61:10 62:17 64:5
64:10,17,21,25
65:3,6 66:5,6,15
66:18,21,25
67:25 68:9,12,20
68:22,25 69:4,9
69:14,18,22,23
70:14,17,21 71:1
71:9,12,14,20,23

72:1,4,8,12,16
72:19,22,25 73:3
73:8,11,15 74:4
74:11,15,19,23
75:3,8,13,18,23
76:3,11,15 77:1
77:5,11,20,25
78:5,8,14,18,22
79:2,5,10,16,23
80:3,7,11,16
81:4,11 82:10,14
82:17,22 83:2,14
83:17,21,25 84:3
84:10,14,20 85:1
85:5,9,15,21,25
86:6,9,16,24
87:3,8,12,17,21
88:2,5,10,15,19
89:6,12,16,18,20
89:23 90:2,5,10
90:14,19,24 91:4
91:9,12,15,18,23
92:2,6,17,20,21
92:22 93:1,7
answered 37:22
47:17 51:17
54:18
answers 9:22
10:11
anticipated 67:11
anti-money 88:4,7
anyone 14:9 51:2
anything 24:4 54:8
54:19 57:15,18
78:20
anywhere 36:14
36:24 59:23
appearance 21:14
22:6
appeared 84:2
application 6:21
appointed 4:12
appropriate 54:14
74:3
approximately
1:22 78:2 90:7
April 90:7,12
areas 34:10 60:16
60:21
argue 61:22
arguing 35:22
argument 7:14,17
61:22,25
Arleo 7:16
arm 67:23
arose 5:19
arrest 4:11
article 3:21,23



**Rizman**
**Rappaport**
**Dillon & Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

81:12,15 83:11
83:18
articles 84:12,23
Arvedlund 3:23
81:15 83:19
asked 10:7 13:25
47:1,6,24 48:9
51:17 54:1,15
asking 13:23 23:8
33:7 35:8 41:10
49:15 50:8 54:6
59:17 62:24 63:1
65:18,25 66:2,4
66:5
assert 34:25 35:18
asserted 6:13
asserting 20:23
21:9 22:7
assertion 11:7
35:19
assist 50:7 52:21
assisting 43:11
Association 53:9
53:11
assume 10:5
attempting 45:20
attorney 15:14,20
18:3,3 19:5,13
25:3 27:18 29:20
30:3 35:9 49:20
57:6 94:12
attorneys 94:14
attorney's 4:19 5:3
5:12 30:4,9 49:3
49:11 50:6 56:12
93:4
attorney/client
11:15 16:4 29:17
29:18 39:3 48:11
49:9,17 50:3
audible 10:12
audit 87:1,5
audits 73:9,13,13
authored 57:11,14
authorize 16:1,9
available 5:4
Avellino 80:9,13
Avenue 1:20 2:3
2:10 59:8
avoided 78:20
award 58:1
aware 41:5 76:12
78:6,15 79:3
82:11
A-r-v-e-d-l-u-n-d
83:19
A-v-e-l-l-i-n-o
80:9

a.m 1:22

### B

B 3:12 69:15,19
back 32:24 33:16
33:17 50:23,24
59:19 65:8 66:8
66:9
background 51:15
Bail 5:9
based 11:3,23 12:5
12:12,19 13:11
13:19 14:4,11,17
15:4,16,22 16:16
16:22 17:4,23
18:5,11,17,24
19:8,17,24 20:7
23:3,14,25 24:7
24:16,23 25:5
26:16 27:4,24
28:6,12,19 29:2
29:8,23 30:19
31:5,14,22 32:13
34:2 38:1 39:14
41:11 85:22
basic 7:7 58:17
basis 8:13 11:7,9
21:6,8 22:3,10
33:5 36:18 50:18
74:14 86:20,21
86:21
Beach 46:19,24
before 4:1 6:15
11:21 14:2 16:13
30:13,17 36:20
38:24 50:12,14
69:17 71:8 94:6
95:17
began 4:2
begin 27:17
beginning 89:8
behalf 15:14 16:10
29:13
being 6:10 9:23
33:16 43:17 64:4
65:9,10,12 86:22
belated 23:8 32:1
35:23
believe 44:19 50:7
belonged 91:20
belongings 30:25
31:10
benefit 6:9
Bernard 4:10,11
4:21,24 5:15,20
18:15 19:15
43:12 46:7,9
52:16 59:25 60:2

61:12 69:20 70:7
70:10 84:12,16
84:22
between 19:21
44:25 74:2 90:7
90:12
Bienes 80:9,13
Bistro 46:24
blanket 8:13 62:3
BLMIS 4:13 18:21
19:22 22:24
23:11,12 24:14
24:21 25:3 30:17
30:25 31:20
32:21 33:25
34:12 50:14
59:24 60:1,25
64:4,8,12,19,24
65:1,4 66:11,16
66:19,22,23
67:23 68:2,7,10
69:2,12 71:25
72:3,10,15,21
73:5,7 74:8,13
74:16,20,24 75:5
77:15,24 78:3,25
79:8,13,20,25
80:12,25 81:1,6
81:8 82:20 84:8
85:4,8,14,18
86:2,5,11,14,18
86:25 87:9,13,18
87:23 88:3,6,11
88:17 89:21,25
91:1,2,5
BMIS 31:20 40:12
42:19,24 43:5,9
43:13,24 44:6,11
45:8,13,17,21
58:13,21,24 59:1
59:4,6,24
board 28:4 58:9
books 74:17,21,25
84:1,11,21
Box 2:4
boxes 5:7
breached 45:8
81:6
break 37:2 63:8
briefly 7:12
brother 4:18 18:15
19:15 30:23
43:12 46:3,6,9
46:15 52:12,23
61:9 64:6 70:13
70:15,19,23 77:6

78:10 79:18
80:13 84:12,16
84:21 88:12
91:24
building 5:6 59:7
68:6
business 5:6,16,21
31:20 60:14
66:20 76:24
77:24 78:25
79:14 85:4,8,13
businessman 44:15
B-i-e-n-e-s 80:10

### C

C 1:16 2:1 71:2
94:1,1
call 49:9,16 50:3
called 9:2,21
calls 16:3 40:19
42:6 48:11 53:18
56:3 74:1
came 91:1
capacity 64:23
81:6 86:2,11,17
care 45:5
CARPENTER 2:3
case 12:3,10 51:2
65:14 94:15
cases 47:25 48:14
48:18
caused 79:7
CCR 94:18
certain 22:22
certainly 36:16
47:9
Certified 1:18
certify 94:4,12
95:4
chairman 27:22
28:16,24
chance 71:5
characterization
8:2 34:20 81:23
charged 41:2
charities 91:7,20
Charles 2:13 4:4
Charlie 37:14 39:5
62:20
Chesler's 8:7 38:8
38:18,22 40:17
Chez 46:24
chief 24:13 64:13
circumstances 6:4
6:25 7:9,11
circumstantial
40:13
City 59:8

civil 1:2 12:3 36:11
48:15
clarification 59:22
71:13
clarify 7:21
clear 22:7 25:10
34:6 35:5 36:11
Clearing 53:10
clearly 34:21
41:14 50:12
clients 70:9
Cliffside 64:20
66:12
college 52:1
commencing 1:22
Commission 94:20
committed 4:8
committee 87:1,5
communicate
86:19
communication
29:14 49:19
company 41:3
compelled 11:5,25
12:7,14,21 13:13
13:21 14:6,13,19
15:6,18,24 16:18
16:24 17:6,25
18:7,13,19 19:1
19:10,19 20:1,9
23:5,16 24:2,9
24:18,25 25:7
26:18 27:6 28:1
28:8,14,21 29:4
29:10,25 30:21
31:7,16,24 32:15
34:4 38:3 39:16
complained 77:15
78:24
complaint 3:15 4:6
5:13,17 8:3,6
12:16,24 13:2,9
13:24 14:8 15:10
16:2 22:18,21
26:5,8,21 27:10
27:19 40:11
42:11,15 43:25
68:13 69:20,23
69:23 76:23
77:23 79:4 80:18
81:19 82:12,13
82:16,19 88:20
89:4,8,9
complaints 77:23
78:1,7,12 79:13
Complaint's 6:1
complex 5:19
compliance 24:13



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

98

25:3 41:5 64:14
72:6 75:5,10,15
75:20,25 86:3,5
86:12,18,22 88:4
88:7
conceal 87:15 88:8
concealed 5:24
77:7
concealing 79:18
concerned 30:12
84:17
concerning 5:7,20
8:17
concluded 93:11
conclusion 40:20
41:10
condition 74:13
85:13
Conditions 5:9
confessed 30:24
70:19,23
confidential 67:6
67:12,17
Confidentiality
67:11,16
conjunction 78:9
connection 87:22
consciously 78:19
consequences 63:3
63:4,7
consider 90:20
considered 67:17
constitute 40:12
Constitution 11:5
11:25 12:7,14,21
13:13,21 14:6,13
14:19 15:6,18,24
16:18,24 17:6,25
18:7,13,19 19:1
19:10,19 20:1,9
23:5,16 24:2,9
24:18,25 25:7
26:18 27:6 28:1
28:8,14,21 29:4
29:10,25 30:21
31:7,16,24 32:15
34:4 38:3 39:16
constitutional 7:2
62:1
construed 25:11
contacts 65:5
contain 68:23
69:11
contained 84:5,23
89:3,8,14
containing 5:6
contents 5:5
continuation 46:10

46:20
continuous 65:5
control 71:25 72:3
79:25 81:6 86:3
86:12,18
controls 75:6,10
75:16,20,25
85:24 86:4,8,14
conversation
34:21 46:2
conversations 51:1
51:10 56:11
cooperated 79:18
85:17
cooperation 88:12
copy 13:2 38:8
69:20
Corp 53:10
correct 8:14 15:2
15:13 16:6 24:11
24:20 25:2 27:21
28:3 30:10,14
33:13 47:25 48:7
48:16 50:17
53:12 55:6,7,12
55:17,23 56:5,9
56:16,21 57:3
58:13 59:8,10
60:10,22 63:5
65:15,16,24
67:22 68:2 70:12
70:18,22 71:10
71:17,18,21,24
72:2,5,9,13,20
72:23 73:1,4,9
73:12 74:12,16
74:20,24 75:4,9
75:14,19,24 76:4
76:6,23 77:2,6
77:12,21 78:1,6
78:9,15,19,23
79:3,6,11,17,24
80:4,12,24 81:5
82:11,15,18,23
82:24 83:9,11,22
84:4,11,15 85:6
85:10,16 86:1,10
86:17,25 87:4,9
87:13,18,22 88:3
88:6,11,16 89:2
89:4,7,9,13,17
89:18,24 90:3,6
90:11,15 92:22
correcting 65:21
correctly 22:25
23:9 32:22 33:2
33:3,8
correspondence

4:17
counsel 2:8,14 4:4
7:14 9:11 11:2
11:10,22 12:4,11
12:18 13:10,18
14:3,10,16 15:3
15:15,21 16:15
16:21 17:3,22
18:4,10,16,23
19:7,16,23 20:6
21:9 23:2,13,24
24:6,15,22 25:4
26:15 27:3,23
28:5,11,18 29:1
29:7,22 30:18
31:4,13,21 32:12
34:1 37:25 39:9
39:11,13 41:14
41:23 42:7 49:11
71:15 74:3 94:13
course 10:15 25:24
31:19 68:7 74:9
76:8 86:10
court 1:1,18 4:13
5:4 6:20 7:5,19
7:22,24 9:24
20:4 36:3,6,8,20
40:10 47:25
55:19 59:22
62:23 73:23 83:4
93:12
Court's 34:16
36:21 39:25 40:5
40:22,25
cpada@lswlaw.c...
2:12
create 21:14 22:5
criminal 11:11
48:15 49:21,22
49:25
culpable 5:22
culpably 43:17
currently 12:9
customer 64:9
customers 42:20
42:25 43:5,9,13
45:12,17 80:14

_____

D

D 3:1 9:1 80:17
81:18 82:13
daily 86:20
dated 80:21
daughter 15:2
24:21
David 72:18,20
73:10 85:17
day 95:18

day-to-day 22:23
23:11 32:19
decades 4:8
deceiving 69:12
December 4:7,12
18:22 19:22 46:3
69:21 70:7,13,16
72:11
decide 52:22
decided 35:9
decision 7:6 62:13
decline 7:3 11:3,23
12:5,12,19 13:11
13:19 14:4,11,17
15:4,16,22 16:16
16:22 17:4,23
18:5,11,17,24
19:8,17,24 20:7
23:3,14,25 24:7
24:16,23 25:5
26:16 27:4,24
28:6,12,19 29:2
29:8,23 30:19
31:5,14,22 32:13
34:2 38:1 39:14
defendant 1:12
2:14 3:16 4:7
9:15 12:2,9
14:23 22:17,20
22:22 40:14 70:8
Defendant's 6:2,22
8:7
defense 49:10
defenses 6:2
defraud 43:18
74:25 80:14
defrauding 42:17
denials 89:17
denies 22:20
deny 19:21 42:9,13
42:17,22 43:2,7
43:11,17,23 44:4
44:10,24 45:3,7
45:11,16,20 46:5
46:8,17,22 64:18
64:22 65:1,4
66:10,16,19,22
71:21 72:13 74:5
74:7,12 85:2
denying 8:7
department 86:20
DePascale 5:10
60:24 62:15
depend 8:10
depending 6:3
deposed 11:21
deposition 1:5
6:22,23 7:25 9:9

10:16 25:25
34:25 35:6,12,17
48:7 54:1 56:1
62:22 67:14
93:11
depositions 6:15
47:2,7,17 48:5
55:14
Depository 53:10
description 3:13
33:24 72:10
desk 22:24 23:12
detailed 7:1 78:2
detect 76:7
detected 84:18
determine 19:6,14
54:9 63:6
detriment 42:19
43:4
DEUTSCH 2:3
different 8:4
direct 3:7 5:14 9:6
32:18 34:12
36:12 74:4
directing 21:23,25
22:2 36:18 41:3
direction 21:7
54:16
directions 36:13
directly 5:23 45:4
director 24:13
64:13 72:6
directors 58:9
directs 10:19
disclose 43:2
disclosure 11:15
49:17 50:3
discovered 79:20
discovery 6:12,15
6:16,24
discuss 46:9
discussed 14:8
40:9 46:19 48:25
49:2 84:11,16
discussion 8:23
35:15 38:6 67:4
76:19
discussions 34:24
74:2
disingenuous 35:4
35:23
Dismiss 8:8
disobeying 36:21
dispute 40:16,25
41:8
disputing 7:23
District 1:1,1 4:20
49:12



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

99

divulging 49:19
document 6:15,16
  6:24 20:18 21:4
  21:5,16,17 22:4
  27:13 59:12 66:1
  67:18 68:19
  69:17 71:6,8,11
  71:19,22,24 72:5
  80:19 81:20,25
  82:8
documents 3:19
  4:15,16,18,18
  5:7,12 6:11 8:16
  19:3,12 20:23,24
  21:12,19 22:8
  30:2,8,13,16
  31:19 35:17
  41:15 45:21 50:5
  50:14,15 52:21
  55:8,13,18,24
  56:6,10,17,22
  57:13 63:11,20
  64:1,3,4 85:7,11
  93:3
doing 9:25 31:11
  35:11 78:20
domiciled 66:17,24
done 64:9
door 34:8
down 45:23
due 66:4
duly 9:3
during 6:6 10:15
  22:22 23:10
  25:24 43:13 45:7
  45:11 64:8,11
  68:7 74:9 76:8
  86:10 89:24
duties 6:5 45:5
duty 45:9

E
E 2:1,1 3:1,12 9:1
  9:1 94:1,1
each 6:4 25:21
  53:14 62:7
earlier 47:10 65:8
  92:23
early 79:19
efficiency 6:14
effort 63:2
eight 40:23
Either 37:15
eleven 4:22
ELLEN 1:6
employ 30:17
employed 86:2
employee 33:25

51:4,7 64:23
employees 60:14
employment 34:11
  53:3 68:8 74:9
  75:4 76:9 86:11
enable 6:16
end 89:9
endorsed 5:23
enforce 75:24
enforcement 45:22
engaged 88:12
ensnared 7:8
ensure 86:21
ensuring 41:4
enter 21:17
entered 7:18 30:24
enterprise 58:18
entire 42:19,24
  43:4,8,13 45:7
  45:11 52:18,24
  56:18,23 57:19
  68:6 76:8
entities 56:12
entitled 50:14
  80:20
entity 60:12,13,13
  60:14,15
equivalent 5:6
Erin 3:23 81:15
  83:18
ESQ 2:6,7,7,13,13
essentially 37:9
establish 75:5,10
established 75:15
  75:21 76:1 86:4
ethical 81:1,8
ethics 44:11,15,19
Europe 88:17
even 6:8 36:6
  75:15,20,25
event 6:4
events 6:18
ever 11:21 12:2
  14:2 16:20 46:23
  52:5,7,18,23
  54:9 55:19 56:7
  56:18,23 57:18
  57:22 58:1,5,8
  61:2,5 68:5
  69:17 71:8 72:17
  80:8 85:23 86:7
  every 25:16,23
  37:9 48:9,20
  53:15 73:21 89:2
  89:4,7,10
evidence 40:13
  78:11 79:7
evident 37:8

exact 33:9,19
Exactly 92:24
EXAMINATION
  1:5 3:7 9:6
examine 13:25
examined 13:5
example 10:11
except 22:21
excerpts 21:12
exercise 7:2 21:12
  21:19
exhibit 3:13 12:25
  13:7 14:24 15:12
  17:14 20:13,21
  23:20 26:6,11
  32:8 38:12,14,25
  40:1,3 59:14
  63:13,17,24,25
  65:10,11,17 67:6
  68:16,18,21,23
  69:1,5,10,15,16
  69:19 70:1 71:2
  71:4 80:17,23
  81:13,16,18
  82:13 88:21,25
exhibits 38:20 83:7
  83:9 93:12
expedite 37:7
experience 85:23
experiencing 62:5
Expires 94:20
extensive 6:10
extent 29:16 39:2
  40:19 41:21
  48:11 49:9,16
  50:2 74:1
extremely 6:2
e-mail 4:17

F
F 9:1,1 94:1
fact 6:2 30:7 69:11
  72:2 82:7 84:21
  91:20,25
facts 6:17 43:3
failing 41:7
failure 76:13
fair 53:2 58:15
  73:16
fairness 6:14
faith 63:1
false 20:3 22:6
  66:22 69:6 85:7
  85:11,18 87:24
familiar 26:10
family 3:20 46:18
  63:11,21
FBI 4:12 31:11

fear 11:11 49:25
feel 13:15
few 7:13 92:11
fiduciary 44:24
  45:4
fifth 7:6 8:9,13
  11:4,24 12:6,13
  12:20 13:12,20
  14:5,12,18 15:5
  15:17,23 16:17
  16:23 17:5,24
  18:6,12,18,25
  19:9,18,25 20:8
  21:23 23:4,15
  24:1,8,17,24
  25:6,10,12,15
  26:17 27:5,9,16
  27:25 28:7,13,20
  29:3,9,14,21,24
  30:20 31:6,15,23
  32:14 34:3,16,17
  34:22,25 35:7,10
  35:13 36:23 37:9
  37:13,15,20 38:2
  39:7,15,19 41:13
  41:18 47:3,8,18
  48:1,8,19 50:9
  50:19 53:4,14
  54:17 57:4 60:15
  60:21 61:15,25
  62:4 68:3 71:15
  73:19,22 92:16
  92:21
file 16:1,9 17:1
  85:3
filed 15:9,14 16:14
  20:4 29:12,20
  69:20 79:13
  81:20 82:1 85:7
  85:11
filing 5:4
financial 4:18 41:4
  53:11 73:7 74:13
  85:13
financially 94:15
find 7:10 41:7
finding 40:17,25
  41:8
fine 37:3
FINRA 53:9
firm 34:13 64:14
  76:9 80:8
firm's 67:24
first 7:14 9:2 34:21
  51:16
five 92:8
five-minute 63:8
flags 5:19 78:2,16

78:20
floor 2:10 5:5
  67:23 68:2,6
floors 59:7
follow 47:20
followed 86:22
following 56:11
  66:9
follows 9:4
force 34:25 35:6
forced 35:18
foregoing 94:4
  95:3
form 22:6 31:2,12
  32:2 37:12 41:20
  43:14,20 44:1,7
  44:12,16,20
  45:24 46:11
  48:21 55:4,10,15
  55:21 56:2,14,19
  56:24 57:9,16,20
  57:25 58:3,6,10
  58:19,22 59:2
  60:12,17 64:15
  69:3,8,13 71:3
  74:1,10,18,22
  75:2,7,12,17,22
  76:2,10,25 77:4
  77:10 78:4,13,17
  78:21 79:1,9,15
  79:22 80:2,6,15
  81:3,10 83:1,13
  83:16,20,24 84:9
  84:13,19,25
  85:20 86:15,23
  87:2,7,11,16,20
  88:1,9,14,18
  89:11,15,19 90:9
  90:13,18,23 91:3
  91:8,11,14,17,22
  92:5,19 93:6
formally 55:9
former 51:7
formulated 46:19
Forty-eight 32:5
forward 39:19
Foundation 1:5
  9:12 63:21
Foundation/Jos...
  3:20 63:12
fourth 27:9,16
  29:14,21
Frank 5:10 65:12
fraud 4:9,22 5:16
  5:22 40:11 72:24
  80:20
fraudulent 66:23
  73:10,13,14



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

free 21:18
Freighling 72:18
  72:21,23 73:1,5
  73:10,12,17
  85:17
frivolous 36:22
from 10:15 18:21
  21:12 31:1,10,11
  32:23 37:12
  39:18 40:7,23
  43:12,24 45:21
  51:2 54:2,20
  67:6 70:9 72:10
  77:7 78:10 79:7
  79:19 89:8 90:1
  91:1,1
front 17:12,16
  26:7,23 35:15,20
  36:7 54:15 70:3
function 7:7
functions 60:13
  73:18
fund 77:16 78:24
  80:20
further 34:20
  73:17 93:8 94:12
F-r-e-i-g-h-l-i-n-g
  72:18

G

gave 10:6 39:21
getting 22:6
GIOFFRE 1:17
  94:18
give 8:16 23:7
  30:13 41:1 66:5
  66:5 92:7
given 47:25 49:20
  55:14 57:22
giving 21:14 54:2
go 15:11 21:11
  37:19 47:12
  51:20,22,24 52:1
  52:3,5 67:1 71:5
  75:11 76:16
going 8:12,20 10:5
  13:4 20:17,22
  21:11,18 23:7
  33:3 36:4,9,20
  37:21 40:6,18,23
  41:9,20,23 42:4
  42:7 49:8 50:10
  51:14 54:11
  61:22 62:16
  63:19 65:7,8
  67:5 70:5 73:25
  84:17
good 37:2 63:1

90:21
gotten 58:1
Governors 28:4
grammar 51:24
grand 11:16 49:6
granted 6:21
great 42:18 43:4
Greenberg 2:7
  8:18,22 9:10
  38:5
Greg 2:7 9:10
grossly 45:13
group 54:10
groups 53:8,13
gtrif@mdmc-la...
  2:5
guess 67:9 68:14
guilty 72:24

H

H 3:12
Handing 17:11
  68:15
happens 10:1
harm 43:8
Harry 77:14,18
having 9:2 20:18
  21:19 35:16
  37:12 42:9,22
  43:7 46:22 47:25
  58:15 91:16
head 86:2,11,18
health 10:24 54:1
hear 72:17 80:8
heard 30:4,7 59:24
  85:23 86:7
heart 5:17
hedge 77:16 78:24
  80:20
held 54:9
he'll 8:16
hid 78:10 79:6
high 51:20,22
him 10:18 13:25
  21:19,23,25 22:2
  22:7 30:7 34:9
  34:25 35:6,7,16
  36:7,9,18 37:12
  39:6,9 41:23
  47:17 52:18
  54:14,15,20
  59:17 61:5 73:6
  73:6,18
hindsight 5:18
history 47:2,6,17
  47:24
hold 57:1,5
honest 81:1,8

honestly 63:1
honestness 84:6
honesty 84:7
honor 58:5
hospitals 91:10,21

I

identification
  12:25 13:1 14:22
  14:25 15:8 38:7
  38:12,14,17
  63:13 67:7,19
  81:14,17
identified 78:16
ignored 82:15,19
implement 75:14
improper 34:15
inaccurate 35:3
inappropriate
  56:3 62:6
include 4:16
including 88:24,24
  89:3
indicate 65:12
indicating 78:2
indicia 40:10
indirectly 5:23
individuals 4:25
induced 5:23
industry 53:8,11
inference 41:2
  73:23
information 8:17
  40:15 67:6 73:7
  77:7 79:19 84:22
  85:19
informed 11:19
  49:11 70:8
innocent 7:7,10
instituted 86:13
instruct 16:4,12
  21:3 29:15 33:4
  36:4 39:4,5
  49:18 53:19
  62:17
instructing 22:10
instructions 36:24
integrity 44:5 84:6
  84:7
intend 39:19 69:1
  69:5,10
intensive 6:3
intent 43:7
intention 47:3
intentionally 77:7
  78:10 79:6 85:7
  85:11,17
interchangeably

60:7
interest 6:14 66:20
  73:24
interested 94:15
internal 75:6,10
  75:16,20,25
  85:23 86:4,4,8
  86:13
invest 69:12
investigation 4:21
  4:23 5:2 11:17
  11:20 49:7,13,15
  49:21,23 76:13
  79:12
investment 4:9,10
  5:16,21 41:5
  44:11 45:14 60:3
  60:4 67:22 68:10
  87:10,14,19,23
  90:1,20,22 91:1
investments 44:6
  45:18 90:16
Investor 4:14
investors 43:24
  45:8 66:17,23
  75:1 80:25 81:7
  91:2,6
invocation 25:15
  25:20,23,24
  34:15 35:10
  36:22 50:9,19
  53:4 54:17 62:4
invocations 25:10
invoke 35:13 39:19
  47:3,8 48:19
  53:13 57:3 60:15
  60:20 61:15 68:3
  73:19,22
invoked 8:10
  25:12 92:16
invokes 25:24
invoking 8:13
  37:20 39:6 41:15
  41:18,21 47:18
  48:1,8 61:19
  71:14
involved 43:17
  55:9 88:17
involvement 32:19
  33:25 34:13 53:7
  55:3
issued 64:19 66:11
issues 6:9

J

J 2:6
January 46:5,17
Jean 46:24

JEANNIE 2:13
Jersey 1:1,18 2:4
  64:20,23 65:2,5
  66:13,17,20,24
  94:19
job 52:7,10,12
  56:23 72:10
Joshua 1:5 63:21
Judge 7:16 8:7
  38:8,17,21 40:16
  June 18:21 19:21
  72:10
jury 11:16 49:6
just 7:12,15,21
  25:9 26:9 34:7
  36:10,22 39:1,20
  39:21 40:17 65:7
  65:15,19,21
  71:13 92:7,11

K

keep 54:20
Kemble 2:3
knew 70:24 72:20
  73:13 74:20
  82:20,23
know 10:11 29:12
  34:23 36:21 61:7
  62:10,15,18,20
  67:10 77:18 82:1
  82:6 90:25 91:5
  91:19,24
knowing 41:4
knowingly 10:6
  20:3 42:17 79:17
  80:5 82:15,19
  85:6,10,16
knowledge 6:6
  36:14 42:10,14
  44:5 85:22 92:17
  93:1

L

L 4:10 59:25 60:2
  61:12 70:8,10
LANKLER 1:20
  2:10
lapse 55:2
largest 77:16
  80:20
last 52:15 65:11
later 4:22
launched 4:20
laundering 88:4,7
  88:13,16
Lautenberg 1:5,5
  1:6 3:19,20 9:12
  13:2 63:11,12,21



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

63:21 65:13
law 5:24 9:3 35:24
  45:21 52:3 84:6
lawfulness 77:24
laws 76:8
lawsuit 9:12 48:25
  49:2
lawyer 10:16
  29:12 65:15
lawyers 14:9 15:9
  48:24
law-abiding 81:1,8
  84:7
leafed 13:17
least 41:6 42:14
  67:18 80:1
lecture 57:22
left 9:10,10 30:17
legal 36:8 40:19
  41:4,10 53:18
  56:3 74:1,2
let 16:6 36:9 40:20
letters 28:10
license 1:19 57:6,6
  57:7,7 94:18
licenses 57:1,5,8
lie 29:6
life 52:7,19,24
  56:18,23 57:19
  57:23 58:2 61:3
  68:6
lifeguard 52:10,13
light 6:25
like 4:2 61:25
  62:19 91:21
line 41:11
lines 40:23
liquidate 4:13
listed 65:13 67:8
listening 25:10
lists 71:24 72:5
litigation 56:7
  73:24
live 11:1
LLC 4:10 58:21
  59:4
LLP 1:20 2:3,10
located 59:7 67:23
locked 45:22
long 4:9
look 13:5,8 15:8
  17:8 19:5,14
  20:11 23:18 26:4
  26:8,20,21 32:3
  38:20 40:4 59:11
  63:16,22 68:16
  69:15,22 71:2
  80:17 81:18 83:3

83:8 88:20,22
looked 64:1
loss 42:18 43:4
loyalty 45:5,9

—————————

M

M 2:7 9:1
made 42:22 76:24
  77:22,23
Madison 1:20 2:10
Madoff 1:6,10 3:5
  3:16 4:5,7,10,14
  4:15,24 5:1,11
  5:14,18,21,24
  7:2,18 8:3 9:8,12
  9:13 11:1 13:1,3
  14:15,23 15:1
  22:15 32:22 36:2
  38:20 41:18 42:9
  47:1 51:14 52:16
  53:6 59:24 60:1
  60:2 61:13 63:16
  69:21 70:8,10
  74:5 80:17,24
  82:9 85:2 92:15
  95:10
Madoff's 4:11,21
  5:16,20 6:5
  18:15 19:15
  40:12
Magistrate 35:16
  35:20 50:13
mailed 64:19 65:9
  65:10,12,23
  66:12
mainly 34:10
maintained 74:16
  74:21,25
make 10:16,18
  36:16 44:6 62:12
  73:23 84:22 87:5
making 44:11
  82:25
malicious 43:7
mall 73:2
man 7:10
management
  22:23 23:11 74:8
  86:8,13
manager 78:24
managers 86:20
managing 24:13
  64:13
manner 81:2,9
manual 87:10,14
many 79:12
March 77:13,22
  94:21

mark 12:23 14:21
  38:9
marked 12:24
  14:24 20:21
  38:11,14 63:12
  81:13,16 83:5,6
Markets 53:11
market-making
  22:23 23:12
  32:20
Markopolos 77:14
  77:19,22 78:7,12
  78:16 81:21
  82:12,16,19,24
MAS 1:2
massive 4:8 79:20
material 42:22
  43:3 67:14 69:11
  89:10
materially 69:6
  85:12,18 87:24
matter 6:18 8:17
  9:21 13:2 20:4
  26:21 34:10
  42:11,15,18,24
  43:3 48:17 51:11
  61:12,16,18 95:6
matters 50:16
may 3:22 10:16
  11:14 49:20 57:5
  77:12,21 78:23
  79:8 81:12 83:15
  83:23 90:3,7
maybe 82:4
McELROY 2:3
mean 60:12 71:16
  82:6
meaning 60:20
meant 16:8
meet 70:10
member 28:4 58:8
members 46:18
memories 6:8
memory 53:21
  54:8,15,19,23
  55:2
men 7:7
mental 54:1
mentioned 4:1
Michael 3:21
  81:12 83:12
might 7:8 57:4
million 43:24 90:1
  90:4,7,12,17,21
  90:25
minutes 92:8
mischaracterizat...
  65:22

mislead 85:12
misleading 69:6
  85:19 87:25
misrepresentatio...
  42:23
money 43:12 88:13
  88:16 91:6,16,19
  91:20 92:4
monitor 75:19
monthly 86:20
months 4:22
more 7:10 34:9
  43:23 92:11
Morristown 2:4
Motion 5:8 8:8
Mount 2:3
move 34:18 36:19
  36:20
MULVANEY 2:3
myself 11:6 12:1,8
  12:15,22 13:14
  13:22 14:7,14,20
  15:7,19,25 16:19
  16:25 17:7 18:1
  18:8,14,20 19:2
  19:11,20 20:2,10
  23:6,17 24:3,10
  24:19 25:1,8
  26:19 27:7 28:2
  28:9,15,22 29:5
  29:11 30:1,22
  31:8,17,25 32:16
  34:5 38:4 39:17
mystifying 62:25
M-a-r-k-o-p-o-l-...
  77:14

—————————

N

N 1:16 2:1 3:1
name 3:3 4:4 8:16
  9:8 46:24 60:25
  72:18 80:8 89:22
named 77:14,18
NASD 27:22 28:4
  28:10,17,25 53:8
NASDAQ 53:8
  54:7 55:3,9
nature 84:8
nearly 90:4
necessarily 25:20
need 10:10 19:5,14
  47:12 52:21 55:7
  55:12,17,23 56:5
  56:9,16,21 57:13
  93:2
negligent 45:13,18
neither 94:12
never 86:3,13,25

87:9,14
New 1:1,18,21,21
  2:4,11,11 4:20
  28:17,25 49:12
  53:9 59:8 64:20
  64:23 65:1,5
  66:1,5,17,20,24
  94:19
nod 10:11
normal 6:12
Notary 1:17 94:19
  95:24
note 61:11 65:7
noted 7:6
notes 1:17
nothing 54:23 76:5
  76:7
notorious 4:9
November 1:21
  38:18 80:21
number 66:17 67:7
  67:19
N-A-S-D-A-Q 54:7

—————————

O

O 9:1
oath 9:18,19,20
obey 36:3,8
object 20:17 21:3
  25:16,23 33:4
  34:19 39:1 40:18
  41:9,11,20,21,23
  42:4 48:10 49:8
  50:10 54:11
  62:16 73:25
  81:22
objected 16:7
  55:16
objecting 21:1
  25:21
objection 6:22
  10:16,19 11:18
  16:3,11 20:5
  23:8 25:14 29:15
  31:2,12 32:1
  36:16 37:11
  43:14,20 44:1,7
  44:12,16,20
  45:24 46:11
  48:21 50:2 52:25
  53:18,22 55:4,10
  55:15,21 56:2,14
  56:19,24 57:9,16
  57:20,25 58:3,6
  58:10,19,22 59:2
  60:17 64:15
  66:14 69:3,8,13
  74:10,18,22 75:2



**Rizman**
**Rappaport**
**Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

75:7,12,17,22
76:2,10,25 77:4
77:10 78:4,13,17
78:21 79:1,9,15
79:22 80:2,6,15
81:3,10 83:1,13
83:16,20,24 84:9
84:13,19,25
85:20 86:15,23
87:2,7,11,16,20
88:1,9,14,18
89:11,15,19 90:9
90:13,18,23 91:3
91:8,11,14,17,22
92:1,5,19 93:6
obligated 48:12
obligations 36:3,8
70:11
observations 84:5
obtain 6:11
obviously 36:19
occupied 68:7
occurred 6:4
Ocrant 3:21 81:12
83:12
October 77:13,22
off 8:20,23 38:5,6
67:1,4 76:16,19
offered 92:3
office 4:19 5:3,6,12
30:9 31:1,10
49:4,12 50:6
56:13 68:6 93:4
officer 24:13 72:7
offices 1:19 30:25
45:21,22 59:6
67:24 73:2
Ohio 7:6
okay 15:11 21:1
26:14 27:16
33:14 37:3 39:24
70:2 92:11
old 18:9 19:6
51:16
omissions 40:14
69:11
omitting 43:2
one 20:25 38:9
39:21 41:2 65:8
75:21 76:1,17
one-half 5:5
ongoing 4:22
only 7:1 27:18
35:3
open 62:25
opening 30:4
opens 34:8
operate 81:1,8

operated 64:12
operating 7:24
47:15 70:19,24
77:3 78:3 82:20
operation 64:8
operations 32:19
32:20 41:6 77:24
85:14
Opinion 3:17,18
8:7 38:8,11,13
38:19,22,22
39:25 40:5,7,23
41:12
opportunity 6:24
13:8
ORAL 1:5
order 3:18 7:17,19
7:22 19:5 34:17
36:6,21 37:7
38:13,18,22
67:11,16 85:12
88:8
ordered 7:24
45:22
orders 36:3,8
ordinary 31:19
organizations 54:7
other 4:18,24 8:17
12:10 14:9 36:22
39:8,10 46:18
48:14,24,25
50:20,21 54:14
57:7 91:2 93:5
otherwise 7:8 10:4
out 21:12 36:17
41:7
outcome 94:15
outset 53:25
over 4:14 5:19 6:5
6:22 90:1,11,17
owed 45:5
own 89:22
owners 60:12
owns 58:24
O-c-r-a-n-t 83:12

——————
P

P 1:16 2:1 9:1
page 3:3,13 33:8
33:12,20 39:24
40:5,22
pages 65:11,11
paired 40:11
Palm 46:19,24
paragraph 17:8,12
17:16 18:2 20:11
22:16,18,21
23:18 24:4,12

26:8,22 27:8,10
27:17 28:23 29:6
29:14 32:3,17,23
34:12 40:4 59:11
59:15 69:24,25
70:2,6 88:22
paragraphs 34:7
88:23 89:3
Park 64:20 66:13
part 32:17 33:16
participant 5:22
participating
43:18
parties 6:23 59:25
94:13,13
parts 8:8
party 48:15,18
56:7
past 53:3
pending 37:2
pensions 91:13,21
performed 73:9,18
period 5:20 6:5,7
42:13 45:12,16
64:7,11 73:4
89:24
perpetrating 72:24
perpetuated 79:25
80:4
person 48:25 61:2
71:25 72:3,17
77:13,18 81:6
86:3,12,18 93:5
personal 51:15
92:17 93:1
personally 43:23
44:25 80:25
personnel 45:22
persons 56:12
pertaining 47:16
Peter 16,10 3:5,16
4:7 5:1,11,14,18
5:21 6:5,16 7:2
9:12,13 13:3
14:23 40:11
95:10
Peter's 6:20
piece 9:2
Pierre 46:24
place 7:25 58:16
94:6
Plaintiff 65:13
plaintiffs 1:7 2:8
4:6 5:14 6:19,21
7:3 8:5 9:11
12:25 14:24
38:12,14 42:18
42:23 43:3,8,12

43:19 44:4,10
45:1,4,8,12,17
63:13,16,24
64:19,20 65:9,10
65:11,17 66:11
66:12 69:7,12
81:13,16
plan 46:20
pleaded 72:24
please 10:3 15:10
17:9 20:12 32:7
39:24 63:22
68:14,17
point 10:2 30:23
39:19
points 7:13
policies 41:3 74:8
Ponzi 4:21 5:8
30:24 42:10,14
43:18,25 46:10
46:20 64:8,12
70:19,24 75:11
76:14 77:3,8
78:3,11 79:8,21
79:25 82:20
84:17,24 87:5,15
88:8
portion 33:20 70:5
posed 92:18 93:2
position 22:9
34:14 42:3 50:13
54:9
possession 19:4,13
30:8 31:18 50:6
93:3
potentially 6:3
practices 76:24
78:25 79:14 85:4
85:8
precise 6:3
premise 47:16
premises 4:15
preparation 48:4,6
48:9
prepare 55:25
68:21
prepared 31:19
64:4 71:10,18,22
73:13
preprinted 37:12
presented 7:16
pretty 36:11
prevent 76:5
prevented 54:2
previously 55:14
print 84:2
prior 47:2,6,17
56:7

privilege 11:15
16:4 29:17 39:3
39:20 48:2,8,11
48:19 49:9,17
50:4,9 53:4,14
68:3 73:19,22
92:16
problem 54:2
Procedure 36:11
procedures 86:22
proceed 6:15
proceeding 55:20
process 6:12 37:7
produced 90:16
produces 90:21
professional 57:1
57:5,8
program 75:5,10
75:15,20,25 88:4
88:8
programs 86:5
promotional 69:2
promulgated
76:12
proper 36:9 86:21
properly 8:9 25:12
propose 67:9
proprietary 32:20
prosecution 4:24
11:12 49:25
protect 7:7
protecting 45:13
45:18
Protection 4:14
provide 35:7
provided 87:24
providing 73:6
provisionally
41:19
public 1:17 61:12
61:16,18 84:2
85:12 94:19
95:24
publications 57:11
publicly 5:4
published 83:15
pull 21:12
purpose 69:11
purposes 67:16
pursuant 6:12
7:18 87:19
P-1 3:15 12:23
13:1,4,17 14:2
26:4 68:14,16,21
68:23 69:1,5,10
69:15 71:2 88:20
88:24 89:4,8,14
P-2 3:16 14:21


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

103

15:8 26:20,22
32:4 59:13 69:22
89:18
P-3 3:17 38:7,24
P-4 3:18 38:10,17
P-5 3:19 63:17
67:6,17
P-6 3:21 83:3,9,11
84:1,5,23
P-7 3:23 83:3,9,18
84:1,5,23
p.m 93:11
P.O 2:4

**Q**

quasi-criminal
48:16
question 8:11 10:3
10:5,7,17 16:6
17:15 32:2,25
33:15,17,19 34:9
36:9 37:2,9,23
38:23 39:2,9
40:7,16,19 48:9
48:20 50:11,22
50:24 52:22
53:15,24 54:12
56:3 59:18 62:19
66:3,7,9 74:1,3
77:17
questioned 34:8
questioning 41:11
questions 7:3 9:23
21:10,10 35:8
47:1,6,7,13,16
47:24 48:2,17
50:8 53:2,6,12
57:4 60:11 62:8
62:11,24,25 65:9
68:1 73:17 92:12
92:18 93:1,8
question-by-que...
8:10
quoted 33:16
quoting 32:18

**R**

R 1:16,16 2:1,13
9:1 65:12 94:1
raise 61:14
rather 25:15 37:11
67:10
Re 3:19 63:11
read 4:2 12:16
16:20 17:19
20:12,14,16,18
20:23 21:2,4,13
21:19 22:15,25

23:9,18,21 26:9
26:12,25 32:7,9
32:22,24,25 33:7
33:15,15,17
37:12 40:6,17,23
50:22,24 59:20
66:8,9 70:5
92:23 95:3
reading 21:22
reads 40:9
reason 9:25 10:23
70:22 74:24 75:9
82:18 84:15 87:4
87:13 88:6
recall 53:23,25
received 12:24
14:24 38:11,13
58:5 63:12 81:13
81:16 91:1
recent 5:4
recess 37:4,6 63:10
76:20 92:10
reckless 41:6
recklessness 40:13
recognize 60:25
64:3 82:8
recollection 6:17
55:8,13,18,24
56:6,10,17,22
57:14
recommend 35:10
Reconsideration
5:9
record 4:3 8:21,23
10:1 20:16,18
21:2,4,5,13,16
21:17,20,22 22:5
22:16 23:1,9
25:9 34:6 35:5
36:10,17 38:5,6
40:6,24 47:11
49:10 59:20,23
61:11,12,17,19
63:23 65:8,22
67:1,4 69:19
71:3 76:16,19
records 66:23
red 5:19 78:2,16
78:20
redact 67:6,10
redeemed 90:1,4,6
90:11
redemption 46:3
91:6
redemptions 70:9
70:16
refer 8:6 37:24
referred 30:3

42:10,15 43:25
refers 59:25
reflected 34:11
82:12
refresh 6:17 55:8
55:13,18,24 56:6
56:10,17,22
57:13
refreshed 6:10
refuse 11:13,18
regarding 40:14
48:17 51:2,11
53:7 57:5 76:24
85:3,8,13
Region 28:17,25
registered 68:10
regret 91:16
regular 65:4 74:14
regulators 75:1
regulatory 48:16
Reiner 7:6
rejected 7:17
related 63:20
relates 67:18
relationship 5:15
44:25 45:4
relevant 6:11,17
32:17
reliance 81:7
relied 44:4,10 69:7
80:25
remains 5:1
remember 53:20
59:1
remove 30:25
31:10 45:21
repeat 10:4 17:15
rephrase 10:4
report 76:13
reporter 1:18 9:24
59:22 83:4 93:12
reports 85:3
represent 38:21
representatives
49:3
request 6:22 67:12
requests 70:9
required 10:20
reserve 25:22
34:18
reserving 41:25
42:2
respect 48:2,4,6,8
48:14,19 53:14
54:6 55:3 57:4
60:16 61:16 66:4
89:5,10
respectfully 11:3

11:23 12:5,12,19
13:11,19 14:4,11
14:17 15:4,16,22
16:16,22 17:4,23
18:5,11,17,24
19:8,17,24 20:7
23:3,14,25 24:7
24:16,23 25:5
26:16 27:4,24
28:6,12,19 29:2
29:8,23 30:19
31:5,14,22 32:13
34:2 38:1 39:14
respond 21:9 31:3
40:20 41:16¬
43:15,21 44:2,8
44:17,21 45:25
46:12 48:22
50:15 51:18
52:25 60:18
64:16 66:14
responded 54:4,5
54:23
responding 62:7
response 7:12
responsibilities
40:12
responsibility 41:3
85:3
responsible 7:1
22:22 23:10 74:8
restaurant 46:19
46:23
result 11:14 43:24
53:3
resulted 4:23
resuming 37:5
retained 93:12
return 90:21 93:2
returns 90:17
reveal 29:17 39:2
48:12
revealing 29:18
41:24
reverse 42:2
review 13:24 16:13
87:23
reviewed 30:13
87:18
reviewers 87:25
reviewing 6:10
13:7 15:12 17:14
20:13 23:20 26:6
26:11 32:8 38:25
40:3 59:14 63:25
68:18 69:16 70:1
71:4 80:23 83:7
88:21,25

Riccio 2:6 3:7 7:12
8:1 9:6,8 12:23
13:25 14:21 16:6
20:19,25 21:6,21
22:2,9,14 25:9
25:18,22 26:3
27:14 32:6 33:2
33:5,10,13,21
34:6 35:5 36:1
36:10 37:3,5,17
38:7,16 39:5,10
47:5,12,15,23
49:14 50:17,21
54:16,21 55:1
59:16,19 60:2,6
60:9 61:14,24
62:20 63:6,15
65:18,24 66:2,8
67:3,5,15,21
68:13 69:19
71:16 76:18,22
80:22 81:24 82:3
82:5 83:6 92:7
92:11,14 93:8
right 7:3 11:3,23
12:5,12,19 13:11
13:19 14:4,11,17
15:4,16,22 16:16
16:22 17:4,23
18:5,11,17,24
19:8,17,24 20:7
20:24 23:3,14,25
24:7,16,23 25:5
25:23 26:16 27:4
27:24 28:6,12,19
29:2,8,23 30:19
31:5,14,22 32:13
33:10 34:2,18
38:1 39:14 41:25
42:2 60:5 61:20
62:14 83:8
rights 21:9 22:8
35:14,18,21
41:13,19,22
61:19,23 62:1,12
71:14
rise 41:1
risk 86:8,13
risking 13:15
role 40:12
Ron 4:1 7:21
Ronald 2:6 9:8
Rosie 4:5
rriccio@mdmc-l...
2:6
rrubin@lswlaw....
2:12
Rubin 2:13 4:5



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

104

rules 36:11,15,25

**S**

S 1:5,16 2:1 3:12
same 9:20 11:18
  16:11 37:16,17
  37:19,22,24
  39:20 40:21
  41:17 42:12,16
  42:21 43:1,6,10
  43:16,22 44:3,9
  44:14,18,22 45:2
  45:6,10,15,19
  46:1,13,16,21,25
  47:4 49:1,5,24
  50:1,25 51:3,6,9
  51:13,19,21,23
  51:25 52:2,4,6,8
  52:11,14,17,20
  53:1,5 55:5,11
  55:16,22 56:4,8
  56:15,20,25 57:2
  57:10,12,17,21
  57:24 58:4,7,11
  58:14,20,23,25
  59:3,5,9,21
  60:19,20 61:1,4
  61:6,8,10 64:5
  64:10,17,21,25
  65:3,6 66:15,18
  66:21,25 67:25
  68:9,12,20,22,25
  69:4,9,14,18
  70:14,17,21 71:1
  71:9,12,14,20,23
  72:1,4,8,12,16
  72:19,22,25 73:3
  73:8,11,15 74:11
  74:15,19,23 75:3
  75:8,13,18,23
  76:3,11,15 77:1
  77:5,11,20,25
  78:5,8,14,18,22
  79:2,5,10,16,23
  80:3,7,11,16
  81:4,11 82:10,14
  82:17,22 83:2,14
  83:17,21,25 84:3
  84:10,14,20 85:1
  85:5,9,15,21,25
  86:6,9,16,24
  87:3,8,12,17,21
  88:2,5,10,15,19
  89:6,12,16,20,23
  90:2,5,10,14,19
  90:24 91:4,9,12
  91:15,18,23 92:2
  92:6,20,21,22

93:7
sanctions 34:18
  36:20
satisfactorily 5:18
saw 84:1
saying 62:9
says 22:17 33:1,8
  33:11 59:6,11
  65:17,22 66:1
scheme 5:8 30:24
  42:10,15 43:18
  43:25 46:10,20
  64:8,12 70:20,24
  75:11 76:14 77:3
  77:8 78:3,11
  79:8,21,25 80:5
  82:21 84:17,24
  87:6,15 88:8
school 51:20,22,24
  52:3,5 56:18
SEC 51:2,5,8
  56:13 76:12,14
  77:2,7,15,23
  78:10,24 79:7,7
  79:13,19,20
  81:21 82:2,5,12
  82:25 85:3,7,11
  85:12,19
second 40:4 67:2
  76:17
secondly 34:23
seconds 8:19
secretly 45:20
secured 5:5,12
securities 4:10,13
  4:14,15 5:24,25
  53:9,11 59:24
  60:1,3,4 76:7
SEC's 79:12
see 27:11,12,19
  68:13
seek 6:11
seen 14:2 38:23
  61:2 69:17 71:8
seized 4:15
self-incrimination
  13:16
self-serving 7:15
senior 24:12 64:13
Sent 82:3,5
sentence 20:25
  40:7,9,24
sentences 27:10,17
  29:14,21
separate 79:13
September 90:12
series 5:19 53:6
  57:6,7,7

served 27:21 58:8
sets 74:17,21,25
seventh 59:16
Shana 14:15 15:1
  24:21 25:2
sharpest 6:8
show 13:4 63:19
showed 39:9,11
showing 17:2
sides 7:23
SIFFERT 1:20
  2:10
significant 66:16
  66:19
significantly 8:4
silently 26:9
simply 37:13
since 22:15 37:1
SIPC 19:4,13 30:9
  50:7 51:11 56:13
  93:4
sit 13:23 20:23
  35:16 61:21
situation 41:4
six 79:12
ski 46:8,14
skill 44:6
solely 74:7
some 21:14 22:6
  30:23,25 31:10
  35:2,22 91:5
somehow 41:13
something 23:9
  39:8,10 53:20
  61:16
son-in-law 51:4,7
sorry 22:19
sort 21:15 35:2,23
sought 30:25
Southern 4:20
  49:12
Spada 2:13 4:1,4
  7:21 8:15,20
  11:9,13,18 13:23
  15:14,20 16:1,3
  16:9,11 17:1,10
  20:5,17,20 21:1
  21:3,8,25 22:4
  22:12 23:7 25:17
  25:19 26:1 27:12
  29:15 31:2,12
  32:1,5,24 33:3,7
  33:11,14,18
  34:19 35:15 36:4
  37:1,15,19 39:1
  39:8,12 40:18
  41:9,20 42:4
  43:14,20 44:1,7

44:12,16,20
45:24 46:11 47:9
47:14,19 48:10
48:21 49:8,16
50:2,10,20,22
51:17 52:25
53:18,22 54:4,11
54:18,22 55:4,10
55:15,21 56:2,14
56:19,24 57:9,16
57:20,25 58:3,6
58:10,19,22 59:2
59:15,17,23 60:4
60:17 61:11,18,
62:7,16 63:5,9
63:23 64:15 65:7
65:16,21,25 66:7
66:14 67:1,9
69:3,8,13 71:13
71:17 73:25
74:10,18,22 75:2
75:7,12,17,22
76:2,10,16,25
77:4,10 78:4,13
78:17,21 79:1,9
79:15,22 80:2,6
80:15,19 81:3,10
81:22 82:1,4,6
83:1,4,13,16,20
83:24 84:9,13,19
84:25 85:20
86:15,23 87:2,7
87:11,16,20 88:1
88:9,14,18 89:11
89:15,19 90:9,13
90:18,23 91:3,8
91:11,14,17,22
92:1,5,9,19 93:6
93:10
speak 61:5
specific 36:12
specifically 34:9
  34:15 69:24
spell 36:17
spoke 52:23
SRC 1:2
stand 28:10
standing 25:14
state 1:18 34:20
  35:2 64:22 65:5
  94:19
stated 5:3 11:19
  41:22,22 47:10
  49:10 50:12
statement 4:2 7:16
  11:19 22:25 30:5
  37:25 69:6 70:12
  81:25

statements 4:17
  64:18 66:10 67:8
  68:24 87:25
states 1:1 5:9 11:4
  11:24 12:6,13,20
  13:12,20 14:5,12
  14:18 15:5,17,23
  16:17,23 17:5,24
  18:9,14,18,25
  19:4,9,13,18,25
  20:8 23:4,15
  24:1,8,17,24
  25:6 26:17 27:5
  27:25 28:7,13,20
  29:3,9,24 30:9
  30:20 31:6,15,23
  32:14,17 34:3
  38:2 39:15 49:3
  50:6 56:12 93:4
status 49:20
stay 6:23
stealing 43:12,23
stenographic 1:16
stenographically
  9:23 94:6
Stephen 2:7 9:10
steps 84:22
still 4:22 67:15
stipulate 81:24
stipulated 39:18
  67:13
stipulation 47:5
  67:5
stopped 31:11
strike 30:3 41:25
  44:23 46:4,7,22
  48:5 53:23 55:6
  72:14 74:5 76:5
  77:16,17 84:6
  88:23
strip 73:2
strong 40:13 41:2
structure 58:17
  60:11,12
subject 5:1 11:20
  34:10 48:17 49:6
  49:13 51:11
Submit 82:4
submitted 66:22
submitting 85:18
Subscribed 95:17
substance 41:24
substantial 8:8
substantially
  43:11
sufficient 92:17,25
suggest 35:12
suggestions 84:4

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdresr.com

105

supervisory 32:18
  34:13
supported 35:24
  36:15,25
Supreme 7:5
sure 8:20 25:17,19
  63:9 84:22 87:5
  92:9
surprised 70:18,23
SUSAN 1:17 94:18
suspected 77:2
Switzerland 46:6
  46:15
sworn 9:3 95:17

**T**

T 1:16,16 2:13
  3:12 9:1 94:1,1
take 6:21 7:25
  9:20 13:5 15:8
  15:10 17:8 20:11
  23:18 26:4,20
  32:3 34:24 35:6
  37:2 38:20 46:14
  62:22,23 63:8,16
  63:22 68:16
  69:15,22 71:2
  80:17 81:18 83:3
  88:20,22
taken 1:19 35:6,7
  83:8 91:16 94:5
taking 21:23 35:12
  37:8 42:3 91:6
talk 30:7 52:18
  70:15
talked 52:15
talking 59:12
target 11:16 49:14
  49:21,22
taxpayer 67:7,18
teenager 52:9
tell 9:19 13:5
  62:10,15
ten-minute 37:6
term 85:23 86:7
terms 60:6
testified 55:19
testifies 9:4
testify 9:21 10:24
  50:16
testifying 54:20
testimony 6:20
  21:15 22:7 30:14
  47:25 54:2 94:5
  95:5
Thanks 93:10
their 42:18 43:4
  44:11 45:14,18

49:13
thing 62:3
things 8:5 36:22
  50:20,21 62:9
think 17:10 35:3
  35:23 47:10 54:3
  59:25
third 27:9,16
  29:13,20 33:21
  59:8
thirty-seconds
  13:16
thousands 5:7
three 36:13
through 13:17
  15:11 21:11
  47:12 71:5 72:11
  80:12 88:23,24
  89:3
Thursday 1:21
time 4:19 7:4 10:2
  10:15,15 15:10
  25:16,21 30:23
  33:21 37:2 42:19
  42:24 43:4,8,13
  45:7,12,16 52:15
  64:7 68:5 73:4
  73:21 78:12 84:2
  86:19 89:25 93:9
  94:6
times 6:6 24:12,20
  25:3
today 7:18 9:9
  10:1,24 14:2
  30:14 38:24
  41:13 42:3 50:13
  54:3,19 62:5
  67:17 73:22
  92:16 93:2
told 4:7
top 40:23
total 90:15
Traders 53:9
trades 64:9
trading 22:24
  23:12 32:20
trading/chief 72:6
training 44:6
  85:22
transcribed 9:23
  10:12
transcript 94:5
  95:3,5
traveled 46:6
treacherous 7:11
treatment 67:12
  67:14
trial 9:21

trick 41:12 62:18
  62:21 63:2
tried 31:9
Trif 2:7 9:10
trip 46:9,14
true 24:5 28:16,23
  31:1,9 89:4,9,18
  94:4 95:4
trust 44:5 53:10
trustee 4:12 19:4
  19:14 30:9 50:7
  51:11 56:13 93:4
truth 9:19
try 21:14
trying 41:12 62:18
  62:21,22
turn 39:24 40:22
two 4:24 8:18
  36:13 65:10,11
  74:16,21,25

**U**

unable 10:24
  70:10
uncover 76:14
  79:8 84:24
uncovered 77:8
  78:11 87:6
under 4:13 7:24
  11:4,24 12:6,13
  12:20 13:12,20
  14:5,12,18 15:5
  15:17,23 16:17
  16:23 17:5,24
  18:6,12,18,25
  19:9,18,25 20:8
  23:4,15 24:1,8
  24:17,24 25:6
  26:17 27:5,25
  28:7,13,20 29:3
  29:9,24 30:20
  31:6,15,23 32:14
  34:3 38:2 39:15
  71:14 87:23
understand 8:12
  10:3,8,13,21
  20:20 21:21
  23:23 26:14 27:2
  32:11 33:18 36:2
  36:7 59:25 73:21
understanding
  10:6 29:19 49:22
  50:18 58:17
  81:21
understood 7:23
  10:5 22:12 25:18
  26:1 37:21 39:22
undetected 75:11

United 1:1 5:9
  11:4,24 12:6,13
  12:20 13:12,20
  14:5,12,18 15:5
  15:17,23 16:17
  16:23 17:5,24
  18:6,12,18,25
  19:4,9,13,18,25
  20:8 23:4,15
  24:1,8,17,24
  25:6 26:17 27:5
  27:25 28:7,13,20
  29:3,9,24 30:9
  30:20 31:6,15,23
  32:14 34:3 38:2
  39:15 49:3 50:6
  56:12 93:3
unless 10:19
until 6:23 8:15
  18:22 19:22
  20:24 22:8 41:15
unwilling 6:20
used 80:13
using 60:6
utilized 69:2
U.S 4:19 5:3,12 7:5
  49:11

**V**

vaguely 36:7
various 6:2,6
  24:12,20 25:2
  40:10 53:7 60:13
verbalize 10:10
verified 74:13
very 41:6 62:25
vice 27:22
victims 5:15
view 8:5 34:8
violation 34:16
violations 5:24
  76:7
virtue 79:24
visit 68:5
vs 1:9 5:10 7:6
  9:12 13:2

**W**

waived 35:21
  61:23
waiver 34:17,22
  35:3,23 62:10,12
waiving 41:13
  62:14
want 17:15 21:17
  21:21 22:5 61:24
  62:11 92:7
wanted 34:24

wantonly 80:5
wasn't 35:6
way 15:1 35:20
well 22:15 34:12
  37:1 54:16,18
  62:14 65:24
  67:15 88:23
went 56:18 64:22
were 9:21 23:10
  24:12 28:16,24
  31:10,19 42:19
  42:24 43:5,9,13
  45:8,12,13,17,17
  52:9 55:9 56:7
  58:18 60:10 64:9
  64:13,19 66:11
  66:17 70:18,23
  72:2 73:10,14
  74:7 78:6,15
  79:3,11 82:11
  84:8 86:1,22
  91:6,7
we'll 67:11
we're 7:23,24 8:20
  9:25 21:11 36:19
  37:5 60:6 62:5
  67:5,15
we've 11:19 41:22
  50:12
while 86:1
whole 13:24 77:17
wide-ranging 4:21
wife 14:15
willfully 80:5
witness 3:3 9:2
  11:5,14,25 12:7
  12:14,21 13:7,13
  13:21 14:6,13,19
  15:6,12,18,24
  16:4,12,18,24
  17:6,14,25 18:7
  18:13,19 19:1,10
  19:19 20:1,9,13
  20:18,22 21:4,13
  22:10 23:5,8,16
  23:20 24:2,9,18
  24:25 25:7,13
  26:6,11,18 27:6
  28:1,8,14,21
  29:4,10,16,25
  30:21 31:7,16,24
  32:8,15 33:4
  34:4,7 36:5,12
  37:8 38:3,25
  39:16 40:3,20
  41:10,12 42:7
  47:21 49:15
  50:14 53:19



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

59:14 61:19
62:17,19,21 63:2
63:25 65:18,20
65:20 66:2,5
68:18 69:16 70:1
71:4 74:2 80:23
83:7 88:21,25
**WOHL** 1:20 2:10
**words** 27:18 32:23
33:8,9,19,24
**work** 18:21 23:11
**worked** 19:22
24:21 58:13,16
60:24 73:6
**working** 58:18
67:15
**world's** 77:15
80:20
**worth** 4:16
**wouldn't** 62:9,11
**written** 57:18
83:12,18,22
**wrong** 53:21 54:8
54:19,23
**wrongdoing** 40:10

**X**

X 3:1,12
**XI001220** 1:19
94:18

**Y**

year 6:5,7
**yearly** 86:21
**years** 4:16 5:20
18:9 22:22 23:10
34:10 42:14
58:13,16 64:7,12
80:1
**York** 1:21,21 2:11
2:11 4:20 28:17
28:25 49:12
53:10 59:8

**S**

$16 90:1,17,21,25
$3 90:12
$32,000 90:17,20
$6 90:4
$6.9 90:7
$60 43:24

**0**

07962-2075 2:4
09-00816 1:2

**1**

1 12:25 46:17 57:6

1:40 93:11
10:45 1:22
10110-3398 2:11
11 17:8,12,16 18:2
34:12 69:21
12 1:21 3:15
13 20:11 22:16,18
22:21
1300 2:3
14 3:16 23:18 24:4
24:12
15 26:8,22 27:8,10
27:17 28:23 29:6
29:14
17th 67:23 68:2,6
17-19 59:7
18 39:24 40:5
19 40:22
1969 18:21 19:21
72:11
1992 76:23 77:3,9
79:19

**2**

2 14:24
20 42:14 64:7,12
80:1
20-plus 6:5,6
2000 77:12,21
2001 3:22 7:5
77:13,22 81:12
83:15,23
2002 90:3
2003 78:23 79:8
90:7
2004 46:8,15
2005 77:13,22
80:21 90:8,12
2006 90:12
2007 87:19,23
2008 4:7,12 18:22
19:22 46:3,5,17
69:21 70:7,13,16
72:11
2009 1:21 38:18
95:18
2010 94:21
2075 2:4
212 2:11
26 69:24,25

**3**

3 38:12,20 40:1
30 78:2,16 94:21
31 88:23 89:3
32 88:22
33rd 2:10
34 88:24 89:3

35 88:24
38 3:18,20

**4**

4 38:14,18,21
40 4:16 34:10
58:13,16
48 32:3,17,23

**5**

5 63:13,24 65:10
65:11,17
5/7/01 3:24 81:15
500 1:20 2:10
55 57:7

**6**

6 81:13
63 18:9

**7**

7 57:7 59:11 80:21
81:16 83:23

**8**

81 3:22,24
885 59:8

**9**

9 3:7 70:7,13,16
921-8399 2:11
973 2:5
993-8100 2:5



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com